# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| | : | |
| v. | : | No. 15-cr-00155 (RNC) |
| | : | |
| ROSS SHAPIRO, | : | |
| MICHAEL GRAMINS and | : | |
| TYLER PETERS | : | |
| | : | MARCH 18, 2016 |
| | : | |

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF THEIR
## <u>JOINT MOTIONS TO DISMISS AND FOR A BILL OF PARTICULARS</u>

PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Fl.
New York, New York 10017
Telephone: (212) 370-0330
*Attorneys for Ross Shapiro*

ALSTON & BIRD LLP
90 Park Avenue
15th Floor
New York, NY 10016-1387
Telephone: (212) 210-9400
*Attorneys for Tyler Peters*

GREENBERG TRAURIG LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-9200
*Attorneys for Michael Gramins*

# TABLE OF CONTENTS

ARGUMENT ................................................................................................................ 1

POINT I: THE WIRE FRAUD ALLEGATIONS MUST BE DISMISSED BECAUSE THE
INDICTMENT FAILS TO ALLEGE AN INTENT TO HARM ............................................... 1

POINT II: THE WIRE FRAUD ALLEGATIONS OF THE INDICTMENT MUST BE
DISMISSED BECAUSE THEY FAIL TO ALLEGE THE EXISTENCE OF WIRE
COMMUNICATIONS "IN FURTHERANCE OF" ANY FRAUDULENT SCHEME ............ 6

   A.  Defendants' Motion is Not Premature ............................................................. 6

   B.  The Government Has Failed to Allege any Connection Between the Marketing
       Emails and the Alleged Fraudulent Scheme .................................................. 7

      1.  The Marketing Emails Promoted Only Nomura's RMBS Business Generally,
           Not the Alleged Fraud ......................................................................... 7

      2.  The Marketing Emails Increased the Likelihood that the Scheme Would Be
           Discovered ........................................................................................ 8

   C.  The Trade Confirmation Emails Could Not Be "In Furtherance of" the
       Alleged Scheme ............................................................................................. 9

POINT III: DEFENDANTS ARE ENTITLED TO A BILL OF PARTICULARS
IDENTIFYING THE TRADES THAT THE GOVERNMENT INTENDS TO PROVE AT
TRIAL ...................................................................................................................... 11

   A.  Defendants' Motion is Timely .................................................................... 11

   B.  Defendants are Entitled to a Bill of Particulars .......................................... 12

      1.  This is the Type of Complex Fraud Case in Which Particulars are Freely Granted .. 12

      2.  Particulars are Necessary for the Defense to Prepare an Expert ............... 13

      3.  The Request for Particulars is Narrowly Tailored ................................... 14

CONCLUSION ......................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alkhatib v. New York Motor Group, LLC*
    No. 13-CV-2337 (ARR), 2015 WL 3507340 (E.D.N.Y. June 3, 2015) ............................ 8

*Lundy v. Catholic Health Systems of Long Island Inc.*
    711 F.3d 106 (2d. Cir. 2013) ............................................................. 9

*Parr v. United States*
    363 U.S. 370 (1960) ............................................................... 7, 10

*United States v. Aquart*
    No. 06-CR-160 (PCD), 2006 WL 2684304 (D. Conn. Sept. 19, 2006) ..................... 11, 12

*United States v. Barrera*
    950 F. Supp. 2d 461 (E.D.N.Y. 2013) .................................................. 12

*United States v. Bernard*
    No. 97-CR-48 (AHN), 1998 WL 241205 (D. Conn. Apr. 2, 1998) .......................... 14

*United States v. Binday*
    804 F.3d 558 (2d Cir. 2015) ............................................................ 5

*United States v. Bortnovsky*
    820 F.2d 572 (2d Cir. 1987) ........................................................... 12

*United States v. Dinome*
    86 F.3d 277 (2d Cir. 1996) ............................................................. 5

*United States v. Ferguson*
    478 F. Supp. 2d 220 (D. Conn. 2007) .................................................. 13

*United States v. Jacobsen*
    No. 92-5406, 1993 WL 343172 (4th Cir. 1993) ........................................... 8

*United States v. Kaplan*
    554 F.2d 958 (9th Cir. 1977) ........................................................ 9, 11

*United States v. Lake*
    472 F.3d 1247 (10th Cir. 2007) ....................................................... 10

*United States v. Levin*
    973 F.2d 463 (6th Cir. 1992) ........................................................... 3

*United States v. Litvak*
  808 F.3d 160 (2d Cir. 2015) ................................................................ 3

*United States v. Mahaffy*
  446 F. Supp. 2d 115 (E.D.N.Y. 2006) ............................................... 12

