UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:15CR155(RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO, | : | July 25, 2016 |
| MICHAEL GRAMINS, and | : | |
| TYLER PETERS | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE THAT DEFENDANTS' ACTED AS AN "AGENT" OR "BROKER" OR OWED ANY AGENCIES DUTIES TO COUNTERPARTIES**

The defendants' motion *in limine* [doc. #164] seeks an order to exclude evidence or argument that the defendants acted as an "agent" or "broker" to his victims, and preclude the Government and its witnesses from using terminology such as "broker" and "commission." In doing so, the defendants ask the Court to prohibit victims from testifying truthfully as to their perceptions of their relationship with the defendants and to preclude the Government from presenting evidence as to the way Nomura employees discussed their work. The defendants also hope to prevent the Government from putting on evidence that, as part of the defendants' securities fraud scheme, they proactively created the misimpression that they were serving the interests of their victims. Their argument fails to acknowledge the facts of this case and the defendants' own words. For the reasons below, the Court should deny this motion.

**ARGUMENT**

**I.   THE GOVERNMENT WILL NOT INTRODUCE EVIDENCE OR TESTIMONY THAT DEFENDANTS WERE LEGAL AGENTS FOR THEIR VICTIMS OR OWED THEM A FIDUCIARY DUTY**

There has never been any dispute that, as a technical matter, firms like Nomura are "dealers" engaged in "principal" trades that have no fiduciary duties to their counter-parties.

Although the defendants claim otherwise, the Government has never argued and does not intend to argue that the defendants "committed fraud by violating some independent duty of trust owed to the victims." Defs.' Mem. at 7 [doc. #164-1]. In fact, contrary to the defendants' motion, the Government does not "wish[] to suggest to the jury that Defendants owed agency duties to trading counterparties" *id.* at 10.[1] Therefore, there is no risk that the jury would misconstrue the actual legal relationship between the defendants and the jurors.

## II. THE VICTIMS' VIEW OF THEIR RELATIONSHIP WITH DEFENDANTS IS PROBATIVE OF MATERIALITY AND INTENT

The Government, however, will seek to introduce evidence and elicit testimony about how the defendants purposefully misled the victims as to the nature of their relationship and the effect that these lies had on the victims.

The defendants' scheme created the false impression that their interests were aligned with their victims', that the defendants were truthfully relating information otherwise unknowable to their victims, and that the defendants were making accurate representations in negotiating the amount of compensation their victims were paying for trades. For example, when Gramins told an investment manager that he was "happy to reflect" the investment manager's offer to another counterparty because he was "purely looking to broker" the trade, his words plainly indicated that he was working on behalf of the victim, rather than for Nomura as the victim's adversary. NSI0007940. Furthermore, all three defendants falsely told victims that they "showed" or "used"

---

[1] The defendants rely on *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 274 (2d Cir. 2013), to argue that the victims' perception of their relationship with the defendants is irrelevant, as that relationship is defined as a matter of law. The plaintiffs in *Johnson*, however, were seeking relief for a breach of fiduciary duty and the Second Circuit held that they failed to adequately allege an agency relationship. Here, the Government is not alleging an agency relationship or fiduciary duty; instead, the Government intends to offer evidence that the defendants misled victims as to the truthfulness of their statements and the alignment of their interests.

their bids or offers, as when Peters falsely told an investment manager that he "didn't pad [the investment manager's] offer at all" and he had "been showing [the investment manager's] levels," asking if he "should assume that [the buyer] needs to pay on top or that [the investment manager will] pay [Nomura] from there." NSISEC00104673-74.

The defendants' misrepresentations regarding the relationship were made specifically to give the counterparties the impression that the defendants were acting as the victims' "broker" or on behalf of the victims, instead of acting for Nomura as a principal. Given that in many of these trades the defendants were not taking on meaningful risk, having arranged to both purchase and sell the bond prior to the transaction, meaning that the bonds were on Nomura's books for only a moment, it is no surprise—and entirely reasonable—that victims believed that the defendants were acting on their behalf to facilitate trades in exchange for a negotiated amount of compensation.[2] Simply put, these lies were effective; counterparties believed that the defendants were working on their behalf to facilitate trades, creating a level of trust that otherwise may not have existed if the defendants had held themselves out as principals. For example, one investment manager scolded Gramins after Nomura purchased bonds for its own account that it earlier asked the investment manager to bid on. The investment manager made his understanding of his relationship with Gramins very clear: "Yes but my point is that you are bidding for clients, and you can't drop clients at the last minute and just buy for the house." NSISEC00051412.

