## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:15CR155 (RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO, | : | |
| MICHAEL GRAMINS, and | : | |
| TYLER PETERS | : | August 5, 2016 |

## GOVERNMENT'S REPLY IN SUPPORT
## OF ITS MOTION *IN LIMINE* TO PRECLUDE
## EVIDENCE REGARDING VICTIM PROFITABILITY

The Government submits the reply in further support of its Motion *in limine* to Preclude Evidence Regarding Victim Profitability [doc. # 167]. For the reasons stated below, the Government respectfully requests that the Court preclude evidence or argument regarding the profits ultimately earned by victims on fraudulent trades.

## BACKGROUND

In this case, the defendants worked at a broker-dealer that arranged trades between buying and selling parties. The defendants made factual misstatements to certain clients about the actual sale or purchase price of particular bonds, allowing them to negotiate higher prices with buying victims and lower prices with selling victims. In this extremely opaque market, in which the victims had no recourse to confirm the actual purchase price of bonds, this allowed the defendants to fraudulently steal an additional hidden transaction cost for Nomura, secretly making Nomura's trades more profitable at the expense of victims.

Accordingly, every victim suffered a fraud loss, insofar as their trades were less profitable than they would have been absent the fraud. This is true regardless of whether a victim's later trades in the same bond made profits greater than the fraud loss.

- 1 -

## DISCUSSION

The defendants are seeking to introduce evidence that the trades at issue in this case ended up being profitable for the victims. The Government moved to preclude this evidence because, as the Second Circuit stated, "[w]hether a victim later made a profit or loss on the bonds it purchased from [the defendant] has no bearing on whether [the defendant's] misrepresentations were material or whether [the defendant] intended to deceive the purported victims." *United States v. Litvak*, 808 F.3d 160, 186 (2d Cir. 2015). In their response, the defendants argue that evidence of profitability is relevant to assessing the defendants' intent to harm under the wire fraud statute and materiality. The defendants' arguments ignore and miscast Second Circuit precedent. Victims' ultimate profits (or losses) are irrelevant to whether the defendants made material misrepresentations with criminal intent and, as discussed below, evidence of profitability should be precluded under Rules 401 and 403.

## I.    Victims' Profitability Is Irrelevant

### A.    Whether Victims Later Turned a Profit is Not Relevant to Defendants' Intent to Harm

The defendants' claim that ultimate profitability negates intent under wire fraud fails for two reasons. First and foremost, the ultimate profitability of an investor's decision to buy or sell a bond is not relevant because the defendants are not charged with intending that the victims enter into trades that were not profitable in some absolute long-term sense. Rather, as the Government argued in its opening brief, "the charged fraud made [the victims'] investments relatively less profitable by driving up victims' purchase prices and driving down their sale price." Gov. Mot. at 2-3. The money stolen by the defendants through their lies may make the trades ultimately unprofitable, or it may make the trades simply less profitable than they otherwise would have been. Either way, and regardless of the overall profitability, the defendants lied to obtain money

that otherwise should have been obtained or retained by the victims at the time of the original transaction. The defendants do not address this critical point in their response.

Instead, relying primarily on *United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983), the defendants' argue that evidence of whether victims ultimately incurred profits or losses is relevant to assessing a defendant's fraudulent intent, and therefore "evidence that the counterparties profited from the subsequent sale of bonds they purchased from Defendants is admissible." Defs.' Opp. at 3-4. Their argument, however, conflates the concepts of fraud loss and ultimate profit or loss; a victim's financial injury suffered as a direct result of a fraudulent trade (the additional transaction cost paid as a result of the defendants' lie) is different than a victim's ultimate ability to make a profit in some later independent investment decision. The former is circumstantial evidence of a defendant's intent to defraud; the latter is happenstance and irrelevant.

