UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:15CR155 (RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO, | : | |
| MICHAEL GRAMINS, and | : | |
| TYLER PETERS | : | August 5, 2016 |

**GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING FAIR MARKET VALUE**

The Government respectfully submits this reply in support of its Motion *in Limine* to Preclude Evidence or Argument Regarding Fair Market Value (Dkt. 166).[1]

Defendants lied to their victims about facts important to pricing so that Nomura could make more money, resulting in greater prestige and compensation for defendants. Defendants knew victims would use the misrepresented information in their price negotiations. At the time of the charged trades, neither defendants nor their victims had access to the historical and future pricing information defendants now seek to introduce as "fair market value" evidence. Such evidence is irrelevant and will confuse the jury, and should be precluded.

## BACKGROUND

### A. The Charged Crimes

From 2009 through 2013, defendants and their co-conspirators made fraudulent statements to victims to obtain unearned compensation for Nomura on RMBS trades and deprive victims of information relevant to making a discretionary economic decision. Defendants were senior members of Nomura's RMBS desk who perpetrated a scheme to misrepresent information relevant

---

[1] The Government requests that the Court also consider this in the context of its opposition to the defendants' motion for Rule 17(c) subpoenas (Dkt. #173), which was based in significant part on the relevance of fair market value evidence.

to victims' price negotiations, falsely overstating Nomura's purchase price and understating Nomura's sale price, causing buying victims to pay more money and selling victims to accept less. The profits of this scheme flowed directly to Nomura, leading to increased compensation and reputation for defendants. Defendants trained their subordinates to lie in this way to customers.

### B. The RMBS Market

As traders at Nomura, defendants acted as intermediaries for their customer-victims in RMBS transactions. Defendants could buy a bond either to hold in Nomura's inventory for later sale (taking the risk the price would depreciate) or to sell almost immediately at a higher price (with the purchase and sale often simultaneously negotiated).

#### 1. Price negotiations were important to victims

Nomura's customers, including the victims, analyzed the fundamental attributes of a particular bond, often using mathematical models resulting in a range of prices at which they perceived a trade to be attractive. A victim would not necessarily have any information about past trades in the same bond, other than those it had executed. Armed with its analysis, a victim could decide whether to enter into price negotiations with a broker-dealer, such as Nomura.

Each victim owed its investors a fiduciary duty of best execution. Those duties often included seeking the best possible price for the purchase or sale of bonds. From a buying victim's perspective, the lower a bond's price, the higher its investors' profit; from a selling victim's perspective, the higher a bond's price, the greater its investors' profit. RMBS bond prices were negotiated in increments of a 32nd of a percentage point (or 1/32 of a cent on the dollar), known as a "tick." Price was so important to victims that at least one is expected to testify that he refused to enter into a trade over a difference of one or two ticks.

#### 2. Victims had limited market information

The RMBS bond market is structured very differently from other markets. Unlike securities

traded on an exchange, there is no publicly available market data to show the buy and sell prices of other transactions.[2] And unlike commercial transactions, such as car sales, there are no publicly broadcast sales prices (or even manufacturer's suggested retail prices) and it is difficult to compare prices among competitive dealers. Moreover, in the RMBS market there is no analogue to the Kelley Blue Book—which provides a Fair Market Range and Fair Purchase Price based on reported prior transactions of similar vehicles.

No one (other than the parties) knew the price for a particular trade. Even then, the seller would never know the price the buyer paid, and the buyer might never know the price the seller accepted. Such information was in the exclusive control of the broker-dealer, which had no obligation to share. In the rare instances when broker-dealers chose to share price information, customers had no way of knowing whether it was true. More typically, a broker-dealer would provide vague "color" about pricing. That color might be specific: "I had that offer last week." Bates No. NSI00006075. Or it might be very general: "another account showed us an overnight bid in the 57h" (*i.e.*, 57-handle, meaning 57 and anywhere between 0 and 31 ticks). NSI00016610. Or the broker-dealer might provide no color at all. In any event, color was also nearly impossible to verify.

This market structure made it possible for defendants to misrepresent facts important to victims' price negotiations. Defendants only needed to be careful not to get too greedy, otherwise victims would have refused unattractive trades. While market information about the price of other trades would surely have been valuable—to both the victims and defendants—it did not exist at the time of the alleged crime.

