UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | No. 15-cr-00155 (RNC) |
| ROSS SHAPIRO, MICHAEL GRAMINS and TYLER PETERS | : | OCTOBER 19, 2016 |

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTIONS *IN LIMINE* AND IN FURTHER OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE***

Defendants Ross Shapiro, Michael Gramins, and Tyler Peters respectfully submit this supplemental memorandum in further support of Defendants' Motion *in Limine* to Preclude Evidence and References to the PPIP Program and Identities of Passive Investors in the Funds Managed by the Counterparty Institutions (Dkt. 162), and in further opposition to the government's Motion *in Limine* to Preclude Evidence or Argument Regarding Fair Market Value (Dkt. 166) and Motion *in Limine* to Exclude Evidence of the Absence of Criminal Activity in Uncharged Transactions (Dkt. 159).

**1. Supplemental Argument in Further Support of Defendants' Motion *in Limine* to Preclude Evidence and References to the PPIP Program and Identities of Passive Investors in the Funds Managed by the Counterparty Institutions (Dkt. 162)**

At the pretrial conference of September 2, 2016, the Court stated that considerations of unfair prejudice militated against admission of evidence concerning the identities of passive investors in the counterparty funds. *See* 9/2/2016 Hr'g Tr. at 44-45. In preliminarily addressing the evidence concerning PPIP funds – partnerships in which the government held passive

investments as a limited partner – the Court noted that to the extent evidence about the PPIP program is necessary to give the government a fair opportunity to prove how the market operated, the Court would likely admit evidence of the same, with limiting instructions. *See id.* In this connection, we respectfully submit that evidence about the PPIP program is irrelevant to show how the non-agency RMBS market operated; would not be relevant to any element of any offense charged; and is not admissible background evidence. Accordingly, such evidence does not have a place in this trial. Moreover, even if this evidence had marginal relevance, its probative value would be substantially outweighed by the undue prejudice and confusion it would cause – especially in view of the evidence that the government plans to offer otherwise in this case.

The government intends to offer proof relating to twenty specific non-agency RMBS trades ("Subject Trades"). Of these, only three trades involved a PPIF – meaning a fund that was independently managed by a private investment firm in which government funds were invested on a passive basis in exchange for a limited partnership interest in the fund. The government was a passive investor in these funds and is thus encompassed by the Court's current ruling that evidence as to the identity of passive investors would be prejudicial. The proffered PPIP evidence should be barred on this ground alone.

In addition, the evidence concerning PPIP that the government seeks to admit would not prove how the non-agency RMBS market operated, the subject of the Court's focus in adjourning the issue pending further argument. *See id*. PPIP was a program enacted as part of the fiscal stimulus to authorize the government to fuel market activity during the financial crisis. The investment by the government in PPIP funds did not change trading in the non-agency RMBS market and did not change the laws or rules applicable to dealer market making in this

market. Nor did the PPIP rules dictate changes in trade protocol where PPIP funds were involved (rather, the rules mandated that PPIP funds purchase instruments with certain ratings and required certain reporting to Treasury). Accordingly, with respect to (a) analyzing RMBS for investment and (b) trading and investing in RMBS, managers of PPIP funds did nothing differently because PPIP funds were invested in their funds (other than comply with the ratings related limitations and reporting requirements). *See* Trial Tr. 606:1-7, *United States v. Litvak*, No. 3:13-CR-19 (D. Conn. Feb. 20, 2014) (testimony of Michael Canter that managing a PPIF "was different [from managing a private fund] just in terms of the amount of compliance rules and things like that, but the day-to-day functions are similar.").

The government nonetheless seeks to introduce evidence that Michael Canter, a PPIP manager at AllianceBernstein, aggressively confronted Mr. Litvak at Jefferies & Co. when he learned that Mr. Litvak had made misrepresentations in RMBS price negotiations with AllianceBernstein, and also reported his discovery to the Treasury. *See* Dkt. 232 at 1 n.1. The government suggests that this evidence is relevant to materiality under the securities and wire fraud laws. *Id*. We have previously briefed the matter, *see* Dkts. 162, 200, and therefore limit our comments below to a summary of the reasons that the proffered evidence should be barred.

