**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| v. | : | S3 No. 15-cr-00155 (RNC) |
| | : | |
| ROSS SHAPIRO, | : | |
| MICHAEL GRAMINS and | : | April 6, 2017 |
| TYLER PETERS | : | |
| | : | |
| | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE**
**GOVERNMENT'S OMNIBUS TRIAL MEMORANDUM AND SUPPLEMENTAL**
**SUBMISSION REGARDING MOTIONS *IN LIMINE***

PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391
*Attorneys for Ross Shapiro*

GREENBERG TRAURIG LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-9200
Facsimile:   (212) 801-6400
*Attorneys for Michael Gramins*

ALSTON & BIRD LLP
90 Park Avenue, 15th Floor
New York, NY 10016
Telephone: (212) 210-9400
Facsimile:  (212) 210-9444
*Attorneys for Tyler Peters*

# TABLE OF CONTENTS

**PAGE**

I.  The Government's Supplemental Submission Regarding Defendants' Motions *In Limine* Is Deficient, And Defendants' Motions *In Limine* Should Be Granted............ 1

 A.  Evidence of Defendants' Compensation Should Be Excluded..............................1

   1.  Motive ..................................................................................................................1

   2.  Hierarchy and Organizational Structure ......................................................3

   3.  Evidence of Alleged Conspiracy ...................................................................4

 B.  Evidence of the Identity of Passive Investors and the PPIP Program Should be Excluded .........................................................................................................................5

   1.  The Identity of Passive Investors Is Irrelevant to the Question of Whether Nomura's Counterparties Were Reasonable Investors ...............................5

   2.  The Identify of Passive Investors Is Not Probative of Materiality ..............7

II.  The Government's Proposed Summary Charts Should Be Precluded As Argumentative, Misleading, And Incomplete Characterizations Of The Evidence .... 9

III.  The Government's Proposal To Admit Exhibits Through Witnesses Who Cannot Authenticate The Documents Is Improper And Should Not Be Permitted.................17

IV.  The Skadden Report Is Admissible Impeachment Evidence Pursuant To Federal Rules Of Evidence 608(B) And 403......................................... 19

 A.  Background: The Skadden Report ....................................................................... 20

 B.  The Conduct Described in the Skadden Report is Probative of Mr. Harrison's Character for Truthfulness and His Credibility........................... 21

 C.  The Skadden Report Will Not Confuse the Issues for the Jury ...........................23

V.  There Is No Basis to Preclude Defense Counsel From Referring To Defendants' Personal Lives During Opening Statements Or Closing Arguments ........................ 24

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*,
    No. 04 Civ. 10014 (PKL), 2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009) ........................ 2

*L–3 Commc'ns Corp. v. OSI Sys.*,
    No. 02 Civ. 9144 (PAC), 2006 WL 988143 (S.D.N.Y. Apr. 13, 2006) ........................... 3

*United States v. Bakker*,
    925 F.2d 728 (4th Cir. 1991) ........................................................................................... 11

*United States v. Blum*,
    62 F.3d 63 (2d Cir. 1995)................................................................................................. 23

*United States v. Bray*,
    139 F.3d 1104 (6th Cir. 1998) ................................................................................. 12, 13

*United States v. Cedeno*,
    644 F.3d 79 (2d Cir. 2011)............................................................................................... 23

*United States v. Citron*,
    783 F.2d 307, 316 (2d Cir. 1986)............................................................................. 10, 11

*United States v. Drougas*,
    748 F.2d 8 (1st Cir. 1984)................................................................................................ 11

*United States v. Ferguson*,
    No. 3:06 Cr. 137 (CFD), 2007 WL 4240782 (D. Conn. Nov. 30, 2007)........................ 3, 5

*United States v. Harvey*,
    547 F.2d 720 (2d Cir. 1976)............................................................................................ 24

*United States v. Litvak*,
    No. 3:13-CR-19 (D. Conn. Feb. 20, 2014) ............................................................. *passim*

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015)............................................................................................. 8

*United States v. Logan*,
    250 F.3d 350 (6th Cir. 2001) ........................................................................................... 3

*United States v. Lopac*,
    411 F. Supp. 2d 350 (S.D.N.Y. 2006)............................................................................. 12

ii

*United States v. Nuey*,
　　No. 05-4684 Cr., 2007 WL 2807880 (2d Cir. 2007) ....................................... 12

*United States v. Quattrone*,
　　441 F.3d 153 (2d Cir. 2006).................................................................................. 3

*United States v. Stone*,
　　852 F. Supp. 2d 820 (E.D. Mich. 2012)............................................................... 9

*United States v. Taylor*,
　　210 F.3d 311 (5th Cir. 2000) ............................................................................. 11

*United States v. Weiss*,
　　914 F.2d 1514 (2d Cir. 1990).................................................................................. 3

*United States v. Yakobowicz*,
　　427 F.3d 144 (2d Cir. 2005)......................................................................... 11, 19

## RULES

Fed. R. Evid. 1006 ...................................................................................... *passim*

Fed. R. Evid. 106 ............................................................................................... 12

Fed. R. Evid. 608(b).......................................................................................22, 23

Defendants Ross Shapiro, Michael Gramins and Tyler Peters respectfully submit this memorandum of law in opposition to the government's omnibus trial memorandum.  *See* Dkt. 329 ("Gov't Tr. Mem.").[1]

## I.     THE GOVERNMENT'S SUPPLEMENTAL SUBMISSION REGARDING DEFENDANTS' MOTIONS *IN LIMINE* IS DEFICIENT, AND DEFENDANTS' MOTIONS *IN LIMINE* SHOULD BE GRANTED

### A.  Evidence of Defendants' Compensation Should Be Excluded

The government's proffer as to why it intends to offer evidence of defendants' annual compensation figures underscores the irrelevance and prejudicial nature of this evidence.  The government asserts that the admission of such evidence would help establish:  (i) defendants' motive, (ii) the hierarchy of Nomura's RMBS desk, and (iii) the existence of a conspiracy. However, the government's proffer fails to establish any *connection* between this evidence and these purported objectives.  Accordingly, this evidence should be precluded, not only because it is irrelevant, but also because it carries a significant risk of unduly prejudicing defendants by inflaming and distracting the jury.  *See, e.g., United States v. Litvak*, No. 3:13-CR-19 (D. Conn.), 12/6/2016 Hr'g Tr. at 42 (Judge Hall indicating her intent to preclude evidence of Litvak's compensation, stating, "there's no way you are introducing his W-2 unless you have drawn some *connection* between the information on the W-2 and the scheme at issue in this case.") (emphasis added).

