# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:15CR155 (RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO, | : | |
| MICHAEL GRAMINS, and | : | |
| TYLER PETERS | : | April 6, 2017 |

**GOVERNMENT'S OPPOSITION TO DEFENDANT SHAPIRO'S MOTION TO STRIKE SURPLUSAGE, OR, ALTERNATIVELY, ADMIT EVIDENCE RELATING TO NOMURA'S INTERNAL REVIEW, AND PRECLUDE EVIDENCE OR MENTION OF JESSE LITVAK'S INDICTMENT**

The Government respectfully submits this memorandum in opposition to defendant Ross Shapiro's motion to strike surplusage or, in the alterative, to admit evidence of Nomura personnel decisions, and to preclude reference to the indictment of Jesse Litvak [Dkt. #328]. Shapiro's motion should be denied. First, the challenged overt acts are in furtherance of the alleged conspiracy and any references to Shapiro are entirely relevant to an element of the charged crime. Shapiro's claim that he was not a knowing participant in the act or the conspiracy at the time of the overt acts must be left to the jury at trial. Second, evidence of Nomura's after-the-fact personnel decision to suspend the defendants and to fire Peters and Gramins cannot bear on intent and knowledge, which is measured at the time the defendants committed the crimes alleged. Conversely, evidence of Nomura's compliance policies that were transmitted to the defendants during the period of the crimes, and thus bear directly on knowledge, is quintessentially relevant. Finally, evidence of the *Litvak* indictment is relevant proof of the two principal issues in this case—intent and materiality.

I.      **REFERENCES TO SHAPIRO IN OVERT ACTS "u." AND "x." ARE PROPER**

Shapiro's first claim, that the Court should strike reference to him in two overt acts related to a November 22, 2013 fraudulent trade, is a challenge to the Government's evidence that can only be resolved by the jury at trial.  As alleged and according to the Government's theory of this case, Shapiro participated in and/or undertook these overt acts in furtherance of the conspiracy to defraud Nomura's customers and with the knowledge that his acts were wrongful.  As a result, the references to Shapiro in these counts are relevant to the crimes charged and cannot be surplusage.

A.      **Background**

On March 6, 2017, a grand jury sitting in New Haven returned a third superseding indictment (hereinafter the "Indictment").  The current version of the Indictment is, for present purposes, substantially similar to earlier iterations—it charges defendants Shapiro, Gramins, and Peters with conspiracy to commit wire and securities fraud (Count One), substantive securities fraud (Counts 2-3), and substantive wire fraud (Counts 4-9).   All three defendants are charged, with participating in the conspiracy "[b]eginning in approximately 2009 and continuing through approximately 2013, the exact dates being unknown to the Grand Jury . . .," without distinction as to the period of their respective participations.  Ind. ¶ 32.  The Indictment alleges that "SHAPIRO oversaw all of Nomura's trading in [RMBS]" at all times relevant to the Indictment, Ind. ¶ 1; that all three defendants made material misrepresentations to customers, *id*. ¶ 34; and that the defendants (including Shapiro) trained members of the RMBS desk in their fraudulent trading practices, *id*.  The Indictment does not distinguish between the time before and after the *Litvak* indictment.  Rather, it charges all defendants with knowing participation in the conspiracy for the entire period.

The Indictment further alleges that the "defendants and others" committed and caused others to commit at least one of 25 listed overt acts "in furtherance of the conspiracy and to

accomplish its purposes and objects." *Id*. ¶ 35. The listed overt acts, labeled "a" through "x," include both acts that are in themselves misrepresentations, as well as acts that may be innocent in themselves but are in furtherance of the criminal objectives of the conspiracy. Although Shapiro was the desk supervisor, he also participated in trades, and in some cases is specifically referenced as being present in a fraudulent trade and/or making the misrepresentation identified in the overt acts. The Indictment alleges 7 overt acts in which Shapiro participated, *id*. ¶¶ 35 a, d, e, g, n, u, x, one of which alleges that Shapiro himself made the misrepresentation, *id*. ¶ 35g (in a chat with a bond seller, "SHAPIRO misrepresented about a third-party buyer, 'they aren't going to pay >85,' when, in fact, the buyer had already told SHAPIRO 'happy to get to 87.'").

