UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:15CR155 (RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO and | : | |
| MICHAEL GRAMINS | : | October 20, 2017 |

**GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR A
JUDGMENT OF ACQUITTAL AND FOR DISMISSAL ON DUE PROCESS GROUNDS
AND DEFENDANT GRAMINS' MOTION FOR A NEW TRIAL**

## **<u>TABLE OF CONTENTS</u>**

I.    Introduction ........................................................................................................... 1

II.   Defendants' Arguments for a Judgment of Acquittal Are Unpersuasive ........................... 3

   A.    Rule 29 Standard of Review ............................................................................ 3

   B.    There Was Sufficient Evidence of an Unlawful Agreement ............................................ 3

   C.    There Was Sufficient Evidence of Intent to Harm ..................................................... 35

   D.    There Was Sufficient Evidence of Materiality ........................................................ 40

   E.    There Was Sufficient Evidence for a Rational Juror to Find Gramins Guilty of Count Three ............................................................................................................... 45

   F.    There is Sufficient Evidence for a Reasonable Juror to Find Gramins Guilty of Count Nine ................................................................................................................ 49

III.  This Prosecution Did Not Violate Due Process ................................................................ 53

   A.    Governing Law ............................................................................................ 53

   B.    Discussion ................................................................................................. 56

IV.   Rule 33 Motion for a New Trial ................................................................................. 58

   A.    Standard of Review ....................................................................................... 58

   B.    The Government's Use of the *Litvak* Indictment Did Not Unduly Prejudice Gramins . 59

   C.    Gramins Was Not Prejudiced By the Government's Comments .................................. 64

V.    Conclusion .................................................................................................................. 71

The Government respectfully submits this opposition to defendants Shapiro and Gramins' respective Motions for a Judgment of Acquittal, to defendant Gramins' Motion for a New Trial, Dkts. 440, 475, and 476, and to defendants' Motion to Dismiss the Indictment on Due Process Grounds, Dkt. 400. Defendants' arguments are unpersuasive and the Court should deny their motions.

## I.    Introduction

From 2009 to 2013, defendants Ross Shapiro and Michael Gramins were traders and supervisors on a bond-trading desk that purchased and sold residential mortgage backed securities ("RMBS") at Nomura Securities International ("Nomura"). During that time, defendants engaged in a scheme to misrepresent the purchase and sale price of bonds to their customers, thereby defrauding their customers out of millions of dollars and earning secret compensation for Nomura. Defendants trained their subordinates to engage in the scheme, at times providing them with the lies to tell their customers.

A grand jury indicted defendants on one count of conspiracy, two counts of securities fraud and six counts of wire fraud. At trial, the Government presented nine witnesses and 176 exhibits in its case against defendants. The Government's witnesses were subjected to vigorous cross-examinations by each defense counsel, and defendants offered numerous exhibits as well. The jury convicted Gramins of conspiracy, failed to reach a verdict on one count of securities fraud and one count of wire fraud, and acquitted him on the remaining counts. The jury failed to reach a verdict against Shapiro on the conspiracy count and acquitted him of the remaining counts. The Court declared a mistrial on the unresolved counts against each defendant. Defendants now seek a judgment of acquittal on all counts that resulted in conviction or mistrial; Gramins, in the alternative, seeks a new trial on his count of conviction.

Each of the defendants' arguments fails.  First, defendants' contention that there was insufficient evidence of an unlawful agreement reflects a misapprehension of conspiracy law, which does not require proof that defendants intended to violate a law or regulation.  Judged against the correct intent standard, there was sufficient evidence for a rational juror to find that defendants and their co-conspirators agreed to deceive their victims, defraud them out of money, and force them to negotiate with objectively false information.  Even judged against defendants' incorrect, stricter standard, a rational juror could have concluded that the conspirators were well aware of the wrongfulness and unlawfulness of such a scheme.  Second, defendants incorrectly argue that the Government failed to prove intent to harm.  Misrepresentations about price go directly to the benefit of the bargain in a price negotiation in which Nomura plays the role of middleman in an opaque marketplace.  Third, defendants' materiality arguments are directly refuted by the Second Circuit's decision in *United States v. Litvak*, which held that testimony that misrepresentations were "important" to victims and that victims were "injured by those misrepresentations . . . precludes a finding that no reasonable mind could find [the defendant's] statements material." *United States v. Litvak*, 808 F.3d 160, 176 (2d Cir. 2015).[1]  The Government's evidence here easily passes that low bar.  Fourth, there was sufficient evidence for a rational juror to find Gramins guilty on Count Three—the evidence was that Gramins worked with co-conspirator Caleb Chao to deceive victim Aadil Abbas and that Chao's lies were material to a reasonable investor.  Fifth, there was sufficient evidence for a rational juror to find Gramins guilty on Count Nine, related to the same fraudulent trade—the evidence was that e-mailing a trade confirmation was foreseeable and in furtherance of the scheme, and that Gramins intended to harm HIMCO by making more money at HIMCO's expense.

---

[1] The appeal from the second *Litvak* trial is scheduled to be argued on December 11, 2017.

Separately, defendants' due process claim fails because this prosecution is a straightforward application of the wire and securities fraud statutes, and thus there was "fair notice" that defendants' conduct could be subject to prosecution.

Finally, Gramins' motion for a new trial on the conspiracy count is similarly meritless. The Government properly introduced evidence of the *Litvak* indictment, as it had proposed, as relevant to issues of intent and materiality. Gramins' motion is not entitled to revisit evidentiary rulings the Court made during trial. Likewise, the Government's statements in rebuttal summation about which Gramins complains were fair commentary on the trial evidence and had no effect on the outcome of the trial.

## II.    Defendants' Arguments for a Judgment of Acquittal Are Unpersuasive

### A.    Rule 29 Standard of Review

Rule 29 permits a defendant to move for a judgment of acquittal on the basis of insufficiency of the evidence. Fed. R. Crim. P. 29(c). A judgment of acquittal should only be entered if the court concludes that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003). A court should not grant a motion of judgment of acquittal if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotations omitted, emphasis in original). "In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government. All permissible inferences must be drawn in the government's favor." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal citations omitted).

### B.    There Was Sufficient Evidence of an Unlawful Agreement

Both defendants make the legally and factually erroneous argument that neither they nor their co-conspirators had the requisite intent to enter into a conspiracy. *See* Shapiro Mem. at 6-

16; Gramins Mem. at 17-30.   In short, defendants contend that, although they entered into an agreement in which all participants contemplated committing fraud and that agreement otherwise satisfied all of the elements of fraud, they nonetheless are entitled to acquittal because there was insufficient evidence that they and their co-conspirators knew that it was illegal or wrong to commit that fraud.   The cases cited by defendants do not support their reading of the requisite intent, and binding precedent makes clear that fraud is not one of those unique crimes that requires specific knowledge of the statute or even of general unlawfulness.   Applying the correct standard, the Government presented overwhelming evidence that defendants agreed among themselves and with fellow traders to intentionally defraud their customers of money and valuable information. Moreover, even if the Court were to apply defendants' incorrect stricter standard for intent, there was sufficient evidence for a rational juror to find that defendants and their co-conspirators were aware of both the unlawfulness and wrongfulness of their fraudulent actions.

1.   Relevant Law

"The elements of a conspiracy under [18 U.S.C. § 371] are: '(1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an 'overt act' by one or more members of the conspiracy in furtherance of the conspiracy.'"   *United States v. Allen*, 788 F.3d 61, 70 (2d Cir. 2016) (quoting *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002)).

With respect to the first element, "the government must prove that there was an agreement between two or more participants to achieve a particular illegal end."   *United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996).   "Circumstantial evidence may be used to prove specific intent to commit the object of a conspiracy, as it may to prove agreement to join the conspiracy."   *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014).   "The agreement need not be shown to have

been explicit. It can instead be inferred from the facts and circumstances of the case." *Amiel*, 95 F.3d at 144 (quoting *Iannelli v. United States*, 420 U.S. 770, 778 n.10 (1975)). "Furthermore, the participants in a conspiracy need not be fully aware of the details of the venture so long as they agree on the 'essential nature of the plan.'" *Id*. (quoting *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992)).

Conspiracy law does *not* require that the Government prove that a defendant or co-conspirator knew of the criminality of the object of the agreement. *See Ingram v. United States*, 360 U.S. 672, 678 (1959) (holding that, to convict for conspiracy, "[t]here need not, of course, be proof that the conspirators were aware of the criminality of their objective," but rather, there must only be proof of knowledge of the unlawful conduct). Instead, the level of criminal intent required under § 371 is the same as the statutes that are the object of the offense. *Allen*, 788 F.3d at 70 ("While conspiracy to commit a substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself, . . . neither does it require a greater degree of criminal intent than the substantive statute." (internal quotations and citations omitted)); *United States v. Feola*, 420 U.S. 671, 692 (1975) ("[W]here a substantive offense embodies only a requirement of *mens rea* as to each of its elements, the general federal conspiracy statute requires no more."). In other words, a conspiracy charge levies no additional burden on the Government to prove that an individual knew that the object of the conspiracy was in violation of any law, besides what is required by the underlying statute.

Ordinarily, the Government has no burden "to prove a defendant's awareness of the legal consequences of his conduct, *i.e.*, that the conduct was illegal." *United States v. Hilliard*, 31 F.3d 1509, 1517-18 (10th Cir. 1994). Importantly, the word "willful" in a statute does not demand proof of intent to violate a specific law. *See United States v. George*, 386 F.3d 383, 393 (2d Cir.

2004) ("[T]he Second Circuit has held that the term 'willfully' in criminal statutes typically does not require the government to prove the defendant's specific intent to violate the particular criminal statute in question.").  Proof of intent to violate a law is only required in "exceptional cases," that is, "when those activities classified as illegal do not on their own provide notice of their criminality, either because of the difficulty of comprehending the legally acceptable parameters of the activity or because the criminal *actus reus* can often be undertaken with a lawful purpose." *Id.* at 390; *see also id.* at 395 ("[B]ecause no conceivable meritorious reason exists for knowingly submitting false information on a passport application, conviction under [18 U.S.C.] § 1542 does not require a finding that the defendant acted with an awareness of the generally unlawful nature of his or her conduct, an improper purpose, or an 'evil-meaning mind' as required in [*Bryan v. United States*, 524 U.S. 184 (1998)].").  Except in those exceptional cases, "it is well settled that ignorance of the law or mistake as to the law's requirements is not a defense to criminal conduct." *United States v. Duggan*, 743 F.2d 59, 83 (2d Cir. 1984).

Applying these principles, courts have found that wire fraud and mail fraud require proof of intent to defraud, but not proof of willfulness or intent to violate the law.[2]  The elements of wire fraud under 18 U.S.C. § 1343 are: "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires."  *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000).  To establish the first element, "the government must prove (i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (internal citations omitted).   The Government proves fraudulent intent by establishing that a

---

[2] Though these cases reference mail fraud, wire fraud is considered identically for these purposes.  *See United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) ("Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way.").

defendant intended to cause harm to his victim, including either the intent to cause immediate financial loss to victims, *see*, *e.g.*, *United States v. Stitsky*, 536 Fed. App'x 98, 108-09 (2d Cir. 2013) ("[the defendant]'s intent to cause *that* immediate loss to his victims is sufficient to sustain his mail and wire fraud convictions"), or the intent to deprive victims of "potentially valuable economic information," *see*, *e.g.¸ United States v. Finazzo*, 850 F.3d 94, 112 (2d Cir. 2017) ("Moreover, we have repeatedly used the phrase 'potentially valuable economic information' to describe the scope of the 'right to control' theory.").

The fraudulent intent standard for wire fraud—or its analogue, mail fraud—does not require the Government to prove that the defendant or a co-conspirator knew that his conduct violated a specific law, was generally unlawful, or even was generally wrongful. *United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989) ("The specific intent required under the mail fraud statute is the intent to defraud . . .  and not the intent to violate a statute." (internal citations omitted)); *United States v. Precision Medical Laboratories, Inc.*, 593 F.2d 434, 443 (2d Cir. 1978) ("Appellant was convicted under 18 U.S.C. §§ 287 and 1341. The Scienter requirement in both of those sections is 'knowledge.'"); *United States v. DiRoberto*, 686 Fed. App'x 458, 461 (9th Cir. 2017) ("The mail and wire fraud statutes do not require proof of willfulness. 18 U.S.C. §§ 1341, 1343. Accordingly, the district court's instruction that DiRoberto did not need to know his actions were illegal was not erroneous."); *United States v. Blagojevich*, 794 F.3d 729, 739 (7th Cir. 2015) ("The wire-fraud statute requires a specific intent to defraud but *not* willfulness or any other proxy for knowledge of the law."); *United States v. Stockheimer*, 157 F.3d 1082, 1088 (7th Cir. 1998) ("Both bank fraud and mail fraud require an intent to defraud the victims. . . .  But a defendant's belief in the legality of his conduct is not a defense to mail or bank fraud."); *United States v. Paradies*, 98 F.3d 1266, 1285 (11th Cir. 1996) ("In mail fraud cases, the government need only

7

prove that the defendant had the intent to deceive, and ignorance of the law is no defense."); *United States v. Wicker*, 80 F.3d 263, 267 (8th Cir. 1996) (Rejecting defense that defendant did not know his fraudulent activity was illegal, and holding that "[t]he critical inquiry is not whether [Wicker] intended to break the law, but, rather, whether [he] intended to defraud the [homeowners]." (citation omitted)); *United States v. Gole*, 21 F. Supp. 2d 161, (E.D.N.Y. 1997) ("'Willfully' appears nowhere in the mail fraud statute, and the Second Circuit has expressly held that the only scienter requirement for a violation of § 1341 is that the acts proscribed be carried out 'knowingly.'"), *aff'd* 158 F.3d 166 (2d Cir. 1998).

While securities fraud specifically requires proof of willfulness, 15 U.S.C. § 78ff(a), that proof need not include that a defendant knew he was violating the law.  In *United States v. Kaiser*, which dealt with the same provisions of the securities law as this case (15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5), the court held that willfulness for purposes of securities fraud "do[es] not require a showing that a defendant had awareness of the general unlawfulness of his conduct, but rather, that he had an awareness of the general wrongfulness of his conduct."  609 F.3d 556, 569 (2d Cir. 2010) (concerning misrepresentations in earnings results and accounts receivable results during an audit of year-end financial results).  *See also United States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004) ("Under our jurisprudence, . . . 'willfully' as it is used in § 78ff(a) means intentionally undertaking an act that one knows to be wrongful; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful."); *United States v. Reyes*, 577 F.3d 1069, 1080 (9th Cir. 2009) (citing Second Circuit and writing that "our circuit and others have rejected the argument that, in the context of the securities fraud statutes, willfulness requires a defendant know that he or she was breaking the law.").

Indeed, in *Kaiser*, the Second Circuit upheld an instruction that did not even separately define willfulness, but instead required only proof of specific intent to deceive—that is, proof of knowledge that the false statements in question were being made.  609 F.3d at 567-68.  This was in spite of the fact that both parties had requested a charge that required "knowledge of illegality." *Id.* at 568 n.2.  The district court rejected that charge, finding that it was a "waste of time," and the Second Circuit affirmed, noting that the jury had been instructed "that that they had to find that Kaiser knew the statements were 'false and fraudulent' and that he made those statements 'with intent to create a deception,' and the government had to prove 'the contrary of the idea of mistake or good faith.'" *Id.* at 569-70.  The court then reasoned that "[f]or the jury to have found that Kaiser possessed such an intent, it follows necessarily that it also concluded that there was 'a realization on the defendant's part that he was doing a wrongful act.'" *Id.* at 570 (citation omitted). In other words, an intentional deception is necessarily a wrongful act.  *Id.*; *see also United States v. Petrossi*, No. 16-CR-234 (BMC), 2017 WL 2437259, *2 (E.D.N.Y. June 5, 2017) ("Therefore, for the jury to have found defendant acted with intent to deceive, 'it follows necessarily that it also concluded that there was a realization on the defendant's part that he was doing a wrongful act.' That is all that is needed to prove willfulness."  (quoting *Kaiser*, 608 F.3d at 570)); *United States v. Wey*, No. 15-cr-611 (AJN), 2017 WL 237651, at *13 (S.D.N.Y. January 18, 2017) ("[T]he *Kaiser* court held, in the context of securities fraud charges premised on express misrepresentations, that willfulness under Section 32(a) requires only that a defendant 'had an awareness of the general wrongfulness of his conduct.'"); *United States v. Kipp*, No. 3:15-cr-00244-MOC-DSC, 2017 WL 2662983, *18 (W.D.N.C. June 20, 2017) (in securities fraud, "as it relates to willfulness, 'the government is not required to prove that the defendant knew he was

violating the law,' rather, willfulness is established if the government proves that 'the defendant intended to commit the act prohibited.'" (quoting *Kaiser*, 609 F.3d at 568)).[3]

Thus, because neither wire fraud nor securities fraud requires proof that the defendant knew his conduct was unlawful, a conspiracy to violate either statute does not impose such a burden on the Government. *See United States v. Brooks*, 681 F.3d 678, 699-700 (5th Cir. 2012). In *Brooks*, which involved a charge of conspiracy to commit wire fraud, the Fifth Circuit affirmed a jury instruction that explained "[t]he government is not required to prove that a defendant knew the purpose of the agreement was in fact unlawful, that is, in violation of a statute, but the government must prove the defendant knew the purpose of the agreement, and the government must prove that the purpose was in fact unlawful." *Id.* at 699. As the court in *Brooks* held, the wire fraud statute does not fall into the "narrow exception to the general rule" that ignorance of the law is no defense. *Id.* at 700 n.18. As explained above, and as this Court noted (Tr. 2617), the securities fraud statute is no different in this regard.[4] Defendants must agree to commit the wrongful act with the requisite intent; knowledge of illegality is not required.

---

[3] *United States v. Tagliaferri*, 820 F.3d 568 (2d Cir. 2016) is not to the contrary. There, the court principally held that criminal violations of Section 206 of the Investment Advisors Act of 1940 (codified at 15 U.S.C. § 80b-6) do not require proof of intent to harm. *Id.* at 569. The court noted that "'willful' is a word of many meanings, its construction often being influenced by its context.'" *Id.* at 573 (quoting *Screws v. United States*, 325 U.S. 91, 101 (1945)). The court—referencing *Kaiser*—gave as an example the willfulness requirement in Rule 10b-5 criminal violations, saying that "[o]ur Court likewise has held in contexts similar to this one that to prove willfulness, 'the prosecution need only establish a realization on the defendant's part that he was doing a wrongful act.'" *Id.* (citation omitted). Later, after noting the differences in context and legislative history between Rule 10b-5 and Section 206, and upon rejecting an intent-to-harm standard for Section 206, the court noted that "the willfulness mental state required by [Section 206] ensures that criminal penalties are limited to cases in which the Government is able to prove that, at minimum, 'the defendant acted with knowledge that his conduct was unlawful.'" *Id.* at 575 (quoting *Bryan*, 524 U.S. at 191). While the court did not explicitly note the difference between this willfulness standard for Rule 206 and the one it had already cited for Rule 10b-5, it then clarified that "[b]ecause the wrongfulness of section 206 violations derives from their deceptiveness, proof that the defendant intended to deceive his clients suffices to establish the requisite mens rea for guilt." *Id.* This is entirely consistent with *Kaiser*'s finding that intent to commit a deception is a proxy for willfulness in this context.

[4] The cases cited by Gramins do nothing to undermine these rules, and do not independently demand that defendant or a co-conspirator agree on the illegality of their object. Gramins Mem. at 19-20. First, in *United States v. Valle*, 807 F.3d 508, 522-23 (2d Cir. 2015), the court found that the Government could not prove that Valle's co-conspirators intended to kidnap the victims that they discussed online. In other words, there was insufficient evidence of agreement on the object of the agreement (kidnapping); the court did not absolve Valle because his co-conspirators did not know

2.    Discussion

Applying the law of this and other circuits, there was more than sufficient evidence for a rational jury to find that defendants and their co-conspirators entered into an agreement in which each intended to deceive and to harm their victims, and as such intended to engage in wrongful acts.  The evidence showing this unlawful agreement included the testimony of co-conspirators and the documentary evidence of the deceptions—primarily Bloomberg chats and messages regarding RMBS trades.

a)       Testimony of Co-Conspirators

Each of the testifying co-conspirators—Frank Dinucci, Caleb Chao, and Alejandro Feely—acknowledged their participation in an RMBS desk-wide scheme to deceive in order to increase Nomura's profit at the expense of their customers.  They each testified that they learned these practices from Shapiro, Gramins, or both, and that these deceptions were often done in concert with others on the desk (which Shapiro led).  In short, the evidence demonstrated that there was an agreement among the Nomura RMBS desk traders, the objects of which were (i) to deceive customers and (ii) to make more money for Nomura that would otherwise have belonged to their customers.  There were four principal areas of testimony on this score.

(1)      The nature of deceptive practices

First, each of the co-conspirators acknowledged that they and their fellow Nomura traders, including defendants, engaged in "deceptive practices" that increased Nomura's profit on trades.

---

that kidnapping was illegal, as defendants imply.  Second, citation to *United States v. Goldberg*, 105 F.3d 770 (1st Cir. 1997), is particularly unhelpful here because (1) the objective in a *Klein* conspiracy (which was charged in that case) is not to violate a law, but to defraud the government, and (2) the law treats willfulness differently in tax cases. *See Cheek v. United States*, 498 U.S. 192, 202 (1991).  *Goldberg* also focused on the shared object of the conspirators—to defraud the IRS—and not the conspirators' intent to violate Section 371.  Third, in *United States v. Disimone*, 119 F.3d 217, 223-25 (2d Cir. 1997), the court considered whether the government had proven the intent of the co-conspirators to effect the object of the conspiracy—sale of narcotics—and not knowledge of the underlying law.  In short, defendants cite no cases that support their view of the law, namely that conspiracy requires all participants to know of the illegality of their conduct.

*See*, *e.g.*, Tr. 157 (Dinucci), 1684-85 (Chao), 1932 (Feely).  They described the ways in which

these deceptions were carried out.  When facilitating an RMBS transaction between a buyer and a

seller, they would misrepresent to the buyers the price that Nomura was paying the seller for a

bond or misrepresent to the seller the price Nomura was receiving from the buyer, or both:

- Dinucci:  "Two of the most common ways of these deceptive practices were we
  would lie about where we were actually buying or selling securities to clients. Tr.
  158.
- Dinucci:  "You know, typically the buy side when we were engaged on a trade with
  them typically only had the information that we were giving them regarding price. So,
  you know, they basically had to take our word when it came to the actual price on the
  bond." Tr. 161-62.
- Dinucci:  "Then at times we would also market bonds that we had owned and would
  say that we were working them on behalf of a client looking to sell a particular  bond,
  when in fact we owned the bond."  Tr. 165.
- Chao:  "Q. . . why don't you tell us, first off, a way that you recall Mr. Gramins and
  Mr. Dinucci, and ultimately yourself, engaging in those practices.  A. Sure. So one of
  the ways was in out-of-comp trades.  If we had both -- if we had a buyer and seller, we
  might misrepresent the prices that we told to them.  So for example, we might tell the
  seller that we were seeing a bid that was lower than what the bidder had actually bid,
  or vice versa.  It might be the case where we tell the seller that we had a bid that was
  actually -- sorry -- might tell a bidder that we had an offer that was higher than the offer
  actually was."  Tr. 1685.
- Feely:  "I would sometimes engage in trades where I would lie about where I bought a
  bond or where I can sell a bond."  Tr. 1932.

In many of those cases, they also misrepresented the spread, or commission, that Nomura

would be receiving from the transaction:

- Chao:  "Q.  . . . would it also be made a part of the negotiation about how much the
  spread or compensation or commission that Nomura was making on the trade was? A.
  Yes. If we had misrepresented that -- if we misrepresented to a client that, for example,
  we needed to be paid on top, or if we needed to be -- if we were buying at a certain
  price, then the client might think we were earning a spread that was different than what
  Nomura actually made."  Tr. 1686.

Moreover, they also testified that they would misrepresent to buyers that there was a third-party seller when, in truth, the bond was coming from Nomura's inventory.  For example, the co-conspirators testified:

- Dinucci: Another way was if we had owned a bond in our inventory that Nomura had owned, we would represent that it was a client order looking to sell the bond, not that we owned it." Tr. 158.

- Dinucci:  "So for example, if we were discussing a bond with a client and said that the best price we could possibly buy the bond on behalf of the client was 50 and it was actually 48, we would represent that it was 50 to the potential buyer, therefore increasing our profit on the trade."  Tr. 158.

- Chao:  "[A]nother way was if there was a -- there were times when we made up that we were selling a bond from a client instead of, in reality, it was a bond that Nomura had already owned. . . . So, there might be a bond that Nomura owned in its inventory, and a trader might tell a client that it was an offer from a client and not tell them that Nomura actually owned the bond. And throughout the negotiations, a Nomura trader might tell the client that the other client was showing a bid or showing offer or something, but sort of making up there was another client involved when, in reality, Nomura owned the bond."  Tr. 1687-88.

- Feely:  "From time to time the desk would misrepresent the ownership of the bond as if the negotiation was taking place as if there was a seller on the other side of the trade; whereas in truth, the bond was owned by the desk."  Tr. 1933.

> (2)  Deception was a cooperative effort on the Nomura RMBS desk, and was taught by defendants to their subordinates

Dinucci, Chao, and Feely further testified that they did not come up with these deceptive practices, but observed them, were trained in them by others at Nomura, including Shapiro and Gramins, and discussed them with other Nomura traders.  It was clear from this testimony that the practice of deceiving customers was not an isolated one, but one done in concert with others on the desk, and one that was expected of Nomura RMBS traders.

- Dinucci: "Q: Would Mr. Shapiro lie to customers? A. He would. Q. Would Mr. Gramins lie to customers? A. He would." Tr. 171.

- Dinucci:  "When I first joined Nomura, this was a tactic that I had seen other traders use and they wanted to employ in our day-to-day business. . . . Specifically, [I saw] Michael Gramins and Ross Shapiro [use this tactic]."  Tr. 159.

- Dinucci: "When we were misrepresenting the prices that we were telling clients, we all had to make sure that on the desk anyone involved in that negotiation or in a particular chat room with a client knew exactly what prices we were relaying when they were not the accurate prices. . . . [That was] [s]o one of us didn't basically slip up and tell a different price than another trader who had already told the client." Tr. 161.

- Dinucci: "[Mr. Gramins and I would] have discussions about what prices we were going to represent to clients on an inventory trade, a riskless trade, whatever it may be. How we were going to negotiate a larger spread for Nomura." Tr. 164.

- Dinucci: "Q. Could you tell us, who were the other traders who engaged in this conduct? A. Michael Gramins, Ross Shapiro, Tyler Peters, you know, to name a few." Tr. 167.

- Dinucci: "Other traders on the desk taught me this tactic. . . . Mostly Michael Gramins and Ross Shapiro." Tr. 175.

- Chao: "Q. Did you yourself lie to customers? A. I did. Q. And where did you learn about that practice from? A. I mostly learned it from Mr. Gramins and Mr. Dinucci. Q. Did you observe them engaging in that practice as well? A. I did." Tr. 1685.

- Chao: "A. When I first started to do out-of-comp trades, it was using a chat room. And oftentimes I had Mr. Gramins sort of tell me what I should be writing to the client and how to engage in a trade with a client. Q. And did that include, in some instances, lying? A. In some cases." Tr. 1687.

- Chao: "Q. And again, was this another strategy [lying on inventory trades] that you learned from Mr. Dinucci and Mr. Gramins? A. Yes." Tr. 1689.

- Feely: "Q. . . . Training to engage in these lies; how would that occur? A. It would be first by observation and by direct indication. Q. What do you mean by direct indication? A. They would tell me how to say something or how to go about a specific situation. Q. Okay. Who would tell you that? A. Ross Shapiro and Tyler Peters. . . . Q. Would this be while you were engaged in a trade negotiation? A. Sometimes, yes. Q. How so? How would you consult with them during that process? A. Well, either I was in the same chat that they were, so there was -- the situation was demanding an answer, and they -- I would either ask or they would volunteer on how to answer to that specific situation. Other times, if I was in a chat that they were not in, I would go and ask what is the best way to go about the specific situation." Tr. 1945-46; *see also* Tr. 1932.

> (3)  The conspirators knew and expected that their lies would profit Nomura at the expense of their customers

Not only did the conspirators knowingly work with their fellow traders to deceive customers, but they did so fully understanding that the purpose of the lies was also to harm them—

that is, by making more money at their customers' expense and by forcing their victims to negotiate

with materially false information.

- Dinucci: "[We lied about purchase and sale prices] to increase the profit for Nomura. . . . Like I said earlier, the typical commission that we would receive on these types of trades was anywhere from four ticks to 16 ticks. When we would misrepresent the price that we were buying or selling at, we could further dictate what the commission was going to be by lying to the client."  Tr. 159.

- Dinucci: "You could [get commissions off inventory trades when you would make up this fictitious third-party on your inventory trades].  It would [be extra money on top]. [That money would come from] the clients, basically."  Tr. 165-66.

- Dinucci: "The lies would increase the profit on the desk, which theoretically would increase the bonus pool at the end of the year."  Tr. 170.

- Dinucci: "Q. Did [Mr. Gramins and Mr. Shapiro] ever explain to you why they would lie to customers?  A. Again, to increase the profit for Nomura."  Tr. 171-72.

- Dinucci: "Q. Now, Mr. Dinucci, in your training at Nomura, were you trained to give a false bid to sellers?  A. Yes.  Q. Were you told about -- were you given a purpose for doing that?  A. To increase the profit on the trade.  Q. Who told you that that was the purpose of doing that?  A. Mr. Gramins, Mr. Shapiro."  Tr. 255.

- Dinucci: "Q. Okay. Mr. Dinucci, in your time at Nomura, were you trained to give a false offer to a buyer that wasn't the one you received from the actual seller?  A. Yes. Q. Who taught you to do that?  A. Mr. Gramins and Mr. Shapiro.  Q. Did they explain to you why they thought you should do this?  A. Again, to increase the profit on a trade."  Tr. 256-57.

- Chao: "The effect [of making misrepresentations to a buyer or seller] was to get either one side or both sides to lower their offer or increase their bid, and that would increase the spread or money that Nomura earned on the trade."  Tr. 1685-86.

- Chao: "Q. And again, what was the purpose of [misrepresenting the spread being made by Nomura]?  A. The purpose was to sort of make the client feel like we were working for them, but in reality we were making money.  Q. And when you make more money, when Nomura makes more money, where does that money come from?  In other words, whose money was that?  A. From the client."  Tr. 1686.

- Feely: "Q. Why would you lie about where you bought a bond or where you could sell a bond?  A. To make more money."  Tr. 1932.

- Feely: "Q. Could you explain to us how would misstating the purchase price of a bond result in more profit for Nomura?  A. If I would tell the buyer I can buy the bond higher than the actual truth, or I'd tell the seller that the bid that I have is lower than is actually

truth, and they agree on the trade, I get to keep that difference between the truth number and the number that I am representing; and I kept that for the desk."  Tr. 1932.

- Feely: [The lies the co-conspirators would tell were] "hurtful" [because they had the effect of getting clients to] "pay more or some more than they would otherwise."  Tr. 1967.

(4)     Efforts to keep lies hidden from victims

A telling and corroborative piece of circumstantial evidence of the conspirators' intent was their understanding of the importance of keeping the truth from their victims.  Defendants and their conspirators concealed their conduct from their customers, knowing that their lies hurt victims' profits and, if revealed, would impair their relationship with victims.  The co-conspirators explained:

- Dinucci:  "Q. Did you have conversations at Nomura about whether or not you need to make sure clients didn't catch you in lies?  A. Yes. . . .  Q. How often would you have these type of conversations?  A. We would have them often. . . .  THE COURT: Who did you have those conversations with?  THE WITNESS: Other traders on the desk.  Q. Who were those other traders, Mr. Dinucci?   A. Michael Gramins and Ross Shapiro."  Tr. 194-96.

- Dinucci:  "Q. Yesterday you referred to something being called 'put in the box,' do you remember that?  A. Yes, I do.  Q. And that was a sort of penalty that might be imposed by a counterparty if the counterparty had perceived misrepresentations, is that correct?  A. That's correct."  Tr. 288.

- Dinucci:  "Q. You recognize lying to clients might lead to bad relationships with clients as well as bad business, correct?  A. That's correct."  Tr. 289.

- Feely:  "As a common practice, you would make sure that everybody understands the lie, is aware of it just in case the client would reach out to them directly that same day or down the road, and you don't want anybody to be unprepared or without the knowledge of what is the story that's been told to that specific client."  Tr. 1947.

b)     Trade Evidence

The co-conspirators' testimony about the concerted practice of fraud and deception on the RMBS desk at Nomura was corroborated at trial with overwhelming documentary evidence of that deception aimed at harming Nomura's customers.  Indeed, as it is well settled that a jury may infer

that a defendant intended the natural and probable consequences of his actions, *see United States v. Russo*, 302 F.3d 37, 47 (2d Cir. 2002), the documentary evidence of repeated lies that had the effect of increasing Nomura's profit at victims' expense was sufficient, in itself, to prove intent. While the Government will not recount all of the trades introduced at trial, a handful of examples are instructive.

(1)    Trades 14/15

These were two trades in which Shapiro and Peters sold HVMLT (Trade 14) and LXS (Trade 15) bonds to Putnam Investments (Zachary Harrison) from MKP on March 16, 2011. At 16:30:46, Harrison bid 52-16 for the LXS bond. Gov't Exs. 14A, 15A. At around 17:14:57, Nomura purchased the LXS bond for 52 and the HVMLT bond for 62, both from MKP. *See* Gov't Exs. 15B, 14B. At 17:16:34, Harrison bid 62-24 on the HVMLT bond—which would have netted Nomura a commission of 24 ticks, or three-quarters of a point. Gov't Exs. 14A, 15A. Six minutes later, at 17:20:02, Peters lied and informed Harrison that the sellers "are going to come right back to us," *i.e.*, with a price, when in fact the bonds had already been acquired by Nomura. *Id*. Peters then "hand[ed] the baton" to Shapiro, who continued the negotiation with Harrison under the false pretense that the seller was still negotiating. *Id*.

At 17:27:12, Shapiro lied and told Harrison that Nomura purchased the LXS bond for 53.5 (not, as we now know, at 52), and the HVMLT bond at 62.75 (not, as we now know, at 62). *Id*. As a direct result of those lies, at 17:28:52, Harrison agreed to pay an additional quarter point (8 ticks) above the falsified purchase prices. *Id*. Thus, because he was lied to by Shapiro, Harrison paid 53.75 (53-24) for the LXS bond—56 ticks over Nomura's purchase price of 52, 48 ticks more than price would have been with the negotiated commission (52-8), and 40 ticks more than what Harrison originally bid (52-16). *See* Gov't Ex. 15D. Similarly, based on Shapiro's lie, Harrison agreed to pay 63 for the HVMLT bond—32 ticks more than Nomura's purchase price of 62, 24

17

ticks more than the price would have been with the negotiated commission (62-8), and 8 ticks more than Harrison's bid of 62-24.  *See* Gov't Ex. 14D.  Shapiro and Peters' lies deceived Harrison, who agreed to pay Nomura significantly more than he would have otherwise, to his investors' detriment.  Moreover, this trade corroborated the co-conspirators' testimony that negotiating fraudulent transactions was a collaborative endeavor on the Nomura RMBS desk—in this case, one that involved Peters and Shapiro.

(2)      Trade 26

This was a trade in which Chao and Gramins sold 12.3 million of a PPSI bond from Bracebridge (Gabe Sunshine) to HIMCO (Aadil Abbas) on May 1, 2012.  Earlier in the same day, at 15:23:39, Chao sold 7.2 million of the same PPSI bond to HIMCO for 78-22.  *See* Gov't Ex. 26C.  Likely after seeing a trade post from that trade, Sunshine informed Gramins at 18:58:01 that "I own 13.8 of these puppies . . . happy to peel off all or some in the h70s."  Gov't Ex. 26A.  Then, at 19:04:53, Chao said to Abbas, "Hey we are itw 10+mm more PPSI . . . think i can pull them out in the L80s."  Gov't Ex. 26B.  This was the first lie—and one that could only have been arranged by communication between Chao and Gramins.  At 19:36:46, Abbas communicated a bid of 78-22 to Chao.  Gov't Ex. 26E.  At 20:09:02, after Gramins bid 78 to Sunshine, Sunshine countered at 78-16.  Gov't Ex. 26D.

At that point, Gramins and Chao could have executed the trade with Bracebridge and HIMCO and made 6 ticks, well within the typical commission for this type of trade.  Instead, Chao—who testified that he took direction from Gramins, Tr. 1707—told Abbas that "seller came back to us with an 80-16 offer."  Gov't Ex. 26E.  This was a lie, as the offer was actually 78-16, or two full points lower.  At 20:19:10, based on that lie, Abbas expressed a willingness to improve his bid to 79-00.  Gov't Ex. 26E.  Again, a trade could have been done at that point, but Chao continued the charade in an effort to get more money out of Abbas through further deception.  At

18

20:21:14, Chao told Abbas that that "[w]e just showed him 78-16 to get started. We'll show 78-24 and see what comes back." Gov't Ex. 26E. Both of those statements were lies—Gramins never showed 78-16 to the seller, and he and Chao had no intention to show 78-24. Rather, these misrepresentations were made in an effort to get Abbas to pay more. *See* Tr. 1733 (Chao: "I think it was to give Mr. Abbas sort of an illusion, a false illusion that, you know, we were trying to buy the bonds cheaper for him.").

Similarly, at 20:27:25, Chao again lied and told Abbas that the seller was "showing [a] 79-24 offer now," that there may be "wiggle room" but the seller "wants a 79h to trade them." Gov't Ex. 26E. Again, these were lies; the seller had offered 78-16, which is ultimately the price at which he sold to Nomura. As if Chao's intent was not otherwise clear—that he was trying to force Abbas to go even higher through these additional lies—Chao made it even more explicit, saying "[k]now you said 79-00 was your best. Do you have some room? Worried he is going to engage [the second best bid from earlier] if we don't get to 79h." *Id.* Despite Chao's lies, Abbas insisted on staying at 79-00. Not surprisingly, Chao accepted the offer (with an additional two ticks), since the trade had been in the money for Nomura all along. In short, Abbas agreed to pay 12 ticks more than he would have otherwise because of Chao's lies, meaning that Abbas's investors were harmed in the amount 12 ticks and Nomura's balance sheet profited by 12 ticks. This was precisely the object of the scheme described by the co-conspirators, as Chao explained:

> Q. Do you have an understanding, based on what you've testified about today, as to what the effect of that lie would be?
>
> A. The effect would be, hopefully, that Mr. Abbas would increase his bid based on that information.
>
> Q. And what would the utility of him increasing his bid be for Nomura?
>
> A. It would hopefully increase the spread or amount of money that Nomura earned on this trade.

Tr. 1715.

Moreover, this trade further corroborated the co-conspirators' testimony about the collective efforts involved in deceiving customers.  In this case, Chao had the relationship with Abbas, and so he dealt with HIMCO, while Gramins dealt with Bracebride.  Tr. 1698.  To maximize Nomura's profit, it was necessary for the two to coordinate their approach; otherwise they would risk Nomura doing the trade at a loss.  Tr. 1683-84 (Chao: "The traders would need to know if there was a spread created or no spread created.").  Here, Chao testified that "in a trade like this, [Gramins] would instruct me on what to tell the client."  Tr. 1707.  Chao explained that he would need that direction from Gramins because the trade was not "straightforward," since there were two bidders for different sizes and one who would pay a higher price, and given his relative inexperience at the time.  Tr. 1707-08, 1711-12, 1734.

In short, a rational juror could look at this trade, credit Chao's explanation of Gramins' control, and conclude that Chao and Gramins were participants in an agreement to defraud victims like HIMCO.

### (3)    Trade 27

This was an August 29, 2012 trade in which John Fleisher sold a WAMU bond to Putnam (Zach Harrison) that Nomura sourced from Marathon.   Nomura acquired the bond at approximately 16:50:00 from Marathon at a price of 83.  *See* Gov't Ex. 27A.  Just under thirteen minutes later, at 17:02:52, Fleisher messaged Harrison that a seller was offering the WAMU bond at a "higher level than last week," or 85-16.  Gov't Ex. 27B.  This was obviously a lie, since the seller had just sold at a price 2 ½ points lower.  Nonetheless, Harrison bid—based on the bogus offer communicated by Fleisher—and ultimately agreed to pay 85.  Gov't Ex. 27B.

This trade is particularly noteworthy in the context of the charged conspiracy because it corroborates the co-conspirators' testimony about defendants' control over Nomura's trading. When Harrison challenged Fleisher based on inconsistent color Harrison had received, Fleisher's

reaction was to consult defendants.  At 18:16:40, while Fleisher was in the midst of feigning a non-existent negotiation with the seller, Harrison sent him a chat with Dan Ezra of Credit Suisse in which Ezra claimed that Nomura had already purchased the bond at "82a," or in the "area" of 82.  Gov't Ex. 27B.  Harrison instructed Fleisher to ask the seller if he is "giving bogus color out to [Credit Suisse]," because the "possibility that you are taking out 3pts is out of the question to me."  Gov't Ex. 27B.  In other words, Harrison was trying to figure out if he was receiving inconsistent and potentially false information, while making clear that he wanted the truth, that a 3-point spread was not acceptable, and that he trusted Nomura.  Fleisher then falsely claimed that he went back to the seller to ask about the "color," and Harrison kept inquiring, asking at 18:40:52 "why would [Credit Suisse] say their guy sold these with u 82/3," to which Fleisher responded "i was just talking to gramins.  there are other [money managers] out with wamu 05 mezz axe."  Gov't Ex. 27B.  At 18:42:17, after fielding repeated questions from Harrison about the discrepancy, Fleisher forwarded the chat to Shapiro and Gramins.  Gov't Ex. 27C.

This is consistent with specific testimony that Nomura's relationship with Putnam/Harrison was critical, and thus the lies had to be carefully monitored to prevent detection.  *See* Tr. 218-19 (Dinucci:  "[Putnam was] a very large account for us that generated significant P and L, and had to be handled by the most senior traders."); 1974-75 (Feely:  "Zach Harrison was the biggest client of the desk, therefore we were extra careful.  And. . . . you want to make sure that everybody understands. . . .  In case someone later talks to him about the same security, they know what I told him had happened.").  Indeed, Gramins also engaged with Harrison on the subject, providing some of the same false explanations as Fleisher.  *Compare* Gov't Ex. 27D at 19:15:15 (Gramins:  "don't know why someone would be talking these down") with Gov't Ex. 27B at 18:39:49 (Fleisher:  "we were just on with the guy.  He was saying he hasn't talked to other dealers on it.  *I don't know*

*what his incentive to talk the bonds down are, though*.") (emphasis added).  Ultimately, Harrison

agreed to buy at 85, instructing Fleisher to tell the seller that "[Credit Suisse] is spreading bogus

bullsht," Gov't Ex. 27B, although he continued to try to ferret out the source of the misinformation.

In sum, a rational jury could take several salient points from the evidence underlying Trade

27 that support defendants' intent.  First, it is another example of the conspiracy deceiving a victim

customer with the intent and effect of causing the victim to suffer financial harm and to bargain

with false information.  Second, it shows the lengths to which Nomura traders—here, Fleisher and

Gramins—would go to conceal their deception from Harrison; a rational juror could conclude that

the conspirators did not believe their lies were inconsequential, as defendants suggest, otherwise

they would not have bothered.  Third, a jury could reasonably conclude that, based on Harrison's

reactions, Fleisher and Gramins understood that the false price information they were providing

was important to Harrison—insofar as Harrison spent a great deal of effort to ferret out the source

of any misinformation.  Fourth, a rational juror could rely on this trade to find that defendants and

other members of Nomura's trading desk had an agreement to engage in a scheme to defraud

customers; here, Fleisher lied to a customer, forwarded evidence of his lie to Shapiro and Gramins,

and Gramins assisted in making sure the lie did not come unraveled.[5]

(4)    Trade 29

In this trade, Gramins sold a JPMAC bond from TCW (Harrison Choi) to QVT (Joel

Wollman) on November 22, 2013.  At 20:29:37, Gramins agreed with Wollman to bid 77-16.  At

21:11:21, Choi countered with an 80 offer.  At 21:22:33, Gramins lied to Wollman, saying, "I think

if you get over 80 we have a shot," and then "and I certainly don't have that in hand."  At 21:29:16

Gramins began lying to Choi, saying in a phone call, "this guy's passing over 80," and then shortly

---

[5] Likewise with Trade 11, where Gramins lied then to a customer, then forwarded evidence of his lie to Shapiro and
Nomura salesman Jonathan Sebiri.  *See* Gov't Ex. 11F.

after continued, ". . . so he wanted me to show you a 78 bid," when in fact Wollman had actually bid 80.  There was nothing ambiguous about these lies to Choi, and a jury could easily conclude that it was intended to affect Choi's view of the price at which he could sell.  In his call with Choi, Gramins continued, ". . . he wanted to be 78.  I said no.  I have 78 and three-quarters," and then clarified that the bid was "to you.  He's paying me on top."  In fact, that was also not true— Gramins had not negotiated anything with Wollman about compensation.  Critically, Choi then says "I was going to say 79 handle before you told me 78 3/4," showing both that the false price information being provided by Gramins weighed heavily in Choi's decision-making and that Gramins knew that to be the case.  Choi then offered 79-8 at 21:38:50.

Gramins then turned around and lied to Wollman.  At 21:43:45, Gramins said to Wollman that "80-16 is the best I can get them to you," and about five minutes later told Wollman that "he is paying me."  This is the first discussion of commission in the negotiation with Wollman, and Gramins lied—he had told the buyer (Choi) that the seller (Wollman) was paying the commission, and now he told Wollman the exact opposite.  At any rate, it is clear that Choi did not understand himself to be paying a commission, contrary to what Gramins told Wollman.  Moreover, a rational jury could conclude that Gramins knew that this mattered to Wollman.  Wollman testified that,

> I'm trying to figure out what my all-in price is going to be. So since it hadn't been discussed before, I wasn't sure whether his understanding was the 80 and a half was the price the seller would sell and then he still needs to be paid a commission, or whether or not he was already incorporating that commission into that 80-and-a-half price that he was showing.

Tr. 2182.  When Gramins said that the seller was paying, Wollman took that to mean that the 80-16 was "the pre-commission price, the price that the two sides had agreed on, and then the seller would then pay a commission on top of that."  *Id*.  Wollman based that understanding on his own experience as a trader, as well as his experience "doing many, many transactions" with Gramins.

Tr. 2183.  Thus a rational juror could conclude from this evidence that—given the circumstances of the trade and their shared business history—Gramins was lying with the intent to deceive Wollman.

The Government also introduced a recording of an internal Nomura call between Gramins and co-conspirator Michael Romanelli.  Gov't Ex. 29F.  That call took place directly after Gramins' call with Choi, and before he returned to chat with Wollman.  At that point, Gramins had already lied to both sides about their respective counterparties' positions; in truth, Wollman had bid 80, expressing a strong preference to go no higher and Choi had offered 79-08, and likewise said that was his best.  At this point, a trade could have been done with Nomura making three-quarters of a point in profit—well above typical.  However, Gramins instead engaged with Romanelli—who was the Nomura salesperson covering QVT—to discuss how to get more money out of Wollman, or how to "maximize the situation."  Gov't Ex. 29F.

Specifically, Gramins and Romanelli discussed how to return to Wollman with a counter-offer without discussing how much commission Wollman will be paying, contemplating saying "80 and a half to you."  While Gramins contends that this was a nod to Nomura's compliance policy, such a connection is speculative and not grounded in the evidence.[6]  In fact, Romanelli proposed lying to Wollman if he asked about commission, suggesting that Gramins would say "I'm gonna try to get him down a little bit more.  I won't lose the trade to see how much I can make off of him, but right now it's not much."  In other words, Gramins would tell Wollman that he would try to get the seller down a little more in order to make a profit for Nomura, suggesting

---

[6] In fact, to the extent there was a compliance "policy" that applied here, it was the same as it has always been—traders were forbidden from making material misrepresentations.  *See* Tr. 649-50.  On this point, Gramins also conflates a compliance meeting he attended in February 2013, immediately after the Litvak indictment, *see* Gov't Exs. 5A, 5B, with one that Caleb Chao attended in December 2013, after the conduct charged in the Indictment, *see* Tr. 1846.  *See* Gramins Mem. at 13.

(as Wollman testified he believed) that the seller's offer was around 80-16 at that point.  In fact, and as Romanelli and Gramins well knew, they had no intention of going back to the seller, and already stood to make Nomura 1.25 points—far more than "not much."  Moreover, Gramins had already agreed with the seller that the buyer would pay the commission.  In short, a rational juror could easily conclude that this call was further evidence of the conspiratorial agreement between Gramins and others on the RMBS desk at Nomura.

Finally, leaving aside Romanelli's involvement, Gramins' misrepresentations in this trade were themselves persuasive evidence of his participation in the conspiracy to commit fraud.  Here, Gramins knowingly lied about price to both sides of the transaction in order to increase the profit for Nomura at the expense of the victims.  The trades in evidence demonstrated a years-long pattern of Gramins and other members of the RMBS desk repeatedly making these same kinds of price misrepresentations to customers in the same way and for the same purpose.  Thus, the jury was entitled to consider Gramins' fraudulent acts in this trade as evidence that he had agreed to participate in the conspiracy to defraud.

> 3.    Even applying a stricter intent standard, a rational juror could find a conspiratorial agreement

Although the law is clear that the Government need only prove that the conspiratorial agreement is directed at deceiving victims and causing them harm, there was also sufficient evidence for a rational juror to conclude that the traders on the Nomura RMBS desk were acting with knowledge of the unlawfulness and wrongfulness of their fraudulent conduct.  That evidence included:  Nomura's compliance policies, which incorporated legal standards of conduct regarding truthfulness; the traders' training as registered securities representatives; the testimony of Jonathan Raiff that lying to customers about price in negotiations was never acceptable at Nomura; and—

perhaps most importantly—the jurors' common sense that lying to cheat other people out of money is both wrong and illegal.

a)        Compliance Policies

First, the Government introduced several passages from the Nomura compliance manual that dealt with truthfulness as probative of the state of mind of defendants and their co-conspirators, who were required to review them.  *See United States v. Anderson*, 533 F.3d 623, 632 (8th Cir. 2008) (permitting introduction of compliance manual on issue of intent in an insider trading case). The manuals included several relevant passages, among others:

- "Rule l0b-5, which was promulgated by the SEC under the Exchange Act, prohibits manipulative, fraudulent and deceptive practices in connection with either the purchase or sale of securities, whether or not those securities are exempt from registration."  Gov't Ex. 126-2A at 2.
- "Employees should not take unfair advantage of anyone through concealment of material information, misuse of confidential information, misrepresentation of material facts, or any other unfair dealing practice."  Gov't Ex. 126-3 at 2.
- "All communications over the Firm's electronic systems must be truthful and in good taste."  Gov't Ex. 126-3 at 5.
- "In every context, communications with the public, whether oral, written or electronic, must be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts regarding any particular investment, industry discussed or service offered.  All communications must be truthful, balanced and in good taste, must not omit material facts and must not use language that is misleading, promising or exaggerated.  Forecasts must be described as such."  Gov't Ex. 126-8 at 1.
- Nomura People must respect fair business practices in jurisdictions where they operate and endeavor to deal fairly with Nomura Group's customers, suppliers, competitors and Nomura People. Nomura People should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or any other unfair-dealing practice."  Gov't Ex. 126-A1 at 1-2.

Nomura's manual also described the various regulators of the securities industry and the law enforcement agencies tasked with "prosecution of alleged violations of the federal securities law." Gov't Ex. 126-2A.

Not only did company policy require employees to review the manual, *see*, e.g., Gov't Ex. 126-1A at 1, the company maintained records of each employee's annual compliance with that policy, some of which the Government introduced. *See* Gov't Exs. 160 (Shapiro), 161 (Gramins); 162 (Peters); 163 (Fleisher); 164 (Feely); 165 (Dinucci); 166 (Chao). Each certification confirmed that the employee understood their obligation to read the compliance manuals. A rational juror could easily have concluded that these attestations were credible and that defendants and their co-conspirators were well aware of their legal obligation to avoid fraudulent conduct, specifically material misrepresentations.

Similarly, the relevant compliance policies were digested in presentations given to defendants and their co-conspirators, which instructed Nomura employees to refrain from "omission of material facts or making untrue / misleading statements," Gov't Ex. 156 at 6 (May 2012), and "DO Not Lie," Gov't Ex. 5A (February 2013). The directive in 2013 to refrain from lying was hardly a new one—it was reflected in several places in the pre-existing compliance manuals and in an earlier presentation. Moreover, Nomura had no policies to the contrary, meaning that there was nothing in any manual that suggested employees were permitted to lie or to maximize profits by deceiving customers, or that deception was permissible in certain circumstances.

The jury was entitled to consider Nomura's policies and training as evidence that defendants and their co-conspirators intended to do something they knew to be illegal and wrongful.

b)      FINRA Licensing

The Government introduced evidence that Shapiro and Gramins both had their FINRA Series 7, 63, and 24 licenses.  *See* Gov't Exs. 170 (Shapiro), 171 (Gramins).  Likewise, Dinucci, Chao, and Feely testified to having Series 7 and 63 licenses.  *See* Tr. 147 (Dinucci), Tr. 1669 (Chao), 1931 (Feely).  Jonathan Raiff, who testified that all Nomura traders had to pass Series 7 and 63 exams, further explained that "[s]ubjects of the exam are primarily focused on things like Securities Act of '33, '34, and other SRO rules."  Tr. 405.  In discussing his training as a licensed representative, Dinucci explained that he learned of his ethical obligations as a trader, and specifically "[t]o be truthful in your negotiation with the clients."  Tr. 147-48; *see also* Tr. 361 (Dinucci: "Basically, while I was actually doing these deceptive trading tactics, I didn't think they were illegal tactics, yet my licenses that I needed to be certified for to trade effectively said that I had to be honest and truthful and not deceptive in my communications to concur with the law.").

The jury was entitled to consider the licenses of defendants and their co-conspirators as proof that they understood their conduct to be illegal and wrongful.

c)      Raiff's testimony

The Government called Jonathan Raiff, an experienced securities trader and Head of Global Markets for the Americas at Nomura.  Raiff explained that the Nomura compliance manual's message on misrepresentations was "[d]on't do it, everything you say has to be truthful and accurate."  Tr. 397.  Raiff testified that Nomura's policy was not unique, saying "[m]y previous employers have had similar policies.  And when I started trading, it was also made very clear to me."  *Id*.  Moreover, the policy against lying did not change during Raiff's tenure, which encompassed defendants' and their co-conspirators' employment.  Tr. 398.

Raiff also testified about Nomura's compliance trainings, in particular, the two discussed above.  Raiff first testified on the May 2012 training (Gov't Ex. 156), attended by both defendants,

entitled "Trading Practices" as part of "Fixed Income Compliance Training."  Tr. 426.  He

reviewed its directive prohibiting "omission of material facts or making untrue statements," stated

that this was not announcing any new policy at Nomura, and pointed to one place (among others)

in the pre-existing compliance manual which echoed the same idea.  Tr. 428.  Raiff then testified

on the February 2013 training, which both defendants attended, undermining defendants' argument

that there was a change in policy, rules, or regulations on lying after the *Litvak* indictment:

> Q. Was this [February 2013] announcement of Nomura's policy at this training a
> shift in what had been Nomura's policy prior to the Litvak indictment?
>
> A. In no way.
>
> Q. Can you explain?
>
> A. So this was in 20- -- early 2013, February 5, as we just said, so all the compliance
> manuals had these principles in there.  There were previous annual training sessions
> which had this -- perhaps not written in this way, but had similar wordage and
> verbiage.  And of course the actual content of the presentation, as presented by
> compliance, where we went into each of these bullet points in detail, made it very
> clear repeatedly through the years that this was not within the ordinary bounds of
> business.

Tr. 436.  *See also* Tr. 456 ("Q. I also believe you testified that this was a refresher based on material

that was in the preexisting Nomura compliance policies, is that right?  A. A refresher or

reminder."); Tr. 640 ("This was a reminder or refresher to everyone like, hey, guys, you should all

be knowing this."); Tr. 642 ("Q. Did you understand there to be a change in the rules and

regulations at Nomura following Litvak?  A. I did not.").  A jury could reasonably have credited

Raiff's testimony that there was no shift in policy, rules, or regulations after *Litvak*.  In other words,

a rational jury could conclude that all Nomura employees—including defendants and their

confederates—always knew that lying to customers about price was illegal and wrong.

Raiff also talked about the role of supervisors in compliance, describing them as "the first

line of defense in terms of compliance."  Tr. 458.  Raiff explained that because "[t]hey are the

people sitting amongst the individual traders or salespeople," compliance "is their primary

responsibility as far as the firm is concerned." *Id.*  Raiff testified that compliance personnel had no

role in day-to-day monitoring of trading activity.[7]  Tr. 462.  Instead, Raiff explained that the

supervisor—in this case, Shapiro as the head of the RMBS desk—was responsible for monitoring

and keeping track of what was happening on the trading desk.  Tr. 467.  Thus, a rational juror could

draw the reasonable inference from Raiff's testimony that everyone at Nomura knew the official

policy was not to defraud customers, but as long as Shapiro, and later Gramins as well, were in

charge of the trading activity on the desk, no trader had a reason to fear repercussions.

>          d)      Common sense assessment

Finally and perhaps most importantly, a rational juror could reasonably conclude that an

educated individual licensed to sell securities understood that it is wrongful and unlawful to

deceive people to cheat them out of money, and that any testimony to the contrary was self-serving.

Such a principle is hardly novel; the Second Circuit held over a hundred years ago that "[n]o one

can have an innocent intent in devising a fraudulent scheme." *Marshall v. United States*, 197 F.

511, 515 (2d Cir. 1912).  Indeed, as described above, this was not a complicated scheme—

defendants and their co-conspirators lied about prices to take money from victims and increase

Nomura's profits.

The co-conspirators' testimony on this score was admittedly incongruous, and presented

the jury with a decision about which portion to credit.  On the one hand, the witnesses

acknowledged that they understood they were engaged in wrongful conduct, judged by common

sense standards.  Frank Dinucci testified:

---

[7] While some e-mail review for the 400 fixed income personnel was delegated centrally to Bill Kramer, Kramer's function was not to examine traders' truthfulness in trades.  Given the volume of e-mail, Kramer relied on keywords like "rumor" to flag potentially troublesome communications.  *See* Tr. 464-66.  Indeed, the kinds of e-mails that were shown to witnesses at trial bear this out—for example, Dinucci was confronted by an e-mail from Kramer regarding expenses.  Tr. 287.  However, Diunucci explained that he did not expect Kramer to identify fraudulent trades: "They would be very difficult to match up separate chat rooms where we would be lying to one client versus lying to another, and then crossing them with trade tickets to see where the actual transaction prices were."  Tr. 359.

Q. How did you know it was wrong, Mr. Dinucci?

A. Lying in any sort of instance is not the right way to handle anything.

Q. Is there anything else that told you it was wrong, Mr. Dinucci?

A. We were being deceptive in our practices when trading with clients.

Q. So why did you do it?

A. To increase the profit for our book.

Tr. 167.  Similarly, Chao agreed that "it's generally speaking wrong to lie to people," and "in particular wrong to lie to people to take their money."  Tr. 1908.  As mentioned above, Feely identified the co-conspirators' actions as "hurtful" to their customers, Tr. 1967, agreed that he had an obligation to be truthful, Tr. 1931, and stated he knew his conduct was wrongful whether before or after *Litvak*, Tr. 1970.  In short, all three co-conspirators acknowledged that they understood their obligations to be truthful and the wrongfulness of their fraudulent conduct.

Likewise, these three witnesses acknowledged that they understood their training and licenses forbade deceptive conduct.  Dinucci testified:

Q. When you started at Nomura, Mr. Dinucci, did you think it was illegal to deceive people out of money in purchase and sales of securities?

A. When I first started, I didn't think of the legality behind the trades we were doing.  I just knew that lying and deception was not right.

Q. Did the idea of it being illegal in the purchase of sales and securities, was that something you were familiar with?

A. Yes.

Q. How so? How did you become familiar with it?

A. Basically through my training to get my licenses.

Q. And Mr. Dinucci, did you deceive people out of money?

A. Yes.

Q. Why did you do that, Mr. Dinucci?

A. To increase the profit for Nomura.

Tr. 175. *See also* Tr. 1915 (Chao); Tr. 1931 (Feely).

On the other hand, defendants rely heavily on the fact that each of these three witnesses also testified that he did not think that his deceptions were illegal or did not consider the issue. Gramins Mem. at 21-25, Shapiro Mem. at 9-11.  For instance, Dinucci said, "[w]hen I first started, I didn't think of the legality behind the trades we were doing.  I just knew that lying and deception was not right," but then added that his "training to get [his] licenses" put him on notice that such actions were illegal.  Tr. 175; *see also* Tr. 361 (Dinucci:  "Basically, while I was actually doing these deceptive trading tactics, I didn't think they were illegal tactics, yet my licenses that I needed to be certified for to trade effectively said that I had to be honest and truthful and not deceptive in my communications to concur with the law.").  Chao likewise claimed, "I didn't think about [my training on making misrepresentations] and what I was taught at the same time."  Tr. 1915.  And Feely said he never thought about the deceptive practices "in legal terms."  Tr. 1935.  Importantly, none of the co-conspirators testified that they affirmatively believed that it was legal to make misrepresentations regarding price in RMBS trades.

Given this apparent incongruity in the co-conspirators' testimony, and looking at the totality of the evidence on the subject of intent, a rational jury was not compelled to blindly accept as true that highly educated securities traders did not understand lying to increase the profitability of trades was illegal and wrong.  As above, there was significant uncontroverted evidence that these defendants and their co-conspirators consciously engaged in what they knew to be wrongful and illegal conduct.  Faced with this overwhelming proof of willfulness, a rational jury charged with assessing witness credibility in light of all the evidence was entitled to reject the co-conspirators' self-serving and implausible testimony that they never put "two and two together." *See United States v. Mergen*, 764 F.3d 199, 204 (2d Cir. 2014) (deferring to jury assessment of witness credibility); *United States v. Messina*, 806 F.3d 55, 64 (2d Cir. 2015) (factfinder can accept

some portions of witness's testimony and reject others).  *See also Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (when witness makes contradictory statements, including recantations, factfinder can determine "whether one statement is more truthful than the other").

Similarly, a rational jury could also choose not to credit the argument that defendants and co-conspirators lacked intent because they did not—in their view—hide themselves from compliance.  *See* Gramins Mem. at 22-23; Shapiro Mem. at 14-15.  As Raiff clearly explained, the only person responsible for monitoring individual trades on the RMBS desk was the supervisor, Shapiro, and the remainder of the desk answered to him, both with respect to compliance and their salaries.  Dinucci echoed that testimony, explaining that he had no expectation that compliance was monitoring the veracity of his trading statements.  Tr. 359.  This is further corroborated by the fact that, despite the testifying co-conspirators' admissions that they understood their conduct was wrong, none sought guidance beyond their immediate supervisors.  *Cf. In Re: Air Disaster at Lockerbie Scotland on December 21, 1988*, 37 F.3d 804, 817-818 (2d Cir. 1994) (finding exception to the general rule that ignorance of the law is no excuse for criminal activity where defendant acts in "legitimate reliance on an official interpretation of law").

Moreover, defendants can point to no principle of law that permits good faith reliance on their own alleged perception of the non-reaction of compliance personnel who may have been in the general vicinity of the wrongful activity, particularly where there is no evidence that the compliance personnel were ever made aware of that activity.  Indeed, to find otherwise would undo well-established law that an advice-of-counsel defense requires both full disclosure to an attorney and following that attorney's advice.  *See United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181, 1194-95 (2d Cir. 1989).  Here, defendants and co-conspirators made no disclosure about their conduct to Nomura's compliance, and thus did not receive any advice excusing their

continued misrepresentations.  In fact, Raiff testified that he had no idea that people at Nomura were engaged in Litvak-like conduct. Tr. 641-42.  Nor did Gramins change his behavior after Litvak's indictment and the 2013 compliance meeting.  *See* Gov't Exs. 29A-29F, Tr. 1758 (Chao: "[After Litvak,] there was a time when Mr. Gramins had used -- had used the phone intercom system, and he had talked with another salesperson and told a salesperson to tell the client that Nomura's buying a bond at a price that I didn't know as true.").

Finally, a rational jury could also decline to excuse defendants' conduct on the ground that it was supposedly common practice in the industry or at Nomura.  Despite counsels' repeated arguments that deception was accepted industry practice (Gramins Mem. at 25, Shapiro Mem. at 9), there was very little evidence to support that claim outside of Nomura.  Rather, the co-conspirators principally limited their statements to their time at Nomura, and were much more reluctant to opine beyond that.  *See* Tr. 341 (Dinucci); 1830, 1907 (Chao).  Chao agreed that his "understanding of industry practice came from the only place that [he] worked at in the industry," that is, Nomura.  Tr. 1907.  In fact, the only witness who had been a sell-side RMBS trader at a place other than Nomura, Abbas, said:

> Q. So it's your testimony again, now generalizing it, if asked the information and if you thought it appropriate, you would provide it truthfully, correct?
>
> A. Yes. Either I would provide it truthfully or I would just tell them that this is an information I cannot provide.
>
> Q. And then they would have to make a decision, but they would know the truth, either you're not going to provide transparency or you're going to provide them truthful transparency, right?
>
> A. Correct.
>
> Q. Why is that, why did you feel compelled to tell them the truth?
>
> A. This is how I was trading when I was at Credit Suisse.
>
> Q. Did you understand that to be the correct way to trade?
>
> A. That's my understanding.

Tr. 1645-46.  This is consistent with the testimony by Raiff, another experienced trader, that it was not permissible for a trader to make a misrepresentation in the course of a so-called principal-to-principal transaction.  Tr. 625.[8]

### C.   There Was Sufficient Evidence of Intent to Harm

Next, defendants revisit their pretrial claim that there was insufficient evidence as a matter of law to prove intent to harm in the context of the wire fraud objective of the conspiracy.  Shapiro Mem. at 16-25; Gramins Mem. at 50-51.  Defendants' argument, that their lies about price did not go to the benefit of the bargain of the price negotiations, is contrary to both the law and the facts elicited at trial.  The evidence at trial showed that defendants engaged in their fraud in order to induce their counterparties to pay more or accept less than they would otherwise have done, putting money in Nomura's pockets that belonged to the victims.  Moreover, defendants' lies deprived their victims of "potentially valuable economic information," which itself is a property right belonging to the victims.

### 1.   Governing Law

To prove a scheme to defraud in a wire fraud case, the Government must show that, through their deceptions, "defendants contemplated some actual harm or injury to their victims," although "[i]t is not required that the victims of the scheme in fact suffered harm."  *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (internal quotations omitted).  An "intent to harm" is shown where the defendant either contemplated direct pecuniary loss, or "denie[d] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Binday*, 804 F.3d at 570 (citation omitted).

---

[8] Shapiro also makes arguments regarding the testimony of customers.  Shapiro Mem. at 11-12.  But he does not explain why the counterparties' view of the marketplace should have impacted his own intent, and there is nothing in the evidence to connect that evidence to his state of mind.

Not all deprivations of information are sufficient; "the deceit must deprive the victim of potentially valuable economic information." *Id.* (citation omitted). The Government must show that "the deceit affected the victim's economic calculus or the benefits and burdens of the agreement," and not just that a scheme "cause[d] [its] victims to enter into transactions they would otherwise avoid." *Id.* (citation omitted). "Such harm is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'" *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (quoting *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970)). Thus, "it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Binday*, 804 F.3d at 579. By way of example, "[w]here the false representations are directed to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *Id.* at 578 (quoting *Regent Office Supply*, 421 F.2d at 1182).

Fraudulent intent "may be proven entirely through circumstantial evidence," *United States v. Romano*, 794 F.3d 317, 335 (2d Cir. 2015), including "by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false," *Guadagna*, 183 F.3d at 129. Intent to harm "may be inferred when the scheme has such effect as a necessary result of carrying it out." *Regent Office Supply Co.*, 421 F.2d at 1181 (quotation marks omitted).

2. <u>Discussion</u>

Here, defendants' price misrepresentations in the course of negotiations over investment securities clearly went to the benefit of the bargain, intending both to take money from victim

customers and to induce them to bargain with demonstrably inaccurate valuable economic information.

First, as discussed at length above, *see* Section II(B), the evidence demonstrated defendants' intent to cause victims pecuniary loss.  Indeed, the entire purpose of the conspiracy was to use deception to induce victims to pay more than they otherwise would have to increase Nomura's trading profits.  *See, e.g.*, Tr. 1932 (Feely).  The evidence showed that the members of the conspiracy, including defendants, knew that Nomura's secret profits on these trades did not come out of a vacuum—they came directly out of the pockets of victims who believed the false information provided by defendants. *See, e.g.*, Tr. 256 (Dinucci:  "Q. And if you were to increase the profit for Nomura, where would that money come from? A. The clients."); Tr. 1686 (Chao: "Q. And when you make more money, when Nomura makes more money, where does that money come from? In other words, whose money was that?  A. From the client.").

Likewise, victims agreed to the price that they would buy or sell a bond for, and on that basis also agreed to the amount of the "on top" commission.  *See, e.g.*, Tr. 750, 768, 769 (Harrison); Tr. 1479 (Abbas); Tr. 2124, 2132, 2132 (Wollman); Tr. 2321, 17-19, 2322 (Marks).  The evidence at trial contained specific instances of financial harm where victims paid a specific additional and unearned amount of money to Nomura because defendants lied about the price they bought or sold a bond for, increasing Nomura's profit beyond the "commission" that had been bargained.  In each of these instances, the victims did not receive the full economic benefit of their bargain, insofar as they had bargained to purchase or sell a bond at the price Nomura was paying or receiving, plus or minus a specifically-negotiated matchmaking fee for Nomura.  *Binday*, 804 F.3d at 570.  Indeed, because a victim's return on investment is determined by the price at which it bought or sold an

asset, *see, e.g.*, Tr. 1446 (Harrison), Tr. 1648 (Abbas), Tr. 2165 (Wollman), it is self-evident that

a lie as to price of a financial investment product necessarily goes to the heart of the bargain.

Second, the evidence also demonstrated that defendants had the intent to harm under the

"right to control" theory, as recently considered in *United States v. Finazzo*.  In *Finazzo*, the Second

Circuit upheld a jury instruction that informed the jury that "the 'right to control' one's assets is

injured when a victim is deprived of potentially valuable economic information it would consider

valuable in deciding how to use its assets."  *Finazzo*, 850 F.3d at 111 (quotation marks and citation

omitted).  Here, there was ample evidence to support a rational juror's conclusion that defendants

intended to cause (and did cause) harm to their victims by depriving them of information important

in their economic calculus.  For example:

- Harrison:  "This transaction—from what I've reviewed today these transactions appear to be ones that Nomura was acting as middleman between me and this other account, and so the information that the two accounts are trying to relay back and forth through Nomura is what we're talking about, it's the information."  Tr. 753.

- Harrison:  "Q: Can that information . . . affect what you ultimately pay for a bond?  A: Yes.  Q: How so?  Can you explain that to the jury?  A: . . . it appears that I agreed to pay a quarter-point commission based on the price that Nomura paid . . . ."  Tr. 754.

- Abbas:  "Yeah, it's important because I could have bought it at 78 and 22, which is cheaper than what I eventually ended up paying."  Tr. 1510.

- Abbas:  "Q.: Was your decision to move up to 79 influenced by what Mr. Chao—the lie that Mr. Chao had told you?  A: Yes."  Tr. 1511.

- Abbas:  "If I had known that the offer is 78 and a half, I would never had paid 79 and 2.  So that's the effect I could see."  Tr. 1515.

- Abbas:  "[T]here is a non-zero probability I could have still bought it, but I would have— less likelihood that I would have bought it, let's put it that way, less likelihood I would have bought it considering that the 18-point commission is a lot in my view because I just paid the ticks in the morning."  Tr. 1524.

- Wollman:  "Well, my interaction in this trade is all predicated on the fact that there was a bid and we were negotiating to buy the bond.  I wouldn't negotiate against myself."  Tr. 2114.

- Wollman:  "Well, I had assumed that he had, in fact, bid 18-1; and then when he said that it's yours, I assumed it was bought at 18-1, and it influenced the all-in price that I ultimately agreed to pay."  Tr. 2132.

- Wollman:  "Well, essentially the seller is willing to sell it over a point lower than what I'm being told I can buy it at, so I wouldn't have agreed to pay over a point more."  Tr. 2184.

In the face of the overwhelming evidence that they intended to cause their victims real economic harm and deprive them of valuable economic information, defendants claim that the victims got the bond they wanted at a price they were willing to pay in light of their own analysis. *See* Shapiro Mem. at 17.[9]  This uncontested fact is irrelevant to defendants' intent to harm.  In fact, the evidence was clear that there was no one single attractive price at which a customer would trade.  Rather, all of the victim traders testified that they would attempt to acquire a bond as cheaply as possible, sell for as much as possible, and that their models and other research identified the price at which a trade is not attractive.  Zach Harrison explained that he would decide "a range in which I thought a security had an attractive value amongst the other opportunities," then "attempt to buy [the bond] as low in price as possible, because that would help my clients make as much money as possible."  Tr. 700.  *See also* Tr. 1445 (Abbas: model provides a floor, not a ceiling, at which to sell a bond); Tr. 1445-1446 (Abbas: "So once I like the profile of the bond . . . at that point my goal is to buy it as cheap as possible because the less money I pay for it, the more return it generates for my client.").  Neither market "color" from prior trades nor a victim's model could identify where a bond would actually trade at a particular time—the only way to get that information was to engage a broker-dealer, such as Nomura, and attempted to negotiate an actual

---

[9] Shapiro inaptly relies on the factually distinguishable case *United States v. Davis*, No. 13-cr-923 (LAP), 2017 WL 3328240 (S.D.N.Y. August 3, 2017).  There, the court reversed the defendant's wire fraud conviction because no rational juror could have found that lies related to minority participation in World Trade Center-related construction projects would have potentially harmed the Port Authority.  First, the court's decision was highly fact-based and relied in significant part on credibility determinations for the Government's main witnesses.  Second, the contracts were fixed-price, so the Government could not show how the lies could have led to any Port Authority losses.  Third, the court only considered the right-to-control theory, and not direct pecuniary loss.  Shapiro makes no effort to explain how *Davis* is instructive here, where the defendants' lies clearly were intended to alter the price paid by victims and where there is evidence of intent to cause not just deprivation of valuable economic information, but also immediate monetary loss.

trade with a counterparty.  Tr. 712-714 (Harrison), 1407-09 (Abbas).  As Abbas explained, a bond's trading price has less to do with its intrinsic value and much more to do with what price he can negotiate in the market.  Tr. 1446.

Thus, when defendants lied about price information in negotiating RMBS trades, it went to the heart of the issue for the customer—acquiring a bond for as little as possible and selling it for as much as possible.[10]  Moreover, as described above, the evidence showed that defendants and their co-conspirators intended their lies to go to the heart of the bargain, that is, they intended the lies to affect the price paid and the profit for Nomura.  No more need be shown to sustain the Government's burden.

### D.      There Was Sufficient Evidence of Materiality

Shapiro claims that there was insufficient evidence of materiality.  Shapiro Mem. at 26-37. This claim is belied by the testimony of victims and co-conspirators alike, and ultimately fares no better than it did when the Second Circuit rejected the argument in *Litvak*.

### 1.      Governing Law

"[W]hen the government (as opposed to a private plaintiff) brings a civil or criminal action under Section 10(b) and Rule 10b–5, it need only prove, in addition to scienter, materiality, meaning a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision."  *United States v. Vilar*, 729 F.3d 62, 89 (2d Cir. 2013); *see also United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) (*en banc*) (holding that for wire fraud, the misrepresentations or omissions must have "ha[d] the natural tendency to influence or [were] capable of influencing the [victim] to change its behavior").  Such

---

[10] The lies were not, as defendants claim, limited to what "slice" of the price went to Nomura; rather, they affected the overall price paid or received by the victims.  *See* Tr. 1650 (Abbas: "Q. . . . In here and on direct you talked -- about a minute ago you talked about the lie happening, and then you raising your bid, correct, from 78-22 to 79, is that right?  A. Yes, I raised my bid.  Q. And that raises not just the slice going to Nomura, that raises your overall price, correct?  A. The price I'm paying, it raises that, yes.").

an issue is "especially well suited for jury determination."  *United States v. Bilzerian*, 926 F.2d

1285, 1298 (2d Cir. 1991).  Testimony that misrepresentations were "important" to victims and

that victims were "injured by those misrepresentations … precludes a finding that no reasonable

mind could find [the defendant's] statements material."  *Litvak*, 808 at 176.

> 2.   Discussion

Judged by the standard set out in *Litvak*, under a virtually identical factual scenario, a

rational juror could conclude that the Government met its burden to prove materiality.

Here, as in *Litvak*, the victim traders testified that defendants' lies were important and

harmed them.  *See Litvak*, 808 F.3d at 177 ("There is no dispute that Litvak misrepresented facts

related to the securities transactions at issue, and that several of his counterparties' representatives

testified at trial that they considered the misrepresentations meaningful in the course of those

transactions and that they or their employers were harmed by Litvak's misleading course of

conduct.").  For example, Harrison testified that defendants' misrepresentations about price were

important to him.  Tr. 752-753.  He made clear that this is because that information affected what

he ultimately paid for a bond.  Tr. 754. *See also* Tr. 769.  As detailed above, Abbas gave similar

testimony, saying Chao's lies caused him to pay more than he otherwise would have. *See* Tr. 1515.

Similar testimony was also given by Wollman and Marks.  *See* Tr. 2112-2114 (Wollman), Tr.

2333-2334 (Marks).  Under *Litvak*, that evidence alone was enough to permit a rational juror to

find materiality.

Moreover, the Government's evidence of materiality went even further than *Litvak*.  In

*Litvak,* only victims testified on materiality, whereas here, co-conspirators also offered testimony

that defendants believed their lies would have an important financial effect on victims.  Dinucci

testified that he was told by Shapiro and Gramins that the purpose of giving clients false bids was

to "increase the profit on the trade," thereby taking additional money from "the clients."  Tr. 255-

256.  Chao testified as to the effect of lies, saying "[t]he effect would be hopefully, that Mr. Abbas would increase his bid based on that information. . . .  It would hopefully increase the spread or amount of money that Nomura earned on this trade."  Tr. 1715.  Feely testified, "[i]f I would tell the buyer I can buy the bond higher than the actual truth, or I'd tell the seller that the bid that I have is lower than is actually truth, and they agree on the trade, I get to keep that difference between the truth number and the number that I am representing; and I kept that for the desk."  Tr. 1932. Feely called the lies defendants told at Nomura "hurtful" for victims because they had the effect of getting them to "pay more or some more than they would otherwise."  Tr. 1967.  All the co-conspirators were trained in this practice by Shapiro, Gramins, or both.  Although the materiality standard is objective and judged based on a "reasonable investor," evidence of defendants' subjective belief that their lies would hurt their investors and profit Nomura both corroborates the victims' testimony and is probative of the fact that the lies were actually material.

In addition to victim and co-conspirator testimony, the transcripts of the trades provided circumstantial evidence of the materiality of misrepresented price information.  As discussed above, the lies defendants told had the effect of changing their customers' bid and offer prices in negotiations.  In every trade presented at trial, a victim reacted to defendants' lie, adjusting the amount of money he was willing to part with to buy a bond or the amount of money he was willing to accept to sell a bond.  *See*, *e.g.*, Gov't Exs. 29E (Choi decreased his offer from 80 to 79-8 after Gramins lied that "this guy's [Wollman] passing over 80"); 26E (Abbas raised his bid from 78-22 to 79-00 after being falsely told that "seller came back to us with an 80-16 offer"); 11A (Banks raised bid to 52 from 51-16 after Gramins falsely told him he had a 53-00 offer); 19A (Harrison agreed to sell at 86-08, giving Nomura an 8 tick commission, after Shapiro falsely told him that he had an 86.5 bid.); 21A (Harrison lowered his offer from 86 to 84-24 (or 85 less an 8 tick

42

commission) after Shapiro falsely said the buyers "aren't going to pay >85 i think i can get her to pay 85 for whole piece").

For a court to find that the lies at issue in this case were immaterial, it would have to find that each and every investor who changed their behavior based on defendants' misrepresentations was an unreasonable investor. There is no reason to think this. The Second Circuit made clear in the first *Litvak* opinion that "[f]inding Section 10(b) inapplicable here, as a matter of law, would require an impermissibly technical and restrictive construction." *Litvak*, 808 F.3d at 177. In light of the testimony at trial, and the holding in *Litvak*, Shapiro's materiality argument fails.

Despite the evidence that defendants' lies were material, Shapiro makes three inapt claims. First, he argues a rational juror cannot credit the testimony of victims who lack perfect recall of every factor involved in each trade, especially where the Government fails to call every potential witness that may have been consulted by the victim. Shapiro Mem. at 27-28. These were fair arguments to make to the jury, and the jury was entitled to reject them in light of the other evidence. *See United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2015) ("Rule 29(c) does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" (quoting *Guadagna*, 183 F.3d at 129)). Indeed, it is hardly novel that a witness in a trial may not remember a specific e-mail or document they received, but testifies based on their current interpretation. It is up to the jury to determine whether that interpretation is credible in light of the passage of time and all the other evidence. *See Mergen*, 764 F.3d at 204 ("We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence.").

43

Next, Shapiro rehashes the same argument he made in the context of intent—that the victims were satisfied with the price they received, and thus indifferent to the possibility of receiving better prices. *See* Shapiro Mem. at 29-30. As above, the victim witnesses were consistent in the view that they sought to buy for their clients at the lowest possible price, so long as the price did not exceed what their analytics considered attractive. Abbas explained:

> Q. In either of those prices, 78-22 or 79, those were acceptable within your model, correct?
>
> A. Correct.
>
> Q. Your analysis told you both of them were fine, correct?
>
> A. Yes.
>
> Q. But as between the two of them, you would prefer to pay less because it's better for your investors, right?
>
> A. Correct.

Tr. 1648. The fact a victim also considered other factors in deciding whether a bond fit its investment profile does not prevent it from also considering representations about price in negotiating a trade. Although Shapiro discounts the importance of a victim's ability to use this information to negotiate further, *see* Shapiro Mem. at 28, the Second Circuit has made clear that information allowing a party to "negotiate[] better deals for itself" is material. *Finazzo*, 850 F.3d at 110. Put differently, despite a victim's sophistication, a rational juror could clearly find a price "misrepresentation important in making an investment decision." *Vilar*, 729 F.3d at 89.

Finally, contrary to Shapiro's claim, it is irrelevant that victims were not entitled to price information and would sometimes negotiate without it. Shapiro Mem. at 29-35. Here, it was defendants who chose to inject false price information into negotiations, with the intent of causing the victims to pay more or accept less. Once defendants chose to speak, even absent a pre-existing duty, they were obliged to do so truthfully and completely. *See* Tr. 2609 (Court: "I think the law does provide that if a party voluntarily undertakes to speak about a material matter, it has a duty

to be truthful."); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("It is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic.") (citations omitted).[11]  Raiff testified that this was the policy at Nomura.  Tr. 650 (Raiff:  "Q. And if he asks you where you bought it, you can say I'm not going to tell you, correct?  A. Correct.  That's one option.  Q. And if you answer the question, you have to be truthful, correct?  A. Correct.").  As discussed above, the evidence demonstrated that, once defendants and their confederates chose to provide false price information, victims gave it significant weight in their price negotiations with Nomura.

### E. There Was Sufficient Evidence for a Rational Juror to Find Gramins Guilty of Count Three

Gramins erroneously challenges the sufficiency of the evidence on Count Three, alleging securities fraud related to the trade of a PPSI bond on May 1, 2012.

#### 1. Governing Law[12]

In addition to liability as a principal, a defendant may be charged under three other theories—aiding and abetting the offense (18 U.S.C. § 2(a)), willfully causing the offense (18 U.S.C. § 2(b)), and conspiratorial liability for substantive offenses (so-called *Pinkerton* liability).

---

[11] *See also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("The law is well settled . . . that so called 'half truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud."), rev'd on other grounds sub nom., *Gabelli v. SEC*, 568 U.S. 442 (2013); *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty [to disclose] is not . . . a defense to . . . liability[,] because upon choosing to speak, one must speak truthfully about material issues."); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("[I]t is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."); *S.E.C. v. Syron*, 934 F. Supp. 2d 609, 629 (S.D.N.Y. 2013) ("[O]nce a party chooses to discuss material issues, it 'ha[s] a duty to be both accurate and complete' so as to avoid rendering statements misleading.") (quoting *Caiola*, 295 F.3d at 331);

[12] In this and the following section, the Government incorporates its above statement of the governing law for securities fraud and wire fraud, respectively, except where defendants raise new issues.

*United States v. Bala*, 236 F.3d 87, 95 (2d Cir. 2000) (internal quotations omitted) ("The *Pinkerton* theory permits criminal liability of a conspirator for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes." (citations omitted)).  A defendant may be charged under all four theories of liability for the same conduct and, in fact, there is no requirement that the jury be unanimous as to which theory of liability drove their determination.  *See United States v. Ferguson*, 676 F.3d 260, 279 (2d Cir. 2011) ("Just as there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict, neither must it agree on alternative mental states." (internal citations omitted)).

2.    Discussion

Gramins' arguments notwithstanding, the Government's evidence was sufficient for a rational juror to find that he was involved in making the false statements in Count Three and that those misrepresentations were material.

a)    Gramins' involvement in the fraudulent statements

In the trade at issue in Count Three, Trade 26, there are three separate ways that a rational juror could have found Gramins liable for the false statements that Chao made to Abbas:  (1) a juror could have credited the testimony that Gramins supplied Chao with false language to give to Abbas; (2) a juror could have held Gramins liable for inducing and commanding Chao into the fraudulent scheme; and (3) a juror could have held Gramins liable through *Pinkerton* liability.

A rational juror could have found Gramins guilty of Count Three as a principal based on the evidence that Gramins supplied Chao with the misrepresentation to tell Abbas.  Gramins is wrong to argue that Chao's testimony is little more than a "guess" that Gramins instructed him. Gramins Mem. at 41.  Chao testified it was the practice, at that time, for Gramins to instruct him

46

on what to say to clients, particularly in complex trades: Gramins "would instruct me on what to tell the client." Tr. 1707. In fact, Chao repeatedly testified that he would have to be in constant communication with Gramins to receive instruction on what to say to Abbas: "I would need to have some sort of advice on what I should be communicating to the client." Tr. 1707. Chao testified that when he falsely told Abbas that he could "pull [the bonds] out in the low 80s"—when they had actually already been offered in the high 70s—he was lying at Gramins' instruction. Tr. 1709, 1711; 1712. Similarly, when Chao falsely told Abbas that they would show a bid of 78-24, he did so in consultation with Gramins. Tr. 1734. This testimony corroborated Dinucci's prior testimony that the traders would have to coordinate what they told their clients in order to keep their stories straight. Tr. 160-161. Likewise, Feely testified that "[a]s a common practice, you would make sure that everybody understands the lie, is aware of it just in case the client would reach out to them directly that same day or down the road, and you don't want anybody to be unprepared or without the knowledge of what is the story that's been told to that specific client." Tr. 1947.

Moreover, even if Gramins did not induce Chao's specific lies in Trade 26, the evidence at trial proved that Gramins induced and commanded Chao to participate in the scheme that Gramins was already engaged in when Chao joined Nomura. The Court properly instructed the jury that a defendant is liable for aiding, abetting, counseling, commanding, inducing or procuring another to engage in fraud, Tr. 2663-2665, providing jurors with a second avenue to find Gramins guilty for the lies that Chao told Abbas. Chao testified that he began working in the bond industry right after college, when he started working for Nomura. Tr. 1663. He reported directly to Gramins and Dinucci, Tr. 1671, and learned the industry by shadowing them, Tr. 1677. Gramins was the first person that Chao ever saw engage in the deceptive conduct at issue in this case, Tr. 1690, and

47

trained Chao to lie to clients, Tr. 1692.  Gramins also provided Chao, in some instances, with the specific lies to tell clients.  Tr. 1687.  This was clearly inducing, counseling, and commanding Chao's participation in a securities fraud scheme, satisfying the aiding and abetting requirement and making Gramins liable for the false statements by Chao to Abbas as part of that scheme.

Additionally, for the same reason, a rational juror could have concluded that Gramins was liable for Chao's statements under *Pinkerton* liability even if jurors did not find that Gramins did not aid or abet Chao's misrepresentations.  *Bala,* 236 F.3d at 95.  In this case, the Court instructed the jury on *Pinkerton* liability, Tr. 2671-2673, and each juror found Gramins guilty of conspiracy.  Viewing the evidence that Chao and Gramins were engaged in a common conspiracy in the light most favorable to the Government, it is clear that a rational juror could find Gramins guilty for Chao's securities fraud as charged in Count Three under *Pinkerton*.

b) Materiality of the statements

Gramins' challenge to the materiality of the lies Chao told to Abbas is equally unpersuasive.  In Trade 26, the seller offered the bonds at 78-16.  However, Chao falsely told Abbas that the seller's offer was 80-16.  As detailed above, Abbas made clear throughout his testimony that this was the sort of lie that deprived him of truthful information which was important in his negotiations.  Tr. 1529-1530.  Abbas testified that this lie caused him to raise his bid, resulting in pecuniary harm to HIMCO.  Tr. 165014, Tr. 1510 and 1515.  By its nature, a lie that dupes a victim into unnecessarily paying extra so that the liar can secretly keep that extra sum is material.

Moreover, "materiality is judged according to an objective standard."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).  Accordingly, in determining how a "reasonable investor" would assess lies about bids, offers, and purchase and sale prices, a rational juror was entitled to take into account all the evidence about the importance of that information.

48

*See Litvak,* 808 F.3d at 175-176.  As detailed above, the buy-side witnesses all deemed the false price information that Chao provided to Abbas "important" because it adversely affected their price.  Tr. 769 (Harrison), Tr. 2184 (Wollman); Tr. 2333 (Marks).  This conclusion was underscored by the co-conspirators' testimony that such information was expected to cause economic harm to victims and profit to Nomura.  Tr. 1685-1686 (Chao); Tr. 1932 (Feely); Tr. 170, 171-172 (Dinucci).

Viewing the evidence in the light most favorable to the Government, it is clear that a rational juror could find Chao's lies to Abbas material.

**F.      There is Sufficient Evidence for a Reasonable Juror to Find Gramins Guilty of Count Nine**

1.      Governing Law

In addition to the elements of intent and materiality described above, to sustain a charge of wire fraud, the Government must prove that the defendant caused the use of an interstate wire in furtherance of the scheme to defraud.  "[T]he government need prove only knowledge that a co-conspirator would use the wires in an interstate transmission in furtherance of the conspiracy or that such use of the wires was reasonably foreseeable."  *United States v. Zichettello*, 208 F.3d 72, 105 (2d Cir. 2000).  The "reasonably foreseeable" use of the wires can be made by an innocent third party.  *United States v. Muni*, 668 F.2d 87, 89 (2d Cir. 1981).

"To be in furtherance of the fraud, the wire transmission 'need not be an essential element of the scheme'; rather, '[i]t is sufficient' if that transmission was incident to an essential part of the scheme, … or 'a step in [the] plot.'"  *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006) (quoting *Schmuck v. United States*, 489 U.S. 705, 710-711 (1989)).  The wire communication itself does not have to be false; "even innocent transmissions, i.e., ones that contain no false information—may supply the [transmission] element."  *Reifler*, 446 F.3d at 95 (internal quotation

marks and citation omitted).  Nor is it necessary for the defendant to participate personally in the wire transmission "as long as it is reasonably foreseeable that the charged transmission would occur in the execution of the scheme."  *United States v. Bahel*, 62 F.3d 610, 641-42 (2d Cir. 2011). In addition, there is no requirement that the communication precede the fraud.  *See United States v. Slevin*, 106 F.3d 1086, 1090 (2d Cir. 1996).  "Where the frauds are not isolated or unrelated swindles," communications "may further the scheme by, for example, lulling the victims into believing they received the services fraudulently promised . . . or by helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant."  *Id.* (internal citations omitted).  The "in furtherance" requirement is not to be given a narrow interpretation; rather, courts should "consider[] the scope of [the] fraudulent scheme," and give appreciation to its "full flavor."  *Schmuck*, 489 U.S. at 711-12.

        2.    <u>Discussion</u>

Gramins argues that there was insufficient evidence of his intent to harm, that no reasonable juror could have concluded that the wire was in furtherance of the conspiracy, and (in passing) that the evidence did not prove that he knew about the trade ticket Chao sent to Abbas.  Gramins Mem. at 46, 50-52.  Each of these arguments fails.

        a)    Intent to Harm

The intent to harm standard discussed above, and evidence supporting it, is equally applicable to this specific trade.

Although evidence of intent to harm is often circumstantial in nature, direct evidence of Gramins' intent to harm was adduced at trial.  Dinucci testified that defendants taught him to lie to clients about the purchase and sales price of bonds.  He told the jury that they explained to him that the lying was designed to "increase the profit for Nomura," Tr. 171-172, which would come from the clients, Tr. 256.  In a similar vein, Chao testified that Gramins and Dinucci taught him to

lie about the purchase and sales prices in trades in order to deceive clients out of money.  Tr. 1684-1686.  In Trade 26 specifically, both the evidence and testimony was clear that Chao and Gramins lied to Abbas with the intent of causing him to increase his bid, with the difference going to Nomura.  *See* Part III(A)(2)(b)(2), supra.

The jury had all this evidence that defendants—in particular Gramins in the trade charged in Count Nine—employed their scheme specifically to swindle clients out of money, which is the essence of intent to harm.

b)      The Trade Ticket was in Furtherance of the Fraud

Contrary to Gramins' argument, the evidence at trial showed that the trade confirmation email charged in Count Nine was sent in furtherance of the scheme to defraud.

First, in every trade before the jury, trade tickets were sent by Nomura to the seller and buyer after the completion of the negotiations to verify the trade's terms.  Tr. 138 (Dinucci: "Whenever we would buy or sell a bond, we would send over this type of ticket as a way of confirming the trade.").  This was evident from various exhibits.  *See e.g.* Gov't Ex. 16A at 16:36:53; Gov't Ex. 16B at 16:36:10 and 16:39:36 and Tr. 2163 (Wollman:  "I say 'Shoot over the ticket.'  Q: What does that mean?  A: That we're done and send me the trade ticket.").  The trade would then "settle" three days after the trade was confirmed.  Tr. 505.  Therefore, without the trade tickets, defendants' scheme to defraud would have been unsuccessful as no money would ever change hands.  A scheme to defraud is not complete until the schemer actually receives the ill-gotten gains he sought.  *See, e.g., United States v. Salmonese*, 352 F.3d 608, 615 (2d. Cir. 2003) ("[W]here a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators' receipt of their anticipated economic benefits.") (internal quotation marks omitted).  Here the trade ticket confirmed for the parties the purchase and sale prices, a step that occurs days before Nomura received its ill-gotten gains.

51

Second, the Third Superseding Indictment (the "Indictment") charged defendants with participating in a scheme to defraud beginning in approximately 2009 and continuing through approximately 2013.  The scheme to defraud thus continued for more than a year after the May 1, 2012 PPSI trade ticket was wired.

Third, as the case law plainly states, the trade ticket does not need to contain false information for it to have been sent "in furtherance" of the scheme to defraud.  *Reifler*, 446 F.3d at 95  ("even innocent transmissions, i.e., ones that contain no false information—may supply the [transmission] element" (internal quotation marks and citation omitted)).  Here, the May 1, 2012 PPSI trade ticket was a necessary step in Gramins' fraudulent trade in order to achieve the point of the scheme—duping a victim into providing Nomura with unearned money.

c)      Wiring the Trade Ticket was Foreseeable

The Government was not required to prove that Gramins knew that Chao had sent the trade ticket to Abbas, as Gramins argues in passing.  Instead, the Government was only required to show that wiring the trade ticket to Abbas was reasonably foreseeable to Gramins.  The evidence met this test.

Dinucci testified "whenever we would buy or sell a bond, we would send over this type of ticket as a way of confirming the trade … to effectively confirm the trade with our client."  Tr. 138.  The Government provided the jury with various examples of Gramins receiving and sending trade tickets.  For example, in Gov't Ex. 10G, Gramins sent the trade ticket from his trade with Goldman Sachs to the trader at Goldman Sachs.  Similarly, in Gov't Ex. 18D, Gramins sent a trade ticket to Harrison.

Taken together and in the light most favorable to the Government, this evidence provided a rational juror a basis to find that it was foreseeable to Gramins that Nomura would wire a trade ticket to Abbas to conclude its fraudulent trade.

### III.    This Prosecution Did Not Violate Due Process

Gramins and Shapiro also move to dismiss this case because of a lack of fair notice.  In essence, this is a reframing of their willfulness argument with an objective standard—even if the elements of the crime are otherwise met, they claim there was not reasonable notice that the conduct was criminal because the exact factual analogue (*Litvak*) had not yet been brought.[13]  Their argument fails because this case involves a straightforward application of the federal fraud statutes, and no court has ever required a substantially similar fact pattern in order to find fair notice.

#### A.    Governing Law

The Due Process Clauses of the United States Constitution protects a defendant from being "held criminally responsible for conduct which he could not reasonably understand to be proscribed."  *United States v. Harriss*, 347 U.S. 612, 617, (1954).  "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259, 267, 117 S. Ct. 1219, 1225, 137 L. Ed. 2d 432 (1997).  "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."  *Id.* at 266.  When, as here, "the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only as applied in light of the specific facts of the case at hand, and not with regard to the statute's facial validity."  *United States v. Rybicki*, 354 F.3d 124, 129-30 (2d Cir. 2003) (en banc) (internal quotations omitted).  "The standard is an objective one.  Courts ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular plaintiff actually received a warning that alerted him or her to

---

[13] Shapiro does this by renewing his Motion to Dismiss (Dkt. #400). Shapiro Mem. at 1.

the danger of being held to account for the behavior in question." *Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010) (internal quotation and citation omitted).

However, "the unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement." *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 159 (2d Cir. 2009). "The claimed novelty of this prosecution does not help [defendant's fair notice argument], for it is immaterial that there is no litigated fact pattern precisely in point." *United States v. Kinzler,* 55 F.3d 70, 74 (2d Cir. 1995) (internal quotations omitted). "Due process is not . . . violated simply because the issue is a matter of first impression." *Ponnapula v. Spitzer,* 297 F.3d 172, 183 (2d Cir. 2002). "The fact that there is no litigated fact pattern precisely in point may constitute a tribute to the cupidity and ingenuity of the malefactors involved but hardly provides an escape from the penal sanctions of the securities fraud provisions here involved." *United States v. Brown*, 555 F.2d 336, 339-40 (2d Cir. 1977).

Statutes with willfulness elements are less likely to be found impermissibly vague because, "where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act that he does is a violation of law." *Screws v. United States*, 325 U.S. 91, 101-103 (1945); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) ("[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."); *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (fair notice "concern is ameliorated by the fact that [the statute] contains a scienter requirement").

Both the wire fraud and securities fraud statutes at issue here are based on well-established principles, both in the securities industry as well as society at large, and proscribe conduct that is neither novel nor vague.

First, "[t]he [Supreme] Court has said that the 1934 [Securities Exchange] Act and its companion legislative enactments embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, (1972) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, (1963)). The anti-fraud "proscriptions [of the 1934 Act], by statute and rule, are broad and, by repeated use of the word 'any,' are obviously meant to be inclusive." *Id.* The 1934 Act "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) (internal quotations and citations omitted). In weighing due process challenges to criminal prosecutions under Rule 10b-5, the Second Circuit has held that "[n]o honest and reasonable citizen could have difficulty in understanding the meaning of 'untrue,' 'material fact,' 'any omission to state a material fact,' 'in light of the circumstances under which they were made,' or 'misleading.'" *United States v. Persky*, 520 F.2d 283, 287 (2d Cir. 1975) (citing *Coplin v. United States*, 88 F.2d 652, 657 (9th Cir. 1937)).

Second, the Supreme Court has held that "the words 'to defraud' in the mail [or wire] fraud statute have the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (internal quotations omitted.). "The Supreme Court early on gave the scheme to defraud element a broad interpretation, construing it to 'include[ ] everything designed to defraud by representations as to the past or

present, or suggestions and promises as to the future.'" *United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995) (quoting *Durland v. United States*, 161 U.S. 306, 313 (1896)). "The specific intent required under the mail [or wire] fraud statute is the intent to defraud and not the intent to violate a statute." *Porcelli*, 865 F.2d at 1358 (internal citations omitted).

### B.    Discussion

Defendants in this case—and in the case against Litvak—were charged with violating fraud statutes via classic fraud by trick. They designed a plan to lie to take money from others through deceit. As discussed in Section II above, the cooperating witnesses gave uncontradicted testimony that they intended to deceive their customers out of money. *See*, *e.g.*, Tr. 256 (Dinucci); 1686 (Chao); 1932 (Feely). They testified that they were taught to do this by defendants. *See*, *e.g.*, Tr. 257 (Dinucci); 1692 (Chao); 1932 (Feely). As discussed at length above, that intent was corroborated by transcripts of the trades negotiations, in which defendants' lies clearly contemplated increasing Nomura's profits at their customers expense. Given the overwhelming evidence that defendants intended to work a fraud on their victims, the law is clear that both the securities and the wire fraud statute "give[] the person of ordinary intelligence a reasonable opportunity to know that conduct of the type in which the defendants engaged with the specific intent to defraud" would be in violation of the law. *Rybicki*, 354 F.3d at 132 (internal quotations omitted); *see also Persky*, 520 F.2d at 287 ("[n]o honest and reasonable citizen could have difficulty in understanding the meaning of 'untrue,' 'material fact,' . . . ' or 'misleading.'" (citations omitted)).

Notwithstanding the clear and straightforward application of the fraud statutes to their conduct, defendants claim that because there was no case precisely on point prior to *Litvak*, they

could not have been on notice that their conduct would violate the law. *See* Gramins Mem. at 55-56; Dkt. 400 at 1-4.[14]  Defendants' arguments fail for two reasons.

First, the Second Circuit has made clear that "it is immaterial that there is no litigated fact pattern precisely in point." *Kinzler*, 55 F.3d at 74.  Otherwise, any defendant with some degree of "cupidity and ingenuity," *see Brown*, 555 F.2d at 340, would easily be able to avoid criminal prosecution by devising a fraudulent scheme with a unique fact pattern.  This is precisely why the securities fraud statute "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes," *Zandford*, 535 U.S. at 819 (citations omitted), and "[t]he Supreme Court early on gave the scheme to defraud element a broad interpretation, construing it to 'include[ ] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.'" *Altman*, 48 F.3d at 101.

Second, defendants' rely inaptly on *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016).  In *Weimert*, the Court found that the defendant concealed the "true goals" of his "negotiating positions."  819 F.3d at 354.  In this case, in contrast, defendants lied about objective, external facts—the bids and offers on the other side of a transaction and the specified bargained-for compensation Nomura would earn.  The Government presented overwhelming evidence that Shapiro and Gramins facilitated deals between two parties in RMBS bond trades, acting as "effectively middlemen." Tr. 121 (Dinucci). *See also* Tr. 2181 (Wollman).  Thus, the deception at issue in this case was the misrepresentation of objective, external facts by a middleman that altered prices for the victims—the true parties in interest.

---

[14] Defendants' argument implicitly concedes fair notice after Litvak's indictment.  The evidence at trial showed that the conspiracy continued even after defendants were on notice that the Government was pursuing this fraudulent conduct.  Tr. 1758; Gov't Ex. 29A-J; Tr. 2179-84.

In sum, prosecution of defendants' conduct here was a straightforward application of the wire and securities fraud statutes, and as such, there was fair notice that such conduct could be subject to criminal liability.  Accordingly, there is no due process violation.[15]

## IV.   Rule 33 Motion for a New Trial

### A.   Standard of Review

Rule 33 authorizes a district court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  "Generally, a motion for a new trial should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotations omitted).  A motion for a new trial should be granted only "sparingly and in the most extraordinary circumstances."  *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (internal quotations omitted).  In evaluating a Rule 33 motion, the "district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury.  Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001) (internal quotations omitted).

---

[15] Gramins' argument about individuals that were not criminally prosecuted warrants scant mention.  "'[T]he decision as to whether to prosecute generally rests within the broad discretion of the prosecutor.'"  *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (quoting *United States v. White*, 972 F.2d 16, 18 (2d Cir. 1992)).  "This broad discretion is proper because 'the decision to prosecute is particularly ill-suited to judicial review.'"  *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).  "Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts.  'Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.'"  *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quoting *Wayte*, 470 U.S. at 607).

"In its Rule 33 analysis of the evidence, the Court can draw no conclusions from the jury's inability to reach a unanimous verdict on charges other than that of conviction.  A hung jury is a nonevent for such purposes."  *United States v. Botti*, 722 F. Supp. 2d 207, 211 (D. Conn. 2010).

**B.    The Government's Use of the *Litvak* Indictment Did Not Unduly Prejudice Gramins**

In his motion, Gramins speciously contends that the Government "did not use evidence of the *Litvak* indictment in the manner it proffered to the Court" and concocted a "manufactured excuse to use the *Litvak* indictment to inflame the jurors."  Gramins Mem. at 32-33.

1.    Governing Law

"[T]rial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind.  No evidence which bears on this issue should be excluded unless it interjects tangential and confusing elements which clearly outweigh its relevance."  *United States v. Collorafi*, 876 F.2d 303, 305 (2d Cir. 1989) (citing *Vinieris v. Byzantine Maritime Corp.*, 731 F.2d 1061, 1064 (2d Cir. 1984)).  "Since bad faith and evil intent involve intangible mental processes, proof of willfulness usually must be accomplished by means of circumstantial evidence."  *Id.* (citing *United States v. Brown*, 591 F.2d 307, 311 (5th Cir. 1979)).

"Evidence of warnings by government agents, followed by continued activity of the same character, is certainly relevant."  *Id.* at 306 (quoting *United States v. Angelini*, 607 F.2d 1305, 1311 (9th Cir. 1979)).  For instance, "proof that knowledgeable persons warned the defendant of tax improprieties has been admitted in numerous cases as proper circumstantial evidence of knowledge and wrongful intent."  *Id.* at 305.  Likewise, letters from bank examiners criticizing transactions have been admitted as proof of willfulness.  *Id.* (citing *United States v. Gustafson*, 728 F.2d 1078, 1081-84 (8th Cir. 1984)).  Similarly, tax examiners' warnings of impropriety have been admitted to prove knowledge and intent.  *Id.* (citing *United States v. Durant*, 324 F.2d 859, 862-

64 (7th Cir. 1963)).  Evidence of reliance on judicial decisions has also been used to prove intent.

*United States v. Schiff*, 612 F.2d 73, 78 n.6 (2d Cir. 1979).

> 2.   <u>Discussion</u>
>
> a)   Background on the use of testimony regarding Litvak

Prior to trial, the Government outlined three ways in which it would use evidence regarding *Litvak*:  (i) to show Michael Canter's reaction to the discovery of Litvak's scheme as evidence of materiality; (ii) to provide context to a number of events at Nomura that followed the *Litvak* indictment; and (iii) as evidence of defendants' willfulness and lack of good faith.  *See* Dkt. 329 at 22-23; Dkt. 342 at 19-21; Dkt. 359.  Defendants objected to references to Litvak's indictment, arguing, *inter alia*, that it was irrelevant and the term "indictment" was prejudicial.  *See* Dkts. 328, 351, 362, 363, 371.  At the pre-trial conference, the Government expanded further on its reasons why the fact of that indictment was relevant and outlined generally when the Government would make reference to it, including during the testimony of the cooperators, along with Raiff, Canter and Wollman, then followed that hearing with further briefing.  *See* Dkt. 359.  Gramins specifically objected to Canter's testimony of his reaction to discovering Litvak's identical scheme, Dkt. 252 at 5, and the Court sided with Gramins before the trial, Transcript of April 24, 2017 Telephone Conference (Dkt. 372) at 63.

In opening statements, the Government made no reference to the *Litvak* indictment. However, all three defendants argued that there was a change in the rules in February 2013.  *See* Tr. 75 (Shapiro "was provided with a different set of rules" in February 2013); *id.* at 93 ("Now, at some point down the line, the rules of the road changed a little bit, and when the rules of the road changed a little bit, Mike changed."); *id.* at 99 ("And the evidence will be that when the rules of the industry changed in 2013—and they changed dramatically in 2013 . . . [Mr. Peters] followed

the rules.").  In fact, Peters' counsel specifically referenced Litvak's indictment, claiming that this was a "lightbulb moment."  *Id.* at 110.

The first time the Government raised the *Litvak* indictment was during its direct examination of Mr. Raiff.  The Government offered Gov't Ex. 5A and 5B, the one-page "DO Not Lie" presentation and the sign-in sheets for that meeting.  Defendants objected to the exhibits' introduction on relevance grounds, and the Government argued these exhibits—which specifically referenced the pre-existing Nomura compliance policies—rebutted defendants' claims in their opening statements that the *Litvak* indictment changed the rules.  The Court overruled defendants' objections.  Mr. Raiff was asked about the context of the meeting and referenced *Litvak* indictment in his answers.  Tr. 430-432.  At Gramins' request and without objection from the Government, the Court gave warning instruction to the jury about what an indictment is.  Tr. 432-35.

The testimony of Chao, Feely and Wollman also referenced *Litvak*.  Chao and Wollman's testimony showed that Gramins continued his involvement in the fraudulent scheme after Litvak's indictment and after the February 2013 compliance meeting.  *See* Tr. 1758 (Chao:  post-*Litvak* lies by Gramins); Tr. 2142-2169, 2176-2186 (Wollman:  Trade 29 in November 2013).  Although the Government had previously informed the Court of its intention to ask Wollman about his conversation with Shapiro about the *Litvak* indictment, *see* Dkt. 359 at 8, the Court sustained objections to that line of questioning at trial, *see* Tr. 2150.  Feely testified that Litvak's indictment did not change his assessment that their fraudulent conduct was wrongful.  *See* Tr. 1970.

> b)  The Government Did Not Use Testimony About *Litvak* to Inflame the Jurors.

Mr. Gramins' claims—that the Government's reasons for eliciting evidence about *Litvak* were pretextual and that the Government never established the probity of that evidence—are unfounded.  Except where precluded by the Court, the Government followed its stated plan to ask

certain witnesses about the *Litvak* indictment to prove materiality and intent, and to provide context for certain exhibits and testimony.  *See* Dkt. 329, Dkt. 342 at 19-21, Dkt. 359.  Each of those issues was relevant to important issues at trial, and did not unfairly prejudice Gramins.

First, consistent with its stated intentions, the Government used evidence regarding Litvak's indictment to show defendants' intent in post-*Litvak* trades (Gov't Ex. 28 and 29 series).  As the Government said in its Trial Memo, "[t]he defendants' fraudulent trading activity following the *Litvak* indictment, despite knowledge of the *Litvak* charges, is highly probative of the defendants' willfulness and bad faith."  Dkt. 329 at 24-25.  Although one post-*Litvak* trade was excluded from evidence (Gov't Ex. 28 series), the other post-*Litvak* trade (Gov't Ex. 29 series) demonstrated that Gramins engaged in fraudulent trades despite his awareness of Litvak's indictment, and thus was probative evidence of willfulness.  Likewise, the jury was entitled to determine for itself the significance of the so-called "huddle" with Gramins and Chao following *Litvak*.  *See* Gramins Mem. at 32.  Although Chao recalled Gramins instructing him not to lie after *Litvak* indictment, the evidence that Gramins did not follow that advice was evidence that he understood the wrongfulness of his activities.

Second, as previewed in its pre-trial filings, Dkt. 329 at 24, the Government used the *Litvak* evidence to provide context for events that followed that indictment.  Specifically, Litvak's indictment provided necessary context for Nomura's February 2013 compliance meeting, during which defendants were "refreshed" about their duties not to mislead customers.  *See* Tr. 432 (Raiff: "This was the one-page handout that was given to everyone who attended a training session in early 2013, refreshing everyone on ethical principles.").  Raiff explained the timing of the meeting (at which point, the Court gave the aforementioned limiting instruction) and denied that it reflected a change in Nomura's policy, as defendants had claimed.  *See* Tr. 436 ("Q: Was this announcement

of Nomura's policy at this training a shift in what had been Nomura's policy prior to the *Litvak* indictment?  A: In no way.").  Another piece of post-*Litvak* evidence is a chat in which Stephen Finkelstein discussed a "dirty" trader with Peters.  Finkelstein wrote, "he was the first guy to start using the phone after the Litvak incident, which is fairly telling."  Gov't Ex. 7 at 16.  Without explaining what "the Litvak incident" was, this comment would have no meaning to the jury.  Moreover, this chat was evidence of materiality—in that it showed a counterparty implying that a trader who engaged in Litvak-type conduct was "dirty"—and evidence of willfulness and intent— in that Peters was on the e-mail in which the counterparty expressed that view.[16]  The Government's use of this evidence shows that its stated interests in using the *Litvak* indictment were not pretextual.

Third, Gramins is wrong to claim that the Government's decision not to call Canter shows that it never genuinely intended to elicit evidence about his reaction to Litvak's lies.  *See* Gramins Mem. at 32.  The Court agreed with Gramins regarding Canter's reaction to discovering Litvak's scheme and the Government can hardly be faulted for heeding the Court's guidance.

Gramins also points to some of his evidentiary objections that were overruled and the fact of the guilty verdict to claim manifest injustice.  Rule 33 is not "a vehicle to relitigate rulings with which [a defendant] disagrees."  *United States v. Smith*, No. 08 Cr. 390(BSJ), 2009 WL 4249120, at *8 (S.D.N.Y. Nov. 25, 2009).  *See also United States v. Wilson*, 5:14-CR-0273 (GTS), 2016 WL8671072, at *4 (N.D.N.Y. Apr. 14, 2016) (defendants arguments "merely seek to relitigate the Court's earlier evidentiary rulings, a purpose for which a Rule 33 motion is an inappropriate vehicle." (internal quotation marks and citation omitted)); *United States v. Soto*, No. 12 CR

---

[16] The Government also proposed in its Trial Memo that evidence regarding Litvak would give background to Gov't Ex. 8 (in which a counterparty wrote to Peters "don't Litvak me," meaning "don't lie to me").  However, the Court excluded Gov't Ex. 8 on defendants' motion.  Tr. 2498-2499.

556(RPP), 2014 WL1694880, at *7 (S.D.N.Y. Apr. 28, 2014).  There was no manifest injustice—the Government's evidence was relevant and probative to intent and materiality.[17]

Gramins' request for a new trial on this basis should be denied.

### C.   Gramins Was Not Prejudiced By the Government's Comments

#### 1.   Governing law

The Supreme Court has imposed a high bar for new trials based on claims of improper prosecutorial argument.  "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."  *United States v. Young*, 470 U.S. 1, 11 (1985).  "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding."  *Id.* at 11-12.  Such comments "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error."  *Id.* at 12.  "[T]he reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo.  Thus the import of the evaluation has been that if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."  *Id.* at 12-13.

The Second Circuit has held that evaluating a prosecutor's comments "is largely controlled by three factors: (1) the severity of the misconduct; (2) curative measures taken by the district court; and (3) the certainty of conviction absent the misconduct."  *United States v. LaMorte*, 950 F.2d 80, 83 (2d Cir. 1991).  "[A]ppropriate curative instructions" can "mitigat[e] any possible

---

[17] Underlying Gramins' manifest injustice claims is a sufficiency of the evidence argument.  *See* Gramins Mem. at 32-33 (discussing Trade 29).  As discussed above in Section II, the evidence was sufficient for a rational trier of fact to find Gramins guilty beyond a reasonable doubt.

prejudice." *United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir. 1986). "The law has long recognized that summations—and particularly rebuttal summations—are not 'detached exposition[s],' with every word 'carefully constructed . . . before the event[.]' Precisely because such arguments frequently require 'improvisation,' courts will 'not lightly infer' that every remark is intended to carry 'its most dangerous meaning.'" *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal citations omitted).

2.  <u>Discussion</u>

Here, the Government's rebuttal statements do not warrant the extreme measure of vacating Gramins' conviction.

a)  The Government Properly Rebutted defendants' Argument about Motive.

Gramins primarily lifts out of context and challenges one comment made by the Government in rebuttal: "And remember that these are a selection of the trades; that we could be here for six months if we bring you every trade." Tr. 2945. While perhaps inartfully worded, this comment, in the context of the Government's rebuttal, was made in good faith based on the Government's view of the evidence in the record, was invited by Shapiro's argument that the transcripts of trades in evidence were the only fraudulent trades that existed, and did not prejudice Gramins in light of the Court's curative instruction.

At trial, the Government alleged that from January 2009 through November 2013, defendants engaged in a scheme to defraud their customers out of money by lying about the purchase and sales price of bonds. The Indictment alleged that defendants engaged in numerous, specified overt acts in furtherance of their conspiracy and enumerated certain wirings in furtherance of their alleged scheme. The Government said in its opening statement that it intended to present a "selection of trades" as evidence of the scheme. Tr. 51. The trial testimony made

65

clear that these trades were examples—but not the entirety—of a scheme that was executed on a regular basis.  For instance, Dinucci testified that the fraudulent practices would occur "[p]retty frequently.  Almost on a daily basis."  Tr. 164.  Similarly, Feely testified that the co-conspirators would defraud their clients "every time the opportunity presents," Tr. 1932, which to his recollection, occurred "on a daily basis,"  Tr. 1933.  Likewise, Chao testified that these practices would occur "fairly often."  Tr. 1689.  This testimony was unrebutted and came into evidence without objection.

Throughout trial, the Government also presented evidence that the motive for the scheme was to boost Nomura's profits, which, in turn, likely boosted the co-conspirators' bonuses.  *See, e.g.*, Tr. 170 (Dinucci:  "The lies would increase the profit on the desk, which theoretically would increase the bonus pool at the end of the year.  Q: Did you think it would increase your own personal payment?  A: I did.").   In closing arguments, counsel for Shapiro attacked the Government's motive evidence by arguing, despite this testimony, that the trades in Government's exhibits 10 through 29 were the only fraudulent trades:

> So what is the evidence of motive here?
>
> There's zero evidence that any of the trades that you've seen in this case had any impact on anybody's bonus. The only evidence you've seen is Jonathan Raiff's testimony . . . .
>
> Mr. Raiff also testified that if the RMBS desk made an extra one, two, three, four, five, even six million dollars -- I only asked him about six million, I don't know, maybe it goes up to seven, eight, nine, I don't know.  But he said, if you're making up to six million dollars in a given year, it had no impact on bonuses or compensation.  That's at the bottom of your screen here.
>
> And what evidence do you have about the amount of money that these trades added up to?
>
> I suspect all the trades put together are substantially less than $5 million.  And remember, those trades occurred from 2009 through 2012.  That's four years.  In

> any given year the number is far lower than what Mr. Raiff said would even stand a chance of influencing anybody's compensation.

Tr. 2840-41.  This was a misleading factual argument that required response.  *See United States v. Marrale,* 695 F.2d 658, 667 (2d Cir. 1982) ("[A] prosecutor is ordinarily entitled to respond to the evidence, issues, and hypotheses propounded by the defense.").  Based on the testimony by all three cooperating witnesses at trial that the fraudulent conduct at Nomura was frequent, even daily, in its rebuttal summation, the Government argued:

> Not every trade is listed as an overt act but they're all evidence of the conspiracy.
>
> And remember that these are a selection of the trades; that we could be here for six months if we bring you every trade.
>
> Dinucci told you that these tactics would occur almost daily; and Feely told you that the defendants would engage in these tactics at every opportunity, which he also estimated would be daily.

Tr. 2945.

When read in this context, it is clear that Gramins is wrong to contend that the Government intended to reference "proof outside the record."  Gramins Mem. at 34.  The Government did not suggest, as Gramins claims, that all of the trades on the Nomura desk were fraudulent, Gramins Mem. at 36-37, but simply argued based on the uncontroverted trial evidence that an enormous number of other fraudulent trades had occurred—daily over a several year period.

This case is thus easily distinguished from *United States v. Grossman*, 400 F.2d 951 (4th Cir. 1968), cited by Gramins.  There, the prosecutor argued that the defendant must have been involved in additional, unknown misdeeds that were not adduced at trial.  *Id.* at 956.  Here, conversely, the Government argued that the evidence adduced at trial—that the conspirators engaged in fraud almost daily—led to the conclusion that there were many fraudulent trades in addition to those detailed in the documentary exhibits.  "The prosecution and the defense are

generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998). "The government is entitled, in summation, to argue all inferences that may permissibly be drawn from the evidence admitted." *United States v. Rodriguez,* 968 F.2d 130, 143 (2d Cir. 1992). The Government's argument based on the admitted evidence was therefore proper.

Moreover, the challenged statement was in response to an improper argument by Shapiro's counsel. *See United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992) ("defense argument may, in a proper case, 'open the door' to otherwise inadmissible prosecution rebuttal"). Shapiro's lawyer claimed that the trades introduced at trial were the only fraudulent trades that occurred, and thus any resulting illicit profit were too small to provide motive. Tr. 2840-41. But, as Shapiro's lawyers knew, that was not a true statement; in fact, there were more than 150 documented fraudulent trades produced to the defense in discovery. The Government might have asked for an instruction from the Court, or to reopen evidence to introduce additional fraudulent trades, but instead opted to respond with the contrary evidence that was already in the record. The Government's words may have lacked precision, but they did not go outside the record.[18]

Even if the Government's "six months" comment could have been interpreted as a reference to non-record evidence, that is still not a basis for a new trial. Under the first of the three analytic prongs—the "severity of the conduct"—"the prosecutor's comments were short and fleeting, and thus much less likely to have had a substantial effect on the jury's verdict." *Tankleff v. Senkowski*, 135 F.3d 235, 253 (2d Cir. 1998). In the context of the entire summation, the comment about which Gramins complains was essentially a throwaway line.

---

[18] The Government appreciates the Court's strong suggestion that it should have raised this issue before rebuttal. In hindsight, the Government agrees that a discussion of its intended response would have been beneficial and led to a more precise choice of words. Should a similar issue arise, the Government will carefully consider raising the issues before rebuttal.

Additionally, the curative measures taken by the Court were sufficient to address any potential prejudice, satisfying the second prong of analysis.  Tr. 3010-11.  Indeed, the Second Circuit addressed a very similar situation in *Biasucci*, where it held that the prosecutor's comments about being able to prolong the trial for three months were appropriately remedied by the trial judge's curative instructions.  *Biasucci*, 786 F.2d at 514.  Indeed, the judge in *Biasucci* gave instructions strikingly similar to the ones given in this case.  *Id*. at 514 n.10.

Under the third analytic prong—the certainty of conviction absent the misconduct—the verdict was unaffected by the Government's fleeting comment.  The Government's comment applied to the entire conspiracy, yet the jury acquitted Peters and could not reach a verdict on the conspiracy count against Shapiro.  This is compelling evidence that the jury separately evaluated the evidence against each defendant and this rebuttal comment had no effect.

b)       Gramins secondary argument

Gramins also makes two brief additional arguments:  that the Government prejudiced him by highlighting that the jury instructions did not require the Government to prove that defendants knew their conduct was illegal; and that the Government improperly lowered its burden by presenting the jury with the primary question "did the defendants lie to take money?"  Neither of these was improper.

In its rebuttal summation, the Government addressed the willfulness requirement in the jury instructions, arguing that "the jury instructions do not say you have to know it's illegal.  They don't say that."  Tr. 2941.  This was a fact; the Court's instructions did not state that the Government had to prove that defendants knew their conduct was illegal.  Indeed, the Court stated to the parties prior to summations, "I don't think the Second Circuit case law requires the government to prove that the defendants knew their conduct was unlawful[.]"  Tr. 2617.  Accordingly, the Government was entitled to argue from the Court's jury instructions.  Moreover,

when defendants objected to the Government's statements, the Court gave a robust clarifying instruction to the jury before deliberation.  Tr. 3008-09.  Gramins suffered no prejudice from the Government's proper comment.

The Government's question—"Did the defendants lie to take money?"—was proper argument based on the evidence.  The Government made clear that there were other analyses as well done, specifically intent, materiality, the interstate wires, the purchase and sale of securities, *Pinkerton* liability, and causing an act to be done.  Tr. 2941-43.  In fact, in its principal closing, the Government built the challenged question directly from the elements of the offense, explaining why these were the proper questions.  Tr. 2675-79.  At the end of the principal closing, the Government even directly addressed the issue of wrongfulness, explaining why the wrongfulness of the conduct was well-known to defendants.  Tr. 2742-44.  The Government's question was simply a rhetorical device to help the jury analyze the evidence.  By asking the jury to address the question of whether defendants lied to take money, the Government was arguing that defendants (1) engaged in the prohibited conduct (2) with the requisite intent.  If defendants lied, they engaged in the act; and if they lied to take money from others, it was material and they did it with the required intent to harm.  Such a rhetorical device is a common and acceptable argument.

Moreover, Gramins' conviction was unaffected by either of these arguments.  As above, the arguments that Gramins complains about were directed at all three defendants, yet Gramins was the only defendant convicted at trial, indicating that neither statement had an effect on the jury's verdict.

*       *       *

The Government's arguments were proper and resulted in no prejudice.  There is no cause for a new trial.

## V.      <u>Conclusion</u>

Accordingly, the Government respectfully requests that the Court deny defendants' Motions for a Judgment of Acquittal, Gramins' Motion for a New Trial, and defendants' Motion to Dismiss the Indictment on Due Process Grounds.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

_____
LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27924

HEATHER CHERRY
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV07037

DAVID NOVICK
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV02874

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3835
Liam.Brennan3@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on October 20, 2017, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ *Liam B. Brennan*

_____
LIAM B. BRENNAN
ASSISTANT UNITED STATES ATTORNEY