UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES                       :

V.                                  :      CASE No. 3:15-CR-155(RNC)

ROSS SHAPIRO and                    :
MICHAEL GRAMINS                     :

RULING AND ORDER

The following counts remain pending after the jury trial: the conspiracy count against Mr. Gramins, as to which he was convicted; the conspiracy count against Mr. Shapiro, as to which the jury was unable to reach a verdict; and the wire and securities fraud counts against Mr. Gramins, as to which the jury was unable to reach a verdict.

Both defendants have moved for judgment of acquittal on the ground that the evidence at trial was insufficient to prove any of the charged offenses. In addition, Mr. Gramins has moved for a new trial on the conspiracy count. Finally, both defendants have moved to dismiss the indictment on the ground that they lacked fair notice that their conduct was unlawful.

For reasons summarized below, the motions for judgment of acquittal and to dismiss the indictment are denied; the motion for a new trial is granted.

I. Motions for Acquittal

Both defendants contend that they should be acquitted of conspiracy, and Gramins contends he should be acquitted of wire and securities fraud, because the Government failed to prove materiality, intent to harm or willfulness.

*A. Materiality*

In Litvak I, testimony by counterparty representatives that the defendant's misrepresentations about price were important to them "preclude[d] a finding that no reasonable mind could find [the] statements material." 808 F.3d at 166. In Litvak II, the Court of Appeals clarified that such testimony may be sufficient to sustain a finding of materiality only if the witness's "'own point of view' is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." 889 F.3d 56, 65 (2d Cir. 2018).

In this case, the Government presented testimony by counterparty representatives that misrepresentations about price were important to them. Viewing this evidence in a light most favorable to the Government, a rational trier of fact could find that the "point of view" of these witnesses was "within the parameters of the thinking of reasonable investors" in the RMBS market at the time. Thus, in light of Litvak II, this evidence was sufficient to sustain the Government's burden on materiality.

2

Defendants argue that the misrepresentations at issue were not material as a matter of law because statements about price were not relevant to the intrinsic value of the bonds. The Court of Appeals rejected this argument in Litvak I and adhered to that ruling in Litvak II. See 889 F.3d at 67. The Court stated:

> When the broker-dealer seeks a profit for its role in procuring and selling a security desired by a buyer, the profit becomes part of the price paid by the buyer. The value of the security may be the most important factor governing the decision to buy, but the price must be considered in determining whether the purchase is deemed profitable. The broker-dealer's profit is part of the price and lies about it can be found by a jury to "significantly alter[] the total mix of information . . . available."

Materiality may be decided as a matter of law only if the misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Wilson v. Merril Lynch & Co., Inc., 671 F.3d 120, 131 (2d Cir. 2011) (quotations omitted). Viewing the trial record in this case in a manner most favorable to the Government, I cannot conclude that the misrepresentations at issue were so obviously unimportant to a reasonable investor as to compel a judgment of acquittal.[1]

---

[1] In Litvak II, the Court distinguished Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996), where brokers charged transaction fees that exceeded their actual handling charges. See 889 F.3d at 66. The brokers in Feinman did not

3

*B. Intent to Harm*

To support a conviction for wire fraud, the Government must prove that the defendant contemplated some actual harm or injury to the victim. United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987). It is not enough to show that the defendant used deception to induce victims to enter into transactions they would otherwise avoid. See United States v. Shellef, 507 F.3d 82, 108 (2d Cir. 2007). Rather, the Government must show a "discrepancy between benefits reasonably anticipated because of the misleading misrepresentations and the actual benefits which the defendant delivered, or intended to deliver." Starr, 816 F.2d at 98. Intent to harm cannot be found when alleged victims "received all they bargained for, and [defendant]'s conduct did not affect an essential element of those bargains." United States v. Novak, 443 F.3d 150, 159 (2d Cir. 2006).

The defendants argue that they are entitled to a judgment of acquittal because, like the alleged victims in United States v. Regents Office Supply Co., 421 F.2d 1174 (2d Cir. 1970), Starr,

---

mislead their customers regarding the portion of the total transaction cost going toward the purchase of securities, and they competed with other firms in the labeling and pricing of their services in an open market. Here, customers were deceived about the portion of the total transaction cost going to Nomura, competition among broker-dealers in the pricing of their services was lacking in the RMBS market, and misrepresentations by broker-dealers concerning prices at which they could buy and sell bonds were difficult to detect.

4

and other cases, the counterparties got what they bargained for in that they negotiated with Nomura in principal-to-principal transactions to buy or sell bonds at prices they considered advantageous based on their own extensive internal analysis. However, the Government presented evidence that counterparties agreed to pay Nomura a commission to facilitate trades with third parties and that the amount of the commission was tied to the price at which the bond was bought or sold by the third party. On this view of the nature of the bargain between Nomura and the counterparties, which the jury was entitled to accept, the jury could find that the defendants intended to harm the counterparties with regard to an essential element of the bargain by secretly taking more money from the counterparties than Nomura was entitled to as a commission. Defendants' argument that no fraud occurred because the counterparties got what they bargained for is therefore unavailing. See United States v. Weaver, Case No. 13-CR-120(JMA), 2016 WL 3906494, at *9-10 (E.D.N.Y. June 10, 2016) (rejecting defendants' theory that no fraud occurred in connection with sale of business opportunity because disclaimers in contract limited nature of bargain to purchase of machines at particular price), aff'd, 860 F.3d 90 (2d Cir. 2017).

   *C. Willfulness*

   The defendants contend that the Government failed to prove a

willful violation of the securities laws, as required to support a criminal conviction under 15 U.S.C. § 78ff(a).  See United States v. Cassese, 428 F.3d 2, 98 (2d Cir. 2005) (prosecution must prove defendant acted willfully in order to establish criminal violation of securities laws).  The Government contends that willfulness in this context requires only awareness of the general wrongfulness of conduct, relying on United States v. Kaiser, 609 F.3d 556, 568 (2d Cir. 2010).

The jury was instructed that the Government had to prove willfulness as defined in Cassese,[2] and the Government presented sufficient evidence of willfulness to satisfy the Cassese standard.  Co-conspirator witnesses acknowledged that they engaged in "deceptive practices" and took measures to avoid detection by counterparties.  Some also admitted that the "lies . . . were hurtful to the counterparty" and the "purpose was to sort of make the client feel like we were working for them, but in reality we were taking money . . . [f]rom the client." Nomura's compliance policies and FINRA training provided notice to the defendants that material misrepresentations in connection with the purchase and sale of securities violate section 10(b)

---

[2] The jury was instructed that the Government had to prove that the defendants realized they were doing a wrongful act under the securities laws in a situation where the knowingly wrongful act involved a significant risk of effecting the violation, the standard applied in insider trading cases.  See Cassese, 428 F.3d at 98.

6

and Rule 10b-5. Viewing this evidence in a manner most favorable to the government, the jury could find that the defendants knew it was wrong to lie to counterparties about price in order to obtain additional, secret compensation and also knew that this wrongful act involved a significant risk of effecting a violation of the securities laws.

    III.    Motion to Dismiss the Indictment

"A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008).  When "the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity." United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003).  "[A]lthough clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, . . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within in scope." United States v. Lanier, 520 U.S. 259, 266 (1997).  At

7

the same time, "[d]ue process is not . . . violated simply because the issue is a matter of first impression." Ponnapula v. Spitzer, 297 F.3d 172, 183 (2d Cir. 2002). "The touchstone is whether the statute, either standing alone or as construed by the courts, made it reasonably clear at the time of the charged conduct that the conduct was criminal." Lanier, 520 U.S. at 266.

I agree with the defendants that this case raises due process concerns with regard to both fair notice and discriminatory enforcement. As the Government concedes, lying in arms-length commercial transactions is not always illegal. It depends on the particular facts and circumstances. See Regent Office Supply Co., 421 F.2d at 1179 (lies that are "repugnant to standards of business morality" may nevertheless be insufficient to support a criminal conviction for fraud). Prior to the indictment in Litvak, the conduct at issue appears to have been widespread in the RMBS market. Cooperating witnesses in this case testified that they didn't realize the conduct was illegal. After a series of trials involving five defendants charged with essentially the very same conduct, only Mr. Gramins currently stands convicted on any count in any of the indictments. It is possible the jury convicted him on the conspiracy count, and hung or acquitted as to all other counts in the indictment, only because it was persuaded that he continued to engage in the

8

conduct notwithstanding the Litvak indictment. Others who engaged in this conduct have been the subject of civil enforcement proceedings or no enforcement proceedings at all. It is fair for the defendants to wonder what distinguishes their conduct from that of others who have been spared indictment.

Nevertheless, I conclude that due process has not been violated. It is well-known that the mail and wire fraud statutes may be used to prosecute new forms of fraud, and the Second Circuit has rejected due process claims in cases involving novel applications of these statutes and the antifraud provisions of the securities laws. See, e.g., United States v. Carpenter, 791 F.2d 1024, 1034 (2d Cir. 1986), aff'd, 484 U.S. 19 (1987); United States v. Newman, 664 F.2d 12, 19 (2d Cir. 1981); United States v. Persky, 520 F.2d 283, 286 (2d Cir. 1975). No case has been cited or discovered that compels dismissal of the indictment in this case because of due process concerns. Under existing precedent, even if the defendants did not realize their conduct was unlawful until the Litvak indictment, their right to due process has not been violated if "they clearly treaded closely enough along proscribed lines [for a jury] to find that they had adequate notice of the illegality of their acts." Carpenter, 791 F.2d at 1034. Viewing the evidence in the trial record in a manner most favorable to the government, the jury could find that

the defendants had adequate notice. That the defendants' conduct might be better addressed through civil or administrative proceedings, as they vigorously contend, does not provide a legal basis for the Court to dismiss the indictment.

IV. Motion for a New Trial

Mr. Gramins seeks a new trial based on prosecutorial misconduct in closing argument and the admission of certain counterparty testimony. I conclude that a new trial is necessary.

*A. Legal Standard*

Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. As with a Rule 29 motion for acquittal, "the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility." United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001) (quotations omitted). In determining whether to vacate a conviction based on evidentiary errors or prosecutorial misconduct, two different standards apply, but both focus on whether the error caused or likely caused prejudice to the defendant. See generally United States v. Certified Envtl. Servs., Inc., 753 F.3d 72, 96 (2d Cir. 2014). A prosecutor's inappropriate remarks warrant a new trial "if the misconduct

10

caused substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." Id. (quotation omitted). With respect to erroneous evidentiary rulings, a new trial is warranted if the "improper admission or exclusion affected substantial rights and therefore was not harmless." Id. (citations and brackets omitted).

*B. Prosecutorial Misconduct*

Whether prosecutorial misconduct necessitates a new trial is "controlled by three factors: (1) the severity of the misconduct; (2) curative measures taken by the district court; and (3) the certainty of conviction absent the misconduct." United States v. LaMorte, 950 F.2d 80, 83 (2d Cir. 1991) (citations omitted). I agree with the defendants that the Government's rebuttal argument included statements that should not have been made. However, I don't think the statements warrant a new trial.

The prosecutor's reference to trades that were not in evidence was inappropriate and inconsistent with a pretrial agreement to avoid references to uncharged trades. See Certified Envtl. Servs., 753 F.3d at 97 ("[T]he improvisatory nature of a rebuttal summation is no license for . . . referencing facts not in the record . . ."). But the statement drew an immediate objection, which was addressed through two curative instructions. See United States v. Biasucci, 786 F2d 504, 513 (2d Cir. 1986)

11

(finding no new trial warranted where prosecutor "improperly suggested to the jury that the government could have prolonged the trial for three months," court gave curative instruction, and there was "ample evidence of [the defendants'] wrongdoing").

More problematic in the context of this case is the prosecutor's admonition to the jury that "lying to take people's money" is a crime. The defense objected and a curative instruction was provided on the intent and willfulness elements of the charged offenses. Though the prosecutor's repeated statement was at odds with the Court's instructions on the law, it does not appear that his oversimplification of the law was calculated to inflame the jury. Cf. Floyd v. Meachum, 907 F.3d 347, 351 (2d Cir. 1990) (new trial warranted based on "repeated and escalating prosecutorial misconduct from initial to closing summation," including prosecutor's statement that "Fifth Amendment burden of proof is a protection for the innocent and is not a shield to protect the guilty," and court gave no curative instruction). Moreover, it does not appear that the jury was misled. If the jury believed that "lying to take people's money" is a crime, it likely would have convicted all the defendants on all counts.

*C. Erroneous Admission of Evidence*

Mr. Gramins also argues that "point of view" testimony by

counterparty witnesses should have been excluded. In light of Litvak II, I agree that some testimony was improperly admitted and that the admission of the testimony warrants a new trial.

In Litvak II, the Court of Appeals vacated the conviction because the jury heard "evidence of the idiosyncratic and erroneous belief of [a] counterparty's representative . . . in an agency relationship." 889 F.3d at 59. Brian Norris, the buyer in the sole trade upon which Litvak was convicted, testified that he believed Litvak was his agent, "and that broker-dealers 'serve as an agent in between buyers and sellers." Id. at 63 (brackets omitted). Joel Wollman - the same individual who testified about the JPMAC trade in this case - also testified that he believed Litvak was "acting as his agent." Id. (brackets omitted). The Court permitted the testimony over Litvak's objection because it believed evidence of the witnesses' "own point of view" was relevant to the materiality of the misstatements and Litvak's fraudulent intent. In closing argument, the Government conceded that Litvak was not an agent but argued that he "created the perception of acting as an agent and . . . aimed to establish a 'relationship of trust.'" Id. at 69.

The Second Circuit held that the "point of view" evidence was irrelevant under Federal Rule of Evidence 401 and unduly prejudicial under Rule 403. The evidence was irrelevant because

13

"a reasonable investor would not misperceive the role of a broker-dealer in the RMBS market." Id. at 68. Even if erroneous "point of view" evidence had marginal relevance, permitting the testimony created "a high probability of confusing the jury by asking it to consider as relevant the perception of a counterparty representative that was entirely wrong."

Litvak II does not foreclose the use of "point of view" evidence but clarifies when such evidence is appropriate:

> Th[e] approach is permissible in a case like this, but only so long as the testimony about the significance of the content of a defendant's misstatements and each trader's "own point of view" is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue. In other words, there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market. Materiality cannot be proven by the mistaken beliefs of the worst informed trader in a market.

Id. at 65.

In this case, no counterparty representative explicitly testified that he believed Gramins was acting as an "agent."[3] However, Wollman strongly implied that that is how he viewed the role of broker-dealers in the RMBS market when brokering trades. He testified that although "a broker-dealer effectively earns

---

[3] The Government did introduce the text of Tyler Peters's 2011-12 year-end review, which referenced Nomura taking "agented roles" in some transactions. The Government mentioned this language during closing argument.

14

trust over time through their behavior," in general, his trust level varies depending on the type of trade involved. In particular, he distinguished between trades in which a broker-dealer is "acting as a broker" (i.e., "order" and BWIC trades) and trades in which a broker-dealer is buying or selling on its own behalf (i.e., inventory trades). Wollman testified that when a broker-dealer acts as a broker, it plays the role of "facilitating" a trade and is "acting on behalf of another counterparty." Though he generally approaches transactions with skepticism, "in that context, [he] expects that facts that [the broker-dealer] tells [him] are truthful" and the broker-dealer is "doing what I'm telling them to do." For example, while discussing a BWIC trade, he characterized submitting a bid on his behalf as "almost more clerical, administrative than . . . anything else." In an inventory trade, on the other hand, "it's more [him] on one side and the dealer on the other side." In allowing this "point of view" testimony, I followed the ruling in the Litvak case that formed the basis for the Second Circuit's recent vacatur. See Transcript of Apr. 24, 2017, Telephone Conference, at 65-66 (ECF No. 372).

The Government argues that this case is distinguishable from Litvak II because Wollman did not use the words "agent" or "fiduciary." However, the testimony in Litvak II was problematic

15

not merely because the witnesses used the word "agent"; the Government expressly disclaimed any formal agency relationship and the jury was instructed that no agency relationship existed. The testimony was problematic because it implied that broker-dealers owe trading counterparties a duty of honesty arising solely from a "relationship of trust" between broker-dealers and traders. See id. at 69 ("The government's concept of subjective trust as evidence of materiality became a back door for the jury to apply the heightened expectations of trust that an agency relationship carries."). Wollman's testimony here, like his and Norris's testimony in Litvak II, suggested that "brokering" transactions in the RMBS market carries certain duties - including a duty of honesty - that are not present when a broker-dealer is trading for its own portfolio.

The Government also seeks to distinguish Litvak II on the ground that the defendants in this case "fostered and exploited" the counterparties' misimpressions. It is true that other witnesses in addition to Wollman spoke about the importance of "trust" between traders and broker-dealers, and the Government presented evidence that the defendants endeavored to appear trustworthy by explaining to counterparties that it is a good

16

business practice to be honest in the RMBS market.[4]  But the Government has not identified evidence showing that Gramins caused Wollman's mistaken beliefs about the role of broker-dealers in the RMBS market by means of deception that would deceive an objectively reasonable investor.  See Litvak II, 889 F.3d at 69 n.13.

In determining whether an evidentiary error was harmless, the question is whether one can "conclude with fair assurance that the error[] did not substantially influence the jury." Litvak II, 889 F.3d at 70 (quoting United States v. Rosemond, 841 F.3d 95, 112 (2d Cir. 2016)).  Courts consider the following factors: "'(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony;

---

[4] For example, Zachary Harrison testified, "I think business and personal relationships have an element of trust.  And in these business relationships, I viewed how much I trusted the people I was doing business with []as an important factor in doing . . . business with them."  The government introduced a Bloomberg chat in which Shapiro explained why Harrison should trust him: "pure fact is that you are a MUCH more meaningful % of my team's business than you are of [another broker-dealer's] . . . and it would be foolish of me to risk that for a couple of trades." Harrison and Shapiro also discussed whether from "a pure game theory point of view" it is "logical" to be honest or dishonest in the RMBS market.  As Harrison interpreted the exchange at trial, they agreed that it may sometimes be logical to "lie to someone in a way that you wouldn't get caught," but "that to have good long-term relationships with people and do the best I can for my clients over the long-term, the best way to accomplish that is to not fuck around."

17

and (4) whether such evidence was cumulative of other properly admitted evidence.'" Id. (quoting McGinn, 787 F.3d at 127-28).

Regarding the first and fourth factors, the Second Circuit's conclusions in Litvak II apply equally here: "(1) the government's case on materiality was not overwhelming and was vigorously contested . . . and (4) the testimony was not cumulative of properly admitted testimony." Id. Regarding the second factor - the prosecutor's conduct with respect to the improperly admitted evidence - Gramins is correct that the Government "exploited" the Court's ruling that "point of view" testimony was admissible. In closing argument, the Government relied on the mistaken notion that trading RMBS for one's own account and "brokering" a transaction are fundamentally different types of transactions.[5]

Regarding the third factor - the importance of the wrongly

---

[5] The Government addressed the defense's reliance on the principal-to-principal nature of the market, see Trial Tr. 2954-55 ("The defendants want you to believe that because they weren't the agents of their customers, they didn't actually broker transactions. They want you to think Nomura bought the bond and they're just hanging out with the bond and then they decide to sell the bond to someone else. But that's not what the facts are."), and specifically cited Wollman's testimony suggesting that broker-dealers are not principals in the RMBS market, see id. (citing Wollman's belief that "He's not buying from Nomura. He's buying from [the seller]."); see also id. (citing Bloomberg chat in which Gramins stated to a different trader, "I'm happy to reflect what you want. I'm purely looking to broker."). Even in the Government's post-trial briefing it continues to refer to these trades as "so-called principal-to-principal transactions."

18

admitted testimony - it is likely, though not certain, that the jury relied on the irrelevant testimony. Again, Litvak II is instructive. As discussed above, Litvak was convicted on the basis of a trade with Brian Norris, who testified that he believed Litvak was his agent. 889 F.3d at 70. "Norris's testimony about the perceived agency relationship was the only rational reason for the jury to have convicted [Litvak] on that count." Id.[6] Here, Gramins was convicted of a conspiracy predicated on a number of trades between 2009 and 2013. His codefendants were acquitted, or the jury hung, on all other counts. On the evidence presented to the jury, what distinguishes Gramins from his codefendants was his participation with Wollman in the JPMAC trade after the Litvak indictment.[7] Assuming, as seems reasonable, that Gramins was convicted on the basis of this trade, there is a distinct risk that the jury was influenced by Wollman's testimony that Gramins owed him a duty to tell the truth stemming solely from his role as a broker-dealer. To avoid this risk, it would have been better to preclude use of

---

[6] Though Wollman also testified that he believed Litvak was his agent, Wollman's "credibility in that regard was severely weakened." He stated that he viewed one of Litvak's statements with suspicion, and there was evidence that Wollman himself engaged in similar negotiating tactics.

[7] Shapiro was included in the Bloomberg chats with Wollman but was not involved in the negotiation.

19

the terms "broker" and "commission."[8]

*D. Cumulative Prejudice*

Even if the admission of Wollman's "point of view" testimony, standing alone, does not justify vacating Gramins's conviction, the combination of errors described above justifies a new trial. All things considered, I cannot "conclude with fair assurance that the errors did not substantially influence the jury." See Litvak II, 889 F.3d at 70 (quoting Rosemond, 841 F.3d at 112).

V. Conclusion

Accordingly, the motions for judgment of acquittal and to dismiss the indictment are denied. The motion for a new trial is granted.

So ordered this 5th day of June 2018.

/s/RNC
Robert N. Chatigny
United States District Judge

---

[8] In United States v. Demos, another case involving misrepresentations by a broker-dealer in the RMBS market, Judge Thompson barred counsel and expert witnesses from using the terms "broker" and "commission" because "[j]urors may be familiar with brokers and the concept of commission in their own affairs and associate those terms with an agency relationship." See Order of May 20, 2018, No. 16-cr-220 (AWT) (ECF No. 258). The jury acquitted Demos on all counts. See id. (ECF No. 344).