**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | No. 15-cr-00155 (RNC) |
| | : | |
| | : | |
| ROSS SHAPIRO and | : | June 27, 2018 |
| MICHAEL GRAMINS | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**ROSS SHAPIRO'S MOTION FOR RECONSIDERATION**
**<u>PURSUANT TO LOCAL RULE 7(c)</u>**

PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
*Attorneys for Ross Shapiro*

**TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ...................................................................................1

RELEVANT PROCEDURAL BACKGROUND .........................................................2

APPLICABLE LEGAL STANDARD .........................................................................3

ARGUMENT ..............................................................................................................4

    I.      The Counterparty Testimony in This Case Was Insufficient to Establish Materiality Beyond a Reasonable Doubt ......................................................................................4

    II.     This Prosecution Violates Due Process ...................................................................17

# TABLE OF AUTHORITIES

**Cases:**                                                                  **Page**

*Florida State Conf. of N.A.A.C.P. v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) ................................................................. 5

*Neder v. United States*,
   527 U.S. 1 (1999).......................................................................................... 5

*United States v. Carpenter*,
   791 F.2d 1024 (2d Cir. 1986)................................................................. 17, 18

*United States v. Chiarella*,
   588 F.2d 1358 (2d Cir. 1978)................................................................. 17, 18

*United States v. Chiarella*,
   445 U.S. 222 (1980) ..................................................................................... 18

*United States v. Jabar*,
   No. 09 Cr. 170 (LJV), 2017 WL 4276652 (W.D.N.Y. Sept. 27, 2017) ................................. 16

*United States v. Litvak* ("*Litvak I*"),
   808 F.3d 160 (2d Cir. 2015)........................................................................ 15

*United States v. Litvak* ("*Litvak II*"),
   889 F.3d 56 (2d Cir. 2018)................................................................. *passim*

*United States v. Lucarelli*,
   490 F. Supp. 2d 295 (D. Conn. 2007)........................................................... 3

*United States v. Mix*,
   No. 12-CR-171 (SRD), 2014 WL 2625034 (E.D. La. June 12, 2014) ..................................... 21

*United States v. Newman*,
   664 F.2d 12 (2d Cir. 1981)........................................................................... 18

*United States v. Rodriguez*,
   No. 3:11CR12 MRK, 2011 WL 3203276 (D. Conn. July 26, 2011) ....................................... 3

*United States v. Saliba*,
   489 F. App'x 501 (2d Cir. 2012) ................................................................. 19

*United States v. Weimert*,
   819 F.3d 351 (7th Cir. 2016) ....................................................................... 17

**Local Rules:**

D. Conn. L. Civ. R. 7(c)...........................................................................................................3

D. Conn. L. Crim. R. 1(c) .......................................................................................................3

Pursuant to Rule 7(c) of the Local Rules of Civil Procedure for the District of

Connecticut, incorporated by reference into the District's Local Rules of Criminal Procedure by

Rule 1(c), Defendant Ross Shapiro respectfully moves for reconsideration of the Court's Ruling

and Order dated June 5, 2018 ("Order"), denying his post-trial motion for a judgment of acquittal

pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure and his motion to dismiss the

Indictment as a violation of Due Process.

## SUMMARY OF ARGUMENT

Mr. Shapiro respectfully moves on two grounds:

First, the Order cited but did not apply the materiality standard formulated by the Court

of Appeals in the *Litvak* appellate opinions.  Although, under the rulings, as a matter of

evidentiary sufficiency, materiality may be established by counterparty testimony that a price

negotiation statement was "important" to the party, the prerequisite to the sufficiency of such

testimony is that the witness's "'own point of view' is shown to be within the parameters of the

thinking of reasonable investors in the particular market at issue."  Order at 2 (citing *United

States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018) ("*Litvak II*")).  In the Order, the Court ruled

without elaboration that, viewing the evidence in the light most favorable to the government, this

standard had been satisfied.  Respectfully, however, review of the idiosyncratic counterparty

witness testimony in this case shows that it fell decidedly short of this standard.

Second, while the Court ruled that this case "raises due process concerns with regard to

both fair notice and discriminatory enforcement[,]" (Order at 8), the Court denied the motion

without addressing its primary legal basis, namely, that where a U.S. Court of Appeals has held

that statements in a principal-to-principal negotiation are not material as a matter of law (even if

they would have, if known, caused a counterparty to decline to transact) under the wire fraud

1

statute, no layperson can be said to have been on notice that in fact such statements are material. If X is not material as a matter of law, according to a federal court of appeals, a defendant cannot be held to be on notice that X is material, especially where the charges asserting that X is material, as in this case, were unprecedented at the time of the charged conduct. This issue was not decided by *Litvak I* or *Litvak II*. Moreover, because wire fraud "materiality" is defined less stringently than securities fraud "materiality," it is of no moment that this case charged both securities fraud and wire fraud. In addition, the Court relied on an incorrect legal standard in assessing fair notice, requiring reconsideration of the issue.[1]

## RELEVANT PROCEDURAL BACKGROUND

On June 15, 2017, after a six-week trial, the jury returned verdicts of acquittal as to Mr. Shapiro on all of the securities fraud and wire fraud counts (Counts Two through Nine) and did not return a verdict on the conspiracy count (Count One), which charged conspiracy to violate the securities fraud and wire fraud statutes. On August 28, 2017, Mr. Shapiro filed a post-trial motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c). Mr. Shapiro had, under Fed. R. Crim. P. 29(a), previously submitted a motion for acquittal at the close of the government's case in chief, along with a motion to dismiss under the Due Process Clause, as to which the Court reserved its ruling. The government opposed both motions, and the Court held oral argument on November 8, 2017. On June 5, 2018, the Court issued a Ruling and Order denying Mr. Shapiro's motions and granting a new trial to Mr. Shapiro's co-defendant, Michael Gramins.

At a conference on June 7, 2018, the Court observed as follows regarding the Order:

> The defendants have not had an opportunity to seek reconsideration of that ruling because of the timing of the situation [*i.e.*, the impending trial date of July 9, 2018], indeed, nor has the government, and maybe I could be persuaded that the ruling is incorrect.

---

[1] Mr. Shapiro expressly preserves his prior arguments for a judgment of acquittal under Rule 29, even if not raised herein.

> If you study Judge Winter[']s opinion [in *Litvak II*], which certainly bears careful study, perhaps I need to take a closer look, and it may be that this process [of submission of motions for reconsideration by the parties] would facilitate . . . sober, careful, [and] reflective analysis.

6/7/18 Hr'g Tr. at 27.  On application by the defense, the Court approved a briefing schedule for the submission of such motions and adjourned trial *sine die*.[2]

## APPLICABLE LEGAL STANDARD

Motions for reconsideration require the movant to set "forth concisely the matters or controlling decisions which [the movant] believes the Court overlooked in the initial decision or order." D. Conn. L. Civ. R. 7(c); *see also* D. Conn. L. Crim. R. 1(c) (incorporating by reference D. Conn. L. Civ. R. 7(c)).  The major grounds justifying reconsideration are: (1) an intervening change in the law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or prevent manifest injustice.  *See United States v. Rodriguez*, No. 3:11CR12 MRK, 2011 WL 3203276, at *1 (D. Conn. July 26, 2011) (Kravitz, J) (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  The standard for granting a motion for reconsideration is strict, and "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked— matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *United States v. Lucarelli*, 490 F. Supp. 2d 295, 297 (D. Conn. 2007) (Arterton, J) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)) (granting reconsideration).

---

[2]  Mr. Shapiro did not consent to an exclusion of time under the Speedy Trial Act and persists in his motion for severance and a speedy trial (Dkt. 505) in view of the five-year ordeal that this matter has caused for his family.

**ARGUMENT**

**I.    The Counterparty Testimony in This Case Was Insufficient to Establish
        Materiality Beyond a Reasonable Doubt**

Reconsideration of the Order is well warranted because the Order does not appear to have searchingly reviewed the evidence to assess whether, under the decision of the Court of Appeals in *Litvak II*, the counterparty testimony in this case was "shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." 889 F.2d at 65. An examination of that evidence makes clear that this standard was not met.

In *Litvak II*, the Court vacated the defendant's conviction because the jury heard "evidence of the idiosyncratic and erroneous belief of [a] counterparty's representative . . . in an agency relationship," 889 F.3d at 59, where the absence of such a relationship in the RMBS market was undisputed. The government's decision to elicit testimony from a counterparty witness about his "subjective trust" in the defendant "became a back door for the jury to apply the heightened expectations of trust that an agency relationship carries" in evaluating the materiality of the defendant's misrepresentations. *Id.* at 69-70. Such "point of view" evidence is relevant proof of materiality "only so long as the testimony about the significance of the content of a defendant's misstatements and each trader's 'own point of view' is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." *Id.* at 65. Thus, "there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market." *Id.*

Here, the testimony of the counterparty witnesses did not provide sufficient basis for the jury to determine the viewpoint of a "reasonable investor" in the nonagency RMBS market against which to evaluate the materiality of the misstatements at issue, as required by *Litvak II*. The government called four counterparty witnesses: Joel Wollman (QVT), Zachary Harrison

4

(Putnam), Eric Marks (Ellington), and Aadil Abbas (HIMCO).  Wollman and Harrison expressed

singular points of view of the RMBS market, including concerning perceived relationships of

trust that *Litvak II* ruled irrelevant, on which their testimony that certain information would have

been "important" to them was predicated.  This singular and idiosyncratic testimony, which the

Order adverted to generically in one sentence without analysis, is not reflective of the point of

view of a reasonable investor.  And in light of the extensive testimony provided by Wollman and

Harrison regarding their reliance on analytics, their willingness to trade without information

about dealer cost, and the extent to which they discounted dealer statements because of the

inherent unreliability of those statements – all of which compelled the conclusion that the

misstatements at issue were not material – the jury was not presented with sufficient evidence on

which to base a finding of materiality.[3]

     Marks and Abbas, on the other hand, deemed "important" any and all utterances in a

negotiation without explanation as to the *degree* of importance they attributed to the particular

misstatements at issue.  Embracing all information as "important" without differentiating as to

the type of information that would be "more important to a reasonable investor" and thus

potentially material, and information that would be "less so," *Litvak II*, 889 F.3d at 62, similarly

fails to establish materiality under *Litvak II* because the jury lacks any framework to evaluate the

counterparty's viewpoint against that of a "reasonable investor" in the nonagency RMBS market.

---

[3] Although *Litvak* charged securities fraud only, the Second Circuit's materiality analysis applies with equal force to the materiality element in the wire fraud statute which requires a less stringent showing than materiality, as defined in the context of securities fraud.  *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 16, 25 (1999) (holding that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes," and defining a false statement as material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed") (citation and internal quotation marks omitted); *Florida State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) (contrasting materiality for purposes of securities fraud, which requires a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," with wire fraud, where "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed'").

This is all the more apparent in light of the extensive testimony by Marks and Abbas explicitly conflicting with any finding of materiality—that they often negotiated on an "all-in" basis, made decisions without any mention of dealer cost or markup,[4] relied extensively on their analytical models, and heavily discounted dealer statements, which they understood to be inherently unreliable.

Thus, taken as a whole, the testimony of the government's four counterparty witnesses did not provide sufficient basis for a jury to conclude that the alleged misstatements were material from the perspective of a reasonable investor in the nonagency RMBS market.

(i)  <u>Wollman (QVT)</u>

The Court, in granting the motion for a new trial of Mr. Shapiro's codefendant Michael Gramins, explained that Wollman "strongly implied" that he viewed broker-dealers to be his agents when brokering trades.  Order at 14.  This testimony erroneously implied that dealers such as Nomura owed a duty of honesty to their counterparties.  *Id.* at 16.[5]  Accordingly, this aspect of Wollman's testimony plainly locates his perspective on the "importance" of negotiation utterances outside "the parameters of the thinking of reasonable investors" in the RMBS market.

---

[4] The *Litvak II* Court alluded to this feature of the market when it explained:

> In a sale by a counterparty to a broker-dealer, the counterparty has no legitimate expectation that the broker-dealer will resell the bond at the price paid to the counterparty.  Similarly, in a purchase, the counterparty has no legitimate expectation of purchasing a bond at the price paid by the broker-dealer.  Rather, the broker-dealer and counterparty each have their own price ranges in which they will consummate their ends of the transactions.  The final price is determined in an arms-length negotiation and, if agreed upon, will be somewhere in the overlap of price ranges.

889 F.3d at 61.

[5] Prior to trial, the defense moved to preclude any testimony about an agency relationship between the Nomura traders and the counterparties, but the Court denied the motion, finding that each counterparty witness could "say that he thought that the defendant was acting as his agent," and then be subject to cross-examination on that point.  4/24/17 Hr'g Tr. at 65:22-66:2.  As the Court observed in its Order, in permitting such "point of view" testimony, the Court "followed the ruling in the Litvak case that formed the basis for the Second Circuit's recent vacatur."  *See* Order at 15.

889 F.2d at 65.

The remainder of Wollman's testimony fails to offer any support, let alone sufficient evidence, for the proposition that there is a substantial likelihood that a reasonable investor in the RMBS market would have viewed defendants' misstatements as having significantly altered the available mix of information.  For example, Wollman testified that, when transacting in the nonagency RMBS market, QVT arrived at independent assessments of value using complex credit models that valued a bond based on its expected rate of return at a range of price points, relying on extensive independent data.  5/24/17 Vol. X Tr. 2095:3-12 (when QVT becomes aware of a bond in the market, "typically the first thing" QVT will do is model the bond); 5/24/17 Vol. X Tr. 2095:16-2096:17 (describing QVT's modeling process which seeks to understand "how the underlying mortgages in that security are going to behave" in order to project cash flows).  With respect to each of the subject trades, Wollman testified that QVT transacted at prices that they unilaterally determined, under the rubric of the fiduciary duties they owed to their investors, were in line with their independent analyses.  5/24/17 Vol. X Tr. 2194:15-18, 2195:7-11 (Wollman would not have paid the all-in price if he did not it was in the best interest of his investors).  And confirming the immateriality of dealer cost or margin, QVT's sophisticated model took no account of dealer markup.  5/24/17 Vol. X Tr. 2216:4-10 (QVT's models have no input for dealer acquisition cost or dealer markup).

Wollman also testified that he viewed representations in the nonagency RMBS market with skepticism and understood that dealers were not always truthful during negotiations. 5/24/17 Vol. X Tr. 2216:11-14  (Wollman had "general level of skepticism" about certain types of information in the nonagency RMBS market); 5/24/17 Vol. X Tr. 2220:23-2221:9 (Wollman understood "in negotiations in the RMBS market that sometimes the kind of information that is

7

volunteered . . . may not be 100 percent truthful"); 5/24/17 Vol. X Tr. Tr. 2225:3-6 (agreeing that "[i]t's fair to say that in the RMBS market you have to be sort of on your guard with information that's volunteered to you").[6]

Wollman's idiosyncratic testimony, implying that he viewed broker-dealers to be his agents, with corresponding duties of honesty to their counterparties, formed the basis for his testimony that the defendants' misstatements would have been "important" to him, and cannot be credited in assessing the sufficiency of the trial proof. The remainder of Wollman's testimony related, principally, to QVT's independent computer-driven valuations and his awareness that dealers in the RMBS market dissembled on a regular basis, thus supporting a finding that reasonable investors would *not* have deemed the defendants' misstatements to be material.

(ii)  Harrison (Putnam)

Harrison's testimony established that his perspective on trading with defendants was singular, de-linked from that of his own firm's public disclosures, and not within the parameters of mainstream thinking of nonagency RMBS investors.

As an initial matter, Putnam's public disclosures acknowledged that trading in the market involved undisclosed markups. *See* Putnam Prospectus, DX 1741 at p. II-83 ("Although the fund does not typically pay commissions for principal transactions in the over-the-counter markets, such as the markets for most fixed income securities and certain derivatives, an undisclosed amount of profit or 'mark-up' is included in the price the fund pays."). Yet Harrison claimed to be unfamiliar with his own firm's public stance on undisclosed markups in the fixed income marketplace. 5/16/17 Vol. V Tr. 942:2-8.

Next, Harrison's testimony strongly implied that he viewed Mr. Shapiro as an agent. The

---

[6] *See also Litvak II*, 889 F.3d at 71 ("Wollman admitted that he viewed negotiations with broker-dealers with skepticism.").

word "trust" was referenced over two dozen times in the course of his direct testimony.  Harrison repeatedly testified that "trust" was an "important factor" informing his choice of dealers. 5/11/17 Vol. IV Tr. 701:9-702:2 (factors Harrison considered when he "distributed [his] business" included "which broker-dealers [he] trusted more than other broker-dealers"); 704:1-19 ("[I]n these business relationships, I viewed how much I trusted the people I was doing business with [as] an important factor in doing a business with them"); 709:2-709:7 (Harrison "evaluate[d] other broker-dealers based on how honest [he] believed them to be" and "those evaluations" affected his business with dealers); 709:14-15 (Harrison ranked dealers "in terms of honesty").

Harrison testified that Mr. Shapiro was one of "the three most trusted people" with whom he traded.  5/11/17 Vol. IV Tr. 709:21-710:3 (Mr. Shapiro was among "my more trusted individuals I dealt with" including "on a list I had which I considered to be the three most trusted people I dealt with"); 728:9-10 (Harrison chat to Mr. Shapiro: "If I only dealt with people I trust as much as you, it would be quiet").  Throughout Harrison's testimony, the government repeatedly elicited evidence of the level of importance he placed on subjective trust in his business relationships.  5/11/17 Vol. IV Tr. 734:17-21 (in his business practices, it is "important for [Harrison] in evaluating broker-dealers, to be able to trust that they're going to be truthful" with him); 805:10-805:16 ("I would be able to do a better job for my clients if I felt that I was doing business with people who were trustworthy."); 831:15-18 ("I had more trust in my business with Nomura than with Credit Suisse").[7]

---

[7] In the government's post-trial briefing, it continued to rely on irrelevant testimony as evidence of trust to suggest a heightened duty to the counterparties.  *See, e.g.*, Dkt. 502 at 15 ("Whereas Shapiro claimed to Harrison that he was the 'honest dealer,' . . . the evidence showed that he lied to Harrison on many occasions").  *But see* 5/16/17 Vol. V Tr. 932:9-15 (Harrison testifying on cross-examination that Mr. Shapiro's statement that he is an "honest dealer" was made as Mr. Shapiro "was poking fun of me for what I was wearing."). This emphasis shows the substantial disconnect between the mainstream nonagency RMBS marketplace and the testimony elicited by the government.

Accordingly, this aspect of Harrison's testimony should be disregarded as not probative of materiality. *See* 889 F.3d at 69 ("a reasonable investor would not misperceive the role of a broker-dealer in the RMBS market").[8]

The balance of Harrison's testimony reflects that the defendants' misstatements would not have significantly altered the available mix of information for reasonable investors in the RMBS market. For example, Harrison testified extensively about Putnam's reliance on its sophisticated computer-generated credit model. 5/16/17 Vol. V Tr. 948:5-23 (in the ordinary course of your trading activity, before Harrison traded, he ran the credit model for the bond); 5/16/17 Vol. V Tr. 954:8-955:7 (a portion of the modeling process included a spreadsheet that Harrison termed his "super-secret XLS" as well as "vectoria's secret"); *see, e.g.*, DX 1661 (Putnam model output).

Harrison also testified that he traded on the basis of *verifiable* information. 5/16/17 Vol. V Tr. 956:23-957:11 (the credit model utilized data that included home prices and home price changes, numbers of homes available for sale or in foreclosure, and characteristics of the borrowers, such as FICO scores, incomes, and the size of the mortgage); *see also* 5/16/17 Vol. V Tr. 1018:18-1020:6 (when Mr. Peters told Mr. Harrison that the Intex model for the LXS bond has changed, Harrison "wanted to check [for himself] what the document said relative to what was in Intex").

---

[8] The government's summation underscored that Harrison's testimony reflected his singular perspective rather than a representative view. As in *Litvak II*, the government used the "concept of subjective trust as evidence of materiality" to encourage the jury "to apply the heightened expectations of trust that an agency relationship carries." See *id.* 6/11/17 Vol. XIII Tr. 2713:8-12 ("And you heard about the trust relationships here, particularly with regard to Mr. Harrison, and you also heard some testimony from Mr. Wollman about how he evaluated what information to credit, what types of information to credit."); 6/11/17 Vol. XIII Tr. 2698:4-5; 2714:16-17 ("Let's talk about Mr. Harrison for a second. He thought trust was critical"); 2714:23-25 ("And Mr. Harrison viewed how much he trusted the people that he was dealing with, in particular these defendants, as a critical piece of information."); 2715:4-6 ("Mr. Harrison explained that Shapiro, Peters, and Gramins were among his most trusted individuals that he dealt with"). As the government argued: "These were the things that a reasonable investor takes into the marketplace with him: Who do I trust; who can I trust; what is my history with these people?" 6/11/17 Vol. XIII Tr. 2716:5-7.

Moreover, when Harrison deemed information sufficiently important to his investment decision, he was *unwilling* to trade without such information.  For example, Harrison testified that if data relating to the combined loan-to-value ratio ("CLTV") for the mortgages underlying a particular bond were not available, Putnam would not even consider the investment.  *See* 5/16/17 Vol. V Tr. 987:6-15 (Putnam's proprietary model "required" combined loan to value data in order to evaluate the security); 5/17/17 Vol. VI Tr. 1146:6-19 ("When there is no CLTV, we stop looking at it"); DX 959 (Harrison tells trader at Barclays that Putnam will not trade a particular bond because the absence of CLTV data is a "dealbreaker").

In stark contrast, Harrison regularly traded *without* access to information about dealer cost and profit.  *See* 5/16/17 Vol. V Tr. 939:19-23 ("In the course of trading non-agency RMBS on behalf of Putnam, [Harrison] engaged in purchases of bonds from dealers where the dealer made no representation as to its cost"); 940:3-941:2 (between 2010 and 2013, "there are circumstances when a dealer does not represent its cost" or "the price at which it could sell a bond").

Harrison further testified that he was well aware of the dissembling that occurs in the RMBS market, such that he discounted representations by dealers and sometimes entered into transactions in spite of suspected misrepresentations, and admitted to engaging in such conduct himself.  In this regard, Harrison testified as follows:

- Harrison estimated that he encountered "misstatements or inaccurate information" from dealers "multiple times per week."  5/16/17 Vol. V Tr. 1082:3-7.

- Harrison acknowledged that he was "going to go ahead and lie" to a counterparty "as to whether [he was] the owner of the bond."  5/16/17 Vol. V Tr. 1094:16-18.

- Harrison offered to "fabricate color" and "shop" bids for Mr. Shapiro.  5/16/17 Vol. V Tr. 1091:11-15.

- Harrison admitted that making misrepresentations to counterparties might be appropriate when it was in the best interests of his client or helped to maintain the trust of a counterparty.  5/17/17 Vol. VI Tr. 1218:15-25, 1219:3-17.

11

Consequently, Harrison's testimony, like Wollman's, fails to support a finding that the defendants' misstatements were material.

(iii) <u>Marks (Ellington)</u>

Marks' "point of view" evidence similarly failed to provide sufficient proof of materiality beyond a reasonable doubt. While the government elicited testimony from Marks that a misrepresentation by Nomura as to the price at which it had purchased a bond that it was negotiating to sell, or the price at which it expected to sell a bond, would be "important" to him, this testimony was coupled with Marks' testimony that "*every* additional piece of information would be important to [him] and could affect [his] future negotiations," not just "material" information. 5/25/17 Vol. XI Tr. 2334:11-13. Testimony deeming *any* fact potentially useful in the course of a negotiation as "important" provides an insufficient basis for the jury to determine materiality because it fails to distinguish between misstatements that would be "more important" to a reasonable investor and, thus, potentially material, and those that are "less so." *See Litvak II*, 889 F.3d at 62. Indeed, a "misrepresentation is important" for purposes of determining *materiality* only "if there is *a substantial likelihood* that the disclosure of the omitted fact would have been viewed by the reasonable investor *as having significantly altered the total mix of information made available*." *Litvak II*, 889 F.3d at 64 (internal quotation marks omitted and emphasis added). Marks' testimony that "*every* additional piece of information would be important*"* to him failed to provide the jury with sufficient guidance on how to assess whether defendants' misstatements were material—that is, whether they were *sufficiently* "important" to a reasonable investor in the RMBS market such that the reasonable investor would view there to be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor *as having significantly altered the total mix of information made available*."

Moreover, the evidence that Ellington and other counterparties routinely traded without dealer cost information, and heavily discounted statements made by dealers, further accentuates the lack of sufficient evidence regarding materiality.  For example, despite discussing his eagerness to lay his hands on "every additional piece of information," Marks also testified that on a routine basis counterparties in fact traded nonagency RMBS *without* requesting or receiving any representation about Nomura's cost in acquiring a bond or expected markup on sale.  *See, e.g.*, 5/25/17 Vol. XI Tr. 2371:18-2372:1 ("the[re] are many times where I do not know the markup"); 2372:2-2372:15 (Marks is "still able to trade" when a dealer does not provide him with its acquisition price or markup); 2376:19-2377:2 (where a dealer represents a certain acquisition price, Marks did not ask for a written confirmation of any kind of the represented markup).

Further highlighting the insufficiency of Marks' testimony on the point of materiality was his repeated acknowledgment that he viewed with skepticism representations made by dealers because he knew such information was unverifiable and likely inaccurate because he understood the charged tactics to be commonplace in price negotiations.  Indeed, Marks acknowledged that since he first began trading in the RMBS market in or about 2008, his supervisor "was always warning [him] that people might say anything to convince you to pay more for a bond than you really should be," 5/25/17 Vol. XI Tr. 2375:4-9, and he traded despite thinking that dealers "were actually making more money than they were representing" (2377:4-2377:22).

Accordingly, Marks' testimony similarly fails to support a finding of materiality.

(iv)    <u>Abbas (HIMCO)</u>

The testimony of Abbas, like that of Marks, similarly fails to provide sufficient basis for a reasonable juror to conclude that misrepresentations about dealer cost and market were

13

material to a reasonable investor in the RMBS market.  Like Marks, Abbas also testified that he would have wanted to know whatever information he could "get [his] hands on," 5/18/17 Vol. VII Tr. 1522:17-19, thus diluting the relevance of his testimony that he would have liked to know what Nomura paid, or received, for bonds.

Moreover, Abbas, like Marks, confirmed that on a routine basis, investors in the nonagency RMBS market in fact traded bonds *without* requesting or receiving representations about dealer cost or expected markup.  *See, e.g.*, 5/18/17 Vol. VII Tr. 1525:8-16 (testifying that "at least some of the time that you buy bonds, you don't know what the dealer is paying for those bonds" which "doesn't stop you from being able to assess whether a bond is a good investment"); 1531:3-17 (Abbas often makes decisions to buy or sell RMBS without knowing dealer cost or expected resale price, the lack of which information "doesn't prevent you from trading"); 1531:21-24 (Abbas is "able to trade on a fairly regular basis" without knowing dealer cost or markup); 1533:25-1534:13 (where a dealer represents his acquisition price or markup, Abbas does not ask to see a confirmation).  This testimony further diluted the force of Abbas' testimony that it would have been important for him to know what Nomura paid for its bonds.

Finally, Abbas acknowledged that the market did not require full transparency, and that it was not "bad [in a pejorative sense], not being fully transparent," because that is "how the market is structured."  5/22/17 Vol. VIII Tr. 1652:17-1653:13.  Indeed, Abbas confirmed that he discounted representations made by dealers because he knew that dealer misrepresentations were commonplace in such an opaque market and noted that the prevalence of such misrepresentations did not prevent him from actively trading in the market.  *See* 5/22/17 Vol. VIII Tr. 1600:24-1601:4 (Abbas "understood that in a market . . . in which trading prices are not published to

market participants, that it's a possibility that [he] could receive inaccurate information when [he was] talking to market participants about trading prices").

   For these reasons, the balance of Abbas' testimony supports the conclusion that the defendants' misstatements were not material.

*   *   *

   The teaching of *Litvak I* and *Litvak II*, taken together, is that, in the particular setting of the nonagency RMBS market, the testimony of individual participants may not necessarily provide the jury with sufficient context to evaluate the misstatements at issue under the required objective test, which is based on the mindset of a "reasonable investor" in that market.  This is particularly true in light of the fact that the government called only four counterparty witnesses to testify in a market consisting of several hundred such counterparties.  *See, e.g.*, GX 26K (Nomura subprime trade post following trade in the PPSI bond, showing that this particular trade post was circulated to more than 140 institutions).  Thus, in *Litvak I*, the Court reversed the conviction because the defendant was denied the opportunity to offer expert testimony "to show that, under an objective materiality test, the misstatements would not have been deemed significant by a reasonable investor."  *Litvak II* (citing *United States v. Litvak*, 808 F.3d 160, 184 (2d Cir. 2015)).  In *Litvak II*, the Court reiterated that "the materiality standard is an objective one and centers on the views of a hypothetical, reasonable investor in the market at issue," and reversed again because the sole count of conviction was infected by the "indisputably idiosyncratic and unreasonable viewpoint" of a particular counterparty that was "not . . . probative of the views of a reasonable, objective investor in the RMBS market."  889 F.3d at 68, 69.  In this case, the counterparty testimony fell short of the requirements set forth in *Litvak I* and *II*, and did not provide the jury with sufficient context to evaluate the materiality of the

15

misstatements at issue from the standpoint of a "reasonable, objective investor in the RMBS market."  And the context that was provided by the counterparty witnesses showed that market participants relied heavily on their analytical models, regularly traded without information about dealer cost, and heavily discounted dealer representations which they understood to be inherently unreliable.  This evidence fell far short of the threshold necessary to prove materiality.[9]

On this record, the Court's observation at the conference of June 7, 2018, that "[i]t may be that expert testimony is necessary to enable the jury to reach a reasoned decision" as to materiality in this case is well taken.  6/7/18 Hr'g Tr. at 28.  Because of the "very unusual context" of misrepresentations made during the course of negotiations in the nonagency RMBS market, and given "the absence of expert testimony, the evidence is insufficient under *Litvak II* to support a conviction."  *Id*.  Accordingly, Mr. Shapiro is entitled to a judgment of acquittal on Count One.

---

[9] Lastly, it is notable that Mr. Shapiro was acquitted of all substantive counts of the Indictment, including the six counts pertaining to the JPALT and PPSI trades (which included both substantive securities fraud and wire fraud in connection with each trade) about which Marks and Abbas testified at trial. Neither Marks nor Abbas traded with Mr. Shapiro.  Marks principally testified about the JPALT trade which formed the basis for Count 2 (Securities Fraud), Count 5 (Wire Fraud), Count 6 (Wire Fraud), and Overt Acts 1(h), (i), and (j) of Count One (Conspiracy) and Abbas testified principally about the PPSI trade, which served as the basis for Count 3 (Securities Fraud), Count 8 (Wire Fraud), Count 9 (Wire Fraud), and Overt Act 1(q) of Count One (Conspiracy).  These acquittals show that the jury necessarily concluded that the evidence related to those trades was insufficient to prove wire fraud and securities fraud as to Mr. Shapiro in connection with each of these trades.  Given this jury finding, the testimony of Marks and Abbas must be deemed similarly insufficient to convict Mr. Shapiro of the conspiracy charge.

While in some circumstances a defendant can stand convicted of a conspiracy charge while simultaneously being acquitted of the substantive count related to the conspiracy object, this is not such a case.  The relevant distinction between conspiracy to commit a particular crime, which alleges an agreement to commit that crime, and commission of the substantive crime itself, is of no material consequence here because it was undisputed that the JPALT and PPSI trades were consummated.  Accordingly, no reasonable jury would convict Mr. Shapiro of conspiring to commit securities fraud or wire fraud in connection with the JPALT and PPSI trades while simultaneously acquitting him of the substantive counts of securities fraud and wire fraud relating to these trades.  *Cf. United States v. Jabar*, No. 09 Cr. 170 (LJV), 2017 WL 4276652, at *10 (W.D.N.Y. Sept. 27, 2017) (granting Rule 29 motion on count charging wire fraud conspiracy because "the government failed to prove that the defendants had the requisite intent for the substantive offense of wire fraud, and so no agreement between them could have established a conspiracy to commit wire fraud").

**II.     This Prosecution Violates Due Process**

The Court should reconsider its ruling on due process because the Order failed to address a central question raised by Mr. Shapiro's motion:  How could Mr. Shapiro have been on notice that his conduct violated clearly established lines under the criminal law, if the Seventh Circuit Court of Appeals, in reviewing the issue of materiality in bilateral price negotiations between sophisticated parties in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), held that under the wire fraud statute, statements in such negotiations cannot be material as a matter of law? How could Mr. Shapiro have been on notice when the *Weimert* Court found that the absence of any "other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes. . . . is consistent with more general understandings in the law"?  819 F.3d at 358.  Under *Weimert*, this case must be dismissed as a violation of Due Process.

The cases relied upon by the Court in the Order, all of which were decided well before *Weimert*, do not support a finding that Mr. Shapiro had fair notice of the potential criminal consequences of his conduct.  In *Carpenter*, which was decided in 1986, the Second Circuit rejected a fair notice challenge to an application of securities laws to insider trading by individuals who were not fiduciaries of shareholders, where defendants had a decade of notice from courts, regulators, and criminal authorities that their conduct was proscribed.  *United States v. Carpenter*, 791 F.2d 1024, 1034 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987).  In fact, the Second Circuit had rejected a similar challenge as early as 1978, when it affirmed the conviction of a financial printer under the then-novel misappropriation theory.  *See United States v. Chiarella*, 588 F.2d 1358, 1369 (2d Cir. 1978), *rev'd*, 445 U.S. 222 (1980).  In rejecting the earlier fair notice challenge in *Chiarella*, the Second Circuit found that the financial printer, who engaged in

17

insider trading in 1975 and 1976, had sufficient notice, where in 1974 the SEC settled a complaint alleging that another industry participant "had engaged in activities identical to Chiarella's" which was "well publicized and aroused widespread concern" in the industry. *Id*.[10]

In view of such precedent, the *Carpenter* Court easily concluded that the defendant, who engaged in insider trading "[d]uring 1983 and early 1984" could not raise a fair notice argument. 791 F.2d at 1034 ("Certainly appellants herein had fair notice from *Chiarella*, *Newman* . . . that their conduct might violate section 10(b)."). In other words, there was no concern about lack of notice where, by the time he engaged in a form of insider trading, the defendant had as many as ten years notice from securities regulators, prosecutors, and federal courts that misappropriation of material insider information was a violation of federal securities laws.

By contrast, here, as the Court noted in its Order, "[p]rior to the indictment in Litvak, the conduct at issue appears to have been widespread in the RMBS market" and participants in the market, including the government's "[c]ooperating witnesses[,] testified that they didn't realize the conduct was illegal." Order at 8. In fact, prior to 2013, no law enforcement body or regulator had ever charged that in principal-to-principal arm's-length price negotiations between sophisticated parties, market participants could not misstate their own cost or profit or potential profit (tactics as old as commercial negotiations themselves).

Rather than assessing the existing legal landscape at the time of Mr. Shapiro's conduct, including the absence of guiding caselaw noted in *Weimert*, however, the Court's Order erroneously adjudged the trial evidence to be sufficient to provide a basis for the jury to conclude

---

[10] Two years later, although the Supreme Court reversed the defendant's conviction where the misappropriation theory was not presented to the jury, it did not rule out its use by prosecutors and courts in the future. *United States v. Chiarella*, 445 U.S. 222 (1980). The following year, the Second Circuit confirmed the viability of the misappropriation theory when it held that an indictment alleging insider trading based on this theory stated a violation of securities fraud and mail fraud statutes. *See United States v. Newman*, 664 F.2d 12, 19 (2d Cir. 1981).

that Mr. Shapiro had fair notice of the illegality of his conduct.  Order at 9-10.  The correct

question is not whether Mr. Shapiro and his codefendants "clearly treaded closely enough along

proscribed lines [for a jury] to find that they had adequate notice of the illegality of their acts."

Order at 9 (quoting *Carpenter*, 791 F.2d at 1034 (quotation marks omitted)).  Fair notice is a

purely legal issue, independent of the evidence adduced at trial.  *See, e.g.*, *United States v.*

*Saliba*, 489 F. App'x 501, 502 (2d Cir. 2012) (summary order) (Court reviews a vagueness

challenge "as a question of law").  By that standard, Mr. Shapiro cannot be said to have been on

notice that his conduct subjected him to criminal liability.

But even if the Court looks to the trial evidence as relevant to the issue of fair notice, the

record in fact supports the notion that traders on the nonagency RMBS Desk such as Mr. Shapiro

were caught by surprise by the charges in the Litvak indictment.  5/23/17 Vol. IX Tr. 1894:14-18

(Caleb Chao testimony that news of the charges against Litvak was "shocking").  While they

were aware generally of the antifraud proscription of the federal securities laws – including that

the law prohibited making material misrepresentations in connection with the purchase or sale of

a security[11] – the government's cooperating witnesses did not believe that their use of the

challenged negotiating tactics violated these laws,[12] and none testified that he intended to do

anything that the law prohibited.  Rather, the traders viewed the risk of negotiation

misrepresentations as "a business risk" that "might lead to bad relationships with clients" or a

---

[11] Every member of the trading desk held Series 7 and Series 63 licenses, as did all Nomura employees who worked
in sales or trading.  5/8/17 Vol. I Tr. 146:23-147:1 (Frank Dinucci); 5/9/17 Vol. II Tr. 404:19-405:2 (Jonathan
Raiff); 5/22/17 Vol. III Tr. 1668:19-22 (Chao); 5/23/17 Vol. IX Tr. 1931:2-6 (Feely).  Supervisors like Mr. Shapiro
had a Series 24 license as well.  5/9/17 Vol. II Tr. 395:4-12 (Raiff).  The exams for these licenses tested familiarity
with the relevant securities laws and regulations.  5/9/17 Vol. II Tr. 405:10-16 (Raiff).

[12] Raiff, a non-lawyer, testified that in his view, prior to Litvak's indictment, it was not "permissible" under
Nomura's compliance policies for a trader to make a misrepresentation in the course of a principal-to-principal
nonagency RMBS trades, 5/10/17 Vol. III Tr. 646:6-647:1, but did not testify that he understood the practice to be a
violation of the securities law.  5/10/17 Vol. III Tr. 625:4-9, 646:19-647:1.

loss of business as a result of being put "in the box."  5/9/17 Vol. II Tr. 168:25-169:5, 289:6-14

(Frank Dinucci); *see also* 5/22/17 Vol. VIII Tr. 1753:1-11 (Chao testimony that WAMCO might

put Nomura in the penalty box for lying about the spread on a trade because WAMCO portfolio

manager was a "good trading partner").

The only proof offered by the government in support of the notion that Mr. Shapiro

"treaded closely . . . along proscribed lines" were Nomura compliance manuals and materials

containing various and sometimes inconsistent firm standards of conduct, and evidence that Mr.

Shapiro and his codefendants were registered with FINRA and held securities industry licenses.

No trader witness testified, however, that he understood the compliance materials to bar the

challenged negotiating tactics.  In fact, Nomura's compliance protocols show precisely the

opposite.  For example, GX 156, a PowerPoint presentation relating to a May 2012 compliance

training session, specifically admonished that it was improper to use Nomura's electronic

platforms to "omi[t] material facts."  5/22/17 Vol. III Tr. 643:14-21.  However, Nomura Senior

Managing Director Jonathan Raiff testified that traders were routinely advised that they *should,*

in fact, omit information about the price Nomura paid for bonds during trade negotiations, even

following the *Litvak* indictment.  5/22/17 Vol. III Tr. 643:2-13.  It stands to reason that Nomura

traders who were advised, simultaneously, that it was *impermissible* to use Nomura's electronic

platforms *to omit material information*, but *permissible to omit information about their cost of*

*purchasing bonds* during trade negotiations (that occurred via Nomura's electronic platform),

would conclude, *ipso facto,* that information regarding the price Nomura paid for its bonds was

immaterial.

Furthermore, the Court ruled correctly during the trial that conduct allegedly contrary to

aspirational statements in compliance manuals cannot substitute for proof of criminal intent.

Rather, compliance standards – which can be aspirational and designed to accomplish goals including the setting of organizational tone and the communication of an organizational ethos to promote relations with customers and regulators – do not define the law.  *See United States v. Mix*, No. 12-CR-171 (SRD), 2014 WL 2625034, at *7 (E.D. La. June 12, 2014) (jury instructed that, to the extent a company advised its employees that certain actions "could expose an employee to criminal prosecution or punishment . . . such statements are not statements of the applicable law").  Lastly, the registration evidence was offered with no explanation from any witness as to how it bore adversely on intent or any other contested issue.

Accordingly, neither existing case law nor prevailing practice provided notice to Mr. Shapiro, prior to 2013, that his conduct violated federal fraud statutes.

*        *        *

For the reasons set forth above, this Court should reconsider its ruling and enter a judgment of acquittal on Count One of the Indictment as to Mr. Shapiro or, alternatively, dismiss the Indictment on Due Process grounds.

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By:   /s/ Guy Petrillo
    Guy Petrillo (CT19924)
    Joshua Klein (PHV07748)
    Amy Lester (PHV08919)
    655 Third Avenue, 22nd Floor
    New York, New York 10017
    Telephone: (212) 370-0330
    Facsimile:  (315) 873-2015
    *Attorneys for Ross Shapiro*

21

## **CERTIFICATION OF SERVICE**

I hereby certify that on June 27, 2018, a copy of foregoing Memorandum of Law in

Support of Ross Shapiro's Motion for Reconsideration Pursuant to Local Rule 7(c) was filed

electronically and served by mail on anyone unable to accept electronic filing.  Notice of this

filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or

by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
      June 27, 2018

                        /s/ Leonid Sandlar
                        Leonid Sandlar (PHV07700)
                        655 Third Avenue, 22nd Floor
                        New York, New York, 10017
                        Telephone: (212) 370-0330
                        Facsimile:  (315) 873-2015
                        lsandlar@pkbllp.com