UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA   :                    No. 3:15CR155 (RNC)
                                      :
v.                                    :
                                      :
ROSS SHAPIRO and                      :
MICHAEL GRAMINS                       :                    July 27, 2018

**GOVERNMENT'S OPPOSITION**
**<u>TO DEFENDANTS' MOTIONS FOR RECONSIDERATION</u>**

# **TABLE OF CONTENTS**

I.      Introduction ............................................................................................................... 1

II.     Standard for Reconsideration................................................................................... 4

III.    Reconsideration of the Court's Denial of the Motions for Acquittal is Not Warranted ...... 5

   A.     Legal Standards For Rule 29 and Materiality ................................................. 6

   B.     *Litvak II* Bars Acquittal ................................................................................. 7

   C.     The Defendants' Arguments Are Meritless .................................................. 11

IV.     Reconsideration of the Motion to Dismiss is Unwarranted ............................... 30

   A.     There Is No Basis to Reconsider the Court's Ruling .................................... 30

   B.     Defendants' Due Process Claim Lacks Merit .............................................. 32

V.      Conclusion ............................................................................................................ 35

The Government respectfully submits this opposition to defendants Shapiro and Gramins' respective motions for reconsideration of the Court's denial of their respective motions for acquittal and motions to dismiss. Docs. 519, 520, 522, 523. Defendants' arguments are unpersuasive and the Court should deny their motions.

## I. <u>Introduction</u>

On September 3, 2015, a grand jury sitting in the District of Connecticut returned an indictment, *United States v. Shapiro, et al.*, Criminal No. 3:15-cr-155 (RNC), charging Ross Shapiro, Michael Gramins, and Tyler Peters, with one count of Conspiracy to Commit Securities Fraud, Wire Fraud and False Statements, in violation of Tile 18, United States Code, Section 371; two counts of Securities Fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2; and seven counts of Wire Fraud, in violation of Title 18, United States Code, Section 1343 and 2. In short, the defendants were charged with lying to their customers in RMBS transactions about purchase and sale prices in order to fraudulently induce those customers to pay more or accept less for bonds.

Trial commenced on May 8, 2017. On June 15, 2017, following a six-week trial, the jury convicted Gramins of conspiracy, failed to reach a verdict on one count of securities fraud and one count of wire fraud, and acquitted him on the remaining counts. The jury failed to reach a verdict against Shapiro on the conspiracy count and acquitted him on the remaining counts. The jury acquitted Peters—the most junior trader—on all counts. The Court declared a mistrial on the unresolved counts against Gramins and Shapiro.

After trial, Gramins and Shapiro sought judgment of acquittal on all counts that resulted in conviction or mistrial under Rule 29; Gramins and Shapiro also sought dismissal of the indictment on due process (fair notice) grounds; finally, Gramins, in the alternative, sought a new trial on his

count of conviction under Rule 33. *See* Docs. 475, 476. The Court held the motions under consideration for almost a year, waiting for the Second Circuit to decide the appeal of Jesse Litvak's retrial.

On May 3, 2018, the Second Circuit decided *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*"), holding that there had been sufficient evidence to support Litvak's conviction, but vacating and remanding for retrial because it held that the district court had improperly permitted victim witness Brian Norris to testify about his mistaken view that Litvak was his agent. This Court then allowed Gramins to supplement his briefing to argue the applicability of *Litvak II*. Gramins argued that victim "point of view" testimony was erroneously admitted and the court must, under *Litvak II*, grant him a new trial. Gramins did not suggest that *Litvak II* implicated his sufficiency-of-the-evidence arguments that were already before the Court. *See* Doc. 496. In response, the Government distinguished the testimony in this case from *Litvak II* on several grounds, including that no witness had testified to a mistaken belief that Nomura was his agent or owed him a fiduciary obligation; there was no evidence of a mistaken perception of a fiduciary obligation from broker-dealer to victim; the defendants intentionally attempted to foster the misimpression that they were trustworthy and working for the benefit of their customers; this Court gave a much more robust curative instruction than in *Litvak II*; and, unlike in *Litvak II*, there was no way to ascribe the jury verdict to the challenged testimony, and so it was harmless. *See* Doc. 502.

On June 5, 2018, a little more than a month after *Litvak II* was decided, the Court denied the Rule 29 motions for acquittal and the motion to dismiss on due process grounds, but granted Gramins' motion for a new trial under Rule 33. *See* Doc. 504 ("Ruling").

First, the Court denied the motion for acquittal. Among other things, the Court held that:

In this case, the Government presented testimony by counterparty representatives that misrepresentations about price were important to them. Viewing this evidence in a light most favorable to the Government, a rational trier of fact could find that the "point of view" of these witnesses was "within the parameters of the thinking of reasonable investors" in the RMBS market at the time. Thus, in light of *Litvak II*, this evidence was sufficient to sustain the Government's burden on materiality.

Ruling at 2.

However, the Court vacated Gramins' conviction because of the implications the jury might have drawn from Wollman's testimony. In *Litvak II*, "the Court of Appeals vacated the conviction because the jury heard 'evidence of the idiosyncratic and erroneous belief of [a] counterparty's representative . . . in an agency relationship.'" Ruling at 13 (quoting *Litvak II*, 889 F.3d at 59). The Court noted that point of view testimony is permissible under *Litvak II* so long as it is "shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." *Id*. at 14 (quoting *Litvak II*, 889 F.3d at 65). Applying *Litvak II*, the Court acknowledged that "no counterparty representative explicitly testified that he believed Gramins was acting as an 'agent.'" Ruling at 14. Nonetheless, even though Wollman never claimed that Gramins was his agent, the Court found that "Wollman strongly implied that that is how he viewed the role of broker-dealers in the RMBS market when brokering trades." *Id*. The Court further held that even though there was some evidence that the defendants had fostered a relationships of trust, there was no evidence that Gramins had caused Wollman's implied beliefs about the role of the broker-dealer. *Id*. at 17.

Next, the Court held that the error was not harmless because the Court considered it likely that the reason for the mixed verdict in this case was that Gramins was involved in fraudulent conduct after Litvak's indictment, and that post-*Litvak* conduct involved a trade with Wollman. Ruling at 19. Unlike the Second Circuit in *Litvak II*, the Court did not explain why the testimony

from Wollman was distinct from the other counterparty witnesses, as Norris's had been from the other *Litvak II* witnesses.

On June 7, 2018, the Court held a pre-trial conference. In advance of that conference, the Government announced its intention to file a notice of appeal from the Court's Rule 33 ruling. During the hearing, the Court invited the defendants to move for reconsideration of the Court's denial of their motions for acquittal. The Court suggested that, under *Litvak II*, "the views of traders in that market may not themselves account for a lot," and "[i]t may be that expert testimony is necessary to enable the jury to reach a reasoned decision." June 7, 2018 Hg. Tr. at 28. The Court continued, "Maybe if I scrutinize the testimony of the counterparties in the trial here, I'll have a clearer idea of whether the evidence was sufficient or not sufficient in light of the benefit of the guidance provided by Litvak II." *Id*. at 28-29.

The defendants filed their motions on June 27, 2018, requesting reconsideration based on *Litvak II*, and also requesting reconsideration of the Court's denial of the motion to dismiss on due process grounds.[1]

## II.      Standard for Reconsideration

"The standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see United States v. Lucarelli*, 490 F. Supp. 2d 295, 296–97 (D. Conn. 2007) ("Because no rule of criminal procedure addresses motions for reconsideration, courts typically adopt the standards applied to

---

[1] Gramins joined and incorporated by reference Shapiro's due process motion. In addition, Gramins reasserted his argument that he should be acquitted on Count One because the Government failed to prove a conspiracy. This argument fails to meet the strict motion for reconsideration standard, and relies entirely on the arguments in his prior briefing. *See* Doc. 520 at 17 and n.9.

such motions in civil cases." (quotation marks and citation omitted)). Indeed, this strict standard is expressly incorporated into the Local Rules. *See* D. Conn. L. Civ. R. 7(c) ("Motions for reconsideration . . . shall satisfy the strict standard applicable to such motions [and] will generally be denied unless the movant can point to controlling decisions or data that the court overlooked in the initial decision or order."); D. Conn. L. Crim. R. 1(c) (incorporating Local Civil Rule 7(c)). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. Natl Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 4478). If "the moving party seeks solely to relitigate an issue already decided," the court should deny the motion for reconsideration and adhere to its prior decision. *Shrader*, 70 F.3d at 257.

## III.  Reconsideration of the Court's Denial of the Motions for Acquittal is Not Warranted

Here, the defendants satisfy neither the standard for reconsideration, nor for acquittal. First, the Court did not overlook *Litvak II*; indeed, its decision denying defendants' Rule 29 motions was principally based on *Litvak II*, which itself had denied acquittal on sufficiency grounds. The defendants' arguments for reconsideration, here, amount to nothing more than a second guessing of the jury's assessment of credibility and resolution of competing inferences. Neither is a basis to reconsider the Court's prior ruling, or to overrule *Litvak II* and grant acquittal here. Second, *Litvak II* does not undermine the Court's earlier ruling that there was sufficient evidence of materiality. Even *Litvak II*—which prohibits objectively erroneous point of view testimony absent evidence that the defendant contributed to the erroneous point of view—did not grant acquittal on the single count of conviction about which Norris testified, but remanded for retrial.

### A.    Legal Standards For Rule 29 and Materiality

Rule 29 permits a defendant to move for a judgment of acquittal on the basis of insufficiency of the evidence.  Fed. R. Crim. P. 29(c).  A judgment of acquittal should only be entered if the court concludes that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003).  A court should not grant a motion for judgment of acquittal if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotations omitted, emphasis in original).  In considering a motion for acquittal, the court evaluates the sufficiency of the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (internal quotation marks, citations, and alterations omitted).

"[W]hen the government (as opposed to a private plaintiff) brings a civil or criminal action under Section 10(b) and Rule 10b-5, it need only prove, in addition to scienter, materiality, meaning a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision."  *United States v. Vilar*, 729 F.3d 62, 89 (2d Cir. 2013).  The standard for materiality in wire and mail fraud is even lower, requiring only that the misrepresentations or omissions must have "ha[d] the natural tendency to influence or [were] capable of influencing the [victim] to change its behavior."  *United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) (*en banc*).  "Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'"  *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) ("*Litvak I*") (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991)).  In the context of

broker-dealers' misrepresentations about price to RMBS investors, testimony that misrepresentations were "important" to victims and that victims were "injured by those misrepresentations … precludes a finding that no reasonable mind could find [the defendant's] statements material." *Litvak I*, 808 at 176 (relied on by *Litvak II*, 889 F.3d at 66-67).

### B.    *Litvak II* Bars Acquittal

The relief sought by the defendants—to reconsider the denial of their sufficiency motions—was explicitly denied in *Litvak II*, and this Court should rule accordingly.

In the *Litvak II* trial, two victims—Brian Norris and Joel Wollman—explicitly testified that they believed Litvak was acting as an "agent." *See Litvak II*, 889 F.3d at 63 (citing *Litvak II* Trial Transcript ("*Litvak II* Tr."). at 748, 859). The Second Circuit vacated Litvak's conviction, holding that Norris's testimony of his misperception of Litvak's agency role was irrelevant and should not have been admitted. *Litvak II*, 889 F.3d at 67-70. Although both Norris and Wollman were highly successful and experienced traders in the RMBS market, the Court of Appeals ruled that "a reasonable investor would not misperceive the role of a broker-dealer in the RMBS market." *Id*. at 69. In other words, because Norris's belief that Litvak was his agent was legally incorrect, it could have no conceivable bearing on how an objective, reasonable investor would behave. *Id*. Although the Government argued that Litvak had fostered and preyed upon Norris's mistaken belief in order to create a "relationship of trust," the court held that the Government could not show that Litvak "was the source of Norris's mistaken belief in an agency relationship or took steps sufficient to cause Norris to disregard the common knowledge of the market, much less the information provided Norris by Invesco's legal and compliance department." *Id*. Absent that connection, the Court of Appeals held that the "subjective trust" evidence "became a back door for the jury to apply the heightened expectations of trust that an agency relationship carries." *Id*. at 70.

The Second Circuit held that this error was not harmless. The court compared the evidence related to the Norris trade—the sole count of conviction—to the evidence related to the trades on which the jury acquitted, and found that "Norris's testimony about a perceived agency relationship was the only rational reason for the jury to have convicted [Litvak] on that count of securities fraud while acquitting him on all other counts." *Litvak II*, 889 F.3d at 70.

Despite the Court of Appeals' holding that Norris's agency testimony was "idiosyncratic and unreasonable," *id*. at 69, and that Norris's unreasonable testimony was the reason for the conviction, the Court of Appeals nonetheless rejected Litvak's sufficiency argument as to Count Four, in which Norris was the victim. Even after deeming Norris's erroneous testimony irrelevant and prejudicial, the court held that "there was sufficient evidence for a rational jury to find appellant's misstatements material beyond a reasonable doubt" because materiality is an objective standard, "involving the significance of an omitted or misrepresented fact to a reasonable investor." *Id*. at 66 (cleaned up). In finding the evidence sufficient, the Second Circuit reaffirmed its holding in *Litvak I* that "the testimony of various counterparty representatives was sufficient to sustain a finding of materiality on the counts of securities fraud." *Id*. Indeed, the *Litvak I* court held that "testimony from several representatives of Litvak's counterparties that his misrepresentations were 'important' to them in the course of the transactions on which the securities fraud charges were predicated . . . and that they or their employers were injured by those misrepresentations . . . precludes a finding that no reasonable mind could find Litvak's statements material." *Litvak I*, 808 F.3d at 175-76.

The Second Circuit's refusal to grant acquittal in *Litvak II*, even in light of Norris's mistaken testimony, should guide the Court here, where any alleged error was less egregious,

played less of a role in the conviction, and the overall evidence of materiality was far more compelling.[2]

First, in this case, it is undisputed that no witness explicitly ran afoul of the *Litvak II* court's prohibition against agency or fiduciary point-of-view testimony. *See* Ruling at 14 ("In this case, no counterparty representative explicitly testified that he believed Gramins was acting as an 'agent.'"). Rather, the Court found only that Wollman "strongly implied" such a belief. *Id.* At a minimum, and even were the Government to agree with the Court's characterization of Wollman's testimony, that is a far weaker circumstance than Norris's explicit testimony in *Litvak II*, which still did not result in a judgment of acquittal.

Second, the evidence that Gramins' conviction resulted from Wollman's allegedly erroneous implication is far more attenuated. In *Litvak II*, the court found that Norris's idiosyncratic testimony was the only distinguishing feature of the count of conviction. Here, conversely, the Court suggested that the reason for the conviction was not Wollman's allegedly mistaken belief, but the fact that Gramins continued to lie to counterparties after learning of the *Litvak* indictment (and thus a jury was more likely to find his misconduct to be willful). Ruling at 8-9.

Third, the evidence of materiality in this case far surpassed the evidence in *Litvak II*. As in *Litvak I* and *Litvak II*, the victim traders testified that defendants' lies were important and harmed them. For example, Harrison testified that defendants' misrepresentations about price were important to him. Tr. 752-753. He made clear that this is because that information affected what he ultimately paid for a bond. Tr. 754. *See also* Tr. 769. Abbas gave similar testimony,

---

[2] As argued at length in the Government's supplemental Rule 33 opposition, the admission of Wollman's testimony was not error, Doc. 502, and the Court's grant of a new trial is currently on appeal.

saying Chao's lies caused him to pay more than he otherwise would have. *See* Tr. 1515. Wollman and Marks provided similar testimony. *See* Tr. 2112-2114 (Wollman), Tr. 2333-2334 (Marks).

But, unlike in *Litvak II*, the evidence of materiality did not stop there. In the *Litvak* trials*,* only victims testified in support of materiality, whereas here co-conspirators also testified that the defendants believed their lies would have an important financial effect on victims. Dinucci testified that he was told by Shapiro and Gramins that the purpose of giving clients false bids was to "increase the profit on the trade," thereby taking additional money from "[t]he clients." Tr. 255-256. Chao testified as to the effect of lies, saying "[t]he effect would be, hopefully, that Mr. Abbas would increase his bid based on that information. . . . It would hopefully increase the spread or amount of money that Nomura earned on this trade." Tr. 1715. Feely testified, "[i]f I would tell the buyer I can buy the bond higher than the actual truth, or I'd tell the seller that the bid that I have is lower than is actually truth, and they agree on the trade, I get to keep that difference between the truth number and the number that I am representing; and I kept that for the desk." Tr. 1932. Feely called the lies defendants told at Nomura "hurtful" for victims because they had the effect of getting them to "pay more or some more than they would otherwise." Tr. 1967. All the co-conspirators were trained in this practice by Shapiro, Gramins, or both. *See*, *e.g.*, Tr. 175 (Dinucci); 1685 (Chao); 1945-46 (Feely). Although the materiality standard is objective and judged based on a "reasonable investor," evidence of co-conspirators' and defendants' subjective belief that their lies would hurt their investors and profit Nomura both corroborates the victims' testimony and is probative of the fact that their lies were actually material.

In addition to victim and co-conspirator testimony, the transcripts of the trades also provided compelling circumstantial evidence of the materiality of misrepresented price information. The lies defendants told had the effect of changing their customers' bid and offer

prices in negotiations. In every trade presented at trial, a victim reacted to the defendants' lies, adjusting the amount of money he was willing to part with to buy a bond or the amount of money he was willing to accept to sell a bond. *See*, *e.g.*, Gov't Exs. 29E (Choi decreased his offer from 80 to 79-8 after Gramins lied that "this guy's [Wollman] passing over 80"); 26E (Abbas raised his bid from 78-22 to 79-00 after being falsely told that "seller came back to us with an 80-16 offer"); 11A (Banks raised bid to 52 from 51-16 after Gramins falsely told him he had a 53-00 offer); 19A (Harrison agreed to sell at 86-08, giving Nomura an 8 tick commission, after Shapiro falsely told him that he had an 86.5 bid.); 21A (Harrison lowered his offer from 86 to 84-24 (or 85 less an 8 tick commission) after Shapiro falsely said the buyers "aren't going to pay >85 i think i can get her to pay 85 for whole piece").

In sum, there is no principled reason for the Court to deviate from *Litvak II*. The challenged testimony in this case was less obviously problematic, its connection to the conviction was more attenuated, and the totality of the evidence of materiality was more compelling. The Court should therefore follow *Litvak II* and reject the defendants' motions for reconsideration.

### C. The Defendants' Arguments Are Meritless

In attempting find support in the rationale of *Litvak II*, the defendants have turned Rule 29 on its head. Rather than leave for the jury whether particular testimony is credible, whether particular inferences should be drawn from that testimony, or whether an investor's view is reasonable in the RMBS market, the defendants argue for a legal standard that would require the court to usurp all of those functions in the first instance. In the defendants' view, rather than applying *Litvak II* only to evidentiary questions in circumstances where no rational jury could find the testimony reflective of the reasonable investor (such as an erroneous understanding of legal relationships), the court should instead evaluate and weigh the testimony, leaving nothing to the jury's determination. That is not the rule imposed by *Litvak II*, and the Court should reject it here.

1.      Investor Testimony About Brokering and Facilitating Trades Was Within
        the Mainstream, and Not Precluded By *Litvak II*

First, the defendants contend that the witness testimony in this case was objectively

erroneous because it characterized Nomura as playing the role of middleman in RMBS trades.  *See*

Gramins Mem. at 6-8.  While *Litvak II* bars objectively erroneous testimony about legal agency or

fiduciary relationships, it does not preclude relevant factual evidence of the role of the broker-

dealer in the RMBS marketplace.  At the trial in this case, each witness testified consistently and

"within the parameters of the thinking of reasonable investors in the particular market at issue."

*Litvak II*, 889 F.3d at 65.  At a minimum, it was certainly up to the jury whether to credit the

testimony and to weigh it in determining whether misrepresentations were material.  *See Chavez*,

549 F.3d at 124.

All witnesses—both victim and cooperators—testified that one of Nomura's core functions

was to facilitate trades between counterparties by buying from a selling counterparty and then

selling to a buying counterparty.  *See* Tr. 126 (Dinucci: "Our day would, you know, entail trying

to facilitate as many trades as we could between clients to create profit for our firm."); Tr. 1404

(Harrison: "Generally speaking, I saw broker-dealers doing two different kinds of activities.  You

have buying and selling for their own account or facilitating trades between customers."); Tr. 1433

(Abbas: "So sell side is . . .  basically helping the buyer and seller transact on certain securities by

being the middleman or the market maker."); Tr. 1930 (Feely: "Q. What was your role at Nomura

in relation to these customers in the RMBS market? A. My role was to facilitate trading for them.

Q. What do you mean by 'facilitate trading'? A. Either provide the community, which means

buying bonds for possession for Nomura's book, or try to find -- try to match a buyer and a seller

on behalf of the buyer and the seller."); Tr. 1679 (Chao: "Nomura's main, you know, course of

business is to be a market maker, and that means buying and selling bonds for clients."); Tr. 2086

(Wollman: "So there would be some broker-dealers in the market who were primarily acting in a broker capacity, so they were more or less matching up buyers and sellers. There were other ones who were willing to make more proprietary investments, so invest for their own account."); Tr. 2300 (Marks: "[Broker-dealers] could either be facilitating transactions with another counterparty or they could take the other side of our trade and commit their capital.").[3] The witnesses gave several other synonymous labels to Nomura's trade-facilitation function. *See*, *e.g.*, Tr. 137 (riskless trading), 245 (brokering); 372 (riskless trading); 1535 (market making); 2271 (brokering).

This testimony did not conflict with the principal-to-principal legal structure of the market. *See Litvak II*, 889 F.3d at 61. All witnesses testified that they understood that, as a middleman, Nomura had to take possession of the bond from the seller before it could then resell to the buyer— in other words, that the counterparties could not directly transact with one another. *See*, *e.g.*, Tr. 1535 (Abbas: "Q. The market maker has to take its own money, buy a bond from one party, and then resell or reoffer that bond to you or another counterparty, correct? A. Yes."); Tr. 336 (Dinucci: "Q. And if you're brokering, as you told Mr. Brennan, you have to buy it from one fund, own it for a minute, and then sell it to another fund, right, that's what you call brokering? A. That's correct."); Tr. 2217-18 (Wollman: "Q. So there's two parts of that transaction: One, Nomura first has to buy the bond from the selling counterparty, correct? A. That's right."). The key element of this type of trade was that Nomura "had the potential buyer and potential seller already matched up at the time of the transaction." Tr. 137 (Dinucci). This virtually eliminated Nomura's "market risk" in a trade. Tr. 372 (Raiff: "And it would also conduct transactions where we were transacting risklessly, meaning the firm was assuming no market risk, so we were matching buyers to

---

[3] In Peters 2012 self-assessment, he wrote ""We have increased trading in the FHA/VA sector, both in *agented* roles and by taking position risk." Gov't Ex. 119 at 3 (emphasis added). As his supervisor's supervisor, Jonathan Raiff, explained, "Agented roles would be riskless trading. That's where Nomura was acting as a principal." Tr. 487.

sellers."); Tr. 2314 (Marks: "Q. And if he has you on the other side of the transaction, in other words purchasing them, what does that do to the risk in the transaction from Nomura's vantage? A. I would consider that to be a riskless transaction for the broker.").

Even where witnesses used the term "broker," it was clear that did not imply a fiduciary relationship between Nomura and its counterparties. Wollman, for example, described a broker-dealer's "broker capacity" as "more or less matching up buyers and sellers." Tr. 2086; *see also* Tr. 2181 ("Q. And just to be clear for the jury, what do you mean by 'brokering'? A. Meaning that they aren't his bonds, he is—his role in this is to match together a seller of bonds and a buyer of bonds—two other counterparties, not him—and he's facilitating that transaction."). This was entirely consistent with other evidence about the "broker" designation. *See* Tr. 245 (Dinucci: "Brokering trades is when you have a buyer and a seller matched up on a bond, and you simply play the middleman in that transaction."). Indeed, that is how Gramins himself used the term: in Government Exhibit 11B, Gramins discussed with Jordan Rieger of Monarch what offer Gramins should communicate to a prospective buyer, stating, "i think an offer/trade in 52 or maybe 53 seems in line . . . but happy to reflect what you like . . . .and i am purely looking to broker." Gov't Ex. 11B at 3. Gramins clearly did not intend to suggest (and the Government did not argue) that, by using the term "broker," he owed Rieger a fiduciary duty. Rather, Gramins used "broker" to describe facilitating the purchase and sale of a bond between two counterparties. That view is corroborated by what happened in Trade 11, *i.e.*, the sale of the bond by Monarch and the contemporaneous purchase by DW Investments with Nomura in the middle.

*Litvak II*, while holding that erroneous agency testimony was objectively unreasonable, did not find that accurate testimony about the factual structure of the RMBS market was similarly

objectionable.[4]  In fact, there is ample evidence in the *Litvak II* trial transcript that Norris' and Wollman's understanding of the market was both accurate and widely-shared:

- Michael Canter: "[W]e thought we were negotiating with a seller and Jefferies was intermediary -- intermediating. And so when a broker dealer is intermediating a transaction, their main objective is really that a transaction occurs because that's how they get paid. Whereas, if they own it, every increase in price is more money for them so the interests are aligned differently."  *Litvak II* Tr. 289.

- Katherine Corso: "Q. How were you dealing with Jefferies during this trade? A. They were a broker-dealer. Q. What was your understanding of what that meant in this particular trade? A. That he was arranging the trade between buyer and seller."  *Litvak II* Tr. 501.

- Vladimir Lemin: "The commission is to compensate Jefferies for doing the work to connect -- to find bonds to connect the buyer and the seller."  *Litvak II* Tr. 645.

In each instance, the witness described the same role—the broker-dealer operating as a facilitator or intermediary between a buyer and a seller.  This type of testimony was distinguished from Norris's mistaken agency testimony in *Litvak II*, which the court found to be the reason Litvak was convicted on Count Four and acquitted on all other counts.  Indeed, even Litvak's expert referred to a broker-dealer as an "intermediary."  *Litvak II* Tr. 1259.

In sum, the jury was entitled to consider, credit, and weigh the testimony of the witnesses on how RMBS trades were conducted.  The defendants maintained an informational advantage by sitting between RMBS investors who could not negotiate directly with one another, and they exploited that advantage by lying to their customers.  *See* Tr. 2322 (Marks: ""I only speak through the broker, so I rely on the information they give to me.").  Those facts were not based on a misunderstanding of the law, but the factual operation of the market, corroborated by every witness

---

[4] The Second Circuit in *Litvak II* even acknowledged these practicalities of the RMBS market.  As the court found, "An 'on-top' price refers to the difference between the price the broker-dealer paid for the bond and the price at which the broker-dealer will sell the bond—the 'on-top' price is the broker-dealer's profit. In 'on-top' trades, the broker-dealer's profit is sometimes referred to colloquially as a 'commission,' 'markup,' or 'spread.' In general, inventory trades are quoted as 'all-in' prices. Negotiations over order or BWIC trades may refer to the broker-dealer's acquisition cost and the 'on-top' price."  *Litvak II*, 889 F.3d at 61.

who testified in this trial, as well as every witness who testified in *Litvak II* and Gramins' own words.

2.    Subjective Trust Evidence Was Properly Admitted as Relevant

Next, the defendants attempt to improperly extend *Litvak II* to prohibit all subjective trust evidence. *See* Gramins Mem. at 7-8, Shapiro Mem. at 8-9. According to the defendants, such testimony was objectively unreasonable and therefore should be disregarded. *Litvak II* only rejected evidence that functioned as a "a back door for the jury to apply the heightened expectations of trust that an agency relationship carries" because there was no evidence that Litvak "was the source of Norris's mistaken belief in an agency relationship." *Litvak II*, 889 F.3d at 69. Not so here. First, the subjective trust evidence in this case was untethered to a victim's misunderstanding of a legal relationship, but rather borne of past factual experience with the defendants. It is axiomatic that a reasonable investor would consider his or her history and experience with a trader in assessing whether to believe what that trader said, without regard to the legal nature of the relationship. Second, unlike in *Litvak II*, this case was replete with evidence of the defendants' efforts to instill a false sense of trust.

a)    Subjective Trust Evidence

All of the victim witnesses testified that their history and experience with broker-dealers influenced their assessment of whether to believe the brokers-dealers' information. As Wollman explained: "I mean a broker-dealer that I'm meeting for the first time or don't trade particularly much with, I wouldn't place as much trust in as a broker-dealer that I'd had a relationship with for a longer time and in multiple capacities, different types of trades, different types of situations. So it's just you effectively—a broker-dealer effectively earns trust over time through their behavior." Tr. 2087-88. In this case, Wollman had a longstanding business and social relationship with the defendants, *see* Tr. 2091-93, which a reasonable investor would clearly weigh in assessing

credibility.  Wollman did not suggest, however, that the trust was borne of a legal duty, but of his experience with the defendants.  Moreover, he listed "trustworthiness" as one of many factors he would consider in evaluating broker-dealers, along with such other reasonable criteria as "activity in the market…; willingness and ability to commit capital in the market…; responsiveness, ease of working with them, … good market color, good research."  Tr. 2086.

Similarly, Harrison explained that "business and personal relationships have an element of trust.  And in these business relationships, I viewed how much I trusted the people I was doing business with was an important factor in doing a business with them."  Tr. 704.  Like Wollman, Harrison did not rely on any legal relationship to assess trust, but rather looked to traditional hallmarks that a person uses in deciding whether to believe another person.  Harrison explained, "the more business interactions I had with individuals and their firms gave me the ability to try to gauge their trust in how honest they were and how trustworthy their statements were."  Tr. 704.  Harrison took that a step further, explaining how he would attempt to ferret out dishonest behavior and use it in deciding whether to trust subsequent representations.  He would "[g]ather more information from as many sources as possible and try to analyze which piece or pieces of information didn't seem to make sense with the rest."  Tr. 727.  Harrison gave examples of his efforts to determine whether he had received bad information, which were corroborated by the documentary evidence.  *See*, *e.g.*, Tr. 735-36 (Harrison describing an incident of dishonesty by a regional broker, following which he announces a "lifetime blacklist") (citing Gov't Ex. 3Q); Tr. 737 (Harrison commenting on his reaction to someone lying to him, and announcing "we're not doing business again") (quoting Gov't Ex. 3S).  Harrison's reason for weighing past experiences with broker-dealers was entirely rational: "I would be able to do a better job for my clients if I felt that I was doing business with people who were trustworthy."  Tr. 805.

Aadil Abbas and Eric Marks offered similar testimony that they weighed how broker-dealers behaved in the past in determining whether to believe them. Abbas referred to his "comfort level" with a broker-dealer as influencing his decision to work with that broker-dealer, and explained how lying would undermine that comfort. Among other factors, Abbas testified that "[i]f someone is giving me wrong market color and I could find out from someone else that what you just told me five minutes ago is inaccurate, that could also undermine the comfort level." Tr. 1437. Likewise, Marks testified that he would weigh in his future negotiations whether a broker-dealer had previously lied to him. Tr. 2334, 2430-31.

Notably, none of these witnesses testified that their willingness to trust defendants emanated from their understanding of a legal duty. Nor is it irrational for a reasonable investor to weigh history and experience with a trader in assessing veracity; indeed, failing to do so seems unreasonable. At any rate, factual witness testimony is not objectively erroneous in the way of Norris's agency testimony in *Litvak II*, and could certainly be credited—or rejected—by the jury.

    b)  Defendants' efforts to falsely engender trust

Even if victims were objectively "wrong" to trust the defendants, here (unlike in *Litvak II*, where the court found no evidence that Litvak was the source of Norris's mistaken belief), there was robust evidence that defendants falsely instilled a sense of trust in their victims and then exploited that trust.

Co-conspirator Chao explained that the lies he and Gramins told were designed to create the illusion that Nomura was working to help their customers. He testified:

> Q. In a sort of related way, would it also be made a part of the negotiation about how much the spread or compensation or commission that Nomura was making on the trade was?
> A. Yes. If we had misrepresented that -- if we misrepresented to a client that, for example, we needed to be paid on top, or if we needed to be—if we were buying at a certain price, then the client might think we were earning a spread that was different than what Nomura actually made.

Q. And again, what was the purpose of doing that?
A. *The purpose was to sort of make the client feel like we were working for them*, but in reality we were making money.

Tr. 1686 (emphasis added). He clarified that he learned this practice from "Mr. Gramins and Mr. Dinucci," and observed them putting it into action. *Id*.

Chao reiterated the rationale for this practice in the context of a trade in which he and Gramins played the middlemen in the sale of a PPSI bond from Bracebridge Capital (Gabe Sunshine) to HIMCO (Aadil Abbas). In that trade, Chao lied to Abbas about Sunshine's offer, overstating it by two points—Sunshine offered to sell at 78-16, but Chao told Abbas that the offer was 80-16. *See* Gov't Ex. 26D, 26E. Based on that lie, Abbas told Chao he would raise his bid from 78-22 to 79-00. However, Chao suggested that Abbas not improve that much yet, explaining: "[w]e just showed him 78-16 to get started. We'll show 78-24 and see what comes back." Gov't Ex. 26E. Both of those statements were lies—Gramins never showed 78-16 to the seller, and he and Chao had no intention to show 78-24. Chao testified that the reason for these misrepresentations, purporting that Nomura was engaged in additional rounds of negotiation, was "to give Mr. Abbas sort of an illusion, a false illusion that, you know, we were trying to buy the bonds cheaper for him." Tr. 1733. Chao further explained, "Because, you know, we're offering to show a lower bid, like—we're sort of trying to loop him into the process—. . .—and try to give him a sense that he's—you know, we're sort of like working for him to bid on a—on slower increments." *Id*. Chao testified that he would have had to consult with Gramins to use this strategy. *Id*. at 1734. Notably, this type of testimony was not available in *Litvak II*, where the government did not call co-conspirators.

This same strategy is also apparent in Gramins' facilitation of the sale of a JPMAC bond from TCW (Harrison Choi) to QVT (Wollman) in November 2013. *See* Gov't Ex. 29A-G.

Throughout that trade, Gramins lied to both Choi and Wollman to increase Nomura's profit. Relevant here, Wollman had expressed a strong desire to buy lower than 80, while Gramins wanted to push the purchase price to 80-16. To do so, Gramins strategized with Nomura salesperson Michael Romanelli about how to give Wollman the false impression that Gramins had been negotiating on his behalf to get the seller below 80 (in fact, the seller had already offered to sell at 79 and 1/4). Gov't Ex. 29F. Gramins told Romanelli that he would tell Wollman, "I just hammered him. . . . 80 1/2 is the best I can get them to you at," then did so, falsely representing to Wollman, "I have beaten him up as much as I can . . . I don't think I can squeeze him anymore w/o pissing him off." Gov't Ex. 29D, 29F. As in the PPSI trade, above, Gramins gave Wollman the false impression that he was working on his behalf. And, just as in that trade, it was successful—Gramins convinced Wollman to buy at 80-16. Gov't Ex. 29D.

There are other examples, as well. When facilitating a trade between Monarch and DW Investments, Gramins assured Monarch that he was "happy to reflect what you like . . . .*and i am purely looking to broker*," Gov't Ex. 11B at 3 (emphasis added), introducing the idea that he was honest middleman shuttling information between the buyer and seller. Similarly, in another trade, Zach Harrison of Putnam told Gramins to "go earn that 8 [tick commission]," to which Gramins replied "ok…i am working him pretty good here," Gov't Ex. 18A at 25, conveying the idea that he was trying to help Harrison in the negotiation.

Gramins was not the only defendant who fostered and exploited a false sense of trust with his counterparties. Shapiro, for example, spent a great deal of effort convincing Zach Harrison that he was trustworthy. In one chat, Harrison was attempting to determine whether he had been lied to by Nomura or another broker-dealer. *See* Tr. 741-745, Gov't Ex. 3J. Harrison relayed that his boss "assign[ed] [a] non-zero" chance that Nomura "was the dishonest counterparty." Tr. 742.

Harrison reported that he told his boss there was no such chance. *Id.* Shapiro affirmed that view (that he would not lie), saying "Not my style . . . Not the way I roll." Tr. 743 (quoting Gov't Ex. 3J at 2). Shapiro explained to Harrison that he wouldn't lie because "once you start going down that road . . . it is impossible to keep all the stories straight." Gov't Ex. 3J at 4. Shapiro further explained, "pure fact is that you are a MUCH more meaningful % of my team's business than you are of theirs [Credit Suisse] . . . and it would be foolish for me to risk that for a couple of trades." Tr. 745 (quoting Gov't Ex. 3J at 4). Harrison understood Shapiro to mean that "to have good long-term relationships with people and do the best I can for my clients over the long term, the best way to accomplish that is to not fuck around." Tr. 744-45. In short, Harrison's positive view of Shapiro's trustworthiness was perpetuated and ultimately exploited by Shapiro.

The defendants' efforts to foster and exploit a false sense of trust, and the effect of those efforts on the victims, was entirely relevant to materiality in this case. In addition to *Litvak II*'s acknowledgement of that reality, it would be clearly unjust to allow the defendants to act in such a devious manner and then blame the victims for falling for their deception. At a minimum, the jury was entitled to weigh this evidence in their assessment of credibility, competing inferences, and materiality.

> 3. The jury was entitled to decide how to credit and weigh evidence of other dishonesty in the RMBS market

The defendants' next claim—that victims' testimony that the defendants' lies were important was objectively unreasonable because they knew there was dishonesty in the RMBS market—similarly extends *Litvak II* too far. *See* Gramins Mem. at 14-17, Shapiro Mem. at 7, 11, 13, 14. First, contrary to the defendants' contention, the defense in *Litvak II* spent a great deal of time presenting evidence of and arguing about evidence of other dishonesty in the market, including by Norris (the victim of the count of conviction). Yet the Second Circuit still found the

evidence of materiality sufficient.  Second, Rule 29 is not an opportunity for the defendants to challenge the jury's weighing of the evidence, assessment of credibility, and determination of materiality, and *Litvak II* does not change that long-held principle.

> a) Evidence and Argument in *Litvak II*

First, Gramins' claim that "the regularity of deceptive buy-side negotiating tactics was not otherwise a major focus of the *Litvak II* trial," Gramins Mem. at 14, is simply false.  In fact, deceptive tactics by the buy side were far more central to the *Litvak II* case than here, where the defense focused as much, if not more, on issues of intent and willfulness—and where this Court has already suggested that it was willfulness that may have distinguished the count of conviction.

Every victim in the *Litvak II* trial was vigorously cross examined on issues of dishonesty in the RMBS market:

- Michael Canter was cross-examined on, among other things, the false use of the term "in the hunt," *Litvak II* Tr. 416-18; false use of "bottom line," *Litvak II* Tr. 419; dissemination of false pricing information, *Litvak II* Tr. 427-28; asking others to submit false bids in a BWIC, *Litvak II* Tr. 428-29, 438; and disseminating false pricing information from prior purchases, *Litvak II* Tr. 440, 443-44.

- Katherine Corso was cross examined about giving traders the false impression they can buy a bond out of competition in order to get pricing information from them, when she had already decided to do a BWIC.  *Litvak II* Tr. 560

- Vladimir Lemin was cross examined on refusing to provide his bottom line or maximum price in the context of negotiations.  *Litvak II* Tr. 734-35.

- Norris was cross examined at length about false color, including sending out false color to protect a buyer who paid too much.  *Litvak II* Tr. 796-97.  Norris explained that he expected his information to be taken with a grain of salt.  *Litvak II* Tr. 799-800.

- Joel Wollman was cross examined at length on whether he had lied about having another seller from whom to purchase a particular bond.  *Litvak II* Tr. 971-73.  The defense also claimed that Wollman had invented other bids in a BWIC in order to drive up the price.  *Litvak II* Tr. 982.

These lines of testimony were used extensively by the defense in the *Litvak II* summation.

In arguing that the victims could not have reasonably believed what Litvak was telling them, the

defense cited Wollman's secret agreement with another trader to sell part of the bond he was purchasing from Litvak, *Litvak II* Tr. 1392, 1415; Canter's dissemination of false pricing information and solicitation of misleading BWIC bids, *Litvak II* Tr. 1407; Norris's dissemination of false pricing information, *Litvak II* Tr. 1409; and Corso giving the false impression to broker-dealers that a bond was available, *Litvak II* Tr. 1413. In all those instances, the defense vehemently contested that a lie could be material where the victim was aware of dishonesty in the market. *See Litvak II* Tr. 1409 ("Who more likely to be skeptical about the guy across the table in a buyer-seller situation than a guy that's doing the same thing? Is that person—that sophisticated investor going to let that banter significantly alter the mix of information? Maybe, possibly, probably, but beyond a reasonable doubt? Seriously?").

Despite this evidence and argument related to dishonesty in the market, the Second Circuit in *Litvak II* did not grant acquittal. Rather, the court reaffirmed the basic principle from *Litvak I*, that testimony that misrepresentations were "important" to victims and that victims were "injured by those misrepresentations … precludes a finding that no reasonable mind could find [the defendant's] statements material." *Litvak I*, 808 at 176; *see also Litvak II*, 889 F.3d at 66. This Court should not overrule *Litvak I* and *Litvak II* by finding that contrary evidence and argument offered to challenge witnesses' materiality testimony necessitates acquittal.

  b)  Whether to credit the "importance" testimony is up to the jury

As discussed above, each victim witness in this case testified that the misrepresented information was important in their negotiations and affected either the price they paid or the strategy they employed. *See, e.g.*, Tr. 752-754, 769 (Harrison); Tr. 1515 (Abbas); Tr. 2112-14 (Wollman); 2333-34 (Marks). That testimony was corroborated by the co-conspirators, who explained that the intent of the lies was to cause the victims to accept less or pay more for bonds (*i.e.*, that the lies would be important in the negotiations). *See, e.g.*, Tr. 255-56 (Dinucci), 1715

(Chao), 1932 (Feely). Most significantly, the transcripts of the trades verify that, in the context of the negotiations, the lies actually did move the victim's bid or offer. This was more than sufficient to meet the materiality bar set by *Litvak I* and *Litvak II*.

The defendants' argument on reconsideration is nothing more than an attack on the credibility and weight of the witnesses' testimony, as well as the factual determination of materiality, both of which are appropriately left to the jury. *See Litvak II*, 889 F.3d at 65 ("The evidence must be viewed in the light most favorable to the [g]overnment, crediting every inference that could have been drawn in the [g]overnment's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." (internal citation and quotations omitted)); *Litvak I*, 808 F.3d at 175 (characterizing materiality as "especially well-suited for jury determination"). While the defendants catalog instances where the victims in this case were accused of engaging in dishonest conduct or being aware of dishonest conduct in the RMBS market, whether and to what extent such testimony undermined the credibility of those victims' testimony about the importance of the defendants' lies was a fact question for the jury and not a matter of law. Indeed, these questions were put squarely to the jury at trial by all defendants' counsel, who argued that, because of dishonesty in the market generally, the victims knew that pricing information was unreliable and therefore unimportant. *See*, *e.g.*, Tr. 2817-2819 (Shapiro on Harrison's knowledge that there was dishonesty in the market); Tr. 2867 (Gramins: "My point is simply that when all the data they had, the models and the other information, when all that's combined with the shrewd and shady and sharp practices that they used also, there's no way they're putting a lot of weight on what Nomura says about how much it cost them to buy a bond or what they're making on a bond."). The jury was entitled to accept or reject that argument.

*Litvak II*—the stated basis for the defendants' motions for reconsideration—did not empower the Court to resolve credibility disputes.

### 4. Expert testimony was not required to prove materiality

The defendants' argument that expert testimony is necessary to prove materiality, *see* Gramins Mem. at 10, Shapiro Mem. at 16, also runs contrary to *Litvak I* and *Litvak II*. In *Litvak I*, the court found that it was sufficient to call victim witnesses to testify that the misrepresentations were "important" to them. *Litvak I*, 808 F.3d at 175-76. Indeed, the Court of Appeal's decision that it was error to exclude defense expert testimony was precisely because it was one of "few ways in which Litvak could put forth evidence to rebut the alleged victims' testimony that Litvak's misstatements were important to them, or otherwise counter the government's argument that a reasonable investor would have found Litvak's statements material." *Id*. at 183.

*Litvak II* did not alter that analysis. The Second Circuit's holding that witness point of view testimony must be "within the parameters of the thinking of reasonable investors in the particular market at issue," *see Litvak II*, 889 F.3d at 65, does not undermine the general principle of *Litvak I* that such thinking can be proven through the totality of victim testimony. Indeed, its evidentiary ruling deeming Norris's agency testimony idiosyncratic and prejudicial was based in part on its legal inaccuracy *and* the fact that it was not echoed by the other witnesses. Even then, according to the court, the idiosyncratic part of Norris's testimony did *not* undermine the sufficiency of the evidence, which did not include a government expert.

While experts are routinely called in certain types of cases, it is very doubtful that an expert would have provided anything meaningful to the Government's case here. According to the pattern jury instructions, expert testimony is presented "on the theory that someone who is experienced and knowledgeable in the field can assist [the jury] in understanding the evidence or in reaching an independent decision on the facts." 1 Modern Federal Jury Instructions, Instruction

7-21. However, a jury need not accept an expert's conclusion, but rather should "consider the witness' qualifications, his or her opinions, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness' testimony." *Id.* In this case, four highly educated, trained, and experienced traders, entrusted with managing billions of dollars by highly successful financial firms, all testified consistently about their view of the RMBS market and their assessment of the defendants' lies, and did so consistently with the three co-conspirators and the documentary evidence. Their elite educational and professional credentials (similar to those of the defendants' uncalled experts) would certainly qualify them to be experts in RMBS trading were they not victims of the defendants' conduct. In that context, an expert who is hired by a side and paid tens of thousands of dollars (like the defendants' uncalled experts), hardly provides the jury with a more independent point of view than the victims. Moreover, even if the Government had called an expert, that expert would be no more or less entitled to speak on behalf of the RMBS industry than the victims in this case.

5. Defendants' repeated arguments about the import of analysis, unverified information, and trading without dealer cost are unaffected by *Litvak II*

The defendants attempt to revive their earlier failed Rule 29 arguments that evidence of materiality was insufficient because (1) analytics are central to investors' analysis, (2) they transacted at prices that fit within their analysis, and (3) they regularly traded without dealer cost information. *See* Shapiro Mem. at 5-16. These arguments were all present and rejected in *Litvak II*, and do not provide a basis for reconsideration.

First, the fact that the witnesses relied heavily on their analytics did not mean that lies about price and mark-up were not material. *Litvak II* held:

> We cannot agree that, because statements about the price paid by the broker-dealer for a RMBS are not intended, or understood, as relevant to the intrinsic value of the bond, such assertions are not material as a matter of law. When the broker-dealer seeks a profit for its role in procuring and selling a security desired by a buyer, the

profit becomes part of the price paid by the buyer. The value of the security may be the most important factor governing the decision to buy, but the price must be considered in determining whether the purchase is deemed profitable. The broker-dealer's profit is part of the price and lies about it can be found by a jury to "significantly alter[ ] the 'total mix' of information ... available." (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)).

*Litvak II*, 889 F.3d at 67. Here, the victims testified that their analytics would give them the maximum or minimum price a buy or a sale would be attractive, but did not tell them what price the bond was available in the market. Harrison explained that he would decide "a range in which I thought a security had an attractive value amongst the other opportunities," then "attempt to buy [the bond] as low in price as possible, because that would help my clients make as much money as possible." Tr. 700. *See also* Tr. 1445 (Abbas: model provides a floor, not a ceiling, at which to sell a bond); Tr. 1445-1446 (Abbas: "So once I like the profile of the bond . . . at that point my goal is to buy it as cheap as possible because the less money I pay for it, the more return it generates for my client."). Neither market "color" from prior trades nor a victim's model could identify where a bond would actually trade at a particular time—the only way to get that information was to engage a broker-dealer, such as Nomura, and attempted to negotiate an actual trade with a counterparty. Tr. 712-714 (Harrison), 1407-09 (Abbas). As Abbas explained, a bond's trading price has less to do with its intrinsic value and much more to do with what price he can negotiate in the market. Tr. 1446.

Likewise, it is irrelevant that victims were not entitled to price information and would sometimes negotiate without it. As the Government argued in its principal post-trial opposition, it was defendants who chose to inject false price information into negotiations, with the intent of causing the victims to pay more or accept less. Once defendants chose to speak, even absent a pre-existing duty, they were obliged to do so truthfully and completely. *See* Tr. 2609 (Court: "I think the law does provide that if a party voluntarily undertakes to speak about a material matter,

it has a duty to be truthful."); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("It is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic.") (citations omitted). Raiff testified that was the policy at Nomura. Tr. 650 (Raiff: "Q. And if he asks you where you bought it, you can say I'm not going to tell you, correct? A. Correct. That's one option. Q. And if you answer the question, you have to be truthful, correct? A. Correct."). As discussed above, the evidence demonstrated that, once defendants and their confederates chose to provide false price information, victims gave it significant weight in their price negotiations with Nomura.[5]

### 6. The rationale for the victims' testimony about the importance of the defendants' lies was sufficiently detailed

Finally, Shapiro makes a repeated blanket claim that the victims did not give sufficient reasons for their testimony that the defendants' lies were important, or describe the "degree" to which the information was important. *See* Shapiro Mem. at 5, 12, 14. That claim is untrue and belied by the corroborating evidence, but ultimately irrelevant.

One of the core reasons why the victims relied on the defendants' lies was that they had no other choice in the RMBS market. For instance, Eric Marks—whom Gramins himself classifies as "in the mainstream," Gramins Mem. at 10—testified that "I only speak through the broker, so I rely on the information they give to me." Tr. 2322. Marks further testified that, when commission is discussed, he specifically negotiated that as a term of the transactions. *Id*. In that context, Marks testified that the misinformation about price and commission provided in the JPALT trade was

---

[5] This was also an argument advanced by the defense in *Litvak II*. *See Litvak II* Tr. at 314-15 (Canter: "Q. And normally if you would ask a broker dealer what price they bought a bond at, they wouldn't even tell you? A. Most do not. Q. But that didn't stop you from buying bonds from them, correct? A. Correct."); 706 (Lemin: "Q. A lot of times when you are buying a bond in the market -- I think you said yesterday you don't know what the acquisition costs were to the party from whom you're buying the bond? A. A lot of times I don't know that. Q. And you still end up buying in a lot of those instances? A. Some of them, yes, some of them we can't agree on price.").

"important" because he "would probably negotiate differently." Tr. 2333. Thus Marks is very clear about why misrepresented price information is important—because he had negotiated price and commission based upon false information and made that information part of the negotiation, thus having different information would have affected how he approached the negotiation. There is nothing idiosyncratic or unusual about that logical testimony. And, in fact, Marks' position is corroborated by the documentary evidence, in which he agreed to pay 8 ticks in commission based on lies.

Likewise, in the PPSI trade, Abbas testified that the reason Chao's lie was important was that "If I had known that the offer is 78 and a half, I would never have paid 79 and 2. So that's the effect I could see [of the lie]." Tr. 1515. The documents corroborated that Abbas had made it clear that he wanted to pay 78-22, and went to 79-2 based on the lie. *See* Gov't Ex. 26E. Moreover, Abbas had just paid a 4-tick commission earlier in the day, *see* Tr. 1479, which corroborated his testimony that he would not have paid more than a half point. And, of course, Abbas believed it important because he "could have bought it at 78 and 22, which is cheaper than what I eventually ended up paying," Tr. 1510, and "lower is better," Tr. 1512.

In any event, Shapiro's argument fails for an even more fundamental reason, discussed at length above. That Shapiro rejects the witnesses' rationales, or would weigh the evidence differently, or would draw different inferences, is ultimately irrelevant. This sort of factual testimony about what victims did and why is distinct from Norris' erroneous and idiosyncratic understanding of the legal relationship that the Second Circuit identified in *Litvak II*. It is properly left to the jury to decide how to decide among competing inferences and whether to credit the explanations from the witnesses.[6]

---

[6] Defendants also misleadingly cite to exhibits that do not bear on materiality here. For example, the fact that Putnam's prospectus references undisclosed markups, *see* Shapiro Mem. at 8, does not impact the importance of a broker-

# IV.  **Reconsideration of the Motion to Dismiss is Unwarranted**

Although not invited by the Court, the defendants also attempt to relitigate the Court's denial of their motion to dismiss on due process grounds.  As discussed more fully below, the defendants neither meet the standard for reconsideration nor give the Court any reasons to reconsider its earlier ruling.

### A.  **There Is No Basis to Reconsider the Court's Ruling**

Just as in the case of the motion to reconsider the denial of acquittal, the motion to reconsider dismissal fails to meet the strict standard set forth for reconsideration.  The motion simply re-hashes the same due process arguments previously made on numerous occasions.  *See* Supplemental Br. [Doc. 135-1], Mot. to Dismiss [Doc. 400], Reply Mem. [Doc. 486], Shapiro Mem. [Doc. 523], and Tr. Oral Argument Nov. 8, 2017 [Doc. 489].  Defendants points to no new case law or fact that the Court overlooked that warranted a change in the Court's decision.

The defendants are simply wrong to suggest that the Court should reconsider its ruling because it "failed to address a central question raised by [the] motion . . . ." Shapiro Mem. at 17 [Doc. 523].  The defendants raised *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), during their initial motion to dismiss, *see* Doc. 400 at 2-4, and again in their post-trial reply memorandum, *see* Doc. 486 at 13-15.  The government responded in its post-trial opposition.  *See* Doc. 482 at 57. *Weimert* was then raised at length by both sides during oral argument.  *See* November 8, 2017 Hg. Tr. at 59, 60, 77, 81.  And yet the Court correctly stated that "[n]o case has been cited or discovered that compels dismissal of the indictment in this case because of due process concerns."  Ruling at 9.  This is more than sufficient to reject the defendants' motion.  The Court clearly need not address

---

dealer's price statements to Harrison.  Putnam's prospectus to its investors—and the question of whether it discloses markups to its investors—is irrelevant to whether it reasonably considers important its negotiations over markups with its broker-dealers.  Similarly, Gramins cites to a boilerplate disclaimer used after the time of this conspiracy, *see* Gramins Mem. at 16, which he cannot show was the market norm, was read by any of the victims, or had an effect on any investor's calculus.

every case specifically (especially an inapt out-of-circuit case that does not bind this Court), and reconsideration is clearly not an opportunity to force the Court to directly address every citation provided by a party.

The Court also did not "erroneously adjudge[] the trial evidence to be sufficient to provide a basis for the jury to conclude that [the defendants] had fair notice of the illegality of [their] conduct." Shapiro Mem. at 19 [Doc. 523]. Examining the evidence at trial was not error; the Court did so to alleviate its heightened due process concerns, *see* Ruling at 8. Statutes with a specific intent element are less likely to be found impermissibly vague because, "where the punishment imposed is only for an act knowingly done with purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act that he does is a violation of the law." *Screws v. United States*, 325 U.S. 91, 101-103 (1945). *Cf. Hygrade Provision Co. v. Sherman*, 266 U.S. 497, 502-03 (1925) ("[S]ince the statutes [at issue] require a specific intent to defraud in order to encounter their prohibitions, the hazard of prosecution which appellants fear loses whatever substantial foundation it might have in the absence of such requirement."). Instead of simply relying on the requirement that the Government must prove specific intent for wire and securities fraud, the Court went further.[7] The Court evaluated the evidence to determine whether the defendants' conduct "treaded closely enough along proscribed lines [for a jury] to find that they had adequate notice of the illegality of their acts." Ruling at 9 (alteration in original) (*quoting United States v. Carpenter*, 791 F.2d 1024, 1034 (2d Cir. 1986). In other words, where the jury could find intent, the Court was satisfied that the defendants had fair notice.

---

[7] The Court noted that "as the government's concedes, lying in arms-length commercial transactions is not always illegal." Ruling at 8. To be clear, *all lies* that are material and made with the intent to defraud, whether in an arms-length transaction or otherwise, constitute fraud under the securities and wire fraud statutes (assuming the jurisdictional elements are met).

The defendants have no basis for reconsideration. The Court properly rejected the defendants' claim that they lacked fair notice that their conduct was criminal. This motion does nothing more than improperly "relitigate an issue already decided." *Shrader*, 70 F.3d at 257. For that reason alone it should be denied.

### B.     Defendants' Due Process Claim Lacks Merit

Even if the Court were to revisit the defendants' due process claim, it remains meritless.

The defendants argue that they did not receive fair warning or notice that they could be criminally liable for their conduct, and therefore their prosecution violates the due process clause of the Constitution. *See* Shapiro Mem. at 17. That argument is wrong. First, both the wire and securities fraud statutes plainly provide fair notice of their prohibitions, using straightforward terms proscribing conduct that is neither novel nor vague, and having a *mens rea* requirement that blunts any notice concern. Second, the Seventh Circuit's holding in *Weimert*, an inapt case without any support in Second Circuit precedent, does not require finding a due process violation.

The wire fraud statute plainly provides fair notice of its prohibitions. The statute criminalizes the use of interstate wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1343. The defendants were charged with violating the wire fraud statute via classic fraud by trick. They designed a plan to lie about price to take money from others. The scheme achieved its goal by way of "trick, deceit, chicane or overreaching," through "dishonest methods." *McNally v. United States*, 483 U.S. 350, 358 (1987). Such a scheme falls squarely within the conduct prohibited under § 1343; the defendants "were not ensnared by a trap laid for the unwary." *Al Kassar*, 660 F.3d 108, 119 92d Cir. 2011). Furthermore, to convict defendants, the Government is required to

prove that they acted knowingly with the intent to defraud. This intent requirement undermines any claim that the defendants could be found guilty without fair notice.[8]

The same can be said of the securities fraud statute. A "person of ordinary intelligence would understand that this conduct implicates the deceptive statements and deceit, potentially important deal terms, and securities transactions, and thus runs afoul of the unambiguous terms of Rule 10b-5." Order of April 23, 2018, *United States v. Demos*, No. 3:16cr220 (AWT) (D. Conn.) (Doc. 317) at 4-6; *see also United States v. Persky*, 520 F.2d 283, 287 (2d Cir. 1975) ("no honest and reasonable citizen could have difficulty in understanding the meaning" of Rule 10b-5's terms, which "call for interpretation in accordance to the facts of a given case," just like "the terms 'malice,' 'probable cause,' 'self-defense,' 'negligence,' 'fraud,' 'duress,' 'justification,' and thousands of other expressions well established in the law."). And the securities fraud statute's *mens rea* requirement dulls any fair notice concerns.

Furthermore, there need not be any prior similar case to provide a defendant fair warning. Indeed, "it is immaterial that there is no litigated fact pattern precisely in point." *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) (rejecting defendant's due process and fair notice claim) (internal citation and quotation marks omitted); *see also United States v. Lanier*, 520 U.S. 259, 269-71 (1997) (holding that the "fair warning" requirement is not dependent upon "fundamentally similar" prior case law); *United States v. Litvak*, 808 F.3d 160, 177 (2d Cir. 2015) (*Litvak I*) (Section 10b of the Securities Exchange Act "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes, and to protect against fraudulent practices, which constantly vary.") (quoting *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 221 (2d Cir. 2014) (per curium)). Otherwise, any defendant with some degree of "cupidity

---

[8] That the Court also imposed a willfulness requirement, which is not generally required for wire fraud, doubly discredits any due process concern.

and ingenuity" would easily be able to avoid criminal prosecution by devising a fraudulent scheme with a unique fact pattern. *United States v. Brown*, 555 F.2d 336, 340 (2d Cir. 1977).

The defendants also unpersuasively rely upon the Seventh Circuit's decision in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), to reframe their materiality argument as a lack of fair notice argument. The defendants urges the Court to find that because Weimert's lies were found to be immaterial as a matter of law, the defendants could have had no way of knowing that their lies in this case were subject to criminal liability. This argument fails for several reasons. First, *Weimert* does not address the allegations presented here—that defendants' misstatements were deceptions about the price Nomura had paid. *See Litvak II*, 889 F.3d at 67 ("The value of the [RMBS] may be the most important factor governing the decision to buy, but the price must be considered in determining whether the purchase is deemed profitable. The broker-dealer's profit is part of the price and lies about it can be found by a jury to significantly alter the total mix of information . . . available."). Second, the Second Circuit in the *Litvak* cases has twice found that the type of lies used by the defendants are not immaterial as a matter of law, and that their criminality is suitable for determination by a jury.[9] And third, as already discussed, the defendants' conduct—classic theft by trick—falls squarely within the conduct prohibited by the wire and securities fraud statutes. Nothing in *Weimert* permits (much less compels) a finding that the defendants were not given fair notice that their conduct was criminal. *See* Ruling at 9.

*    *    *

---

[9] In his second appeal, Litvak cited *Weimert*, along with *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996) for the proposition that these price lies were immaterial as a matter of law. The Court of Appeals rejected the argument for the second time, again distinguishing *Feinman* and choosing not to even mention *Weimert*.

In sum, the defendants' conduct was a straightforward violation of the wire and securities fraud statutes, and as such, there was fair notice that the defendants' conduct could be subject to criminal liability. Accordingly, there was no due process violation.

**V.**     <u>**Conclusion**</u>

Accordingly, the Government respectfully requests that the Court deny defendants' motions for a reconsideration of the Court's order denying judgment of acquittal and dismissal on due process grounds.

Respectfully submitted,

JOHN H.DURHAM
UNITED STATES ATTORNEY

/s/ *David E. Novick*

DAVID NOVICK
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV02874

/s/ *Heather L. Cherry*

HEATHER CHERRY
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV07037

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3700
david.novick@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *David E. Novick*
_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY