## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | : |
| | : |
| v. | : No. 15-cr-00155 (RNC) |
| | : |
| | : |
| ROSS SHAPIRO and | : March 12, 2019 |
| MICHAEL GRAMINS | : |
| | : |

## DEFENDANTS' SUPPLEMENTAL BRIEF IN FURTHER
## SUPPORT OF THEIR MOTIONS FOR RECONSIDERATION

Defendants Ross Shapiro and Michael Gramins respectfully submit this Memorandum of

Law in further support of their respective Motions for Reconsideration of the Court's Order

dated June 5, 2018, denying the Defendants' Motions for Judgments of Acquittal Pursuant to

Rule 29(c) of the Federal Rules of Criminal Procedure (ECF Nos. 519 and 522).  Below, we

bring to the Court's attention the recent decision in *United States v. Bogucki*, 18-cr-21 (CRB)

(N.D. Cal. Mar. 4, 2019), ECF No. 217 (Ex. A hereto), in which the trial judge dismissed the

indictment at the close of the government's case pursuant to Fed. R. Crim. P. 29.  The ruling and

its rationale are directly applicable to and strongly support the pending motions for entry of a

judgment of acquittal on the remaining counts, or, in the alternative, to dismiss the Indictment.

## ARGUMENT

### The *Bogucki* Decision Further Supports a Judgment of Acquittal or, Alternatively, Dismissal of the Indictment

Bogucki, a foreign exchange trader at Barclays, was charged with conspiracy and wire

fraud in relation to allegedly false and misleading statements to the Hewlett-Packard Company

("HP") and the misuse of confidential HP information in connection with the trading of certain

1

foreign exchange options (so-called "cable" options) in which the U.S. dollar and British pound constituted the currency base pair.  *See generally id.* at ECF No. 54 (Superseding Indictment). Specifically, in connection with HP's planned acquisition of a company called Autonomy, Barclays sold £6 billion in cable options to HP.  *Id.* ¶ 22.  Once HP had determined that it no longer needed the options, it decided to unwind them by selling them back into the market in several tranches.  *Id.* ¶ 25.  The charges alleged a scheme to defraud in relation to statements made to HP by Bogucki and others at Barclays and Barclays' alleged misuse of its foreknowledge of HP's unwind intentions, namely, by selling short ahead of the HP unwind trades, thus achieving a trading pricing advantage at the expense of HP, which traded at lower prices as a result of Barclays' front-running short sales.  *See id.* ¶¶ 30-55.  Bogucki's alleged false and misleading statements to HP included that Barclays was "not touching the market" and would "go to the mat" to obtain favorable pricing for HP, and his allegedly invented explanations for the decline in cable option volatility (an options market variable which is linked to price) at the time of the HP unwind trades.  *Id.* ¶¶ 29, 32, 51.  According to the Indictment, this alleged conduct violated a duty of trust and confidence owed by Barclays to HP, and deprived HP of its right to control its money and property.  *Id.* ¶ 16.

At the close of the evidence, the trial Judge granted the defense motion under Rule 29. As the court explained:  "there are two pieces of evidence that are crucial to understand the context in which the allegedly materially false statements that Defendant provided to HP occurred."  (*Bogucki* Op. at 3).  First, the International Swaps Dealers Association ("IDSA") agreement between Barclays and HP (like every trade confirmation issued by Nomura to the counterparties in this case), expressly stated that the parties entered into "each Transaction as principal (and not as agent or in another capacity, fiduciary or otherwise)."  *Id.*; *compare* DX

1122 (trade confirmation sent by Nomura to QVT stating that Nomura executed the transaction as a principal and "has not acted as an advisor or otherwise as a fiduciary").  Second, it was "generally-understood industry practice" in the FX market that banks such as Barclays engaged in "pre-positioning" or "hedging," whereby the bank would "change[] its position prior to taking on an asset" by placing trades in advance of a transaction.  *Id.* at 3-4.  Indeed, "[t]he parties agree[d] that there are no rules or regulations, beyond banks' internal policies and any agreement that may be formed between two particular parties, that regulate[d] [the conduct at issue.]"  *Id.* at 5.  And, in keeping with the nature of this principal-to-principal relationship, in which each principal was acting for its own interest, an HP employee, Zac Nesper, testified that he "understood some of what Barclays told him to be 'posturing,' rather than entirely honest," and that he sometimes "bluffed" or was "BS-ing" Barclays "about the prices [he] was seeing from other banks." *Id.* at 4.

> Against this backdrop, the court held as follows:
>
> Viewing the evidence in the light most favorable to the Government, there is simply no evidence in the record that, in the context of an arms-length transaction in which the parties bluffed and "BS-[ed]" each other, operated as principals, looked out for their own interests, and understood the other party to be "posturing," rather than providing strictly true information, someone in HP's position could, objectively, be induced by the statements in this case to part with money or property.

*Id.* at 11.  The court further held that "Nesper's subjective belief [does not] alter this conclusion," as "the standard for materiality is objective." *Id.* Thus:

> Whether Nesper or HP were gullible, guileless, naïve, or actually took Defendant to be representing that Barclays would not take action that undermined the value of HP's options, in light of the relationship of the parties, the agreement governing their interactions, industry practice, HP's own dishonesty, and Nesper's expectations as to Barclays' dishonesty, no reasonable jury could conclude beyond a reasonable doubt that it was objectively reasonable for HP to be influenced by the statements the Government has identified.

*Id.* at 11-12.

Importantly, the court also found that the government's case against Bogucki raised due process concerns because "the Government has pursued a criminal prosecution on the basis of conduct that violated no clear rule or regulation, was not prohibited by the agreements between the parties, and indeed was consistent with the parties' understanding of the arms-length relationship in which they operated." *Id.* at 12.[1]  The court accordingly decided that it "cannot permit this case to go to the jury on such a basis." *Id.*[2]

The court's analysis and ruling in *Bogucki* directly apply here.  Every trade in the secondary nonagency RMBS market was executed on a principal-to-principal basis.  As a principal, dealer Nomura acted on its own behalf and not as an agent or fiduciary of its counterparty.  *See, e.g.*, Trial Tr. 549:6-551:16; DX 1122; *see also United States v. Litvak*, 889 F.3d 56, 61 (2d Cir. 2018) ("An essential feature of all [RMBS] trades . . . is that the broker-dealer acts solely in its own interest as a principal. . . . A broker-dealer is not, therefore, an agent for its counterparties in these trades and owes them no special or fiduciary duty.").

As in *Bogucki*, where the objective reasonable investor knew the nature of the principal-to-principal trading relationship, and where market participants "bluffed" and "BS-ed" each other, the counterparty witnesses were likewise highly skeptical of negotiation statements made

---

[1] At the hearing where he announced his decision to grant the Rule 29 motion, the District Judge also stated that "the Government completely overreached in this case," and pointed out that the transaction at issue was between "two highly sophisticated individuals, both of whom knew what the business was about; how it was operating; . . . how it was addressed in the commercial context; and it was eyes wide open."  Mar. 4, 2019 Hr'g Tr. at 1039:1-9 (Ex. B. hereto).  The Judge further opined that it was wrong for the government to "assume the role of nanny of the FX options market." *Id.* at 1039:20-22.

[2] Although Bogucki was charged solely with wire fraud, and, in the case of Shapiro, the open count charges a conspiracy to commit wire fraud and securities fraud, and, in the case of Gramins, the open counts charge conspiracy to commit wire fraud and securities fraud and substantive securities fraud, *Bogucki* focused on materiality and the absence of the duty of a principal to act in the interests of a counterparty principal, two of the major legal issues in this prosecution.

by Nomura.  To cite several examples:

- Marks "understood . . . that market participants may not be truthful all the time" and his "supervisor was always warning [him] that people might say anything to convince you to pay more for a bond than you really should be." Trial Tr. 2375:4-9.

- Wollman knew that he had to be "on [his] guard with information that's volunteered to [him]." Trial Tr. 2225:3-6.

- Abbas understood that it was "a possibility that [he] could receive inaccurate information when [he was] talking to market participants about trading prices," and that therefore "all [he could] really know for sure [was] the price that [he was] willing to pay for a bond based on [his] analytics and the price at which a bond [was] offered to [him]." Tr. 1600:24-1601:10.

- Harrison testified that "[m]ultiple times per week I thought I was in situations where I was receiving misstatements or inaccurate information," complained that "someone lying to my face is like [an] hourly occurrence," and created several humorous animated videos making light of widespread dishonesty and deception in the market. Trial Tr. 1082:3-5; DX 544 at 24; Trial Tr. 815:6-817:15. Harrison even admitted that he suspected that a Nomura trader might be lying in negotiations in connection with one of the trades that the government introduced at trial.  Yet he decided to purchase the bonds from Nomura regardless.  *See* Trial Tr. 1168:1-13.

Moreover, as in *Bogucki*, the trial evidence demonstrated that buy-side counterparties also engaged in deceptive negotiating tactics to further their own interests.  Nomura traders Frank Dinucci and Caleb Chao both testified that counterparties regularly lied to them during negotiations.  Trial Tr. 357:22-24; 1830:20-1831:25; 1889:15-1890:7.  Likewise, Harrison described numerous instances where he thought sell-side counterparties were being dishonest, *see, e.g.*, Trial Tr. 1185:19-1186:5; 1088:1-3, and admitted to engaging in various deceptive negotiating tactics himself.  For example, Harrison conceded that he spread "BS color" to the market, "shaded" transaction prices, "point-blank lied" to dealers, and lied during negotiations when he thought it was in the best interest of his clients.  Trial Tr. 1289:22-1291:15-20; 1295:8-20; 1204:24-25; 1219:5-13.  The counterparty witnesses further testified that the RMBS market was not transparent, and that buy-side counterparties benefited from this arrangement.  Trial Tr. 1652:17-1653:13; 2345:19-2346:11; 2378:3-13.

Thus, as in *Bogucki*, the testimony in the present case, even viewed in the light most favorable to the government, established that it was common knowledge in the RMBS market that both buy-side and sell-side market participants were not always truthful in their communications, that they used negotiating tactics to advance their own interests, and that a reasonable investor in the nonagency RMBS market would not expect a dealer like Nomura, a principal, to be reliably truthful during the course of a price negotiation. *Compare Bogucki* Op. at 7 ("The Government has offered no evidence, and indeed no explanation, of why someone in Nesper's position, who was himself engaged in 'bluffing' and 'BS-ing' Barclays, would have had reason to believe that Bogucki was, unlike Nesper himself, being truthful about Barclays' position in the context of their arms-length negotiations.").

Nor, as in *Bogucki*, did dealers such as Nomura owe duties of trust or confidence to their counterparties. A reasonable investor in the RMBS market could not think otherwise. *Compare id.* at 6 ("The evidence presented in this case has shown that, far from a fiduciary-like relationship, HP and Barclays operated as arms-length principals engaged in interactions for their own mutual benefit. Thus, no reasonable jury could conclude that Barclays, or Defendant, had acquired a duty of trust or confidence with HP.") *with United States v. Johnson*, No. 16-CR-457-1 (NGG), 2017 WL 5125770, at *4 (E.D.N.Y. Sept. 21, 2017) (representations in a non-disclosure agreement between the parties concerning how one party would use information provided by the other "tend[ed] to support the existence of a fiduciary-like relationship") *and Carpenter v. United States*, 484 U.S. 19, 28 (1987) (explicit language in an employee manual created a duty of confidentiality between the defendant and his employer). Importantly, moreover, the counterparties in this RMBS market—fiduciaries of hedge funds and mutual fund companies—were highly sophisticated market actors—if anything, likely more so than HP

employees who bought and sold cable options with Barclays. They managed billions of dollars on behalf of their investors, and they utilized the most advanced and sophisticated of financial models. *See, e.g.*, Trial Tr. 517:18-518:18; DX 25. Nomura's counterparties, as a result, had all the more reason to understand the principal-to-principal structure of the RMBS market, the financial instruments in which they were transacting, and the price negotiation tactics used by dealers.

Finally, the District Judge found serious due process concerns in the *Bogucki* prosecution:

> A touchstone of our criminal law is that no person "shall be held criminally responsible for conduct which he could not reasonably [have] understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265 (1997). Here, the Government has pursued a criminal prosecution on the basis of conduct that violated no clear rule or regulation, was not prohibited by the agreements between the parties, and indeed was consistent with the parties' understanding of the arms-length relationship in which they operated.

*Bogucki* Op. at 12.[3]

The same is true here. While this Court also noted its due process concerns in this case, *see* ECF No. 504 at 9 ("Others who engaged in this conduct have been the subject of civil enforcement proceedings or no enforcement proceedings at all. It is fair for the defendants to wonder what distinguishes their conduct from that of others who have been spared indictment."), it declined to dismiss the Indictment on this basis. In the wake of *Bogucki*, we respectfully request that the Court reconsider its holding, especially given *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), which surveyed the case law and concluded that courts have not found the

---

[3] While the FX market in which Bogucki transacted may have been unregulated, the court's rationale in dismissing the case applies equally to the nonagency RMBS market where virtually every market participant engaged in the conduct at issue, which had never, prior to *Litvak*, been charged as a crime, and where the government, arbitrarily, has charged the same substantive conduct variously as a crime, as a civil wrong, or as an administrative violation. *See* ECF No. 476 at 56 n. 27 (citing the numerous RMBS traders who resolved identical conduct by way of SEC or FINRA settlements).

element of materiality satisfied in wire fraud prosecutions based on misstatements in negotiations between sophisticated parties.  In finding that no rule of law prohibited the defendant in *Bogucki* from acting as he did in communications with a market principal, *Bogucki* is in accord with the argument that the defense has presented, citing *Weimert*, that this prosecution violated Due Process.

## CONCLUSION

For the reasons set forth above, as well as those previously set forth in the Defendants' post-trial briefs, the Court should reconsider its ruling of July 5, 2018, and enter a judgment of acquittal on Count One (Shapiro and Gramins) and Counts Three and Nine (Gramins).

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By:  /s/ Guy Petrillo
     Guy Petrillo (CT19924)
     Joshua Klein (PHV07748)
     Amy Lester (PHV08919)
     655 Third Avenue, 22nd Floor
     New York, New York 10017
     Telephone: (212) 370-0330
     Facsimile:  (315) 873-2015
     *Attorneys for Ross Shapiro*

## CERTIFICATION OF SERVICE

I hereby certify that on March 12, 2019, a copy of the foregoing Defendants' Supplemental Brief in Further Support of their Motions for Reconsideration was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
March 12, 2019

/s/ Leonid Sandlar
Leonid Sandlar (PHV07700)
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391
lsandlar@pkbllp.com

1