UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 15-cr-00155 (RNC) |
| | : | |
| ROSS SHAPIRO and | : | April 17, 2020 |
| MICHAEL GRAMINS | : | |

**SURREPLY IN FURTHER SUPPORT OF ROSS SHAPIRO'S
MOTION FOR RECONSIDERATION PURSUANT TO LOCAL RULE 7(c)**

PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
*Attorneys for Ross Shapiro*

Defendant Ross Shapiro respectfully submits this surreply memorandum of law in further support of his motion for reconsideration of the Court's Ruling and Order dated June 5, 2018 (Dkt. 504) ("Order").[1] The government's most recent post-hearing brief ("Govt. Br.") (Dkt. 553) continues to press its facile argument that *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), is an irrelevant analog, Govt. Br. at 6, and that *United States v. Gramins*, 939 F.3d 429 (2d Cir. 2019), and *United States v. Johnson*, 945 F.3d 606 (2d Cir. 2019), fatally undermine Mr. Shapiro's due process claim. Govt. Br. at 1.[2] These arguments are baseless. In fact, *Weimert* involved precisely the same types of alleged misrepresentations and economic harm implicated in *Gramins*. The suggestion that Mr. Shapiro had fair notice that the conduct alleged in *Gramins* was criminal, cannot be squared with *Weimert's* undeniable implication to the contrary.[3]

---

[1] The government incorrectly argues that, in advancing his due process claim, Mr. Shapiro relies on "cases whose relevance the Court has rejected." Govt. Br. at 6. Respectfully, the Court did not reach *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), in its prior Order, *see* Ruling and Order dated June 5, 2018 (Dkt. 504) (omitting mention of *Weimert*), which was previously presented to the Court, including in Mr. Shapiro's Rule 29(c) motion, which incorporated his previously submitted due process motion. *See* Shapiro Mem. of Law in Supp. of Rule 29(c) Mot. (Dkt. 475) at 1 n.2. Motions for reconsideration may be granted where "the 'moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" *Channer v. Brooks*, No. 3:99CV2564, 2001 WL 1094964, at *1 (D. Conn. Sept. 10, 2001); *M.K.B. v. Eggleston*, No. 05 Civ. 10446, 2006 WL 3230162, at *1 (S.D.N.Y. Nov. 7, 2006) (same). Indeed, courts have granted motions for reconsideration even in circumstances where they had previously addressed the purportedly overlooked legal authority. *See, e.g.*, *Colon v. Metro-N. Commuter R.R. Co.*, No. 3:13-CV-00325 (JAM), 2017 WL 3283187, at *2 (D. Conn. Aug. 2, 2017) ("Here, I am persuaded that my earlier ruling provisionally admitting the FRA casualty reports and the summaries thereof into evidence was based on a clearly mistaken assumption about the scope of admissible evidence."); *Wellswood Columbia, LLC v. Town of Hebron*, No. 3:10-CV-01467 VLB, 2013 WL 5435532, at *5 (D. Conn. Sept. 30, 2013) ("Upon review of the Plaintiff's motion for reconsideration and re-review of Plaintiff's motion for summary judgment . . . the court retains jurisdiction over count one."). Accordingly, Mr. Shapiro's motion comfortably meets the legal standard for reconsideration.

[2] With respect to Mr. Shapiro's application for reconsideration of the Court's Order denying his motion for acquittal on sufficiency grounds, Mr. Shapiro relies on his prior submissions and joins in the arguments made by co-defendant Gramins.

[3] Notably, neither *Gramins* nor the *Litvak* rulings addressed fair notice challenges.

The government's continued insistence that *Johnson* "erodes" Mr. Shapiro's due process claim is likewise specious. In *Johnson*, a principal deal term -- price -- remained unknown, whereas here, all deal terms were fully negotiated and disclosed, a distinction that *Weimert* deemed highly relevant. *See Weimert*, 819 F.3d at 353-54 (rejecting the argument that the defendant's misrepresentations were material where "all the actual terms of the deal [] were fully disclosed and subject to negotiation"). Thus, *Johnson* is consistent with *Weimert* and provides no assistance to the government.

For these reasons, as more fully explicated below, and those advanced in prior briefing, the Court should reconsider its ruling and enter a judgment of acquittal on Count One of the Indictment as to Mr. Shapiro or, alternatively, dismiss the Indictment as a violation of Mr. Shapiro's Fifth Amendment right to due process.

**I.    Because The Facts Of *Weimert* Are Squarely Analogous To Those Alleged Here, *Weimert's* Holding Compels Dismissal Of The Indictment On Due Process Grounds**

The government's argument that *Weimert* is inapposite and "does not reach" the "facts" presented here, Govt. Br. at 7, is indefensible and should be rejected.

**A.    The Alleged Misrepresentations In *Weimert*, Like Those In *Gramins*, Implicated The Parties' Interests In Consummating The Deal And Affected The Price Of The Transaction**

The government blithely asserts that in *Weimert* "there was no allegation that the lies implicated the parties' interest in doing the deal, or (as would be most analogous to this case) affected the price at which the deal occurred." *Id*. This is simply untrue. In fact, *Weimert* found that the defendant's misrepresentations did, in fact, implicate the parties' interests in consummating the deal and, moreover, affected the price of the deal.

*Weimert* involved a holding company ("ABCW") that owned both a bank ("AnchorBank") and a real estate investment firm ("IDI"). *Weimert*, 819 F.3d at 359. In 2008,

3

during the financial crisis, ABCW and AnchorBank were in danger of defaulting on a loan they had received from another bank. *Id*. In their effort to stave off default, ABCW and AnchorBank sought to raise cash by selling IDI's 50% interest in a Texas commercial real estate project called Chandler Creek. *Id*. The defendant, David Weimert, served as both Vice President of AnchorBank and President of IDI, and was tasked with the job of selling IDI's interest in Chandler Creek. *Id*.

Weimert entered negotiations with two potential buyers, one of which, the Burke Real Estate Group ("Burke"), owned the other 50% interest in Chandler Creek, and ultimately agreed to purchase IDI's interest in Chandler Creek. *Id*. During the negotiations, Weimert made misrepresentations both to Burke as well as to the IDI board of directors. Among other misrepresentations, Weimert falsely represented to the IDI board that Burke wished Weimert to be personally involved in the deal. *Id*. at 361. Weimert also informed the IDI board that he would require a "fee" from IDI to enable him to purchase an interest in Chandler Creek, consistent with Burke's purported wishes. *Id*. Based on Weimert's misrepresentations, the board members "understood that Weimert 'had to be involved or the Burkes were not going to be a purchaser.'" *Id*. at 362.

Thus, contrary to the government's claim that "there was no allegation that [Weimert's] lies implicated the parties interest in doing the deal," Govt. Br. at 7, the *Weimert* Court actually determined precisely the opposite – that the selling counterparty was misled by Weimert to conclude that "Weimert had to be involved" to consummate the deal. *See Weimert*, 819 F.3d at 362. Accordingly, the impact of Weimert's misrepresentations on the counterparty's interest in doing the Chandler Creek deal was comparable to the alleged impact of the misrepresentations in

4

*Gramins* on the interests of Nomura's counterparties in doing trades.[4] In each circumstance, a counterparty was allegedly misled into believing that a concession had to be made to induce a different counterparty to participate in the deal, or trade, as the case may be.

Moreover, the *Weimert* majority, as well as the dissent, both concluded that Weimert's misrepresentations not only "implicated the parties' interests in doing the deal" but also affected the price of the transaction. *See id.* ("According to [an IDI board member] Weimert would not have received his fee or any additional compensation if it had not been tied to The Burke Group deal," and, absent Weimert's fee IDI would have received a higher price); *see also id.* at 370 (Flaum, C.J., dissenting) ("IDI likely would have received a higher purchase price had Weimert not taken a bite out of the deal. IDI received roughly 96 percent, rather than 100 percent, of the purchase price due to Weimert's creation of equity for himself.").

Consequently, the alleged misrepresentations in *Weimert*, like those in *Gramins*, not only "implicated the parties' interests in doing the deal," but also "affected the price at which the deal occurred," thus rendering *Weimert* directly analogous to this case.

### B. The Alleged Misrepresentations In *Gramins*, Like Those in *Weimert*, Concerned The "Preferences And Values" Of The Counterparties

The government also attempts to draw a false distinction between the allegations in *Weimert* and those in *Gramins*, contending that the former involved the "'preferences and values' of the counterparties" while the latter purportedly did not. Govt. Br. at 7. In fact, under *Weimert*, all misrepresentations in negotiations regarding what other counterparties "desire" constitute misrepresentations about the parties' "preferences and values." *See Weimert*, 819 F.3d

---

[4] The government acknowledges that in *Weimert*, the "core misrepresentations were the defendant's lies to (among others) his board of directors about a third party's preference that the defendant economically participate in the sale of real estate from the defendant's company to the third party," Govt. Br. at 7 (citing *Weimert*, 819 F.3d at 365-66), but ignores the reality that these were misrepresentations of fact akin to those made in *Gramins*.

5

at 366 (characterizing the misrepresentations made to IDI as deceptions about "negotiating positions" which constitute "the preferences, values, and priorities . . . of other parties" and distinguishing the foregoing from "the nature of the asset [IDI] was selling or the consideration [IDI] received" about which "IDI was not misled."); *see also id.* at 358 ("Deception about negotiating positions -- about reserve prices *and other terms and their relative importance* -- should not be considered material for purposes of mail and wire fraud statutes.") (emphasis added).

  The alleged misrepresentations in *Gramins* regarding the willingness of other parties to purchase or sell at particular bid and offer prices fall squarely within the contours of what *Weimert* characterizes to be the "preferences and values" of "other parties." As noted above, such misrepresentations about "preferences and values" may affect both a counterparty's "interest in doing the deal" as well as "the price at which the deal occurs," but are, nevertheless, immaterial under *Weimert* for purposes of the criminal fraud statutes. The Second Circuit's contrary position, that the materiality of the Nomura defendants' alleged misrepresentations is a jury matter, cannot be squared with *Weimert's* holding that "deception about negotiating positions -- about reserve prices and other terms and their relative importance -- should not be considered material." *Id.*

  Accordingly, Mr. Shapiro lacked fair notice, under the Due Process Clause of the Fifth Amendment of the United States Constitution, as to whether the alleged "deceptions" in this case were potentially criminal in accordance with the Second Circuit's view, or "not criminal" in accordance with the Seventh Circuit's view. *See id.* at 357 ("Buyers and sellers . . . will often try

to mislead the other party about the prices and terms they are willing to accept.  Such deceptions are not criminal.").[5]

## II.     *Johnson* Does Not Undermine Mr. Shapiro's Due Process Claim

The government continues to propound the simplistic (and mistaken) view that the holding in *United States v. Johnson*, that "misrepresentations about how the price would be determined" can be material, undermines Mr. Shapiro's due process claim.  Govt. Br. at 8-9; *see also* Govt Br. at 6 ("*Johnson* held that price-related lies can be material and thus do not offend principles of due process and fair notice.").  This claim too is baseless.

As explained in Mr. Shapiro's reply to the government's opening post-appeal brief, the misrepresentations in *Johnson* were made to Cairn Energy ("Cairn"), a client of the defendant's employer, HSBC, and related to how HSBC would trade currencies on behalf of Cairn, in the period ahead of the "fix."  *See* Shapiro 1/6/20 Reply (Dkt. 545) at 2-3.  The *Johnson* Court rejected the defendant's claim that he lacked fair notice that his conduct was illegal on grounds that there was no specific bar to trading in advance of the fix (also referred to as "frontrunning") and opined that Johnson was not convicted of frontrunning, but rather of "making material misrepresentations . . . about how HSBC would trade ahead of the fix and the price would be determined."  *Johnson*, 945 F.3d at 615 (emphasis in original).  Critically, the *Johnson* counterparty had not agreed to a specified all-in price but, rather, remained at the mercy of HSBC, which unilaterally affected the price of the transaction (through its trading, about which it had misled Cairn) which it disclosed to Cairn only after the fact.  By contrast, in this case, as in

---

[5] *See also Weimert*, 819 F.3d at 357 ("From strands of case law, it is true, one can piece together a mail or wire fraud case based on such deception about negotiating positions . . . First, information about a party's negotiating position is surely material in the sense that it is capable of influencing another party's decisions.  Second, actionable deception can include false statements of fact, misleading half-truths, deceptive omissions, and false promises of future action . . . But Congress could not have meant to criminalize deceptive misstatements or omissions about a buyer's or seller's negotiating positions.").

7

*Weimert*, all contract terms had been negotiated and disclosed to all counterparties at the time each transaction was consummated.

In addressing *Johnson* in his prior submission, Mr. Shapiro referenced Judge Kaplan's analysis in *United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438 (S.D.N.Y. 2013) ("*BNYM*"), not to rely on *dictum*, as the government suggests, Govt. Br. at 10-11, or to insinuate that Judge Kaplan's decision "limits the Second Circuit's holding in *Johnson*," *id.* at 11, but only to highlight a securities case in which an eminent jurist deemed this very distinction (*i.e.* between a negotiated agreement that incorporated all of the essential deal terms, including price, and one that did not) crucial in assessing the materiality of the alleged misstatements.  In the latter case (where all of the essential terms had not been negotiated), Judge Kaplan deemed misrepresentations about best-execution to be material.  However, he explained (in *dictum*) that in the former case (where the parties negotiate all of the essential terms of the contract), misrepresentations about how the price was arrived at would not be material.  *See* Shapiro 1/6/20 Reply (Dkt. 545) at 4-6.  In recognizing this vital distinction, both *Johnson* and *BNYM* comport with *Weimert* and neither offers any support to the government's claim to the contrary.[6]

The government nevertheless further intones that *Johnson* is persuasive that fair notice was satisfied here because both cases involved "misrepresentations [that] affected [the victim]'s

---

[6] Eliding this critical factual distinction, the government attempts to dismiss Judge Kaplan's analysis in *BNYM*, postulating that "this case is simply a garden variety application of well-established fraud statutes in a different market than in *BNYM*," Govt. Br. at 11, a stunning assertion in view of (1) two opinions of the Court of Appeals vacating judgment in the *Litvak* case, and a lengthy opinion vacating the new trial order in *Gramins*, which observed that "the materiality question here is inherently difficult," *see Gramins*, 939 F.3d at 455; (2) this Court's acknowledgment of due process concerns arising from the instant prosecution, *see* Order at 8 ("I agree with the defendants that this case raises due process concerns with regard to both fair notice and discriminatory enforcement"); (3) the testimony of the government's own witnesses that subject misstatements were common in the marketplace and not understood to be illegal until the government brought forward the *Litvak* prosecution in 2013, *see* Dkt. 400 at 4 (citing testimony), Dkt. 486 at 14 (same); and (4) the jury's failure to convict Mr. Shapiro of *any* count of the Indictment.

decisionmaking and deprived it of the right to control its assets." *See* Govt. Br. at 9, 10, 11, 12 (citing *Johnson*, 945 F.3d at 615-16). First, this claim is misguided because, unlike in *Johnson,* the Court's jury charge in this case did not include a "right to control" instruction. Second, this claim is baseless because, unlike in *Johnson,* the price and all other terms of the contract were disclosed to all of Nomura's counterparties. Consequently, while the misled counterparty in *Johnson* was deceived about "how the price of the transaction will be determined" and thus "deprived of the right to control its assets," *Johnson*, 945 F.3d at 615-16, in contrast, the counterparties here, and in *Weimert*, negotiated, and were apprised of, all of the terms of the contract, including price, and were, therefore, not deceived materially or deprived of their right to control their assets. It is precisely this distinction, which the government claims to be "manufacture[d]," *see* Govt. Br. at 9, that both *Johnson* and *Weimert* deem critical. Indeed, under *Weimert*, such disclosure of the negotiated contract terms, including price, forecloses criminal liability. *See Weimert*, 819 F.3d at 370 ("[P]articularly in light of the rule of lenity invoked in *Skilling*, 561 U.S. at 410-11, 130 S.Ct. 2896, we do not believe the government has proven criminal wire fraud in the circumstances of this unusual, and seemingly unprecedented, prosecution. This is not a case where a party used a secret side-deal to induce a victim to part with an asset at a discount. *The final contract terms were in plain view and were in fact discussed and negotiated by the interested parties*. We leave the civil law issues and remedies for civil cases.") (emphasis added).

     Accordingly, consistent with fair notice principles, the single open count should not be resubmitted to a jury because Mr. Shapiro lacked fair notice as to whether misrepresentations made in principal-to-principal negotiations, involving sophisticated parties, to whom all deal terms had been disclosed, were: (i) potentially illegal, in accordance with the Second Circuit's

view that such deceptions may be deemed material by a jury, or (ii) irrefutably legal in accordance with the Seventh Circuit's view that such deceptions "are not criminal."

\* \* \*

For these reasons and those advanced in prior briefing, the Court should reconsider its ruling and enter a judgment of acquittal on Count One of the Indictment as to Mr. Shapiro or, alternatively, dismiss the Indictment as a violation of Mr. Shapiro's Fifth Amendment right to due process.

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By: /s/ Guy Petrillo
Guy Petrillo (CT19924)
Joshua Klein (PHV07748)
Amy Lester (PHV08919)
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile:  (315) 873-2015
*Attorneys for Ross Shapiro*

**CERTIFICATION OF SERVICE**

  I hereby certify that on April 17, 2020, a copy of foregoing Surreply in Further Support of Ross Shapiro's Motion for Reconsideration Pursuant to Local Rule 7(c) was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
    April 17, 2020

                    /s/ Leonid Sandlar
                  Leonid Sandlar (PHV07700)
                  655 Third Avenue, 22nd Floor
                  New York, New York, 10017
                  Telephone: (212) 370-0330
                  Facsimile:  (315) 873-2015
                  lsandlar@pkbllp.com