*United States v. Mango*
  No. 96-CR-327, 1997 WL 222367 (N.D.N.Y. May 1, 1997) .......................... 12

*United States v. Maze*
  414 U.S. 395 (1974) ......................................................................... 7

*United States v. Nachamie*
  91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................. 12

*United States v. Novak*
  443 F.3d 150 (2d Cir. 2006) ......................................................... 2, 4, 5

*United States v. Panarella*
  277 F.3d 678 (3d Cir. 2002) ............................................................... 7

*United States v. Pirro*
  212 F.3d 86 (2d Cir. 2000) ................................................................. 7

*United States v. Regent Office Supply Co.*
  421 F.2d 1174 (2d Cir. 1970) ...................................................... 2, 3, 14

*United States v. Schiff*
  602 F.3d 152 (3rd Cir. 2010) ......................................................... 4, 7

*United States v. Shteyman*
  No. 10-CR-347 (SJ), 2011 WL 2006291 (E.D.N.Y. May 23, 2011) .......... 11, 12

*United States v. Starr*
  816 F.2d 94 (2d Cir. 1987) ......................................................... 2, 4, 5

*United States v. Taylor*
  17 F. Supp. 3d 162 (E.D.N.Y. 2014) ............................................... 12

*United States v. Trie*
  21 F. Supp. 2d 7 (D.D.C. 1998) ....................................................... 12

*United States v. Upton*
  856 F. Supp. 727 (E.D.N.Y. 1994) ................................................... 12

*United States v. Urso*
    369 F. Supp. 2d 254 (E.D.N.Y. 2005) ............................................................. 15

*United States v. Wallach*
    935 F.2d 445 (2d Cir. 1991)............................................................................... 7

**Rules**

17 C.F.R. § 240.10b-10............................................................................................ 9, 10

Defendants Ross Shapiro, Michael Gramins and Tyler Peters respectfully submit this reply memorandum of law in further support of their joint pretrial motions: (1) to dismiss the wire fraud object in Count One and the substantive wire fraud allegations in Counts Four through Nine of the Superseding Indictment ("Indictment") because they fail to allege adequately (a) an intent to harm and (b) the existence of wire communications "in furtherance of" any fraudulent scheme; and (2) for an order directing the government promptly to issue a bill of particulars.[1]

## ARGUMENT

### POINT I

### THE WIRE FRAUD ALLEGATIONS MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO ALLEGE AN INTENT TO HARM

Defendants, pursuant to Fed. R. Crim. P. 12(b), moved to dismiss the wire fraud object of the conspiracy alleged in Count One and the substantive wire fraud charges in Counts Four through Nine of the Indictment for failure to allege the necessary element of intent to harm. The government opposes the motion, claiming the Indictment properly alleges intent to harm on the basis of alleged misrepresentations that: (i) "impacted the terms of the deals negotiated by the defendants and their victims," (ii) "provid[ed] Nomura with an extra and unearned profit at the buying victim-customer's expense," and (iii) "deprived [] victims of information relevant to making a discretionary economic decision." *See* Gov't Opp. to Defs.' Mot. to Dismiss ("Opp. Br.") (Dkt. 118) at 10, 12-14. The government also portrays this motion as a disguised challenge to the sufficiency of the government's evidence, more appropriately reserved for a Rule 29

---

[1] The defense motion was filed on January 29, 2016, prior to the date on which the Superseding Indictment was returned, February 4, 2016. *See* Dkts. 110, 115. The original Indictment and the Superseding Indictment are substantively similar, except the Superseding Indictment does not include a false statement object in Count One, which Defendants had sought to dismiss. All of the defense arguments related to the government's failure to allege intent to harm and the existence of wire communications "in furtherance of" any fraudulent scheme in connection with the wire fraud counts in the original Indictment apply equally to the Superseding Indictment.

motion.  The government's arguments are unavailing and the wire fraud charges should be dismissed.

The government attempts to distinguish this matter from the principal cases cited in the defense motion, *Regent*, *Starr*, and *Novak*, based on the misguided precept that, purportedly unlike in those cases, the alleged "misrepresentations [here] directly impacted the terms of the deals negotiated by the defendants and their victims."  Opp. Br. 12.  Specifically, the government focuses on the Indictment's allegations that Defendants falsely inflated the price Nomura paid for bonds, or falsely deflated the price at which buyers purportedly had agreed to purchase bonds, in order to induce counterparties to pay a higher overall price for the bonds when purchasing or accept a lower price when selling.  *Id.* at 13-14 (citing Sup. Ind. ¶ 33(a)(i) & (ii)). The government misses the point.  The relevant issue under *Regent*, *Starr*, and *Novak*, was not whether the alleged misrepresentations "impacted the terms of the deals."  Rather, it was assumed in those cases that the misrepresentations affected the terms of the transactions at issue. In fact, in each case, the government alleged that the transactions would not have occurred at all absent the misrepresentations at issue.  Instead, the issue in those cases was whether the misrepresentations affected terms that went "to the nature of the bargain."  *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970); *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("[T]he harm contemplated must affect the very nature of the bargain itself."); *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (same).

In assessing whether the particular deal terms affected by the misrepresentations go "to the nature of the bargain" the Second Circuit has held that "if there is no proof that the defendants . . . intended to get more for their merchandise than it was worth to the average customer, it is difficult to see any intent to injure or to defraud in the defendants' falsehoods."

2

*Regent Office Supply Co.*, 421 F.2d at 1181.  Although the Indictment alleges that Defendants'

misrepresentations were intended to induce counterparties to pay more when purchasing or

accept less when selling bonds, the Indictment does *not* allege that Defendants intended "to get

more for their merchandise than it was worth to the average customer."  Accordingly, the

Indictment does not allege or support an inference of an intent to harm on the basis that the

alleged misrepresentations "impacted the terms of the deals."

Moreover, it is clear from *Litvak*, as a factual matter, that the government's proof that the

misrepresentations reflected an intent "to get more than" the bonds were "worth to the average

customer" will likewise fall short.  Specifically, the Court of Appeals instructed that:

> Because RMBS lack an efficient, transparent secondary market through which
> value can be determined objectively, traders set the value of the security, and
> hence the price each is willing to accept as a seller or buyer, by engaging in
> 'rigorous valuation procedures' involving the use of certain 'analytical tools and
> methods.' Thus, firms trading RMBS rely upon sophisticated computer-pricing
> models, often developed by professionals with applied-mathematics backgrounds,
> to determine the subjective 'value' of the securities.  Certain testimony at trial
> supported a conclusion that this process, and a determination of the amount an
> investment manager is willing to pay for a security, nearly always takes place
> prior to the manager approaching a dealer such as Jefferies, here represented by
> Litvak, to negotiate the price of that security.

*United States v. Litvak*, 808 F.3d 160, 183 (2d Cir. 2015) (internal citations omitted).  And, even

without reference to *Litvak*, the Indictment is deficient because it fails to allege that Defendants

intended "to get more" than the bonds were "worth to the average customer."[2]

---

[2] Notwithstanding the government's protests to the contrary, the Court may consider undisputed extrinsic evidence
in connection with a motion to dismiss.  *See, e.g.*, *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992) ("In the
instant case the operative facts . . . were undisputed and a two or three week trial of the substantive criminal charges
would not have assisted the district court or this court in deciding the legal issues joined by the defendant's pretrial
motion to dismiss the controversial counts of the indictment.  It should be noted that the district court was not
limited to the face of the indictment in ruling on the motion to dismiss since Rule 12 vested the court with authority
to determine issues of fact in such a manner as the court deems appropriate.") (internal quotation marks omitted).
But, as noted, it is unnecessary for the Court to rely upon extrinsic facts here because the Indictment fails to allege
an intent to harm.  *See, e.g.*, *United States v. Schiff*, 602 F.3d 152, 161 (3rd Cir. 2010) ("A district court may grant a
pretrial motion to dismiss an indictment . . . if the indictment's allegations do not suffice to charge an offense.").

In opposition, the government asserts the counterparties are alleged to have bargained, not only to purchase bonds at an agreed-upon price, but also for the payment of certain "commissions."  Opp. Br. 14.  According to the government, the alleged misrepresentations regarding these "commissions" misstated a "term of the deal" and induced counterparties to pay "more than they bargained for."  *Id.*  This argument is flatly contrary to the holdings of *Regent*, *Starr*, and *Novak*.  In *Starr*, the alleged victims had deposited funds with the defendants, which the defendants promised to use exclusively to pay postage on mass mailings sent on behalf of the victims.  *See* 816 F.2d at 99-100.  Instead of using those funds to pay the anticipated postage costs, however, defendants retained some of the funds as pure profit after deceiving the postal service in order to secure lower shipping costs.  The defendants then falsified documents in order to mislead customers into believing that all of the funds that were paid to defendants were used to pay postage costs.  *See id.* at 95.  The Court expressly held that the customers' defeated expectations about "the use to which the money would be put" were insufficient because the misrepresentations did not "affect the nature or quality of the services that was the basis of the customers' bargain," *i.e.*, the processing of mass mailings on behalf of the alleged victims at the agreed-upon price.  *See id.* at 99-100.[3]

Similarly, in *Novak* the defendant, a union official, surreptitiously obtained a portion of payments that employers had made directly to union members within their employ.  *See* 443 F.3d at 154.  The defendant received the payments in the form of a "kickback," which union members paid to ensure the defendant staffed them on future union worksites.  *Id.*  The Court rejected the government's argument that an intent to harm could be inferred on the basis that employers would not have made the payments to the union members had they been made aware that a

---

[3] Moreover, we note that the government has previously conceded that RMBS trades like the ones at issue here are executed on a principal basis.  *See* Defs.' Mem. of Law in Supp. of Their Joint Mots. to Dismiss and for a Bill of Particulars (Dkt. 111) at 3.  Thus the concept of "commission" is inapposite.

portion would be "kicked back" to the defendant. *Id.* at 159.  Instead, the Court concluded that, because the employers received what they bargained for, the defendant's dishonesty in completing the promised services did not "affect the very nature of the bargain itself" and therefore was insufficient to support a finding of fraudulent intent. *Id.* (quoting *Starr*, 816 F.2d at 98).  For the same reasons, the wire fraud allegations in the Indictment fail as well.[4]

Finally, the Indictment alleges that Defendants deprived counterparties of information relevant to making a discretionary economic decision—a concept predicated on the notion that property owners possess the right to control their assets. *See United States v. Dinome*, 86 F.3d 277, 280, 284 (2d Cir. 1996).  But in cases resting upon the so-called "right to control" theory of mail and wire fraud, "the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *Id.* at 284 (holding that defendants intended to harm the victim mortgage bank by submitting false income information).  Because none of the alleged misrepresentations pertained to the value of the alleged RMBS transactions (*e.g.*, no misrepresentations were made about the quality of the RMBS), any alleged failure to correct such misrepresentations (and thus deprive counterparties of information), by definition, cannot support an allegation of intent to harm. *See United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) ("The 'right to control one's assets' does not render every transaction induced by deceit actionable under the mail and wire fraud statutes. Rather, the deceit must deprive the victim 'of potentially valuable economic information.'").

---

[4] Of course the counterparties here, just like the victims in *Starr* and *Novak*, presumably, would have preferred to know how their funds were being used.  Indeed, such knowledge might even have assisted them in their negotiations with Nomura.  But a customer's expectation about the use to which money will be put, even if it "constituted a part of the bargain between the parties," is insufficient to establish fraudulent intent, because it "would not affect the nature or quality of the [product] that was the basis of the customers' bargain."  *Starr*, 816 F.2d at 99-100 (emphasis added); *accord Novak*, 443 F.3d at 159.

For these reasons, and those set forth in Defendants' opening memorandum, the wire fraud charges and object of the conspiracy count should be dismissed.

## POINT II

**THE WIRE FRAUD ALLEGATIONS OF THE INDICTMENT MUST BE DISMISSED BECAUSE THEY FAIL TO ALLEGE THE EXISTENCE OF WIRE COMMUNICATIONS "IN FURTHERANCE OF" ANY FRAUDULENT SCHEME**

Counts Four through Nine of the Indictment, charging wire fraud, must be dismissed because the Indictment fails to allege adequately that the email communications cited in those counts furthered the alleged scheme's success. *See* Defs.' Mem. of Law in Supp. of Their Joint Mots. to Dismiss and for a Bill of Particulars ("Defs.' Br.") (Dkt. 111) at 18-19.[5]  The government responds that (i) Defendants' motion undermines the government's ability to present proof tying the alleged wires to the charged scheme; (ii) the Trade Confirmation Emails were a "necessary step to the completion of the scheme to defraud"; and (iii) the Marketing Emails are in furtherance of the scheme because they "attract[ed] potential victims."  Opp. Br. 15-19.  As to each of these arguments, the government is wrong on both the law and the facts.

### A.    Defendants' Motion is Not Premature

The government describes Defendants' motion as premature because it purportedly challenges "the government's ability to prove that the wire communications in question were in furtherance of the scheme to defraud."  *Id.* at 16.  However, it is well-settled that an indictment may be dismissed where, although it "tracks the relevant criminal statute," "the specific facts alleged fall beyond the reach of the statute."  *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) (internal quotation omitted), *abrogated on other grounds*, *Skilling v. United States*,

---

[5] As with the Indictment, the Superseding Indictment's six emails fall into two categories: (i) the Marketing Emails (now Counts Four, Six, Seven, and Eight), and (ii) the Trade Confirmation Emails (now Counts Five and Nine).  As in the Opening Brief, the Marketing Emails and the Trade Confirmation Emails are referred to herein, collectively, as the "Nomura Emails."  *See* Declaration of Joshua Klein, dated January 29, 2016 ("Klein Decl."), Exs. 1-5 (Marketing Emails), 6-7 (Trade Confirmation Emails).

561 U.S. 358, 401-17 (2010); *see United States v. Schiff*, 602 F.3d 152, 161 (3rd Cir. 2010) (discussed *supra* at 3 n.3). The burden is on the government to plead the existence of wire communications essential to the success of the fraudulent scheme and to provide some factual indication on the face of the indictment as to the connection between the charged wires and the alleged scheme. *See United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) ("A criminal defendant is entitled to an indictment that states the essential elements of the charge against him."); *United States v. Maze*, 414 U.S. 395 (1974) (vacating conviction because mailings were not "essential to the success of [the] fraudulent . . . scheme"); *Parr v. United States*, 363 U.S. 370 (1960) (vacating conviction because "the mailing was [not] designed materially to aid the consummation of the scheme"); *cf. United States v. Wallach*, 935 F.2d 445, 465 (2d Cir. 1991) (rejecting defendants' motion that indictment fails to state an offence because "the [mailings] not only were anticipated by [defendant], but also were essential to the success of the scheme"). As described below, as a matter of law, the charged wires could not have been in furtherance of the charged scheme, and dismissal is warranted.

> **B.** **The Government Has Failed to Allege any Connection Between the Marketing Emails and the Alleged Fraudulent Scheme**
>
> > 1. The Marketing Emails Promoted Only Nomura's RMBS Business Generally, <u>Not the Alleged Fraud</u>

A wire does not occur "in furtherance of" an alleged scheme if "there is no indication that the success of [the] scheme depended" on that wire. *Maze*, 414 U.S. at 402. The Indictment contains no allegation that the Marketing Emails contained any misstatement related to the transactions reflected on those communications, or that those communication were used in any way to help defraud investors.

7

Instead, the government contends that the "evidence will show" that the Marketing Emails "were used to attract potential victims to trade with the defendants . . . ." Opp. Br. 18. In other words, the government contends that the Marketing Emails might have attracted counterparties to enter into—not the transactions alleged in the Superseding Indictment—but future *non-fraudulent* transactions. The same could be said, however, with respect to all of the marketing and advertising efforts in which Nomura engaged during the relevant period. Indeed, the Marketing Emails referenced in Counts Four, Seven and Eight identify transactions completely unrelated to any alleged fraudulent transaction, and there is no suggestion that those emails did anything other than generally promote the business of Nomura's RMBS trading desk. *See* Klein Decl. Exs. 1-5. Where, as here, the identified wires are alleged to do nothing more than promote Defendants' overall business—without any suggestion that such overall business is unlawful—a wire fraud count cannot stand.[6]

## 2. The Marketing Emails Increased the Likelihood that the Scheme Would Be Discovered

The Marketing Emails were not, as a matter of law, sent "in furtherance of" the alleged scheme because those communications actually increased the likelihood that the alleged scheme would be discovered. *See* Defs.' Br. 20. By disclosing that it had traded specific securities, Nomura encouraged market participants to inquire about such trades and the price at which they occurred—an inquiry that had the potential to reveal the discrepancy between the actual trade prices and Defendants' alleged representations during negotiations. *Id*. *See Lundy v. Catholic Health Systems of Long Island Inc*., 711 F.3d 106, 119 (2d. Cir. 2013) (defendant's "mailing of

---

[6] In the few cases where advertisements constitute wires in furtherance of the charged scheme, the advertisement itself went to an essential element of the scheme to defraud. *See, e.g.*, *United States v. Jacobsen*, No. 92-5406, 1993 WL 343172, at *3 (4th Cir. 1993) (where physician charged with operating unlicensed fertility practice, advertisement was essential to the scheme); *Alkhatib v. New York Motor Group, LLC*, No. 13-CV-2337 (ARR), 2015 WL 3507340, at *13 (E.D.N.Y. June 3, 2015) (where car dealer advertised car prices online and then duped customers into accepting deceptive financing terms to obtain the advertised price, the advertisement was essential to the scheme).

pay stubs cannot further the fraudulent scheme [to defraud workers out of overtime pay] because the pay stubs would have revealed (not concealed)" the scheme).

The government contends that the Marketing Emails could not have led to the discovery of the alleged scheme because, even if market participants inquired about a given transaction, "there was nothing that would have compelled the defendants to truthfully share the details of the transaction." Opp. Br. 18. The government misses the point. The Marketing Emails provided market participants with the opportunity to conduct price discovery in the market at large, not just with traders at Nomura. This opportunity for price discovery would not exist absent the information provided in the Marketing Emails, because RMBS are not publically traded. *See* Sup. Ind. ¶ 24 ("RMBS were not publicly traded on an exchange and pricing information was not publicly available.").

### C.     The Trade Confirmation Emails Could Not Be "In Furtherance of" the Alleged Scheme

The Trade Confirmation Emails could not be "in furtherance of" the alleged scheme because they were not a step towards receipt of any funds. As such, the Trade Confirmation Emails cannot support a wire fraud allegation because "[u]se of the [wires] that is not a step toward receipt of the fruits of the scheme is not a violation of § 134[3]." *United States v. Kaplan*, 554 F.2d 958, 965 (9th Cir. 1977). The government asserts—citing no authority—that "these trade confirmations were a necessary step [because] . . . . [n]either the bonds nor dollars would be exchanged before a trade confirmation was sent to the victim." Opp. Br. 17. This argument falls flat. The Trade Confirmation Emails were the legally necessary trade confirmations required by SEC Rule 10b-10, *see* 17 C.F.R. § 240.10b-10 ("This section requires broker-dealers to disclose specified information in writing to customers at or before completion of a transaction"), *or* they were not the "official" confirmation necessary to complete the trade.

In either scenario, the Trade Confirmation Emails could not be in furtherance of the alleged fraud.

If the Trade Confirmation Emails were necessary for legal reasons, then they were not "in furtherance of" the fraud.  The Supreme Court has made clear that "it cannot be said that [wires] made or caused to be made under the imperative command of duty imposed by . . . law are criminal under the federal mail fraud statutes . . . ."  *Parr*, 363 U.S. at 391; *see United States v. Lake*, 472 F.3d 1247, 1255-56 (10th Cir. 2007) ("[M]ailings of documents which are required by law to be mailed, and which are not themselves false . . . cannot be regarded as mailed for the purpose of executing a fraudulent scheme.") (internal quotation marks omitted).  Pursuant to Rule 10b-10, broker-dealers are legally obligated to provide their customers with written notification of, among other things: (i) the date and time of the transaction; (ii) the identity, price and number of shares purchased or sold; and (iii) whether the broker-dealer is acting as the customer's agent or as a principal for its own account.  *See* 17 C.F.R. § 240.10b-10(a)(1)-(2). Thus, if the Trade Confirmation Emails were legally necessary to complete the indicated trade, then Counts Five and Nine must be dismissed because truthful and legally necessary wires can never be in furtherance of a scheme to defraud.  *See Parr*, 363 U.S. at 391; *Lake*, 472 F.3d at 1255-56.

Alternatively, the Trade Confirmation Emails were not legally required at all, and, instead, were sent merely as a courtesy to Nomura's customers.  On such facts, the Trade Confirmation Emails—which are not alleged to be inaccurate in any way—were not essential to the scheme; the bonds and funds would have been exchanged regardless, and Nomura later would have provided the requisite official confirmation for that trade.  *See Kaplan*, 554 F.2d at

10

965 (vacating conviction where "[u]se of the mails [was] not a step toward receipt of the fruits of the scheme . . . ."). Counts Five and Nine should be dismissed.

**POINT III**

**DEFENDANTS ARE ENTITLED TO A BILL OF PARTICULARS IDENTIFYING THE TRADES THAT THE GOVERNMENT INTENDS TO PROVE AT TRIAL**

Defendants' motion for a bill of particulars was timely, and the particulars sought here are necessary to (a) process the substantial materials produced, consisting of over 100,000 documents relating to approximately 900 trades, and (b) to meet the Court's expert summary and notice deadlines.

**A.     Defendants' Motion is Timely**

The government's claim that the motion is untimely because it was not made within fourteen days following indictment or by special permission of the Court, *see* Opp. Br. 26-27 (citing Fed. R. Crim. P. 7), is without merit. The motion was timely filed in accordance with the Court's pretrial motion schedule. *See* Scheduling Order of Oct. 21, 2015 (Dkt. 73). Neither the proposed Scheduling Order nor the Court's endorsement is limited to "Rule 16 and Rule 12 deadlines." *See* Dkts. 71, 73. Although the proposed Scheduling Order and the Court's endorsement do not specifically reference a motion for a bill of particulars, they likewise fail to expressly address any other motion. Because the Court did not adopt a separate briefing schedule for discovery motions, Defendants reasonably construed the deadline to file pretrial motions as applicable to all pretrial motions including this motion for a bill of particulars. *See, e.g.*, *United States v. Shteyman*, No. 10-CR-347 (SJ), 2011 WL 2006291, at *1 (E.D.N.Y. May 23, 2011) (motion for bill of particulars is one of "omnibus pretrial motions"); *United States v.*

11

*Aquart*, No. 06-CR-160 (PCD), 2006 WL 2684304, at *1 (D. Conn. Sept. 19, 2006) (same). Accordingly, the motion was timely filed.[7]

> **B.      Defendants are Entitled to a Bill of Particulars**
>
>> 1.      This is the Type of Complex Fraud Case in Which Particulars are Freely Granted

A bill of particulars may be necessary in a prosecution for fraud that involves voluminous pre-trial discovery.  *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987).  Although the government cites dozens of cases in its opposition brief, they are mostly organized crime, drug trafficking, terrorism, and murder cases.  By contrast, in "cases involving fraud . . . a bill of particulars may be appropriate where the indictment does not identify the specific documents and transactions the Government contends are fraudulent."  *Shteyman*, 2011 WL 2006291, at *3 (citing *Bortnovsky*, 820 F.2d at 574-75).

Since *Bortnovsky*, numerous courts have recognized that a bill of particulars is especially necessary for the defense to prepare in a complex, document-intensive white-collar criminal fraud cause, such as this one.  *See id.*  (Medicare fraud); *United States v. Mahaffy*, 446 F. Supp. 2d 115, 119 (E.D.N.Y. 2006) (securities fraud); *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) (Medicare fraud); *United States v. Trie*, 21 F. Supp. 2d 7, 20 (D.D.C. 1998) (Federal Election Commission fraud); *United States v. Mango*, No. 96-CR-327, 1997 WL 222367, at *12-13 (N.D.N.Y. May 1, 1997) (mail fraud); *United States v. Upton*, 856 F. Supp. 727, 747-48 (E.D.N.Y. 1994) (falsification of airline maintenance records).  Accordingly, the government's attempt to limit *Bortnovsky* to its facts is unpersuasive.  *See* Opp. Br. 28.

---

[7] Should the Court determine that the motion is untimely, Defendants respectfully request the Court's permission to move for a bill of particulars *nunc pro tunc*.  The cases cited by the government demonstrate the willingness of courts to so rule.  *See United States v. Taylor*, 17 F. Supp. 3d 162, 179 (E.D.N.Y. 2014) (although the defendant failed to file a timely motion "[n]onetheless, the Court considers the motion on its merits"); *United States v. Barrera*, 950 F. Supp. 2d 461, 479 (E.D.N.Y. 2013) (addressing merits in spite of defendant's failure to move for a bill of particulars within fourteen days of his arraignment.

The one case cited by the government that appears to have involved discovery comparable in scope to this action is *Ferguson*, which alleged a fraudulent reinsurance transaction.  *See United States v. Ferguson*, 478 F. Supp. 2d 220 (D. Conn. 2007).  To the extent it is relevant here, *Ferguson* militates in favor of *granting*, not denying, Defendants' request. Specifically, although the *Ferguson* Court denied the defense request for particulars, it did so for reasons not applicable here.  First, the *Ferguson* defendants requested broad and sensitive categories of information, including the identities of unnamed co-conspirators, which Defendants do not seek here.  Second, in *Ferguson*, defendants noted in their reply memorandum that the intervening Superseding Indictment and the government's memorandum in opposition "furnish[ed] the answer to most of defendants' requests for particulars."  *See* Reply Mem. of Law at 2, *United States v. Ferguson et al.*, No. 06-CR-137 (D. Conn. Sept. 29, 2006), Dkt. 233. Finally, in *Ferguson* there was "only one fraudulent transaction at issue."  *See Ferguson*, 478 F. Supp. 2d at 227.  Here, by contrast, there are approximately 900 trades the government may seek to prove at trial.  Defendants are entitled to notice of the particular trades the government will seek to prove so as to allow for a reasonable opportunity to prepare and to avoid unfair surprise.[8]

### 2.    Particulars are Necessary for the Defense to Prepare an Expert

In addition, Defendants require the requested information to prepare its expert notice and summaries.  While the government opposes making the requested disclosures, in part, on grounds that much of the requested information will be contained within its trial exhibits and witness list, which must be provided by May 23, 2016, *see* Opp. Br. 27, the government ignores

---

[8] The government also claims that its investigation of this matter did not begin until October 2014, but fails to note that its own investigation relied heavily on the investigation of the Office of the Special Inspector General for the Troubled Asset Relief Program, which began as early as April 2013, when it started receiving well-organized productions from Nomura's external counsel.  Furthermore, since it is the government who will decide the particular trades that will be in issue at trial, not the defense, the parallel the government attempts to draw between the purported length of its investigation and the period during which Defendants have had access to the discovery misses the mark.

that this is the very date on which the defense must provide its expert notice and summaries. Withholding the trades on which the government intends to rely may impede Defendants' readiness to provide expert notice of any testimony specific to particular trades. And, the government is not correct that the specifics of particular trades are irrelevant to expert testimony because such testimony would be inadmissible. *Id.* at 29. Misrepresentations related to specific trades are relevant to the issues of intent and materiality. An expert may be called to analyze specific RMBS transactions and offer an opinion that prices paid for RMBS were within the range of fair market value. Such expert testimony would be probative of Defendants' intent to harm and materiality in connection with the alleged wire fraud and securities fraud offenses.[9] Absent issuance of the bill of particulars, Defendants' ability to provide such expert notice may be hobbled.

### 3.   The Request for Particulars is Narrowly Tailored

Finally, Defendants' request is narrowly tailored and seeks only a list of the trades that the government intends to prove at trial, along with certain minimal identifying information for each, such as the security CUSIP, parties involved, date of trade and the amount of the trade in units and dollars. *See* Defs.' Br. 24. The government exaggerates the scope of Defendants' request and characterizes it as an inappropriate attempt to obtain discovery and freeze the government's proof. *See* Opp. Br. 30. But even a cursory review of the cases cited by the government as support reveals that those cases involved significantly broader requests than the one submitted here. *See United States v. Bernard*, No. 97-CR-48 (AHN), 1998 WL 241205, at

---

[9] Although in *Litvak*, the Second Circuit declined to hold that the District Court's preclusion of expert testimony on the issue of "fair market value" constituted an abuse of discretion, it is certainly within this Court's discretion to admit such evidence. Moreover, here, unlike in *Litvak*, Defendants are charged with wire fraud and, accordingly, the issue of whether counterparties purchased securities above or below "fair market value" is crucial to assessing Defendants' alleged intent to harm. *See Regent Office Supply Co.*, 421 F.2d at 1181 ("If there is no proof that the defendants . . . intended to get more for their merchandise than it was worth *to the average customer*, it is difficult to see any intent to injure or to defraud in the defendants' falsehoods.") (emphasis added).

*1 (D. Conn. Apr. 2, 1998) (involving a request for particulars spanning nine categories and requesting extensive detail including, in part, an enumeration of every overt act taken by every co-conspirator in furtherance of the conspiracy); *United States v. Urso*, 369 F. Supp. 2d 254 (E.D.N.Y. 2005) (three separate requests for a bill of particulars, including one that included a forty-two part demand covering each of the counts and racketeering acts charged).  Unlike the sprawling requests made in these cases, here Defendants' request is narrowly tailored and reasonable.

For the reasons set forth herein and those in Defendants' opening brief, the Court should direct the government to provide the requested particulars.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court issue an Order: (1) dismissing the wire fraud object in Count One and the substantive wire fraud allegations in Counts Four through Nine of the Indictment for failure to allege (a) an intent to harm, and (b) the existence of wire communications "in the furtherance of" any fraudulent scheme;  (2) directing the government to respond immediately to the defense's requests for particulars; and (3) granting such other relief as this Court may deem warranted.

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By:  /s/ Joshua Klein
Guy Petrillo (CT19924)
Joshua Klein (PHV07748)
Leonid Sandlar (PHV07700)
Mirah Curzer (PHV08047)
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile:   (212) 370-0391
gpetrillo@pkbllp.com
*Attorneys for Ross Shapiro*

15

ALSTON & BIRD LLP

By:  /s/ Brett D. Jaffe
Brett D. Jaffe (PHV07701)
Craig Carpenito (PHV0424)
Joseph G. Tully (PHV07702)
90 Park Avenue
15th Floor
New York, NY 10016-1387
Telephone: (212) 210-9400
Facsimile:  (212) 210-9444
Brett.Jaffe@alston.com
*Attorneys for Tyler Peters*

GREENBERG TRAURIG LLP

By:  /s/ Marc L. Mukasey
Marc L. Mukasey (PHV07694)
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2016 a copy of foregoing Reply Memorandum of Law in Further Support of Defendants' Joint Motions to Dismiss and for a Bill of Particulars was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
       March 18, 2016

/s/ Leonid Sandlar
Leonid Sandlar (PHV07700)
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391
lsandlar@pkbllp.com