The Government should be free to elicit from victims the effect these misstatements had on their view of their relationship with the defendants—not the legal relationship, but the

---

[2] Indeed, a number of the traders for Nomura called their trades "riskless trades" because Nomura was not truly committing any of its capital. NOM_USAOCT_000427.

relationship based on the factual conduct of the defendants. This evidence of the defendants' *modus operandi* helps establish the materiality of the information the defendants misrepresented and contributes to the inference that the defendants were acting with fraudulent intent. As the Second Circuit commented in *United States v. Litvak*, "[t]he nature of [the defendant's] relationship with the alleged victims formed the context in which the jury had to consider whether the portfolio managers and traders who testified reflected the views of a reasonable investor." 808 F.3d 160, 187 (2d Cir. 2015). The defendants argue that this statement stands for the proposition that the victims' understanding of their relationship is irrelevant, because "the jury must determine how a reasonable investor would assess information in the context of the actual, legal relationship between counterparties." Defs' Mem. at 8. In essence, the defendants contend that victims were wrong to have been fooled by them into believing that there was an agency relationship, no reasonable investor could ever be so fooled, and thus the victims in this case were not reasonable investors. *See* Defs' Mem. at 9. This argument is unhelpfully circular and amounts to victim-blaming. How a reasonable investor would react to the defendants' lies is a point to be proven at trial. Evidence of both the legal and the purported factual relationship between the defendants and their victims is relevant to the jury's understanding of the "context" in which the charged securities fraud scheme was perpetrated. The defendants, of course, are free to argue that the more significant data point the jury should consider is the legal relationship between the parties, just as the Government is free to counter with evidence of the defendants' misleading statements and the argument that a reasonable investor under such circumstances may be misled into trusting the defendants' representations. In addition, the defendants' suggestion that the perception of individual investors cannot be considered by jurors lies squarely opposite to the Second Circuit's decision in *Litvak*, where the court relied on the testimony of the

individual victim-investors to affirm the jury's finding of materiality. *Litvak*, 808 F.3d at 176 ("The trial record includes testimony from several representatives of Litvak's counterparties that his misrepresentations were 'important' to them in the course of the transactions on which the securities fraud charges were predicated . . . and that they or their employers were injured by those misrepresentations . . . . This testimony precludes a finding that no reasonable mind could find Litvak's statements material.") (internal citations omitted).

Given that this evidence of the defendants' relationship with the victim investors bears on some of the trial's central issues, the probative value of this evidence cannot be substantially outweighed by any unfair prejudice to the defendants. Indeed, it is wrong to even term evidence of the crime as contributing to "unfair prejudice"; all evidence of their crimes is prejudicial to the defendants, but there is nothing unfair about it. Rule 403 is a shield to guard against inflammatory evidence, not a sword for cutting out the heart of the Government's case.

Notably, in the closely analogous case, *United States v. Litvak*, Judge Hall denied Litvak's request to "preclude witnesses from testifying about their perceptions of the relationship between Litvak and themselves, even if, in the course of such testimony, they colloquially say that they understood Litvak to be their 'agent'" finding that "the testimony of witnesses for the government about their perceptions is (1) relevant, and (2) more probative than prejudicial." *United States v. Litvak*, No. 13cr19 JCH (D. Conn. June 28, 2016), doc. # 432 at 4. Specifically, Judge Hall found the testimony relevant because such testimony "could plausibly be part of the government's efforts to establish the materiality of information Litvak misrepresented and could likewise contribute to the inference that Litvak acting with fraudulent intent." *Id.* (internal quotations and citation omitted).

Any potential confusion to the jury can be satisfactorily addressed in several ways. First, the defense can cross-examine the victims as to their understanding of their relationship with the defendants. Second, the defense, as it appears it intends to, can use its experts to discuss issues concerning the distinction between agency and principal trading.[3] And third, the Court can offer a limiting instruction that clarifies that the defendants owed no independent fiduciary duty to their victims.

Because evidence about the defendants' scheme and the effect of their misrepresentations on victims is relevant and not substantially more prejudicial than probative, the Court should reject the defendants motion to exclude.

### III. THE TERM "BROKER" AND "COMMISSION" IS NOT OBJECTIONABLE

The defendants further ask the Court to prohibit use of the word "broker" to describe them or refer to the compensation they received on trades as "commissions." The Court should also deny this aspect of the motion.

#### A. The defendants and others used the term "broker," a word which lacks obvious legal implications to laypeople

The defendants can amply demonstrate a technical legal distinction between "brokers" and "dealers," but fail to show that use of the former is inadmissible because it will mislead or confuse the jury. Fed. R. Evid. 403. On the other hand, an order excluding the term "broker" from the trial would require the witnesses to ignore the actual facts of the case, alter their natural testimony and police their vocabulary simply to avoid a word that a typical person does not

---

[3] Indeed, in *United States v. Litvak*, such expert testimony was cited as the defendant's remedy to correct any potential jury misunderstanding that may be created by a victim's testimony about his own perception of his relationship with the defendant. *See* 808 F.3d 160, 187-88 (2d Cir. 2015). Obviously, if the Court grants the defendants' motion and excludes the victim testimony, significant parts of their experts' proposed testimony will no longer be relevant to any issue of consequence in the trial.

understand to imply any legal connotation. As discussed *supra*, even one of the defendants used the term "broker" when describing his role in a particular trade. NSI0007940 (Gramins "purely looking to broker" a trade). This is simply the evidence that exists. Furthermore, "broker" is a colloquial term that is used by various participants in the market, not to imply a fiduciary duty, but to describe the defendants' role in trades that are essentially riskless to Nomura.

### B. Victims and defendants used terms such as "commissions" to describe Nomura's compensation

The defendants ask the Court to exclude testimony that they or Nomura received "commissions" from trading counterparties arguing that (a) Nomura earns profits through spreads; and (b) commission has a common meaning that would improperly imply some duty of agency owed by defendants. The defendants' argument flies in the face of the facts regarding how compensation is negotiated for BWIC and other non-inventory trades in the RMBS market. There can be no dispute that both victims and the defendants referred to compensation for trades as "commissions" or similar verbiage in non-inventory trades. While technically Nomura may earn profits through spreads, every victim interviewed consistently described how, for certain types of trades, they would "pay on top"—meaning they would negotiate a "fee," "commission," or "vig" to be paid to Nomura in addition to the price of the bond. In addition, other Nomura traders and salespeople referred to the negotiated profit as a commission or the amount a counterparty paid on top. Although the trade tickets do not separately reflect these commissions paid (they show only the all-in purchase price), the Bloomberg chats do. For example:

- Gramins and an investment manager ("IM") chat regarding payment on top or "pot":

    > IM: what do you think is fair pot if we get . . .
    > Gramins: yes going rate for poa [payment option arm] trades is usually 8 ticks
    > Gramins: so that would be great
    > IM: going rate?
    > Gramins: pay on top

> IM: on lists too?
> IM: no way
> Gramins: yep
> IM: what would u call going rate for heq [home equity]
> Gramins: more of a range on heq
> Gramins: 4-8

NSI00035233.

- An investment manager asked Peters after a price for the bond was agreed upon: "Yeah, can he pay the commission?" NSISEC00334801.

- An investment manager asked Gramins: "how should i think about the px [price] to me? He paying you or am I?" Gramins answered: "if you can pay that would be best." The investment manager responded: "commish may involve material goods . . . ." NS100029094.

- An investment manager told Shapiro: ". . . it is a big piece of bonds but from my pov 8 tics is still right pot here." NSI00013766.

- An investment manager told a Nomura salesperson: "i've never paid someone more than 4 ticks . . . . The MTA IO market trades at similar levels and regularly bonds transact with a 1 or 2 tick vig." NSISEC00095534.

Allowing testimony that refers to Nomura's profit as commissions or other similar words would not mislead the jury or be unfairly prejudicial. Instead such testimony would be an accurate description of conversations the defendants had with victims and co-workers and the way Nomura was paid for certain trades. There is no reason to believe that jurors are likely to infer that the defendants had an agency relationship with their victims because they were paid a commission. And any risk can be easily mitigated by the defense during cross-examination or through a jury instruction. This approach would be preferable to banning the use of the word "commission" or other similar words, which would risk obscuring the facts of the case, render clear evidence unnecessarily confusing, make it more difficult for witnesses to explain events with their own vocabulary, and create an artificial construct unrelated to the facts of the case.

## CONCLUSION

The Government respectfully requests that the Court deny the defendants' motion.

          Respectfully submitted,

          DEIRDRE M. DALY
          UNITED STATES ATTORNEY

          /s/
          HEATHER CHERRY
          ASSISTANT UNITED STATES ATTORNEY
          FEDERAL BAR NO. PHV07037

          LIAM BRENNAN
          ASSTANT UNITED STATES ATTORNEY
          FEDERAL BAR NO. CT27924


          U.S. Attorney's Office
          157 Church Street
          New Haven, CT 06510
          (203) 821-3835

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2016, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

>          /s/
> HEATHER L. CHERRY
> ASSISTANT UNITED STATES ATTORNEY