It is well-settled that, in the context of wire fraud, "it is not required that the victims of the scheme in fact suffered harm, but the government must, at a minimum prove that defendants contemplated some actual harm or injury to their victims." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (citation omitted). As the defendants note, courts regularly admit evidence of the fraud loss suffered by a victim as circumstantial evidence of the defendant's intent to cause harm to the victim. *United States v. Guadagna*, 183 F.3d 122, 128 (2d Cir. 1999) ("Intent may be proven through circumstantial evidence."); *Regent Office Supply Co.*, 421 F.2d at 1180-81 (intent to harm "may be inferred when the scheme has such effect as a necessary result of carrying it out"). In this case, evidence that a victim paid more for a bond based on the defendants' lies, making the trade relatively less profitable for the victim, is evidence that the defendants intended to harm that victim.

But the defendants now turn that principle on its head to argue the inverse, namely that evidence of a victim's post-fraud ultimate profit is probative of a defendant's state of mind at the time of the alleged crime. The defendants inaptly rely for this argument on *Heimann*, Defs.' Opp. at 2, which dealt not with ultimate profitability but with direct loss from the fraud caused by the defendant. *Heimann* was an appeal by the Government from an order granting the defendant's Rule 29 motion. The indictment alleged that Heimann devised and executed a scheme to defraud a small group of antique jewelry dealers by obtaining their merchandise "on memorandum," whereby Heimann was entrusted with the merchandise and agreed to either pay for it or return it by a date certain. 705 F.2d at 664. After taking the jewelry, Heimann would represent to several auction houses that he had full ownership rights of the jewelry and would receive a significant cash advance in advance of the anticipated auction proceeds. *Id*. Heimann initially made payments to the victims, but then, after receiving $3.8 million in merchandise from the victims and receiving an advance from an auction house, he ceased doing so. *Id*. The central issue was whether there was a prejudicial variance between the indictment and the proof at trial with respect to allegations of time. The defendant argued, *inter alia*, that a variance between the indictment and the evidence was prejudicial because had "he known that earlier transactions were not in controversy, he would have refocused his defense to show that the value of the merchandise remaining in the auction houses was sufficient to satisfy outstanding creditors, and thereby establish defendant's reasonable belief that [the auctions] would have resulted in everyone being paid." *Id*. at 669. The Second Circuit stated that "[w]hile technically the success or failure of a scheme to defraud is irrelevant . . . realistically, when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence." *Id.*

Notwithstanding the defendants' argument, *Heimann* does not stand for the proposition that a victim's ultimate gain months or even years later is probative of defendant's intent. Instead, it held merely that a defendant may introduce evidence that victims did not stand to lose money as a *direct* result of the defendant's scheme to counter the government's allegations of intent. *Id*. *Cf. United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (noting that "the key word in the relevant portion of the 'good-faith defense' pattern instruction is 'ultimately,' and the point that this portion of the instruction seeks to convey is that where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct"); *United States v. DeSantis*, 134 F.3d 760, 768 (6th Cir. 1998) (because the government is permitted to introduce evidence of loss, "a defendant should be granted equal flexibility in showing that the losses were *not* caused by the alleged fraud") (emphasis in original). Thus, both law and logic dictate that there must be some direct connection between the alleged fraud and the victim's profit in order to establish its relevance.

In this case, whether a victim who completed a fraudulent trade with defendants ultimately made or lost money on the investment is dependent on many factors unrelated to the defendants' conduct. A victim that purchased a bond in a charged trade could have held that bond for any length of time. If the victim did eventually sell it, whether the sale price was higher or lower than the fraudulent purchase price was a function of the market at that particular time. Just as the Government would not attempt to blame the defendants for a market drop, the defendants should not be able to claim credit for a rising market. Moreover, any prior or later transaction by the

victim was a result of its own independent investment decision-making and analysis, which the defendants also cannot claim any credit for.

In short, the victims' ultimate profitability was not caused by or related to the defendants' scheme to defraud, and thus cannot bear on intent. First, at the time of the misrepresentation, each victim suffered a direct fraud loss that diminished whatever unknown net profits it could ever earn or increase whatever net losses it might suffer. Second, at the time of the misrepresentations, the defendants had no way of knowing whether the victims' investments would be ultimately profitable, since they could neither foresee future market conditions nor control victims' later trade decisions. Moreover, even if certain victims' profited eventually through the purchase of the bond, the defendants decreased the victims' net profits by stealing a portion of the victims' money at the time of purchase.

B.      Whether Victims Later Turned a Profit is Not Relevant to Materiality

The defendants also incorrectly argue that evidence of the victims' ultimate profits is probative of the issue of materiality. The Second Circuit held in *United States v. Litvak* that "[w]hether a victim later made a profit or loss on the bonds it purchased from [the defendant] has no bearing on whether [the defendant's] misrepresentations were material." 808 F.3d 160, 186 (2d Cir. 2015). Although the defendants claim this statement is merely *dictum* that the Court should ignore, the Second Circuit's language indicated otherwise. Prior to addressing the materiality of profitability, the Circuit said "Though our conclusion that vacatur is warranted on this ground alone relieves us of an obligation to address Litvak's additional claims of error in respect of the District Court's evidentiary rulings as to the securities fraud claims, we proceed to address them for purposes of judicial economy, as the same issues are likely to arise on remand." *Id.* at 184–85. The Second Circuit addressed this issue so that the district court would follow it in any subsequent trial.

To support their materiality argument, the defendants primarily rely on *United States v. Forbes*, 249 F. App'x 233, 236 (2d Cir. 2007) ("investors losses [are] probative on the issue of materiality"). Although the defendants call *Forbes* "difficult to reconcile" with the Second Circuit's holding in *United States v. Litvak*, Defs.' Opp. at 3 n.2, these two holdings are not contradictory, since it is clear that relevance is established only where there is a direct connection between the alleged fraud and victim profit or loss. *Forbes* concerned a massive accounting fraud by senior management of Cendant Corp., which was a publicly traded company; when the fraud was disclosed, its stock price plummeted. The Second Circuit, in a summary order and without discussion, found that the district court "correctly ruled that references to the decline in Cendant's stock price or investor losses were probative on the issue of materiality and permissible under Federal Rule of Evidence 403." *Forbes*, 249 F. App'x at 236. The evidence of victims' losses in *Forbes* was directly related to the alleged fraud:  when the fraud was discovered the market reacted, showing the materiality of the defendant's misrepresentations and omissions.

As discussed above and in *Litvak*, the victims' ultimate profits in this case were independent of the fraud and, in any event, were diminished by the fraud. Post-fraud profitability that depends on some later transaction and is affected by general market conditions tends to show nothing about whether the defendants' misstatements, if disclosed, "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Evidence of victims' profits, therefore, is irrelevant to the materiality of the defendants' misstatements.

## II.     Victim Profitability Is Substantially More Prejudicial Than Probative

Evidence of victims' net profits also should be excluded under Rule 403. As Judge Hall has written, the minimal probative value offered by evidence of victim profitability is outweighed by its tendency to confuse the issue and mislead the jury:

The concept of financial loss is ambiguous under the circumstances of this case, and an instruction as to financial loss risked confusing the jury by conflating long-term soundness of the investments with immediate injuries in connection with the process of negotiation and executing a given trade. There is no dispute that the scheme pertained only to the latter, that is, trade execution, and not to whether the RMBS bonds were ultimately profitable.

*United States v. Litvak*, 3:13cr0019 (JCH), Ruling re: Defendant's Mots. at 10, n.3 (doc. # 265, July 2, 2014).

## CONCLUSION

The Court should issue an order precluding the defense from introducing evidence, whether through an expert witness or a fact witness, or making argument regarding the profits earned by victims on fraudulent trades.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

___/s/_____
HEATHER CHERRY
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV07037
heather.cherry@usdoj.gov

LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27924

DAVID NOVICK
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV02874

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3700

**<u>Certificate of Service</u>**

I hereby certify that on August 5, 2016, a copy of the foregoing was sent electronically to counsel for Ross Shapiro, Michael Gramins, and Tyler Peters through the Court's ECF system.


_____/s/_____
HEATHER CHERRY
ASSISTANT UNITED STATES ATTORNEY