---

[2] Even broker-dealers do not have access to their competitors' trade information. Thus, Nomura would not know what bonds UBS traded or at what prices. While Nomura might be able to obtain some information from its clients, that is typically closely guarded and labor-intensive to collect.

**DISCUSSION**

Defendants plan to present expert and other evidence concerning the "fair market value" of bonds traded in the fraudulent scheme. This evidence does not currently exist, but will be created from price information for trades that occurred before and after the charged trades. The source of the price data will be victims, victims' competitors, and Nomura's competitor broker-dealers. To be clear, defendants' fair market value evidence did not exist at the time of the alleged crimes.

**I.   GOVERNING LAW**

The elements of wire fraud under 18 U.S.C. § 1343 are "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of mail [or wires] to further the scheme," which wires crossed states lines. *United States v. Fountain*, 357 F.3d 250, 255 (2d Cir. 2004). The three elements of securities fraud under 15 U.S.C. § 78j(b) are:  (1) in connection with the purchase or sale of a security, the defendant (a) employed a device, scheme, or artifice to defraud, (b) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or (c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller; (2) the defendant acted willfully, knowingly, and with the intent to defraud; and (3) the defendant knowingly used, or caused to be used, the mails or any means or instruments of transportation or communication in interstate commerce in furtherance of the fraudulent conduct. 3 Leonard B. Sand et al., *Modern Federal Jury Instructions: Criminal*, Instruction 57-20.

"Intent to defraud" for purposes of securities fraud encompasses "intent to deceive, manipulate or defraud," *United States v. Litvak*, 808 F.3d 160, 178 (2d Cir. 2015), whereas for wire fraud, "[t]he purpose of the scheme 'must be to injure,'" *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970) (citation omitted). For wire fraud, "[i]t is not required that the victims of the scheme in fact suffered harm, but the government must, at a minimum, prove

that defendants contemplated some actual harm or injury to their victims," *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (internal quotation marks omitted), and "the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck." *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991).

An "intent to harm" is shown where the defendant either contemplated direct pecuniary loss, or "denie[d] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Binday*, 804 F.3d at 570 (citation omitted). Not all deprivations of information are sufficient; "the deceit must deprive the victim of potentially valuable economic information." *Id.* (citation omitted). The Government must show that "the deceit affected the victim's economic calculus or the benefits and burdens of the agreement," and not just that a scheme "cause[d] [its] victims to enter into transactions they would otherwise avoid." *Id.* (citation omitted). Thus, "it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Id.* at 579. By way of example, "[w]here the false representations are directed to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *Id*. at 578 (quoting *Regent Office Supply*, 421 F.2d at 1182).

Fraudulent intent "may be proven entirely through circumstantial evidence," *United States v. Romano*, 794 F.3d 317, 335 (2d Cir. 2015), including "by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false," *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). Intent to harm "may be inferred when the scheme has such effect as a necessary result of carrying it out." *Regent Office Supply Co.*, 421 F.2d at 1181 (quotation marks omitted).

Both wire fraud and securities fraud also have a materiality element, each slightly different. For wire fraud, the misrepresentations or omissions must have "ha[d] the natural tendency to influence or [were] capable of influencing the [victim] to change its behavior." *United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) (en banc). For securities fraud, there must be "a substantial likelihood that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

## II.     Defendants' Fair Market Value Evidence Is Inadmissible Under Rules 401 And 403

The Government does not seek to preclude evidence of what market information victims had, victims' models, and whether they were satisfied with the trade price. But, the Court should preclude evidence that the charged trades occurred at a "fair market value" that was created *post hoc* from a survey of unavailable market data of prices for other bonds, executed on other days, and with other counterparties. Whether the charged trades were executed at this "fair market value" is not relevant to intent to defraud or materiality, nor does it tend to establish defendants' good faith. Furthermore, whatever minimal probative value this evidence has is substantially outweighed by the danger it will mislead the jury and confuse the issues at trial.

### A.     Fair Market Value Evidence Is Irrelevant
#### 1.  **Fair market value is not relevant to defendants' intent to harm**

Defendants intended both to cause direct pecuniary harm to their victims—by inducing them to pay more to buy bonds or accept less when they sold bonds—and to deprive them of "the relevant facts necessary to make an informed economic decision," *Binday*, 804 F.3d at 579, specifically "representations [] directed to the . . . price" of the RMBS that would affect how they pursued their price negotiations, *Id.* at 578. It is axiomatic that a counterparty would enter into a transaction only at a price for a bond that it believed to be "fair," typically within a range of

acceptable prices. Defendants used their lies to manipulate the ultimate trade price within that range. Each trade was a zero sum game in which every tick that defendants lied to obtain was taken from their customers. Whether bond prices were "fair" is simply irrelevant; what matters is that defendants lied so that they could take more money from their victims.

In opposition, defendants argue that "fair market value bears directly" on intent to harm. Defs.' Opp. at 3 [Dkt. #184]. This is incorrect for several reasons. First, defendants' argument is based on an incorrect premise. In the opaque, thinly traded RMBS market, bonds have no independently ascertainable "fair market value"; they only have the price at which a willing buyer and seller agree to trade. (And in this case, the victims' determination of prices at which they were willing to trade was infected by defendants' lies.) *See, e.g.*, *United States v. Litvak*, Case. No. 3:13CR19(JCH), Transcript of Feb. 6, 2014 Pretrial Conference (Dkt. #192) at 78 (Hall, J.: "A fair value is what a willing buyer will pay a willing seller, so in my view, it is almost metaphysically difficult to think about these being opined about as being fair if, in fact, that the jury concludes that the willing buyer wouldn't have been willing had they been told the truth. If he is told the truth, he's a willing buyer."). All trades were at executed at a "fair" value on the day of execution. Defendants cannot use the average price of a group of bonds that traded fifteen days before and after the transaction at issue (as their motion for Rule 17(c) subpoenas suggests, *see* Dkt. #173 at 6), and mislabel it the "fair market value" of the bond in the charged trade.

Second, defendants' reliance on *Regent Office Supply* and *United States v. Gole*, 21 F. Supp. 2d 161 (E.D.N.Y. 1997), is misplaced. Defs.' Opp. at 2. Those cases did not immunize frauds where victims pay typical prices, nor are they about price misrepresentations at all. *See Regent Office Supply*, 421 F.2d at 1180 ("The government does not contend that the Regent-Oxford agents made any false representations regarding the quality or price of their nationally

advertised merchandise."). Rather, they merely express the well-settled proposition that "even deliberately false statements do not suffice to prove intent to defraud unless they are more than marginally material to 'ultimate value of the transaction.'" *Gole*, 21 F. Supp. 2d at 166 (quoting *United States v. Dinome*, 86 F.3d 277, 284 (2d Cir. 1996)). Clearly, misrepresentations about the price of a bond are far more than marginally material to the value of a transaction. *Regent Office Supply*, 421 F.2d at 1182 ("Where the false representations are directed to the…price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain."). This is particularly apt here, where price information is not otherwise easily obtainable and victims must rely on broker-dealers. Moreover, recent authority confirms that the Government need only prove that defendants intended to deprive their victims of potentially valuable economic information. *Binday*, 804 F.3d at 570. It cannot logically follow that defendants can avoid criminal liability for a fraud intended to result in economic gain at the expense of victims, as long as their scheme ultimately induced victims to buy or sell bonds within a range of what proved after the fact to be market prices.

Third, defendants attempt to divorce "harm" from intent. The purported "fair market value" of the bonds cannot bear on defendants' intent, because they could not have been aware of this information at the time of the transactions. Indeed, the fact that they must now gather data from their victims, customers and competitors (for example, through Rule 17(c) subpoenas), rather than exclusively from Nomura's trading records, shows that no one in the market knew in real-time what the "fair market value" was for a bond. The RMBS market is opaque; market participants keep their trading data confidential; and there is no exchange on which prices are listed. A *post hoc* attempt by defendants' experts to construct some notional fair market value shows nothing about defendants' intent between 2010 and 2013.

### 2. Fair market value is not relevant to materiality of defendants' lies

Similarly, the prices at which Nomura's other customers and competitors traded bonds was not available to victims and thus cannot be relevant to the materiality of defendants' lies. As the Second Circuit has stated in considering similar conduct, "whether the price the alleged victims paid was within a range of fairness was not relevant to determining if the misstatements themselves were important to a reasonable investor." *Litvak*, 808 F.3d at 185.

Defendants contend that evidence of "a reasonable investor's *knowledge* that the transaction in issue occurred at fair market value is relevant." Defs.' Opp. at 4. As stated above, the Government does not object to introduction of information actually known by victims at the time of defendants' fraudulent trades. Of course, pricing data that is not available to reasonable investors would not qualify. Nonetheless, defendants now assert, that "reasonable investors in the RMBS market employ certain analytical processes that *would have made them* aware that the trades were done at fair market value." Defs.' Opp. at 4. Defendants are conflating two unrelated concepts: as explained above, while victims performed pre-negotiation analysis of a bond to determine the maximum price at which they would be willing to trade that bond (like opening a car's hood to see if it has a V-8 engine), they were not capable of assembling sufficient information about prior trades in the same bond to determine the bond's fair market valuation (which is like looking up a car's Kelley Blue Book value based on prior car sales). Defendants cannot sensibly claim that something unknown to victims at the time of the charged trades is evidence of those same victims' knowledge.

### 3. Fair market value is irrelevant to defendants' good faith

A defendant's good faith vitiates his intent to defraud. *Litvak*, 808 F.3d at 189. Defendants argue that their fair market value evidence will demonstrate that "they believed, in good faith, that the misrepresentations would not have caused reasonable investors to transact outside the range of

fair market value and, consequently, would not have affected a reasonable investor's investment decision." Defs.' Opp. at 5. This argument is flawed in at least two respects. First, the fair market value evidence defendants now hope to assemble was not available, and thus could not have been known to them, at the time of their fraud. Thus, their explanation that "the Fair Value Evidence would provide context for jurors to understand how market participants, like defendants, would draw such a conclusion," is empty.

Second, even if defendants were aware of the fair market value, their argument assumes that investors would be satisfied transacting at any point within a "fair" price range, and defendants act in good faith by lying so long as the price remains in that range. Defendants may have believed, "in good faith, that the misrepresentations would not have caused reasonable investors to transact outside the range of fair market value." But it does not follow that their lies "consequently, would not have affected a reasonable investor's investment decision." Def. Opp. at 5. This incorrectly characterizes investors as happy to pay any amount of money up to the top of their range. But the defendants here induced victims to trade at less favorable prices, albeit still within their ranges.

### B. Fair Market Value Evidence Is Substantially More Prejudicial Than Probative

Even if defendants' fair market value evidence had some minimal relevance (which it does not), it should be excluded under Rule 403. Here, evidence that bonds sometimes traded in a range of prices will allow defendants to insinuate that any trades at those prices are harmless to victims, despite the fact that defendants' lies made victims' trades less profitable. Moreover, this evidence will confuse the jury when defendants attempt to cross-examine victims on it before their experts testify to their fair market value analysis. Furthermore, this evidence will likely also lead to delay as the parties litigate the validity of that analysis. Because its prejudice substantially outweighs its probative value, the Court should preclude this evidence.

## CONCLUSION

The Court should issue an order precluding defendants from introducing evidence or making arguments that fraudulent transactions were executed at fair market values.

> Respectfully submitted,
>
> DEIRDRE M. DALY
> UNITED STATES ATTORNEY
>
> _____/s/_____
> HEATHER CHERRY
> ASSISTANT UNITED STATES ATTORNEY
> FEDERAL BAR NO. PHV07037
>
> LIAM BRENNAN
> ASSTANT UNITED STATES ATTORNEY
> FEDERAL BAR NO. CT27924
>
> DAVID E. NOVICK
> ASSISTANT UNITED STATES ATTORNEY
> FEDERAL BAR NO. PHV02874
>
> U.S. Attorney's Office
> 157 Church Street
> New Haven, CT 06510
> (203) 821-3700

**Certificate of Service**

      I hereby certify that on August 5, 2016, a copy of the foregoing was sent electronically to counsel for Ross Shapiro, Michael Gramins, and Tyler Peters through the Court's ECF system.

                                                                                            _____/s/_____
                                                                                            HEATHER CHERRY
                                                                                           ASSISTANT UNITED STATES ATTORNEY