First, the fact that Mr. Canter reacted adversely to being deceived by a different dealer does not show or tend to show that the price information itself was material to an investment decision. That a communication makes one angry may make the communication important in some sense of the word, but the law requires more – to be material to a securities transaction the information must be significant in the total mix of information considered in making an *investment decision*. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (holding that "there must be a substantial likelihood that the disclosure of the omitted fact[s] would have been

viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" concerning the investment decision); *United States v. Ferguson*, 553 F. Supp. 2d 145, 152 (D. Conn. 2008) (observing that, in the context of securities fraud, material facts are those "that a reasonable investor would have considered significant in making *investment decisions*") (emphasis added). Here, the reaction of Mr. Canter to learning that he had been misled in negotiations is not relevant to materiality under this standard. Notably, Mr. Canter acknowledged in *Litvak I* that the investment decisions he made in transactions negotiated with Mr. Litvak were, on their merits, attractive investments at the prices he paid. Trial Tr. 529:9-534:8, *United States v. Litvak*, No. 3:13-CR-19 (D. Conn. Feb. 20, 2014). *See also United States v. Weimert*, 819 F.3d 351, 358 (7th Cir. 2016) (holding that "[d]eception about negotiating positions – about reserve prices and other terms and their relative importance – should not be considered material for purposes of mail and wire fraud statutes").

Relatedly, Mr. Canter's reaction and report to Treasury in the *Litvak* matter was expressly driven by his concern that he might be obligated to report to Treasury because PPIP funds were invested in his fund. *See, e.g.*, Trial Tr. 359:8-360:15, *United States v. Litvak*, No. 3:13-CR-19 (D. Conn. Feb. 19, 2014) (Mr. Canter explaining the importance of the reporting obligations imposed by Treasury on himself and the firm as managers of a PPIF); *id.* at 390:15-23 (Mr. Canter, having confronted Mr. Litvak concerning his misrepresentation, asked him "[A]re you freaking crazy doing this to the United States Treasury Department. Because of this, I'm going to have to report this."). This shows absolutely nothing about the materiality of the information to Mr. Canter's *investment decision*.

<u>Second</u>, this is not the *Litvak* case. Mr. Canter reported nothing to the government about the Subject Trades in this case. It would be confusing for the jury to hear a tale of Mr. Canter's

report to the Treasury in the *Litvak* matter for reasons unrelated to his relevant investment decisions. Such evidence would have the effect of suggesting that this case somehow involves obligations to the government when it does not.

Moreover, the proffered testimony concerning Mr. Litvak would be entirely unnecessary even if it had minor probative value. Mr. Canter was involved in two Subject Trades in *this* case, and is expected to testify concerning one of these trades that (a) after he agreed to purchase certain RMBS from Nomura, he learned that information he received in negotiations about Nomura's cost to purchase the RMBS was inaccurate, (b) he complained to Nomura as a result, and (c) he and Nomura negotiated a refund. This "reaction-to-misrepresentation" testimony about a charged trade is not the subject of the defense motion, and, regardless of what it may or may not show about materiality, it at least concerns facts relating to events involving one or more of the defendants. By contrast, testimony concerning Mr. Litvak is not only irrelevant, but would be confusing to the jury given the actual testimony about what Canter did in *this* case.

Accordingly, the proffered evidence should be barred on grounds that it is irrelevant, unnecessary, confusing, and unduly prejudicial.

**2. Supplemental Argument in Further Opposition of the Government's Motion *in Limine* to Preclude Evidence or Argument Regarding Fair Market Value (Dkt. 166)**

At the September 2, 2016 conference, the Court, in preliminarily addressing the government's *in limine* motion to preclude fair value evidence concerning the non-agency RMBS transactions that are the subject of the charges, requested input from the parties concerning the portion of *United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438 (S.D.N.Y. 2013) ("*BNYM*"), that addresses the sufficiency of the "intent to harm" allegations in the FIRREA civil complaint in that case, and also referred to *United States v. Frank*, 156 F.3d 332 (2d Cir. 1998) ("*Frank*").

As explained below, *BNYM* provides strong support for the defense position that it is directly probative of intent in this case that the Subject Trades were executed at prices within contemporaneous fair value, and *Frank* is not to the contrary. As detailed in our prior submissions (Dkts. 173, 184, 223, 231), it is settled that in a wire fraud case, the government bears the burden to prove intent to harm, and that courts in this Circuit have repeatedly defined the intent-to-harm element to require proof that defendant, through the alleged scheme, deprived a third party of the benefit of her bargain. Fair value, or the value of what a party in the relevant market would receive or pay on average for the thing transacted, constitutes a common, non-exclusive measure of the benefit of the bargain. *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970); *United States v. King*, No. 98 Cr. 91A, 2000 WL 362026, *10 (W.D.N.Y. 2000); *United States v. Gole*, 21 F. Supp. 2d 161, 167 (E.D.N.Y. 1997). As applied here, in the non-agency RMBS market, where there is no fiduciary duty between RMBS dealers and their counterparties, a defendant who delivers a specifically negotiated quantity of a specifically identified security at a specifically negotiated price within the range of fair value does not harbor intent to harm within the meaning of the wire fraud statute. Competent proof offered by the defense on this point goes to an essential element of the charged offense and is therefore of textbook relevance.

With reference to the specific bargain alleged in this case, the Court queried whether the Second Superseding Indictment alleges a trading services scheme that can be compared with the foreign exchange ("FX") services scheme analyzed on a motion to dismiss in *BNYM*. Close examination of that case makes clear, however, that to the extent that *BNYM* is compared to this case, it supports the defense theory that fair value is relevant proof to show an absence of intent. Moreover, under *BNYM*, in the context of the expected evidence, the defense respectfully

submits that any suggestion that the Second Superseding Indictment charges or could charge a "trading services" fraud lacks merit.

In *BNYM*, the defendant bank allegedly offered an FX conversion service to its securities custodial clients holding non-U.S. issued securities with the bank. This service allowed custodial clients to convert foreign currency to U.S. dollars when, for example, a dividend or interest payment was paid in a non-US currency by a non-US issuer. As alleged, the service – dubbed "standing instruction" – was marketed as providing "best execution" for clients holding fiduciary roles as fund managers and, *inter alia*, a rate generally reflecting the interbank FX market at the time of execution, without any need for the client to negotiate an FX rate on a transaction by transaction basis. *BNYM*, 941 F. Supp. 2d at 444-47. The complaint alleged that these and related representations (including allegedly as to the netting of client trades intra-day and uniformity of pricing among clients) were deceptive in view of the pricing actually afforded to standing instruction clients. *Id.* at 448-49.

Ruling on a motion to dismiss, the district court addressed the sufficiency of these allegations under the wire fraud statute, a predicate to the violations alleged by the complaint of the FIRREA statute. As to materiality, the court upheld the sufficiency of the allegations, underscoring a number of representations made in the bank's standard marketing materials regarding the standing instruction program that arguably suggested that in providing "best execution" the bank would be providing the "best price" available under an alleged industry definition of "best execution." *Id.* at 465-67. Concerning "intent to deceive," the court likewise upheld the sufficiency of the allegations because the complaint *inter alia* (i) permitted the inference that senior officials at the bank knew about the alleged industry understanding of best execution, allegedly knew that the bank was not providing best execution under such

understanding, and yet referred clients to a website that said that standing instruction offered "FX execution according to best execution standards," (ii) alleged that a trader told a customer that poor intra-day pricing had been caused by bad timing or pricing driven by the size of certain trades when those reasons were not related to the pricing, and (iii) the bank told a customer that its mark-up was to cover transaction costs when standing instruction profits were in excess of transaction costs. *Id.* at 467-70.

Turning to the complaint's allegation of intent to harm, the court ruled that in the context of the bank's alleged offering of a one-stop service to deliver "best execution" on FX trades of any size when and as needed by its custodial customers, the disputed issue whether the standing instruction service provided the best available market price at the time of execution or some other, less favorable price, went to the "nature or quality of the service" the bank was allegedly providing – a pleading that satisfied the requirement to allege deprivation of the benefit of the contracted-for bargain. *Id*. at 474.

However, the court made clear that its ruling would have been different had the bank "*engaged a customer in a directly negotiated transaction*" and quoted a specific currency conversion price. *Id*. In this context, provided that "the customer agreed to the price," and even had the bank represented "that this was the 'best available price' at that time—or even that it was making no profit at that price—while in fact the [b]ank expected to make or made a significant profit[,]" the "essence of the bargain" would be "the exchange of currencies at the agreed-upon price . . . and there would be no showing of an intent to harm in the absence of other circumstances." *Id*. In such context, as the court added, "*[t]he customer generally has no interest in what profits the Bank actually made so long as it received what was agreed*." *Id*.

This counterexample to the allegations deemed actionable by the court ("Counterexample") closely fits the expected evidence in this case. Specifically, here:

1. The Subject Trades were not conducted under an umbrella service arrangement; rather each securities transaction was *directly negotiated as to the CUSIP, quantity, and price* by defendants, on behalf of dealer Nomura, and the counterparties.

2. In each negotiation, Nomura, as the dealer, and the counterparty held opposite economic interests and owed no duties to one another.

3. The counterparties *relied* on their own, often proprietary analytic models to assess pricing, and these models, which evaluated "all-in" prices, did not separately factor into the analysis the dealer's cost in acquiring a security or the dealer's compensation.

4. The counterparty *only* transacted when it was satisfied that an offered or bid all-in price was attractive given *its* assessment of return or potential return, the profile or requirements of its portfolio, and its duty of best execution to its investors (a duty satisfied by among other things the counterparty's pricing analysis and determination whether any specific security (in similar quantity) or a comparable substitute could be transacted with a competitor dealer at a more favorable price).

5. The trade confirmations sent by Nomura to its counterparties referred only to the total price agreed and made clear that Nomura acted in a principal capacity. No separate dealer compensation was reflected and no commissions were recorded.

In addition, underscoring (a) the difference between the standing instruction allegations in *BNYM* and the facts of this case and (b) the direct relevance here of the Counterexample, the

counterparties did not transact by pre-set program whereby they paid for regular service triggered by external events, or pursuant to a general "cost-plus" agreement where they were contractually obligated to purchase the RMBS that Nomura purchased at cost plus a fixed negotiated premium. Rather, they were free to reject offers or bids (and did so) when such quotes were outside of their price/return thresholds, and they always remained free to negotiate prices further. The government's assertion that the counterparties were somehow deprived of the information necessary to make an economic decision ignores that the information exchanged in the negotiations here was the same, standard information exchanged in every securities transaction – the CUSIP, quantity, price, and delivery period. Moreover, where the "pay on top" negotiation vernacular was used by the parties in negotiations, the counterparties *sometimes* paid and *sometimes* did not pay, and amounts paid varied, depending on factors such as whether the counterparty judged the all-in price as within its yield target or whether they understood that Nomura had already been or would be compensated by the other party dealing with Nomura in an intermediated trade.

Importantly – unlike in *BNYM* – the counterparties, in executing the Subject Trades based on their own analyses and inquiries of other dealers, unilaterally determined that they had met their obligations to their investors to achieve "best execution," as that term related to counterparty portfolio managers in the non-agency RMBS market.[1] Indeed, as the evidence will

---

[1] The Court, in commenting on *BNYM*, asked why the Second Superseding Indictment did not allege a failure to provide best execution. *See* 9/2/2016 Hr'g Tr. at 40:4-22. Related to the above, the government could not have asked the grand jury to include such an allegation because in this market the dealer was not expected to provide best execution to its principal counterparties. As noted, counterparties independently evaluated pricing and other factors to satisfy *their obligation to their investors* to achieve best execution. Counterparties in *Litvak I* acknowledged this market reality and also affirmed that at the time of each of the relevant negotiated transactions in that matter, they had concluded that the pricing they had negotiated fell within the parameters of their independent analyses and, based on their professional judgment, provided attractive expected returns for their investors. Trial Tr. 529:9-534:8, *United States v.*

show, reasonable counterparties well understood that in assessing pricing and making trading decisions they should rely on verifiable information and that a dealer's representations concerning the reasons for specific prices offered or bid were not verifiable.

The wire fraud allegations here thus fit comfortably within the *BNYM* Counterexample. Centrally, ***each trade was directly negotiated as to price and other material terms***, unlike in the standing instruction program, where pricing was not negotiated trade by trade but set unilaterally by the bank. And here, unlike the bank in *BNYM*, Nomura traded as a principal, not a service provider operating under contract to process transactions as they might arise from events determined outside of the counterparties' unilateral control. In this case, whether to trade and at what particular all-in price to trade was solely within the discretion of the counterparty, who was always free to decline to trade or negotiate further. In this setting, as noted in *BNYM*, the counterparties had "*no interest in what profits the Bank actually made so long as it received what was agreed*." *BNYM*, 941 F. Supp. 2d at 474.

Accordingly, the notion of a separate trading service in this case is illusory. It is also not consistent with the role that a RMBS dealer plays in the market (trading as a principal and holding inventory) or with the written trade confirmations, which reflect negotiated "all-in" prices, without separate dealer compensation. Nomura, as dealer, was no more offering a separate service than an independent antique watch dealer offers a service when it sells a watch to an experienced antique watch collector. There, as here, although communication and negotiation may be required to transact, it cannot be said that such communications and negotiations constitute a service offered separate and distinct from the sale or purchase of the product itself.

---

*Litvak*, No. 3:13-CR-19 (testimony of Michael Canter); 823:5-18 (testimony of Al Vlajinac); 1042:1-10 (testimony of Joel Wollman).

*United States v. Frank* does not suggest a different result. The very thing negotiated for in that case – ocean dumping of sludge at sufficient distance from the shoreline to meet regulatory requirements which, if breached, could result in penalties imposed on the customer municipalities– required that the transport and disposal service actually dump the sludge at an offshore distance that would insulate the customer from liability. *Frank*, 156 F.3d at 334. Thus, appellants' claim that they had delivered the service of ocean dumping and had no intent to harm missed the mark. It was only a specific version of ocean dumping that would provide the benefit of the bargain, namely, dumping that shielded customers from liability. By contrast, here, defendants assumed no responsibility for the counterparties' decisions and compliance with their duties to investors and did nothing to expose the counterparties to liability for lack of best execution or otherwise.

The government argues that because the defendants (1) allegedly misrepresented Nomura's cost or that the price offered by Nomura was driven by the demands of a third party when it was really a price set by the defendants, and (2) engaged in "pay on top" negotiations, that this case is different from *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), and its related cases. But, as *BNYM* explains in the Counterexample, citing *Starr*, in a direct negotiation where duty is absent, mere deception concerning a negotiating party's cost does not prove intent to harm. *BNYM*, 941 F. Supp. 2d at 474. Importantly, in every Second Circuit case the defense has cited where the wire fraud conviction was reversed, defendants engaged in deception concerning the reasons behind their prices or how money exchanged in the bargain would be allocated. But this proof was held to fall short of showing *fraud* because of an absence of evidence of intent to harm.

This Court denied defendants' motion to dismiss the wire fraud counts, and the defense recognizes that the harmony of the trial evidence with the *BNYM* Counterexample is yet to be established. Nevertheless, especially in view of the counterparty testimony in *Litvak I* that the counterparties there satisfied their best execution obligations through the trades in that case, see supra, we respectfully submit that the defense should be permitted to admit all probative evidence tending to show that defendants lacked intent to harm, including but not limited to evidence showing that individually negotiated prices in each of the Subject Trades fell within a contemporaneous range of fair value, and thus that defendants did not deprive any counterparty of the benefit of the bargain.

**3. Supplemental Argument in Further Opposition to the Government's Motion *in Limine* to Exclude Evidence of the Absence of Criminal Activity in Uncharged Transactions (Dkt. 159)**

Based on communications with the government, we expect that it will supplement its motion to preclude so-called "other trades" evidence. While the Court has already indicated that such evidence may very well be appropriate to rebut the government's contentions as to motive (*see* 9/2/2016 Hr'g Tr. at 47:12-17), we write briefly to preserve an additional defense position: that the defense, separate and apart from the issue of motive, may elicit evidence regarding certain other trades, trade types, trade negotiations, and trade conditions and outcomes. The thrust of such evidence will not focus on the government's concern – a tit-for-tat rebuttal of the Subject Trades with evidence of trades that did not involve the tactics that the government challenges in this case; that is not the defense's intention. Evidence concerning other trades, however, may be relevant to defenses that will be offered at trial relating to intent and materiality and may be used in cross-examination of government witnesses. Consequently, the government's concerns under Fed. R. Evid. 403 that permitting evidence of other trades "would cause

confusion and delay that overwhelms its minimal relevance" and "would require its own trial-within-a-trial" are unfounded. Dkt. 204 at 4.

Finally, we write further to object to evidence elicited by the government from former Nomura employees that would amount to "other trades" evidence. In its reply brief, the government states that it "expects that its witnesses will testify that as part of the defendants' scheme, there were trades *other than the charged trades* in which the defendants made misrepresentations to their clients." *Id.* at 2 (emphasis added). The government has identified twenty Subject Trades to be proven at trial. The defense has reviewed these trades and is expecting a trial concerning these trades. We would object to an attempt by the government, to add to this list of case-in-chief trades expressly or implicitly by eliciting testimony or evidence from former colleagues concerning other specific trades.

**CONCLUSION**

For the foregoing reasons, as well as those set forth in Defendants' prior motion papers, Defendants respectfully request that the Court grant their Motion *in Limine* to Preclude Evidence and References to the PPIP Program and Identities of Passive Investors in the Funds Managed by the Counterparty Institutions (Dkt. 162), and deny the government's Motion *in Limine* to Preclude Evidence or Argument Regarding Fair Market Value (Dkt. 166) and Motion *in Limine* to Exclude Evidence of the Absence of Criminal Activity in Uncharged Transactions (Dkt. 159).

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By: /s/ Guy Petrillo
Guy Petrillo (CT19924)
Joshua Klein (PHV07748)
Leonid Sandlar (PHV07700)
Mirah Curzer (PHV08047)
655 Third Avenue, 22nd Floor

New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391
gpetrillo@pkbllp.com
*Attorneys for Ross Shapiro*

ALSTON & BIRD LLP

By: /s/ Brett D. Jaffe
Brett D. Jaffe (PHV07701)
Joseph G. Tully (PHV07702)
90 Park Avenue
15th Floor
New York, NY 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Brett.Jaffe@alston.com
*Attorneys for Tyler Peters*

GREENBERG TRAURIG LLP

By: /s/ Marc L. Mukasey
Marc L. Mukasey (PHV07694)
Jeffrey B. Sklaroff (PHV 08423)
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2016 a copy of foregoing Defendants' Supplemental Memorandum in Further Support of Defendants' Motions *in Limine* and in Further Opposition to the Government's Motions *in Limine* was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
October 19, 2016

/s/ Leonid Sandlar

Leonid Sandlar (PHV07700)
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391
lsandlar@pkbllp.com