#### 1.     *Motive*

The government proffers that certain junior RMBS traders and trading supervisor Jonathan Raiff will testify that defendants engaged in the alleged conduct for the purpose of

---

[1] The government's trial memorandum identifies seven "relevant issues" for the Court's consideration.  *See* Dkt. 329 at 1.  Defendants address six of these issues herein.  With respect to the last issue—references to the conduct and indictment of Jesse Litvak—defendants rely on Mr. Shapiro's prior briefing on this issue, submitted on March 29, 2017, in which Messrs. Gramins and Peters join.  *See* Dkt. 328 at 14-16.

increasing the profits of the RMBS desk, and, therefore, their own compensation, which was based in part on the desk's profits.  But this proffer, even if assumed true for present purposes, fails to support the government's argument that the ***amount*** of defendants' compensation is relevant evidence.  *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04 Civ. 10014 (PKL), 2009 WL 3111766, at *6-7 (S.D.N.Y. Sept. 28, 2009) (excluding information of defendants' compensation, other than the method of compensation, because any limited probative value outweighed by potential to bias jury under Rule 403).  Mr. Raiff's proffered testimony would permit the government to argue that defendants engaged in the alleged conduct for the purpose of increasing their compensation without the need to reference the *amount* of such compensation.  For this reason alone the government should be precluded from offering evidence of defendants' compensation figures.

Moreover, the government's claim that the proffered testimony would tend to show that defendants were motivated by profit to engage in alleged criminal conduct is baseless.  First, the revenue generated by the alleged conduct increased the desk's profits by no more than approximately 1%,[2] so any claim that defendants were motivated by the prospect of increasing the desk's overall profits defies common sense.  Second, there is no evidence as to what percentage, if any, of defendants' compensation is purportedly attributable to this 1% increase in the desk's profits.  Third, there were years in which the defendants received fixed, pre-determined compensation pursuant to employment contracts (as explained in defendants' memorandum supporting their motion *in limine* (Dkt. 161 at 4)) which controverts the claim that defendants' compensation was dependent, in any respect, on desk profitability during such years.

---

[2] The profits resulting from the alleged conduct relating to the 20 trades at issue in this case total approximately $3.85 million.  The profits of the RMBS desk in the relevant period totaled approximately $360 million, the vast bulk of which resulted from long-term "buying and holding" of RMBS securities. The defense intends to offer evidence of the foregoing, in part, to rebut the government's assertion that defendants were motivated by profit.

Given the government's inability to link defendants' total compensation figures to the allegedly unlawful profits associated with any of the charged trades, the government cannot establish that compensation is relevant proof of motive in this case, and, in any event, the unfair prejudice of such evidence far outweighs any minimal relevance that might be conjured.[3] *See United States v. Ferguson*, No. 3:06 Cr. 137 (CFD), 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007) (excluding evidence of defendant's salary and bonuses because they were "irrelevant to the charges against him" and permitting only evidence of deferred compensation plan with a direct causal link to scheme); *L-3 Commc'ns Corp. v. OSI Sys.*, No. 02 Civ. 9144 (PAC), 2006 WL 988143, at *6 (S.D.N.Y. Apr. 13, 2006) (granting motion *in limine* to exclude evidence of wealth and lifestyle because information was irrelevant and would be unfairly prejudicial under Rule 403).[4] Accordingly, evidence of the defendants' compensation cannot be admitted on this basis.

### 2. *Hierarchy and Organization Structure*

Concerning the hierarchy and relative seniority of members of Nomura's RMBS desk, introducing evidence of the defendants' annual compensation is an unduly prejudicial method by

---

[3] In *Litvak* the government presented evidence that the defendant's compensation was tied in a direct way to the profitability of his trading (*see* Trial Tr. at 1932-33, *United States v. Litvak*, No. 3:13-CR-19 (D. Conn. Feb. 20, 2014) (testimony that "5 to 12 percent" of the yearly profits attributable to Litvak's trades would be paid to him as a year-end bonus)), and yet Judge Hall still excluded compensation evidence. No such testimony can be elicited by the government in the present case because Nomura did not distribute bonuses or compensation according to any such profit-recognizing calculation.

[4] The cases cited by the government are inapposite. First, those cases stand only for the narrow proposition that, in certain specific circumstances where a defendant's income is directly correlated to the alleged crime, it may not be an abuse of discretion to admit evidence of compensation, despite the inherent prejudice. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (acknowledging that "evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations . . . [but we] cannot say that the district court acted so far outside the range of reasonable decision-making in admitting this evidence that it abused its discretion"); *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) (finding defendants' income relevant because they were "sole shareholders" of corporation that was selling fraudulent loans to the government, thus their total income "was necessarily dependent" on their misrepresentations regarding loan delinquencies); *United States v. Weiss*, 914 F.2d 1514, 1523-24 (2d Cir. 1990) (permitting evidence of income only because it was "relevant to the issue of credibility" after defendant had understated his salary during testimony and "sought to portray himself and his family as virtually indigent"). None of these cases support the government's overly broad contention that defendants' total compensation should be admitted simply because they could allegedly earn more money by committing fraud.

which to prove such a simple proposition.  First, defendants do not dispute the relative seniority

of the defendants versus other members of the RMBS desk (*i.e.*, that Mr. Shapiro oversaw the

RMBS desk or that Mr. Gramins and Mr. Peters were the next most senior traders beneath him).

The fact that the defense may seek to establish that other members of the trading desk, including

Alejandro Feely, were independent, autonomous, and routinely negotiated trades without direct

supervision, regardless of their relative seniority, does not entitle the government to introduce

evidence relating to compensation, as such evidence is not sufficiently probative of those issues.

Second, the government can readily establish the organizational hierarchy of the members of the

RMBS desk by other, less prejudicial, means than through compensation figures, such as

organizational charts, or testimony from Mr. Raiff or other members of the RMBS desk.  Third,

there is no basis for presuming, as the government does, that defendants' higher compensation

reflects their "greater culpability."  To the contrary, as noted above, substantially all of the desk's

profits were not derived from the alleged trading activity.[5]  Thus, the minimal relevance of

defendants' total compensation to issues of hierarchy and organizational reporting at Nomura is

far outweighed by its significant prejudice to the defendants.

### 3.   *Evidence of Alleged Conspiracy*

Finally, total compensation is an irrelevant and completely inappropriate method to

attempt to prove the alleged conspiracy.  The government proffers that "Jonathan Raiff will

testify that Ross Shapiro was the primary decision maker in determining how the bonus pool . . .

would be split" and that Shapiro "had significant control over the compensation."  Gov't Tr.

Mem. at 6.  Even accepting these statements as true for present purposes, such testimony does

not establish the relevance of the total compensation earned by defendants.

---

[5] Furthermore, the claim that the alleged trading activity yielded *any* increase in the desk's profits presumes defendants could not have achieved the same profits through different negotiation tactics.  We anticipate the evidence will refute this presumption.

In sum, nothing in the government's supplemental briefing remedies the government's inability to link defendants' total compensation to the charged trades, as described in defendants' motion *in limine*. *See Ferguson*, 2007 WL 4240782, at *1 (excluding evidence of defendant's salary and bonuses because "evidence of [defendant's] AIG salary and bonuses is not probative of [his] financial motives"). And, even if the government could establish such a link, the admission of total compensation figures with limited (if any) probative value would be unduly prejudicial – indeed, inflammatory. This evidence should accordingly be excluded.

**B. Evidence of the Identity of Passive Investors and the PPIP Program Should Be Excluded**

In its most recent submission, the government restates its intent to introduce evidence that identifies certain passive investors in the alleged victim institutions. Given that those passive investors include the Department of Treasury, pension funds, and charitable endowments, the Court stated at a September 2016 hearing that it saw "no reason to disclose the identities" of these investors, because "evidence of this nature could pose a risk of unfair prejudice in that it would suggest to the jury that members of the public were harmed." *See* 9/2/2016 Hr'g Tr. at 43-45. Because the government fails to proffer any substantive new evidence to support its position, the identity of such passive investors should be precluded.

**1. *The Identity of Passive Investors Is Irrelevant to the Question of Whether Nomura's Counterparties Were Reasonable Investors***

The government contends that the passive investors it wishes to identify at trial all constitute "highly sophisticated and exceedingly careful" entities, and that one could reasonably infer that such entities would only invest their money with a reasonable investor, like the victim institutions. Gov't Tr. Mem. at 8. This argument is specious. First, the government's conclusion that Nomura's counterparties were reasonable investors does not follow from its premise that some of them may have managed money for pension funds, charities, or

universities.  The sophistication of the passive investors sheds no light on whether individuals at the victim institutions, charged with making investment decisions, acted in accord with the standards of the reasonable investor.  Indeed, Bernard Madoff managed money for some of the country's leading financial, charitable, and educational institutions,[6] but one could not argue that the sophistication of such passive investors shows that Mr. Madoff was a reasonable investor.

Second, the fact that representatives from the passive investor entities are not on the government's witness list and will not testify as to any diligence conducted by the counterparties further underscores the weakness of the government's application.  There will be ample evidence from individuals employed at the victim institutions regarding their investment approach and the sophistication of their investment process.  By contrast, the identity of passive investors adds nothing to this assessment and is, in any event, confusing and prejudicial.

Third, even if the Court were to agree with the government that the sophistication of these passive investors is relevant to assessing whether the counterparties were reasonable investors, there is no reason to permit the government to elicit the explicit testimony that the passive investors included *pension funds, endowments, mutual funds, and government funds*.  The government could readily establish the sophistication of these passive investors by eliciting testimony that they included hedge funds, sovereign wealth funds, and insurance companies.  Noting that the passive investors included pension funds, endowments, mutual funds, and government funds carries an undue risk that jurors will improperly perceive their own interests as intertwined with those of the passive investors.  The government should not be permitted to elicit this type of inflammatory and irrelevant testimony.

---

[6] *Madoff's Victims*, WALL ST. J., Mar. 6, 2009, http://s.wsj.net/public/resources/documents/st_madoff_victims_20081215.html.

### 2.   *The Identity of Passive Investors Is Not Probative of Materiality*

The government also claims the identity of passive investors is probative of the materiality of the alleged misrepresentations because the identity of particular passive investors in a fund affected the behavior of Nomura's counterparties.  *See* Gov't Tr. Mem. at 8.  This argument is baseless.  For example, the government proffers that Putnam's representative and HIMCO's representative will testify that the identity of their clients affected their trading decisions.  *See* Gov't Tr. Mem. at 9.  From its brief, it is not clear whether the government is proffering that these witnesses will testify that the care they took in making an investment decision varied depending on the investor to whom their employers owed fiduciary duties.  If so, we doubt the soundness of the proffer.  Indeed, there is no reason why these witnesses cannot offer this testimony without specifying that their clients included *pension funds* or *charitable endowments*.  In any event, the negligible additional probative value of such testimony is heavily outweighed by the prejudicial, inflammatory nature of this extraneous information.

The government also repeats, *without* any new proffer of evidence, the arguments made in its July 2016 opposition brief that evidence of the PPIP program is probative of materiality with respect to Alliance Bernstein, a counterparty of Nomura's that managed a PPIF fund.  *See* Gov't Opp. (Dkt. 178); *see also* 10/26/2016 Hr'g Tr. at 84:8 (Court: "[W]ith the testimony concerning the PPIP program generally and how it bears on materiality, I'd like to see an indication of what you have in mind.").  For the reasons stated in defendants' prior submissions on this issue,[7] the government should not be permitted to elicit such testimony from the proposed Alliance Bernstein witnesses.

---

[7] *See* Def. Supp. Br. (Dkt. 252) at 1-5.

Notably, the government has failed to proffer any new evidence to show that the PPIP managers did anything differently with respect to PPIP funds as opposed to other investor funds in terms of (i) analyzing RMBS for investment and (ii) trading and investing in RMBS. *See* Trial Tr. at 606:1-7, *United States v. Litvak*, No. 3:13-CR-19 (D. Conn. Feb. 20, 2014) (testimony of Michael Canter that managing a PPIF "was different [from managing a private fund] just in terms of the amount of compliance rules and things like that, but the day-to-day functions are similar."). It was for these very reasons that the Second Circuit rejected the PPIP counts in the case against Jesse Litvak. *United States v. Litvak*, 808 F.3d 160, 172-74 (2d Cir. 2015). Absent a proffer of new evidence that the PPIP program changed the process by which PPIF managers made investment decisions, evidence of the PPIP program should be excluded as irrelevant, confusing, and prejudicial.

Nor does the government proffer any evidence, even with the benefit of a retrial in the *Litvak* matter (including repeat testimony by Mr. Canter), that Mr. Canter's concerns about a Treasury report he might have to file (upon learning of Mr. Litvak's misrepresentation to him) relate in any way to his *investment decision in that case*, let alone in this one. *See* Def. Supp. Br. (Dkt. 252 at 1-5). And, as this Court recognized, "[t]ypically we don't have that kind of testimony in a criminal case. That is that the person on the stand called the cops in some other situation involving somebody else." 10/26/2016 Tr. at 42:16-21. Accordingly, the proffered evidence concerning Mr. Canter's reaction to *Mr. Litvak* should be barred on grounds that it is irrelevant, unnecessary, confusing, and unduly prejudicial.[8]

---

[8] This is all the more so given that Mr. Canter did not file a Treasury report with respect to defendants' conduct here.

8

## II.    THE GOVERNMENT'S PROPOSED SUMMARY CHARTS SHOULD BE PRECLUDED AS ARGUMENTATIVE, MISLEADING, AND INCOMPLETE CHARACTERIZATIONS OF THE EVIDENCE

The charts the government intends to offer to "summarize" communications surrounding the trades at issue go far beyond the permissible bounds of Rule 1006 of the Federal Rules of Evidence.  Instead, the charts are an improper attempt to inject interim summations in documentary form into the government's case-in-chief and to secure a second summation after the jury has begun to deliberate.

The purpose of Rule 1006 is to permit the presentation at trial of a condensed version of records that otherwise are so voluminous that a summary chart "offers the only practicable means of making their contents available to judge and jury."  Fed. R. Evid. 1006, Advisory Committee Notes (1972).  Thus, "the case law is replete with numerous examples of Rule 1006 utilized to distill business records, tax records, phone records, or bank records" because "[t]his type of concrete, mathematical, objective information is capable of accurate presentation in chart or summary form."  *United States v. Stone*, 852 F. Supp. 2d 820, 828 (E.D. Mich. 2012).  But Rule 1006 does not provide, as the government would have it, an opportunity to pick and choose excerpts of documents that favor one party's case and present a highlight reel for the jury, complete with all favorable inferences drawn in the proponent's favor – all of that is for summation.  Furthermore, the government's proposed summary charts are also improper on grounds that they are misleading, incomplete, and mischaracterize the evidence.  Accordingly, the Court should not permit the government to admit the proposed charts as evidence during trial.

The government proposes to admit two types of summary charts to prove the content of various documents:  (1) a series of charts containing summaries of the relevant communications surrounding a trade at issue in order to highlight the "price-related statements in each of the chats

9

and other communications in the particular exhibit series" (Gov't Tr. Mem. at 15); and (2) "an overarching summary chart" containing identifying information for each trade at issue, matched with the government's view of the supporting evidence by exhibit number and the charged conduct (specific count or overt act) in the Indictment that the government will argue is proven by that evidence (Gov't Tr. Mem. at 17).  Neither of these types of charts should be admitted into evidence at trial.

The government's own description of its proposed charts makes clear that they do not fall within the confines of Rule 1006.  For example, the government wishes to introduce "individualized summary charts culling together the relevant statements for each subject trade." Gov't Tr. Mem. at 17.  This case turns, however, on what relevance the defendants and the alleged victims placed on statements during trade negotiations, and any "culling" by the government of statements it deems irrelevant would inevitably interject bias into a summary of the underlying communications.  In other words, the government's proposed charts will hand-pick portions of evidence that will already be before the jury in different forms, with the improper purpose of interjecting argument into what should be a typical and straightforward presentation of evidence.

The government's proposed charts are not designed to streamline the presentation of data for the jury, or even to eliminate the necessity of admitting certain evidence, as envisioned by Rule 1006.  Instead, they would provide a slanted, syllogistic map highlighting specific, cherry-picked portions of the relevant evidence in an argumentative format that underscores the government's theory of the case.  Such a misuse of Rule 1006 would be flatly improper.  "Courts have long required that district courts ascertain that summary charts 'fairly represent and summarize the evidence upon which they are based.'"  *United States v. Citron*, 783 F.2d 307,

10

316 (2d Cir. 1986).  "Care must be taken to insure that summaries accurately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved."  *United States v. Drougas*, 748 F.2d 8, 25 (1st Cir. 1984) (chart summarizing "telephone traffic" of over 100 calls properly admitted) (citing J. Weinstein and M. Berger, Weinstein's Evidence § 1006 [07] (1983)).  Unless the requirement of fairness in representation and summary is met, "the chart is more likely to confuse or mislead the jury than it is to assist it."  *Citron*, 783 F.2d 307.  This "necessary precondition" to the admission of a summary chart is particularly important when the chart is based upon the government's factual assumptions.  *United States v. Taylor*, 210 F.3d 311, 315-16 (5th Cir. 2000) (district court erred in admitting organizational chart that "did not accurately reflect the underlying testimony").

In this case, the government's proposed charts are, at most, "merely an aid to the fact-finder's understanding" of electronic chats that will already be admitted in full and extensively reviewed with other witnesses on direct examination, "not evidence itself." [9]  *United States v. Bakker*, 925 F.2d 728, 736 (4th Cir. 1991).  In other words, the government intends to use its charts to present interim summations in documentary form throughout its case-in-chief in order to argue to the jury the inferences they should draw from the chats and other communications about the defendants' intent during each trade.  This is plainly improper, and the Court should not permit it.  *See, e.g.*, *United States v. Yakobowicz*, 427 F.3d 144, 151 (2d Cir. 2005) ("any summation-like remarks by counsel during the presentation of evidence are improper and subject

---

[9] In fact, the government's proposed summary charts of each trade will not subtract from, but rather *add* to, the amount of information put before the jury, only the charts will be in the form of *argument*, rather than *evidence*.

11

as a routine matter to being stricken" and constitute "structural error requiring reversal"); *United States v. Nuey*, No. 05-4684 Cr., 2007 WL 2807880, at *1 (2d Cir. 2007) (finding that allowing the government to "compare the birth dates and social security numbers among the documents [in evidence] and . . . highlight[ing] both similarities and discrepancies" for the jury during trial constituted error that the Court does "not condone"); *see also United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) (warning that charts must be "nonprejudicial and presented in a "nonmisleading manner" because "a summary [chart] containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations").

Moreover, the government's proposed "summary charts" omit a wealth of relevant information contained in the underlying chat communications that strongly support the defense theory of the case.  The government proposes to summarize the information necessary to highlight only the alleged misrepresentations while omitting from these chats virtually the entire *context* surrounding the alleged misstatements, which bear on the legal element of materiality. Not only is this approach improper under Rule 1006 for the reasons stated above, but it also fails to comport with Federal Rule of Evidence 106, the "rule of completeness," because it effectively eliminates from the jury's consideration the portions of the communications that "in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  This attempt to present to the jury those portions of the electronic chats most favorable to the government's case in a summary fashion, as if the other portions of the chats did not exist, is inaccurate, misleading, and should not be countenanced.  *See United States v. Lopac*, 411 F. Supp. 2d 350, 368-69 (S.D.N.Y. 2006) (ordering new trial of defendant on the outer fringes of a conspiracy where a government

summary chart that the court characterized as the most important piece of evidence in the case was found to grossly overstate defendant's involvement, knowledge and intentions).

Furthermore, in addition to enabling impermissible mid-trial summation and the improper presentation of misleadingly incomplete portions of exhibits, the government's approach is also prejudicial because its proposed summaries inaccurately reflect even those portions of the chat communications they purport to summarize. *See Bray*, 139 F.3d at 1110 ("[A] summary document 'must be accurate and nonprejudicial,'" meaning that the "information on the document summarizes the information contained in the underlying documents accurately, correctly, and in a nonmisleading manner.  Nothing should be lost in the translation.") (citation omitted).

For example, the government identified Government Exhibit 28Z as a summary of two transactions that occurred on April 21, 2013: (1) Nomura's purchase of a bond known as BCAP 2012-RR12 4A2 from one counterparty, Putnam; and (2) Nomura's sale of that same bond to another counterparty, Arlington.  Zachary Harrison was trading on behalf of Putnam, and J.M. was trading on behalf of Arlington.[10]   Through the use of selective editing, the government's summary chart suggests that J.M. bid 65 for the bond at issue ("Think you get the bonds at 65 to me?").  The chart further suggests that, following J.M.'s alleged bid, he engaged in no further discussions with Nomura:

---

[10] Initials are used and excerpts of chats have been redacted herein, where an individual's full name does not already appear in the government's trial memorandum.

13

| TIME | SELLER<br>Harrison (Putnam) | PETERS / O'CALLAGHAN | | BUYER<br>J.M. (Arlington) |
|---|---|---|---|---|
| | | To Seller (Peters) | To Buyer (O'Callaghan) | |
| 14:47:28 | | | we now have 65-00 offer (to us) | |
| 14:50:26 | | | | Think you get the bonds at 65 to me? |
| 14:51:18 | | | yeah, I asked Tyler that, don't want to short it to you, but I think there's a good shot we can get him down a bit and print you there | |
| 15:54:14 | | I can pay you 64 on the BCAP | | |
| 15:54:34 | | might get a few ticks higher but I don't think 64-16 is in the cards right now | | |
| 15:56:01 | guy is 64+pot best? | | | |
| 15:57:33 | | has not said best | | |
| 15:57:51 | | but that's the bid to you right now | | |
| 15:59:39 | what is the vig? just so I can put my last offer on same terms. I wanna counter again | | | |
| 16:01:57 | | haven't discussed exactly how much. in the past this guy is usually 1/4-1/2 pt for re-remic mezz out of comp | | |
| 16:02:18 | doesn't matter I guess. lets assume 8 tics so my last offer was 64-24 to me, can show 64-16 to me | | | |
| 16:11:47 | | 64-04...think that is going to be best right now | | |
| 16:20:04 | I really do think this is cheaper than the 2 rere I have just sold but I won't let 12 tics get in the way. Ty for the work this lets print it | | | |
| 16:22:36 | | we buy @64-04 | | |
| 16:24:52 | | BUY AT 64-04 | | |
| 16:33:53 | | | SALE AT 65-04 | |

When one looks at the underlying chats, however, it becomes clear that the government has omitted important portions of the negotiation. Immediately after, J.M. questions whether he "can get the bonds at 65", the Nomura salesperson asked him to clarify his bid. J.M. never did so. Instead, there is a 22-minute gap in the conversation, after which J.M. says only that he is

"[s]tepping off for a coup[l]e minutes." Thus, the price at which he would agree to buy the

bonds was still unclear:

> Message: 04/10/2013 14:50:26          J.M.(ARLINGTON ASSET INVE)
> <          J.M.@Bloomberg.net>
>  Think you get the bonds at 65 to me?
>
> Message: 04/10/2013 14:51:18  CONOR O'CALLAGHAN (NOMURA SECURITIES IN)
> <COCALLAGHAN3@Bloomberg.net>
>
>
>  yeah, I asked Tyler that, don't want to short it to you, but I think there's a good shot we can
> get him down a bit and print to you there
>
> Message: 04/10/2013 14:55:14  CONOR O'CALLAGHAN (NOMURA SECURITIES IN)
> <COCALLAGHAN3@Bloomberg.net>
>  u want us to try that?
>
> Message: 04/10/2013 15:17:14          J.M.(ARLINGTON ASSET INVE)
> <          J.M.@Bloomberg.net>
>  Stepping off for a coupe minutes.

This critical portion of the exchange appears nowhere in the government's proposed

exhibit. Instead, the government carefully edited the chart to tell only the simple (and

inaccurate) story it wants to jury to believe: that Arlington bid 65 for the bond. In doing so, the

government omits the remainder of the conversation, in which Nomura questions whether

Arlington, in fact, was willing to pay that price. While the parties may argue about the

significance of that omitted exchange, the jury should not be presented with an exhibit that

summarily pretends it never happened.

Proposed Government Exhibit 23Z provides another example of the misleading nature of

the government's proposed charts. The government argues that the Government Exhibit 23

series demonstrates the necessity of piecing together six different exhibits related to the GSAA

2006-9 A2 bond transaction on January 19, 2012. *See* Gov. Tr. Mem. at 12-15 and n.5. In

connection with this trade, the evidence will show that Keri Anisgarten, the representative of the alleged victim counterparty Third Point, *herself* misrepresented her acquisition price in an earlier trade *to Nomura* at the outset of the negotiations with salesperson Conor O'Callaghan.  In GX 23C (a 24-page chat between O'Callaghan and Anisgarten), Anisgarten represents that she previously paid "38-00 to us" for the bond and adds the following rhetorical flair, "So 37 and change and then paid the guy."  In fact, the evidence will show that Third Point previously purchased the bond at 39-12.  The government's proposed summary chart (GX 23Z) misleadingly omits a substantial portion of this exchange.  Similarly, in GX 23D (a 10-page chat between O'Callaghan and defendant Tyler Peters), Mr. Peters notes that he has learned that the bond actually traded near 39 and remarks to Mr. O'Callaghan that Ms. Anisgarten is lying to Nomura. Again, the government omits this exchange from its proposed summary chart.  In sum, GX 23Z skips over approximately 21 minutes of relevant conversation, selectively highlights portions of the conversation that are favorable to the government's case, and omits sections that are relevant to the defense.

The examples above merely provide but two instances of the bias inherent in all of the government's proposed summary charts.  The charts omit many statements that would bolster the defense case at trial, and, importantly, do not even indicate where a substantial number of statements have been omitted.  This is akin to a party splicing together excerpts of a witness' past sworn statements and offering them as an accurate summary of his testimony.  The charts are inherently biased, misleading, incomplete, and outside the bounds of what Rule 1006 permits.

### III.  THE GOVERNMENT'S PROPOSAL TO ADMIT EXHIBITS THROUGH WITNESSES WHO CANNOT AUTHENTICATE THE DOCUMENTS IS IMPROPER AND SHOULD NOT BE PERMITTED

The government also seeks to inject argument into the presentation of its testimonial and documentary evidence by proposing that it be permitted to offer "relevant exhibits" into evidence during the testimony of witnesses who have no personal knowledge of the contents of the exhibits in order to elicit the witnesses' "reaction" to those documents. *See* Gov't Tr. Mem. at 26. This is plainly improper and should not be permitted.[11]

The government explains that it would like to use this technique to ask a counterparty victim-witness about his or her "reaction" to the contents of a communication in which he or she was not a participant and of which he or she had no contemporaneous knowledge. *See* Gov't Tr. Mem. at 25-26. Such a question would be highly objectionable under Rule 602 of the Federal Rules of Evidence and should not be permitted by the Court, as it will effectively present the counterparty witness with an improper hypothetical – *e.g.*, "If you had known this information at the time, what would your reaction have been?" – and can only result in an answer that is based on speculation. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

In addition, as will be well established through witness testimony at trial, the Nomura traders acted in the capacity of a principal and were under no obligation to reveal the substance of their negotiations with a counterparty on one side of a particular trade with Nomura (*e.g.*, a sale) to a counterparty negotiating a separate trade with Nomura (*e.g.*, a purchase). Thus,

---

[11] The defendants do not necessarily object to the government's proposal that the parties agree upon the authenticity of all or most of the parties' exhibits prior to trial, but do object to the government's use of those "pre-authenticated" exhibits with witnesses who could not themselves provide a proper foundation to authenticate the exhibits.

questioning a purchasing counterparty witness about his or her reaction to negotiations between Nomura and a selling counterparty in connection with a particular trade misleadingly suggests to the jury that the purchasing counterparty had a right to obtain such information.  This is wrong factually.

Take, for example, the circumstance where Nomura represented to a counterparty interested in purchasing an RMBS from Nomura that a counterparty interested in selling the same RMBS to Nomura was offering a bond at 62 when, in fact, the offer was 60.  The government assumes, incorrectly, that Nomura was obligated to reveal the actual price – 60 – at which the selling counterparty was offering the bond under the theory that once Nomura spoke it had a duty to speak truthfully.  But even if Nomura had a duty to speak truthfully – which the defense submits is *not* the case with respect to immaterial statements made during trade *negotiations* – Nomura could have truthfully stated that it was *Nomura* (not the selling counterparty) who was offering the bond to the purchasing counterparty at 62, without revealing anything about the price at which Nomura could obtain the bond from the selling counterparty. Indeed, the evidence will show that this is how Nomura often negotiated trades.  Thus, to permit the government to ask a third party hypothetical questions about a transaction in which it did not participate could potentially be very confusing to the jury.

The government's proposal is – like its proposed use of summary charts – another improper attempt to argue to the jury the merits of its case prior to summation.  The government seeks to put before witnesses documents about which the witnesses have no personal knowledge, with the goal of eliciting "reactions" that are purely speculative, unsupported by the evidence, all to unfairly prejudice the jury against the defendants.  The proper moment to juxtapose two transactions, as the government seeks to do, and to present what is in essence an argument about

the inference to be drawn from that evidence, is during summation.  At that point, the defense will have the opportunity to present its own analysis of the evidence and to argue to the jury that they should reject the inference proposed by the government.  To allow the government essentially to argue to the jury during its case-in-chief, as it is proposing, would upend the normal and proper structure of a criminal trial, grossly prejudicing the defendants and compromising the integrity of the jury's verdict.  *See Yakobowicz*, 427 F.3d at 150 (noting that "[t]he traditional order of events at a criminal trial . . . has numerous purposes" including "to enable juries to avoid forming opinions before the close of evidence and deliberations," and "[t]hose goals require that a distinction between evidence and argument be observed until summations").

## IV.   THE SKADDEN REPORT IS ADMISSIBLE IMPEACHMENT EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 608(B) AND 403

Putnam Investments was Nomura's counterparty in 11 of the 20 RMBS transactions the government intends to prove at trial.  For each of those transactions, a single trader – Zachary Harrison – acted as Putnam's representative.  As to the trades at issue, Mr. Harrison is the only Putnam employee to have communicated with the defendants, and Mr. Harrison is the only current or former Putnam employee whose name appears on the government's witness list.  As the government has chosen to make Mr. Harrison the centerpiece of its case, it is hardly surprising that the government would like to shield Mr. Harrison from effective cross-examination.

To that end, the government's motion seeks to prevent the use on Mr. Harrison's cross-examination of a report prepared at Putnam's direction by its outside counsel, Skadden, Arps,

Slate, Meagher & Flom LLP ("Skadden") dated January 20, 2017 (the "Skadden Report"). [12]

That report makes plain that Mr. Harrison himself was investigated for – and ultimately

terminated for – violating the federal securities laws and Putnam's own policies.  The

government's application to preclude the use of the Skadden Report finds no basis in the law,

and would result in unfair prejudice to the defense.  It is beyond question that the defense has the

right to cross-examine Mr. Harrison and to impeach his credibility.  The Skadden Report

qualifies as proper material for cross-examination; the Court should disregard the government's

attempt to win special protection for this particular witness.[13]

### A.  Background: The Skadden Report

Paradoxically, given the government's argument, the Skadden Report has its genesis in

Mr. Harrison's own concerns about the possible cross-examination topics he would face at the

trial of this matter.  In January 2016, Putnam engaged Skadden in connection with subpoenas the

defendants served on Putnam, both in connection with this matter and a related civil action.  The

Skadden Report explains that Putnam's in-house counsel met with Mr. Harrison on several

occasions to discuss the subpoenas and, at one of those meetings, Mr. Harrison confessed to

having engaged in improper trading practices.  As detailed in the report—

> when the time seemed to be approaching for Harrison's likely testimony and
> potential cross-examination by the Nomura Defendants, Harrison disclosed that,
> when selling odd lots for liquidity purposes, he had arranged to use code words
> with brokers in order to signal that they should expect that Harrison would "have
> a good offer for them" to repurchase the securities the next day.

---

[12] In the alternative, the government asks the Court to force the defendants to preview any cross-examination of Mr. Harrison that would rely on the Skadden Report.  Notably, this is the only witness for whom the government has demanded advance notice of possible topics of cross-examination.

[13] The government's efforts to prevent the discovery and use of materials that may be used against Mr. Harrison are not new.  Indeed, the government recently opposed a defense application for a subpoena that sought materials related to "false color" in connection with BWICs that the defense believes Mr. Harrison spread in order to negotiate higher prices in subsequent transactions.  That same application sought a subpoena that requested materials related to possible improper trading tactics engaged in by another government witness, which the government did not oppose.

Skadden Report, at 10.

After Mr. Harrison admitted to this conduct, a practice commonly known as "pre-arranged trading" or "parking", "Putnam terminated Harrison 'for cause' and advised him to retain his own counsel to represent him in connection with the Nomura Actions."[14]  *Id.* at 11. Further, Putnam directed Skadden to commence an internal investigation of Putnam's trading practices to determine to what extent Mr. Harrison and other Putnam traders had engaged in these improper trading practices.  *Id.*

The Skadden Report contains the conclusions Skadden reached as a result of that investigation.  Among other things, the Skadden Report concludes that in some circumstances Mr. Harrison used code words to prearrange bond trades or "park" bonds; in other circumstances where Mr. Harrison did not use code words, other factors led Skadden to conclude that, "given his practice of prearranging trades, these trades also constitute prearrangement."  *Id.* at 46.

### B.  The Conduct Described in the Skadden Report is Probative of Mr. Harrison's Character for Truthfulness and His Credibility

In its memorandum, the government contends that the Skadden Report does "not bear on Harrison's truthfulness or any other proper impeachment purpose . . . ."  Gov't Tr. Mem. at 27. The Skadden Report falls within the category of proper impeachment material, however, because it memorializes a number of facts probative of Mr. Harrison's truthfulness and, more generally, his credibility as a witness in this matter.

First, the Skadden Report reflects that Mr. Harrison lied to investigators when first confronted with allegations of his misconduct.  In January 2016, an anonymous Putnam employee contacted the "Putnam Ombudsman" and alleged that Mr. Harrison "had been selling

---

[14] The government states that Mr. Harrison "recently separated from Putnam," a rather rose-colored way to describe the termination of an employee for cause under circumstances that required an extensive internal investigation.  Id. at 26.

mortgage bonds to brokers and promising the brokers that they would repurchase the bonds the next day at a higher price . . . ." Skadden Report, at 5. When confronted, Mr. Harrison "denied the allegations, saying . . . he never prearranged trades." *Id.* at 6. Of course, only five months later, Mr. Harrison admitted to Putnam's in-house counsel that he had, in fact, used code words to prearrange trades with brokers. *Id.* at 10. And the Skadden Report makes it clear that Mr. Harrison only confessed to engaging in this conduct in May 2016 because he anticipated the conduct might come to light on cross-examination. *Id.* Therefore, Mr. Harrison's prior misstatements about his misconduct belie the government's contention that "Mr. Harrison was the only [Putnam] trader who disclosed truthfully that he had understandings with broker-dealers that he would repurchase the bond the following day at the price he sold the bond for plus some small mark-up." Gov't Tr. Mem. at 27. Mr. Harrison lied and was belatedly truthful.

Furthermore, Mr. Harrison's misstatements about his improper trading practice did not end with his May 2016 admission of misconduct. A memorandum that the government produced to the defense reflects that, on October 27, 2016, Mr. Harrison told the government that he "never had a prearranged agreement with anyone to buy bonds back after selling them." This, too, is false, and is directly contradicted by the Skadden Report.[15]

The Skadden Report falls squarely into the category of proper impeachment evidence under the Federal Rule of Evidence. Rule 608(b) provides that, while specific instances of a witness's conduct may not be proved by extrinsic evidence, they may be addressed on cross-examination if those instances are probative of the witness's character for truthfulness or untruthfulness. Fed. R. Evid. 608(b)(1). The Skadden Report both memorializes Mr. Harrison's false statement to his employer – his initial denials of misconduct – and summarizes an

---

[15] The defense believes that the government did not possess the Skadden Report at the time it elicited Mr. Harrison's statements on the conduct that precipitated his termination from Putnam, including his stated denial that he prearranged trials.

investigation that contradicts those false statements.  This is clearly probative of Mr. Harrison's "character for truthfulness," and therefore within the broad bounds of proper cross-examination under Rule 608.  *See United States v. Cedeno*, 644 F.3d 79, 82 (2d Cir. 2011) ("While a district court may impose 'reasonable limits' . . . it must also give 'wide latitude' to a defendant in a criminal case to cross-examine government witnesses").

<u>Second</u>, the Skadden Report would undercut the credibility of any testimony that Mr. Harrison would offer regarding the materiality of the defendants' alleged misstatements.  At core, the government asserts that defendants' alleged misstatements caused counterparties – including Putnam – to buy bonds at prices higher than that which they would have otherwise bought, and to sell bonds at prices below that at which they otherwise sold.  The statements were material, the government suggests, because counterparties – including Putnam – always acted in a manner to maximize value for their investors.  The Skadden Report casts doubt on that notion, concluding that Mr. Harrison knowingly and willingly engaged in conduct that may have caused internal funds at Putnam to pay an additional amount of approximately $830,000 to repurchase bonds– hardly the actions of someone for whom maximizing value was priority number one.  *Id.* at 2, 42.  The defense should be permitted to cross-examine Mr. Harrison regarding this matter which is central to the issue of the materiality of the defendants' alleged misstatements.

### C.  <u>The Skadden Report Will Not Confuse the Issues for the Jury</u>

The government suggests that "[t]he highly technical nature of the information in the Skadden Report would likely confuse the issues for the jury."  Gov't Tr. Mem. at 28.  This claim is unfounded.  The findings set forth in the Skadden Report certainly are no more confusing or complicated than the plethora of complex, highly technical evidence that the jury will inevitably be presented with at trial.  *See United States v. Blum*, 62 F.3d 63, 68 (2d Cir. 1995) (holding that

23

the district court abused its discretion where it excluded evidence central to defense theory on basis it would confuse jury, noting "given the importance of the testimony to the defense, whatever confusion that may have resulted from its admission would have to have been overwhelming to satisfy Rule 403's balancing test") (quoting *United States v. Harvey*, 547 F.2d 720, 723 (2d Cir. 1976)) (internal quotation marks omitted).

## V.     THERE IS NO BASIS TO PRECLUDE DEFENSE COUNSEL FROM REFERRING TO DEFENDANTS' PERSONAL LIVES DURING OPENING STATEMENTS OR CLOSING ARGUMENTS

Without any legal support, the government makes the novel request that "no references to defendants' personal lives should be made during any jury addresses."  Gov't Trial Memo. at 29. This is a flagrant effort to constrain defendants from defending themselves by providing proper background and context to the jury, and to prevent defendants from outlining the facts and rebutting the government's evidence at trial.  This request is contrary to commonly accepted trial practice, is unsupported by legal authority, and should be rejected.

"[C]ounsel is accorded broad latitude in opening statements."  2 Lane Goldstein Trial Technique § 10:5 n.12 (collecting cases); *see also* Michael Walsh, *Prosecutor's Reference in Opening Statement to Matters Not Provable or Which He Does Not Attempt To Prove as Ground for Relief*, 16 A.L.R.4th 810 ("Although the right to make an opening statement is subject to the control of the court, which in its discretion may properly limit its scope, traditionally much latitude has been allowed counsel in that regard.").  During openings, parties are typically permitted to refer to any relevant evidence that is likely to be admitted during the trial. Providing basic education, employment, household and background information in introducing criminal defendants to a jury is not only typical in federal and state courts, but is among the most fundamental trial techniques used to present individuals accused of crimes as human beings who

make decisions based on their individual experiences.  In closing argument, defense counsel is permitted – indeed is required – to answer statements made in the government's case, point out defects in the credibility of the government's witnesses, and sum up the facts favorable to his or her client.

In this case, intent is an element of all the offenses charged, and the jury will be asked to evaluate the reasons for the decisions made by each defendant.  Indeed, the government has already announced its intention to argue that greed and the desire to increase their compensation motivated defendants' conduct.  But it would be misguided for the jury to hear only the government's view of this case, *i.e.*, that defendants' entire lives consisted of going to work, motivated by greed, and committing crimes.  That is false.  It would be equally misleading to allow the government to introduce evidence of defendants' personal backgrounds, including education, employment and financial means, to advance its case, but to deny defendants the opportunity to rebut such arguments with background and context of the defendants' lives.  Allowing only the government to choose what background and experience of the defendants can be considered by the jury will present a one-sided, obscured lens through which to evaluate intent.

In addition, witness statements provided by the government in discovery suggest that certain of the government's counterparty witnesses may testify that they "trusted" the defendants based on, among other things, their social interaction with defendants.  And the government's cooperating witnesses – former Nomura employees – will likely testify that they felt required to "obey" the defendants' trading instructions or risk losing their jobs.  In light of this anticipated testimony, background and context for the relationships between these witnesses and the

defendants, including the witnesses' knowledge of, and involvement in, defendants' personal lives,[16] is particularly relevant and necessary to test their credibility regarding these allegations.

The defense does not intend to reference background information in order appeal to the sympathy of jurors or make prejudicial or inflammatory remarks.  Rather, we intend to use it to help the jury test the credibility of the government's evidence by allowing jurors to understand the context within which the events at issue took place.  This context is all the more important given that the defendants' intent is an element of the crimes charged.  Accordingly, the government's request should be denied, and the defendants should be permitted to present relevant personal information, as courts routinely allow.

For these reasons, defendants respectfully submit that (i) the government's supplemental submission regarding defendants' motions *in limine* is deficient, and defendants' motions *in limine* should be granted; (ii) the government's proposed summary charts should be precluded; (iii) the government should not be permitted to admit exhibits through witnesses who lack personal knowledge of the contents; (iv) government's application to preclude the use of the Skadden Report should be denied; and (v) the defense should be permitted to refer to defendants' personal lives when addressing the jury.

---

[16] Moreover, proposed exhibits **on the Government's Exhibit List** include information about defendants' personal lives, which the government apparently seeks to introduce into evidence.  *See, e.g.*, GX 29F (proposed government witness Harrison Choi discusses Michael Gramins' upcoming Thanksgiving plans with his wife).

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By:  /s/ Guy Petrillo
Guy Petrillo (CT19924)
Joshua Klein (PHV07748)
Amy Lester (PHV08919)
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile:  (212) 370-0391
gpetrillo@pkbllp.com
*Attorneys for Ross Shapiro*

GREENBERG TRAURIG LLP

By:  /s/ Marc L. Mukasey
Marc L. Mukasey (PHV07694)
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

ALSTON & BIRD LLP

By:  /s/ Brett D. Jaffe
Brett D. Jaffe (PHV07701)
Michael Brown (PHV08372)
Joseph G. Tully (PHV07702)
90 Park Avenue, 15th Floor
New York, NY 10016
Telephone: (212) 210-9400
Facsimile:  (212) 210-9444
Brett.Jaffe@alston.com
*Attorneys for Tyler Peters*

27

By: /s/ Alex Spiro
Alex Spiro, Esq. (PHV08071)
Brafman & Associates, P.C.
767 Third Avenue, 26th Floor
New York, NY 10017
Tel: (212) 750-7800
Fax: (617) 755-4555
aspiro@braflaw.com
*Attorney for Tyler Peters*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2017, a copy of foregoing Defendants' Memorandum of Law in Opposition to the Government's Omnibus Trial Memorandum and Supplemental Submission Regarding Motions *In Limine* was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
      April 6, 2017

/s/ Leonid Sandlar
Leonid Sandlar (PHV07700)
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391
lsandlar@pkbllp.com