Additionally, the Government has given notice of 20 fraudulent trades that will be proven at trial with documentary evidence, out of a total of approximately 180 fraudulent trades that have been identified. Some of those trades are the source for the aforementioned overt acts. Of the 20 noticed trades, five show Shapiro himself making misrepresentations to one or both sides of the trade: Exhibit 14 (Shapiro and Peters lie to bond buyer); Exhibit 15 (Shapiro and Peters lie to bond buyer); Exhibit 19 (Shapiro lies to the bond seller); Exhibit 20 (Shapiro lies to both sides of the transaction); and Exhibit 21 (Shapiro lies to both sides of the transaction). In many of the other exhibits, the evidence will show that Shapiro was present in the chat room during the time of the misrepresentation, reviewed the chat transcript, made trade-related comments around the time of the chat, or received copies of the chat from other Nomura traders. *See*, *e.g.*, Exhibit 10 (contemporaneous trade-related comments in chat with the seller); Exhibit 11 (received e-mail from Gramins with cut-and-pasted chat containing misrepresentations); Exhibit 12 (present in chat room during the time of the misrepresentation, and on e-mail showing actual purchase price from seller); Exhibit 13 (present in one of the chats containing misrepresentations); Exhibit 25 (reviewed

and/or was present for both sides of trade); Exhibit 29 (present in chat during misrepresentation, makes trade-related comments after agreement, but before sell ticket).

Exhibit 29 (and subparts) memorializes a trade from November 22, 2013 that Nomura facilitated between seller TCW (trader Harrison Choi) and buyer QVT (trader Joel Wollman). There are exhibits showing (1) both phone calls and chats between Gramins and Choi in which Gramins lied to Choi about Wollman's bid; (2) a phone call between Gramins and co-conspirator salesperson Michael Romanelli, in which they strategize how to lie to Wollman about TCW's offer; and (3) chats between Gramins, Shapiro, and Wollman (among others), in which Gramins lies to Wollman about Choi's offer.  In the latter category, Shapiro is in the chat rooms for the entirety of the relevant conversations, but does not speak specifically about the trade until Wollman is reluctantly agreeing to bid over 80, at which point Shapiro claims that he does not know the bond they are discussing, but that "80 is just a # . . . cash flows baby."  Overt act "u" constitutes Gramins's misrepresentation of the seller's offer to Wollman, with Shapiro in the chat room; overt act "x" constitutes Shapiro's statement "80 is just a #."  The latter event occurs directly after Wollman agreed to pay 80-16 based on Gramins's misrepresentations but, critically, before the sale ticket issued and long before the transaction settled (typically three days later).

### B.     Legal Standard

#### 1.     Conspiracy Law

It is well-settled that "[t]he elements of a conspiracy under § 371 are (1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an 'overt act' by one or more members of the conspiracy in furtherance of the conspiracy." *United States v. Allen*, 788 F.3d 61, 70 (2d Cir. 2015) (internal citations and quotations omitted).  It is not necessary that each party to such an agreement "knew every other member or was aware of all acts

committed in furtherance of it.  It is sufficient to show that he participated in what he knew to be a collective venture meeting the allegations of the indictment." *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980).

        2.      Surplusage

Rule 7(d) of the Federal Rules of Criminal Procedure provides that "[t]he court on motion of the defendant may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). However, motions to strike surplusage are held to an "exacting standard." *United States v. Scarps*, 913 F.2d 993, 1013 (2d Cir. 1990) (citing 1 Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 127 at 426 (ed. 1982)).  "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged *and* are inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001) (emphasis added); *see also United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990); *United States v. Courtney*, 257 F.2d 944, 947 (2d Cir. 1958).  "Evidence that is admissible and relevant to the charge may not be stricken [from an indictment], no matter how prejudicial it may be." *United States v. Josephberg*, 418 F. Supp. 2d 297, 301-02 (S.D.N.Y. 2005). "To prevail on the motion, then, the defendant[] must prove both that (1) the challenged language is not relevant to the crime charged, and also (2) that the terms are inflammatory and prejudicial; the language should not be struck only because it is inflammatory and/or prejudicial." *United States v. Ferguson*, 478 F. Supp. 2d 220, 235 (D. Conn. 2007). Generally, "words and phrases connoting illegal activity" are relevant and not overly prejudicial.  *United States v. Hsia*, 24 F. Supp. 2d 14, 24-27 (D. D.C. 1998); *see also United States v. Sciandra*, 529 F. Supp. 320, 322 (S.D.N.Y. 1982); *United States v. Gressett*, 773 F.Supp. 270, 275 (D. Kan. 1991).  Likewise, district courts within this circuit have interpreted relevance to include language that explains the crimes charged. *See, e.g., United States v. Stein*, 429 F. Supp. 2d 633, 647 (S.D.N.Y. 2006) (refusing to strike the terms "tax haven,"

"phony," and "concoct" from the indictment and holding that "[w]hile defendants doubtless wish that the government had employed less colorful and prejudicial language, these terms are relevant to the conspiracy of which they stand accused").

Regarding overt acts specifically, "[a] trial judge may strike irrelevant portions of an indictment, including overt acts from a conspiracy count." *United States v. Montour*, 944 F.2d 1019, 1026 (2d Cir. 1991). However, "[i]f an act is relevant to the alleged conspiracy when viewed in light of all the evidence, it should not be stricken." *Id.* Indeed, "subsequent events may show relevance of prior conduct to conspiracy." *Id.* at 1026-27. So long as "the jury could find that [the alleged] conduct was probative of the conspiracy and [the defendant]'s role in it," the overt act is not surplusage, even if the defendant has a different interpretation of the act. *Id.* at 1027. "The Government may broadly allege that which it intends to prove and that which, under applicable principles of law[,] it may prove. … If the allegation is of matters by which the Government hopes to establish the charge, then such allegations can scarcely be called 'surplusage.'" *United States v. DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978).

"[A]n overt act performed in order to effect the object of a conspiracy may be perfectly innocent in itself." *United States v. Donahue*, 539 F.2d 1131, 1136 (8th Cir. 1976). "The function of the overt act in a conspiracy prosecution is simply to manifest that the conspiracy is at work, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence." *Yates v. United States*, 354 U.S. 298, 334 (1957), *overruled on other grounds by Burks v. United* States, 437 U.S. 1 (1978) (internal citation omitted). Indeed, the "factual predicate and overt acts alleged in indictment need not constitute criminal conduct; [the] function of the overt act in a conspiracy prosecution is simply to manifest that the conspiracy is at work." *United States v. Brody*, 808 F.2d 944, 945 n.1 (2d Cir. 1986) (quotation marks and citation

- 6 -

omitted).   Simply put, "an overt act need not be inherently criminal to support a conspiracy conviction."  *United States v. Montour*, 944 F.2d 1019, 1026 (2d Cir. 1991).

    **C.**    **Discussion**

    Here, references to Shapiro in overt acts u and x are factually accurate and entirely proper in the context of the Indictment.  The Indictment charges that from 2009 through 2013, Shapiro, Gramins and Peters were part of a conspiracy—that is, they had an agreement as a group to defraud their clients by using deceit to convince those clients to pay higher prices or sell at lower prices.  Most of the overt acts alleged in the Indictment are, on their face, bad acts—asserting misrepresentations of price, discussions of lies and talk about not getting "caught."  However, consistent with the case law involving conspiracy, certain overt acts are facially neutral—actions that do not seem criminal in and of themselves but, when taken as part of the evidence of the conspiracy, "manifest that the conspiracy is at work."  *See Brody*, 808 F.2d at 945 n.1.   These include the marketing e-mails in overt acts b, j and m, sent to advertise Nomura's trading services and connection to particular bonds; overt act c, in which defendant Gramins states that he was "purely looking to broker" a deal between a buyer and a seller; and overt act x, in which Shapiro attempts to ease the mind of QVT's representative (Wollman) by telling him the price he had just agreed to pay for a bond was "just a #!"

    Shapiro's statement in overt act x is clearly related to the crime charged—it is designed to convince QVT that 80 is an acceptable price to pay for the bond.  Moreover, it uses no inflammatory or prejudicial language.  Indeed, it simply quotes Shapiro's own words.  The defendant argues that the trade was consummated by the time of Shapiro's statement and, accordingly, his statement cannot be in furtherance of the conspiracy.  However, this is both legally and factually wrong.  Lulling statements that post-date a fraudulent transaction can be acts in furtherance of a conspiracy.  *See United States v. Rubin*, 609 F.2d 51, 66 (2d Cir. 1979) (holding

overt acts may include post-transaction lulling statements).  Factually, the evidence at trial will show that: (1) the trade confirmation ticket had not yet issued by the time Shapiro made the comment; and (2) the trades are not fully consummated until they "settle," usually three days after the confirmation ticket is sent.  At any rate, whether the overt act is in furtherance of the conspiracy is clearly a jury question.  Shapiro's cite to *United States v. Lieberman*, 637 F.2d 95, 102-103 (2d Cir. 1980), is unavailing not only because Shapiro's lulling statement was not "idle chatter," but also because it concerned whether a hearsay statement was admissible under the co-conspirator exception, which is a question of law for the court and not one of fact for the jury.

Shapiro's connection to overt act u—that he was in the chat at the time the misrepresentation was made by Gramins—is similarly "relevant to the defendant's alleged criminal liability."  *United States v. Carpenter*, No. 3:13-CR-226(RNC), 2015 WL 9480449, at *1-2 (D. Conn. Dec. 29, 2015).  Specifically, it alleges that Gramins and Shapiro were communicating with a victim when Gramins committed one of the central acts of the conspiracy—lying about an offering price.  Gramins's lie is clearly an "action by [a] person[] ... involved in the charged conspiracy," *id*., and it is entirely relevant to reference Shapiro's connection to that act.

Shapiro does not deny his participation in the relevant chats underlying overt acts u and x—indeed, he cannot.  Nor does he deny that Gramins made misrepresentations in this post-*Litvak* trade.  Instead, he employs a self-serving characterization of the anticipated trial evidence to attempt to convince the Court to grant the equivalent of a summary judgment motion based solely on his evidentiary proffer.  Specifically, Shapiro claims that his alleged statements to co-conspirators, following a post-*Litvak*-indictment compliance meeting—at which he announced that they should no longer lie to counterparties—means that *as a matter of law* he could no longer commit a knowing act in furtherance of the conspiracy.  While Shapiro is certainly free to make

that argument to the jury, the Government is equally free to argue that Shapiro's words were hollow; that he continued to supervise a desk that lied to customers; and that his participation with Gramins in the November 2013 trade is evidence that his announcement was a sham.  This is a dispute over the weight of the evidence related to an overt act, which is squarely in the jury's province.  *See Montour*, 944 F.2d at 1027.  As a matter of pleading, the Government has alleged (contrary to Shapiro's contention) that Shapiro knowingly participated in the conspiracy through 2013, Ind. ¶ 32, and the overt acts are alleged to be in furtherance of that activity.  Overt acts u and x, and Shapiro's connection thereto, clearly relate to the charged conspiracy and evidence of the act is undoubtedly admissible at trial; accordingly, the allegation cannot be stricken from the Indictment.  *Josephberg*, 418 F. Supp. 2d at 301-02.

## II.     NOMURA'S *POST HOC* PERSONNEL DECISIONS ARE IRRELEVANT

Shapiro's argument that—if his motion to strike fails—he should be permitted to employ evidence of Nomura's later personnel actions mischaracterizes the Government's evidence.  One of the central issues in this trial is whether the defendants acted with fraudulent intent.  To the extent that the defendants, prior to their commission of the crimes alleged, were made aware through Nomura policies of the wrongfulness of lying to customers, that evidence is relevant to their state of mind and should be admissible.  The Government has no intention of offering evidence related to Nomura's after-the-fact assessment of the defendants' conduct, as such information would not bear on what was in the mind of the defendants at the time they committed the charged crimes.  The defendants' attempt to do so should likewise be denied.

### A.     Background

#### 1.     Nomura Compliance Procedures

The Government long ago disclosed to the defendants its intention to admit evidence of Nomura's compliance procedures.  The Government disclosed exhibits that include several

iterations of Nomura's Compliance Policy Manual (Exhibit 126); a compliance training presentation handout from May 2012 and the sign-in sheets (Exhibits 156, 157); and a compliance training presentation handout from February 2013 and the sign-in sheets (Exhibits 5A, 5B).  The Compliance Manual includes several relevant provisions, including:

- "Rule l0b-5, which was promulgated by the SEC under the Exchange Act, prohibits manipulative, fraudulent and deceptive practices in connection with either the purchase or sale of securities, whether or not those securities are exempt from registration."

- "Employees must observe good business practices and just and equitable principles of trade in dealings with clients and competitors.  Employees should not take unfair advantage of anyone through concealment of material information, misuse of confidential information, misrepresentation of material facts, or any other unfair dealing practice."

- "All communications over the Firm's electronic systems must be truthful and in good taste."

- "In every context, communications with the public, whether oral, written or electronic, must be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts regarding any particular investment, industry discussed or service offered.  All communications must be truthful, balanced and in good taste, must not omit material facts and must not use language that is misleading, promising or exaggerated. Forecasts must be described as such."

- "Nomura People must respect fair business practices in jurisdictions where they operate and endeavor to deal fairly with Nomura Group's customers, suppliers, competitors and Nomura People.  Nomura People should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or any other unfair-dealing practice."

Shapiro acknowledged, at the time of his initial hire by Nomura, his obligation to review and abide by the Compliance Manual, and reiterated that acknowledgement in each successive year of employment.

In May 2012, Nomura compliance official Nadine Cancell gave a training program that included a seven-page handout. *See* Exhibit 156. This handout, and the presentation, included and advisory regarding "Electronic Communications," including that "[i]mproper use of electronic platforms included but is not limited to . . . omission of material facts or making untrue / misleading statements." Exhibit 157 includes sign-in sheets from the presentation, memorializing that (among others) Peters, Shapiro, and Gramins all attended the presentation. Notably, this presentation was more than six months prior to Litvak's indictment.

In February 2013, shortly following the *Litvak* indictment, Cancell again held a compliance meeting that included a one-page handout. *See* Exhibit 5A. The presentation did not solely focus on *Litvak*-related conduct, but one of the directives was "First and foremost for everyone is <u>DO</u> <u>Not Lie</u>." (emphasis in original). In this instance, the sign-in sheets (Exhibit 5B) reflected the attendance of Shapiro and Gramins.

2.      Personnel Actions

In February 2013, SIGTARP reached out to 14 different broker-dealers, including Nomura, calling on them to undertake internal investigations regarding fraudulent practices similar to the ones charged in *Litvak*, specifically as related to PPIP funds. In most cases, that was followed by broader requests by the SEC and eventually the Department of Justice. In November 2014, Nomura responded with evidence of fraudulent activity by members of its RMBS trading desk, and contemporaneously suspended all three defendants. Later, in June 2015, the Government understands that Peters and Gramins were terminated for cause; this occurred shortly following the identification of post-*Litvak* fraudulent trades by those two defendants. Shapiro, to the

Government's knowledge, remained suspended at that time, and was later let go during a Nomura reduction-in-forces.[1]

### B.  Legal Standard

####  1.  Intent/Knowledge

Each of the charged offenses in this case requires some degree of proof of intent or knowledge, though the parties disagree over the relevant legal standards.  The securities fraud statute—unlike wire and mail fraud—incorporates in its language a requirement that a violation be "willful."  15 U.S.C. § 78ff(a).  The Second Circuit has clarified this requirement for securities fraud cases involving deception, holding that the law "do[es] not require a showing that a defendant had awareness of the general unlawfulness of his conduct, but rather, that he had an awareness of the general wrongfulness of his conduct."  *United States v. Kaiser*, 609 F.3d 556, 568 (2d Cir. 2010).  The defendants, notwithstanding (and in fact ignoring) *Kaiser*, have proposed a jury instruction that defines "willfully" as requiring proof of knowledge of the unlawful nature of their conduct.  *See* Defendants' Proposed Jury Instructions, Dkt. # 316 ("Def. Jur. Instr.") at 62.

Unlike securities fraud, the wire fraud statute has no explicit scienter requirement.  *See* 18 U.S.C. § 1343.  Rather, courts have read the "scheme to defraud" element as requiring that the Government prove "that the defendants possessed a fraudulent intent."  *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991).  "[I]ntent to defraud simply means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another." *United States v. Rossomando*, 144 F.3d 197, 199 (2d Cir. 1998).  While the Government must prove that the defendant acted knowingly and intentionally regarding the falsity of

---

[1] Personnel decisions are the province of the company, and not the Government.  The Government has refrained from learning too much about Nomura's personnel decisions in this matter. If the Court rules that Nomura's personnel decisions are relevant, the Government may inquire further.  However, given that the defendants have interposed no relevant basis for admission, the Government will wait for such a ruling.

misrepresentations in a scheme, it need not prove that he was aware of even the general unlawfulness of his actions. *See United States v. Gole*, 21 F. Supp. 2d 161, 167 (E.D.N.Y. 1997) (citing *United States v. Precision Medical Laboratories, Inc.*, 593 F.2d 434, 443 (2d Cir. 1978)). Again the defendants—citing only to the pattern charge—claim that the Government must also prove that "knowingly and purposely, with an intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." Def. Jur. Instr. at 73.

Finally, the intent requirement for the conspiracy count should mirror that of the substantive offenses. *See United States v. Allen*, 788 F.3d 61, 70 (2d Cir. 2015) ("While conspiracy to commit a substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself, neither does it require a greater degree of criminal intent than the substantive statute.") (internal citations omitted). *See also* Jury Instructions delivered by Hon. Jed S. Rakoff on January 20, 2017, in *United States v. Lumiere*, 1:16-cr-00483-JSR, Doc. #61. ("To act 'knowingly' means in this context to act consciously and deliberately rather than mistakenly or inadvertently; and to act 'willfully' in this context means to act voluntarily, purposely and with an intent to defraud."). Again, the defendants' proposed jury charge suggests an additional requirement that the defendants knew that their conduct was unlawful. Def. Jur. Instr. at 46.

### 2. Compliance Procedures

Evidence of compliance procedures are relevant to proof of intent and knowledge. *See United States v. Anderson*, 533 F.3d 623, 632 (8th Cir. 2008).

In *Anderson*, the CEO of Zomax, a company that replicated compact discs and DVDs, was convicted of securities fraud for trading on inside information, specifically that a sales forecast substantially overstated the company's own projection of anticipated revenues. *Id*. at 627-28. At trial, the Government introduced, on the issue of willfulness, the Zomax policy forbidding insider trading, and requiring officers' stock sales to be pre-cleared by the CFO and outside attorney

(which the defendant had not done). *Id*. at 628. Additionally, the defendant was also convicted of insider trading for directing the trustee of the defendant's Charitable Remainder Annuity Trust ("CRAT") to sell Zomax stock for the same reason. *Id*. at 627-28. However, the district court dismissed the CRAT-related counts at the close of evidence, finding that the trustee had acted independently, i.e., without knowledge of the defendant's illegal conduct. *Id*. at 627. Similarly, the government had also charged the defendant's wife and his friend, but those charges were dismissed either before the close of the evidence by the government (as against the friend) or by the district court at the close of evidence (as against the wife). *Id*. at 627.

In affirming the remaining convictions, the Eighth Circuit held that admission of the Zomax policy on insider trading was proper. In insider trading cases in the Eighth Circuit, the government must prove the defendant's knowledge of the rule he was violating. *Anderson*, 533 F.3d at 629. The court thus found that the Zomax policy on insider trading "was probative of the defendant's knowledge of insider-trading laws and of his intent to defraud." *Id*. at 632. The court specifically rejected the defendant's argument under Fed. R. Evid. 403 that the admission of the company policy was improper because "no one in the company followed it." *Id*. Moreover, evidence regarding the conduct of the defendant's friend and the defendant's conduct related to the CRAT sales "was also probative on the issue of the defendant's intent." *Id*.[2]

---

[2] Although *Anderson* is instructive regarding the relevance of compliance policies to intent, it is important to note that the standard of intent for insider trading cases in the Eighth Circuit differs from the Second Circuit's standard for deceptive practice securities fraud in *Kaiser*. While *Kaiser* required only a showing of "general wrongfulness," 609 F.3d at 569, *Anderson* required proof that the defendant had knowledge of the insider trading rules, 533 F.3d at 629.

C.   **Discussion**

1.   Nomura's Compliance Policy Manual and Presentations Are Admissible
Because They Bear on Intent

Here, the Nomura Compliance Policy Manual and compliance presentations very clearly bear on the defendants' intent and knowledge as of the time of the alleged crimes.  Accepting the Government's view of the willfulness standard in securities fraud, the Government must prove that the defendants were aware of the "general wrongfulness of [their] conduct," *Kaiser*, 609 F.3d at 568, that is, lying to counterparties in the context of securities transactions.  In that regard, the fact that the defendants knew—as of the time of their entry into employment at Nomura—their obligations to review and follow the Compliance Policy Manual is probative of their awareness of the general wrongfulness of their lies and deceitful conduct.  Specifically, the manual put them on notice of, among other things:  the Securities and Exchange Act's prohibition of "manipulative, fraudulent and deceptive practices in connection with either the purchase or sale of securities"; Nomura's requirement that employees "observe good business practices and just and equitable principles of trade in dealings with clients and competitors"; and Nomura's requirement that "[e]mployees should not take unfair advantage of anyone through concealment of material information, misuse of confidential information, misrepresentation of material facts, or any other unfair dealing practice."  The latter requirement is specifically restated in Nomura's "Code of Ethics," which is a part of the Compliance Policy Manual.

Similarly, the defendants' participation in compliance meetings is equally probative of their intent, because it reflects their then-extant knowledge of what was wrongful.  In the May 2012 presentation, attended by all three defendants, they were reminded that the electronic communications policy included a prohibition against "omission of material facts or making untrue / misleading statements."  This admonition stands alone as evidence that the defendants knew that

it was wrong to lie to customers, and also serves to reiterate was previously made clear to the defendants in the manual.  Then, following the *Litvak* indictment, Nadine Cancell's training program in February 2013 reminded attendees, in no uncertain terms, that they could not lie.  This presentation was attended by Gramins and Shapiro, and both (1) reflects their knowledge as of the time of the presentation, and (2) is a reaffirmation of the information they had already been provided through the manual and the other presentation.[3]

### 2. Nomura's Personnel Actions Cannot Bear on Intent

In contrast, evidence of personnel actions that Nomura later took against the defendants cannot possibly be probative of intent.

First, and most importantly, Nomura's employment decisions do not reflect what was in the defendants' minds at the time they participated in any alleged conspiratorial act.  Nomura suspended Shapiro approximately a year after the last overt act; it fired Gramins and Peters more than six months after that. These personnel actions do not tend to show what Shapiro (or any of the defendants) was thinking while he was engaging in the fraudulent conduct, and accordingly have no bearing on Shapiro's intent or knowledge while he was committing fraud.

Second, Shapiro's proposed inferences from the personnel actions are entirely speculative. Shapiro wants to invite the jury to suppose that because Gramins and Peters were fired after the company discovered their post-*Litvak* trades, that was sole reason for their dismissal, and proves that the company did not view Shapiro's conduct (either pre- or post-*Litvak*) as contrary to company policy.  Yet the reasons for the defendants' suspensions—and Gramins' and Peters' terminations—are not explicitly known and, as apparently Gramins and Peters agree, they may in

---

[3] If the Court were to accept the defendants' view of willfulness, that is, proof that the defendants knew their conduct was unlawful, the relevance of the compliance procedures is further amplified.  Not only does the Compliance Policy Manual recite Rule 10b-5, it also identifies the United States Attorney's Office for the Southern District of New York as the office that would prosecute criminal violations of the securities laws.

fact be unknowable.  *See* Defendant Shapiro's Motion, Dkt. # 328 ("Def. Mot.") at 13.  In fact, Nomura's reasons are very likely privileged.  To the extent that the company considered their internal policies in making personnel decisions, the Court simply cannot know how that process was undertaken.  Moreover, the company's after-the-fact assessment of the defendants' conduct is its own business, presumably based on many factors that do not relate to internal policies, including liability and litigation risk.

Third, on a practical level, the proposed evidence poses series risk of confusing the jury, causing undue delay, and wasting time, running afoul of Fed. R. Evid. 403.  The fact that Shapiro, Gramins and Peters were all suspended at the same time indicates that Nomura saw their behavior as problematic.  The firing of Gramins and Peters in June does, in some way, differentiate them from Shapiro but does not indicate that Shapiro is not guilty of being part of the conspiracy (or even that Nomura reached that conclusion).  To rebut the implications that Shapiro would want to jury to draw, the Government would need to present evidence, including that during the post-*Litvak* period, Shapiro had been promoted and was supervising both the RMBS desk and the CMBS desk and he was doing less trading, and that the Nomura internal investigators did not have access to the plethora of information that the criminal investigators had access to.  Parsing what Nomura knew and what it did not know when it fired Gramins and Peters, but not Shapiro, why it had still suspended Shapiro, and what Shapiro's day-to-day role was during the period in question, among other things, would create a trial-within-a-trial, leading the jury on a frolic through what Nomura's management or legal personnel knew or did not know, what they considered and did not consider when they made their employment decision.  This would require multiple witnesses to piece together this tangential evidence, all while telling the jury nothing about Shapiro's intent or the materiality of the conspirators' lies.  This irrelevant evidence will inevitably confuse the jury as to

what they should be focusing on and waste significant time during the trial.  It illuminates none of the pertinent issues at trial and, accordingly, should be excluded.

> 3.      Nomura's Personnel Decisions Are Not a Counterpoint to Shapiro's Post-*Litvak* Conduct

Finally, the connection Shapiro attempts to make between overt acts u and x on the one hand, and Nomura's employment decisions on the other, is illusory, and is premised on a misunderstanding of the Government's proof.

Shapiro claims that the evidence of Nomura's personnel decisions is necessary to rebut the Government's allegations—in the form of overt acts u and x—that Shapiro violated Nomura's policies and procedures following the 2013 compliance meeting.  Def. Mot. at 17.  The premise of Shapiro's argument, though, is fundamentally flawed, as it rests on a misconception of the purpose of compliance-related evidence.  The Government does not seek to introduce evidence of compliance procedures and meetings simply to prove the content of Nomura's policies, or to prove that Shapiro violated the policies, as he suggests.  This is not a civil employment action in which the defendants are charged with violating Nomura's policies.  Rather, the applicable policies are relevant only to the extent that they bear on the defendants' state of mind, i.e., whether the jury can draw an inference that the defendants knew before they committed their offenses that certain acts were wrong and/or illegal.

As a result, the Government will not ask any Nomura witness to provide a retrospective evaluation of Shapiro's conduct in the context of Nomura's policies.  Rather, the Government will explore with Nomura witnesses the policies and compliance presentations of which Shapiro was aware, and draw out those sections that deal with deception and lying.  In the case of the February 2013 compliance presentation, the Nomura witness's assessment of whether the "do not lie" directive was a change in policy will not be his or her own unsupported opinion, but will be based

again on material to which Shapiro had prior access, e.g., the Compliance Policy Manual and May 2012 presentation, and thus was capable of influencing his knowledge.  Moreover, it will be made clear that, as a supervisor, Shapiro himself had compliance functions in overseeing the practices of the RMBS desk, which made him—by design—the person principally responsible for ensuring his subordinates were following the rules.

In short, if Shapiro believes that, prior to 2013 compliance meeting, he did not know that lying to counterparties was a wrongful act, he can make that argument to the jury based on all that would have been available to him in that time period.  The Government, conversely, should be able to present evidence to show and argue that Shapiro was well aware that lying was wrongful both before and after Mr. Litvak was indicted, and further that Shapiro's participation in the November 22, 2013 trade is evidence of participation in and awareness of further fraudulent conduct.  Ultimately, the issue should be resolved by the jury on their own assessment of the evidence, and not any third party's view, including that of Nomura.

## III.   REFERENCES TO THE *LITVAK* INDICTMENT ARE PROPER

Shapiro final claim, that references to *Litvak*'s indictment should be precluded, fails because it ignores the several ways in which that indictment has relevance to the charges against the defendant.  The Government has set these bases of relevance out in detail in its Trial Memorandum, Dkt. # 329, summarized here.

First, the reaction of victim-witness Michael Canter to his discovery of Mr. Litvak's lies reflects the importance of this type of information to a reasonable investor, and thus is relevant to materiality.

Second, and also related to materiality, the *Litvak* indictment is relevant when Peters, shortly after the *Litvak* indictment, is told by a customer "Ok [sic] don't litvak [sic] me!  Go ahead with that bid."  This is clear evidence that price negotiation-related misrepresentations matter to

reasonable investors, but which would be unintelligible to a jury without evidence about how the word "Litvak" had come to mean "lie to" in the RMBS market.

Third, evidence of the *Litvak* indictment is relevant to intent, knowledge, and willfulness as discussed in the prior section. All three defendants are charged with post-*Litvak* trades, and Gramins and Shapiro were both specifically reminded in the 2013 compliance meeting that lying was wrongful. Both the compliance meeting and knowledge of the *Litvak* indictment plainly bear on whether the charged post-*Litvak* conduct was done willfully and knowingly.

As with his other arguments, Shapiro again misunderstands the significance of the *Litvak* indictment, claiming that evidence of it should be precluded because it just reflects the "government's view of whether the alleged conduct is criminal." Def. Mot. at 14. Just as with the Nomura Compliance Manual, the Government does not suggest introducing evidence of the *Litvak* indictment to prove that its contents are true. Rather, the evidence is relevant only to the extent it bears on the knowledge and willfulness of the defendants when they committed their crimes. If the defendants want to argue that there is no evidence that they knew their conduct was unlawful, the Government must be entitled to introduce evidence that they acted with the awareness that criminal charges had been brought against *Litvak*, and their reaction to those charges. The defendants are free to argue the weight of this evidence, but its relevance to their intent is undeniable. For the same reason, the verdict in *Litvak* is irrelevant, because it was not in the mind of the defendants at the time they committed their crimes.[4]

Finally, the clear relevance of the *Litvak* evidence outweighs any minimal prejudice to the defendants, particularly with an appropriate limiting instruction. *See United States v. Rittweger*,

---

[4] It is not entirely clear why the defendants would want Litvak's conviction for securities fraud placed before the jury, but since it is irrelevant under the circumstances, the Court need not explore this further.

524 F.3d 171, 180 (2d Cir. 2008) (permitting a trial of defendants in two separate conspiracies, with separate evidence).

## CONCLUSION

Wherefore, the Government respectfully requests that defendant Shapiro's motion be denied.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

_____/s/_____
LIAM B. BRENNAN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27924

HEATHER CHERRY
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV07037

DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV02874

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3835
Liam.Brennan3@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 6, 2017, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.


_____/s/_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY