UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA      :   No.  3:15CR155(RNC)
                              :
         vs.                  :
                              :
ROSS SHAPIRO, ET AL,          :
                              :   HARTFORD, CONNECTICUT
               Defendants.    :   May 7, 2020
                              :
- - - - - - - - - - - - - - - x


ORAL ARGUMENT VIA TELEPHONE CONFERENCE
VOLUME II


     BEFORE:

          HON. ROBERT N. CHATIGNY, U.S.D.J.








                              Darlene A. Warner, RDR-CRR
                              Official Court Reporter

1    APPEARANCES:

2

        FOR THE GOVERNMENT:
3
            U.S. ATTORNEY'S OFFICE-NH
4            157 Church Street
            P.O. Box 1824; 23rd Floor
5            New Haven, Connecticut 06510
            BY:  HEATHER L. CHERRY, AUSA
6                DAVID E. NOVICK, AUSA

7        FOR ROSS SHAPIRO:

8            PETRILLO, KLEIN & BOXER LLP
            665 Third Avenue
9            22nd Floor
            New York, New York 10017
10            BY:  GUY PETRILLO, ESQ.
                JOSHUA KLEIN, ESQ.
11
            REID & REIGE
12            One Financial Plaza
            755 Main Street, 21st Floor
13            Hartford, Connecticut 06103-3185
            BY:  THOMAS V. DAILY, ESQ.
14
        FOR MICHAEL GRAMINS:
15
            BRACEWELL & GIULIANI, LLP
16            1251 Avenue of the Americas
            49th Floor
17            New York, New York 10020-1100
            BY:  MARC L. MUKASEY, ESQ.
18                ROBERT S. FRENCHMAN, ESQ.
                JEFFREY B. SKLAROFF, ESQ.
19

20

21

22

23

24

25

1                              2:00 P.M.

2

3              THE COURT:  Good afternoon everyone.  This is a

4    continued argument in the Shapiro case.  Let me begin with

5    the appearances of counsel, please, starting with counsel

6    for the government.

7              MR. NOVICK:  For the government, David Novick

8    and Heather Cherry.  Good afternoon, Your Honor.

9              THE COURT:  Good afternoon.

10             MR. KLEIN:  For Mr. Shapiro, it's Josh Klein,

11   Guy Petrillo, and the Shapiro team.  Tom Daily is also on

12   the line on behalf of Mr. Shapiro, and Mr. Shapiro himself

13   is on the line.

14             Good morning, Your Honor.

15             THE COURT:  Good afternoon.

16             MR. MUKASEY:  Hi, Judge, this is Marc Mukasey

17   along with Jeff Sklaroff, and the rest of our team, for

18   Mike Gramins who is on the phone, as are several members

19   of his immediate family.

20             THE COURT:  Good afternoon.

21             When we broke up last time, as I recall,

22   Mr. Novick was presenting comments on behalf of the

23   government; and on that understanding, why don't we pick

24   up from where we left off.

25             Mr. Novick, you're welcome to proceed.

1                    MR. NOVICK:  Thank you, Your Honor.

2              Your Honor, I'm going to, hopefully not take too

3    long, but address a few additional points that counsel

4    made during oral argument last time, and I'm going to

5    start with an additional point with regard to their

6    representation of the Weimert case.

7              Your Honor, I last time talked about that the

8    key points that the government has to make here is that

9    this is a 2016 case.  It could not provide guidance to

10   anyone who was operating in 2011, '12 and '13.  And,

11   unlike Johnson in the Second Circuit, it doesn't actually

12   discuss due process and, of course, is not a Second

13   Circuit case.

14             But beyond that, I know we got into discussion

15   over factual distinctions between the cases in the

16   government's view rendering it's irrelevant in

17   consideration of any due process issue in consideration of

18   the facts in this case.  In other words, even if it was a

19   2011 case, it would have no bearing on what someone could

20   reasonably understand was permissible back then.

21             And so I just wanted to -- and I raised a number

22   of those points last time, but I wanted to just go on a

23   little bit based on what in Klein talked about last week.

24             Mr. Klein claimed that the cases are similar

25   because the defendant Weimert was also acting as an

1  intermediary between two other parties and that a stake in

2  the deal was essentially a fee for facilitating the deal.

3  I understand that may be how Mr. Klein is framing it, but

4  that's not, in the context of the Court's discussion, how

5  the Court framed what was going on.

6  What the Court specifically said, the Seventh

7  Circuit specifically said on page 366 of the opinion, was

8  that it was looking at it viewing it in that context as a

9  three-party arm's length deal in which Weimert ended up

10  with a piece of the property.  Factually distinct from the

11  case here.

12  Here, under our factual scenario and the way the

13  Second Circuit has -- and the Court frankly -- have viewed

14  the case, is that Nomura is participating, the defendants

15  are participating, only as a --

16  THE COURT:  Mr. Novick, I need to ask you to

17  please pause for a moment.  I'll be right back.

18  MR. NOVICK:  Certainly, Your Honor.

19  (Pause)

20  THE COURT:  Thank you, Mr. Novick.

21  MR. NOVICK:  Certainly, Your Honor.

22  And so, as I say, this is not the way the Court

23  and the Second Circuit have termed or framed the situation

24  here.

25  Under this factual scenario, Nomura participates

1    only as a passer; in other words, does not have a

2    continued stake in the RMBS, and is getting paid not for a

3    piece of the bond, not for being a participant ultimately

4    in the final transaction, but essentially for the service,

5    the act of brokering the bond, the services provided of

6    moving the bond from one party to another. And that's how

7    the circuit has framed it.

8              And then in that framework, the lie that then

9    the defendants and Nomura tell go precisely to the core

10   term of the services providing, that is the markup of a

11   commission on the bond.

12             And, Your Honor, the fact that our case, that

13   this case is an intermediated transaction as opposed to a

14   tri-party transaction, matters in a way that you compare

15   the cases.

16             Because in Weimert, with the three-part arms

17   length transaction, there was nothing to prevent, for

18   example, IDI from going to the Burkes and asking whether

19   they can cut out Weimert, who was just another deal

20   participant in this three-party deal.

21             And that's why, I think, Your Honor, the Seventh

22   Circuit framed his lie about whether the sellers wanted

23   him in the deal at all as a lie that, quote, amounted to

24   no more and no less than a false prediction about how the

25   Burkes would respond to a counter offer to exclude

1    Weimert's participation.  In other words, deception about

2    a parties' negotiating position, end quote.

3              In other words, the Court characterized the

4    nature of the lies fundamentally differently than the lies

5    in this case.

6              Here the RMBS market was set up to make Nomura

7    and these defendants the only people who knew the identity

8    of the other counterparty; they were not part of a

9    tri-party agreement where they would have an ultimate

10   stake in the deal or claim the intermediary between two

11   parties that didn't know each other.

12             Thus, when the defendant lied specifically about

13   the sell or offer price on the other side of the

14   intermediated deal; and so every dollar they lied about

15   was a dollar in their pocket at the expense of the victim.

16             Now, as the Second Circuit characterized it,

17   showing to negotiate the compensation at the term of the

18   deal, and so lies about it affected the price at which the

19   deal was done.  It wasn't a lie about the fact that Mr.

20   Gramins lied about an economic component of the deal; that

21   is, Nomura fee for its service of brokering the deal.

22             Your Honor, so in short these are factually

23   distinguishable cases that provide -- even if it was

24   relevant, even if it was a 2011/12 case -- would not

25   provide any guidance, and certainly does not demonstrate

1   any confusion as to the ultimate point here; and that is

2   whether it was a due process point, whether someone be on

3   notice that the conduct in this case would run afoul of

4   the law.

5         And I would quote from also the Peters SEC case,

6   this SEC case, where the Court, the District Court in New

7   York notes that, quote, Peters unpersuasively relied on

8   the Second Circuit's decision in Weimert.  That case does

9   not appear to address the allegations presented here, i.e.

10   that Peters misstatements were deceptions about the price

11   Nomura had paid for the RMBS, closed quote.

12         With that, Your Honor, I'll move on from

13   Weimert, unless the Court has questions.  I made

14   additional points last time, but I wanted to make sure to

15   have added that.

16         THE COURT:  No, that's fine, thank you.

17         MR. NOVICK:  Thank you, Your Honor.

18         I want to move on to a question of the standards

19   for due process and the question the Court asked last time

20   of Mr. Klein.

21         The Court asked Mr. Klein whether the person of

22   ordinary intelligence in the context of due process was

23   someone like Shapiro in the industry as opposed to just

24   the ordinary person on the street, just the generic person

25   of ordinary intelligence, and Mr. Klein said that in fact

1    it was a person like Shapiro in the industry or Gramins in
2    the industry; and, Your Honor, that is fundamentally
3    wrong.  I hear no support that the defense has provided
4    for that, nor do I see in their briefing any argument that
5    that's in fact the case.

6         Due process does not consider industry practice,
7    it does not consider what is going on around the industry.
8    It simply asks whether a person of ordinary intelligence
9    would understand from the statute that the particular
10   conduct at issue is prohibited.

11        The issue raised by counsel and the question
12   posed by the Court is one of ultimately subjective intent
13   to harm.  In other words, did the defendant know it was
14   wrong to take these actions?  Did the defendant intend to
15   harm another through those actions?

16        Due process, on the other hand, Your Honor, is
17   an objective analysis, and there are a number of cases on
18   this point.  I know Your Honor is aware of many of them.

19        Just by way of one example:  The Dickerson case
20   from the Second Circuit in 2010, when the Court says that
21   the standard for due process has been rejectable.  The
22   Court asks whether the law presents an ordinary person
23   with sufficient notice of or the opportunity to understand
24   what conduct is prohibited, not whether a particular
25   plaintiff actually received warning that alerted him or

1   her to the danger of being held to account for the

2   behavior in question.

3           It is an objective standard, Your Honor.  It is

4   not whether these defendants in this industry under these

5   circumstances knew what they were doing was wrong.  That

6   is a different question.  That is a question of

7   willfulness that the Court addressed separately, and it

8   was ultimately a jury question.

9           And I would add, Your Honor, that Litvak I in

10  some ways speaks -- the Second Circuit in Litvak I in some

11  ways speaks to this.

12          Litvak I held that the district court improperly

13  excluded evidence that Litvak supervisors also engaged in

14  the conduct on the grounds that it could be relevant to

15  good faith.  In other words, the Court should have allowed

16  that evidence on the ground that it could be relevant to

17  good faith.  That is Litvak's belief that his conduct was

18  wrong.

19          And that argument was permitted here, as Your

20  Honor is a well aware.  Not just that supervisors were

21  doing it, but the argument -- although government would

22  submit that the defense did not effectively make this

23  point -- the argument that others are doing it impacted

24  willfulness, impacted knowledge of what they were doing

25  was wrong.

1          The Court in Litvak I then specifically goes on

2    to note that if that evidence had been allowed in, the

3    district Court would then have properly prohibited a

4    defense argument, that because everyone was doing it, it

5    wasn't illegal.  Why?  Because legality or illegality of

6    particular representations does not turn on common

7    practice.  It can't.  That's not how the law works.  It is

8    irrelevant for the purposes of due process for, for the

9    purposes of what the law actually prohibits.  Subjective

10   intent plays no role here.

11         However, what I would add, and the Court

12   addressed this a little bit last time in some of its

13   questions, that subjective intent does play a role in the

14   other direction, and that keys into the discussion that we

15   had about Carpenter.

16         The defense argued that the Court analysis of

17   Carpenter in its order was wrong because it included

18   reference to the jury's determination.  Now, we address

19   this argument in our response to reconsideration, the

20   initial response, Your Honor, for the reconsideration

21   motion back in 2019; and I think the Court hit upon the

22   same point last time, and the Court can restate to clarify

23   now.  But as I understand from the Court's order and the

24   statement the Court made, that the Court has both ruled on

25   due process as a matter of law, but also noted that, given

1    its concern, the Court asked the jury to pass on due

2    process as well, particularly at the defendants' request.

3              And that raises an important point, the Court

4    noted last time, that where there is a standard

5    requirement, where there is a requirement of intent to

6    harm with knowledge, and in this case willfulness, it's

7    really difficult to support a claim that there's not fair

8    notice.

9              And as Your Honor is aware, and I think quoted

10   some of these cases in your order, there's a well-settled

11   principle, I think sort of begins with the Screws case

12   from 1945 which said that, quote, where the punishment

13   imposed for an act knowingly done with the purposes of

14   doing what the statute prohibits, the accused cannot be

15   said to stop from lack of knowledge or warning that the

16   act he did was a violation of law, closed quote.

17             This would have been sufficiently met, Your

18   Honor, if the Court only had instructed on intent

19   to defraud.  In other words, if the Court just had just

20   required the jury to find that the defendant had acted

21   with the intent to defraud, the government believes that

22   that more than satisfies the standard that an ordinary

23   person, a person of ordinary intelligence, would know that

24   acting with the intent to cheat someone else out of money,

25   to defraud someone else out of money, puts them on the

1   wrong side of the law, risks prosecution.

2           The Court actually went beyond that, and at the

3   defendants' request, and instructed on a particularly

4   strict requirement that not just required intent to

5   defraud, as we had suggested, but also that the defendant

6   intentionally did a wrongful act that involved a

7   significant risk of affecting the violation of the

8   securities law.

9           In other words, the person of ordinary

10  intelligence would know that acting with the intent to

11  defraud another person about material matters, that was

12  wrongful and significantly risked the violation of the law

13  and could be prosecuted.

14          In the way that the Court had framed the

15  question to the jury, due process is pretty close to

16  actually matter, Your Honor.  And given the way -- in

17  short, given the way the Court instructed the jury, there

18  should be zero question about due process here.  Because

19  anybody would understand that acting with the intent to

20  break the law, acting with the intent to do something

21  wrongful to defraud another is proscribed.

22          THE COURT:  Mr. Novick, picking up from there, I

23  think that you're right in focusing on this aspect of the

24  case; and taking it one step further, it would be helpful

25  if you could do your best to recall the evidence that

1  permitted the jury to convict in accordance with that

2  instruction.

3          MR. NOVICK:  Certainly, Your Honor.

4          THE COURT:  I can rephrase that.

5          If consciousness of wrongdoing supplies a proxy

6  for fair notice in accordance with due process, what

7  evidence did the jury have to accord a finding beyond a

8  reasonable doubt that Mr. Gramins knew his conduct was

9  wrongful?  What matters of fraud were presented by the

10  evidence against Mr. Gramins.

11          MR. NOVICK:  Many things, Your Honor, and I

12  think the Court to some degree hit on many of the key

13  points in its order on pages 6 and 7 of the order in

14  talking about willfulness.  Because ultimately, if

15  willfulness -- if the existence of a willfulness

16  requirement, which is a jury question, that's what --

17  that's the point I'm making, Your Honor, that the

18  existence of a willfulness requirement makes due process a

19  foregone conclusion.

20          In looking at the evidence that the court

21  marshaled and another marshaled in favor of due process,

22  particularly in favor of willfulness, the Court cited to,

23  in part, testimony that everybody understood, everybody I

24  mean the co-conspirators -- even the victims understood

25  that these lies was harmful to the counterparties and the

1  purpose of the lie was to trick the counterparty into

2  making the -- trick the counterparty -- the victim, into

3  making them think that the defendants were working for

4  them.

5          There's the element of concealment that they

6  were hiding from their victims the facts, the true prices

7  that were being traded on the other side.

8          There are the compliance policies and the FINRA

9  regulations, all of which that in black and white are the

10 standards of conduct under Rule 10(b)(5) and the antifraud

11 provision which emphasized, you know, the criminality of

12 making material misrepresentations.

13         Now, ultimately, Your Honor, the defense was

14 free to argue that the facts that the co-conspirators, the

15 junior traders on the desk, believed that what they were

16 doing was not illegal or didn't think of it in legal

17 terms, is certainly something that the defendants could

18 argue from to say that they -- to infer that the

19 defendants also legitimately held that belief.  But that

20 doesn't mean the jury needed to either:

21         A, accept the co-conspirators' view as an honest

22 one, nor did it mean the jury needed to accept that view

23 as one that was honestly held by their supervisors; that

24 is, Mr. Shapiro and Mr. Gramins has honestly held.

25         I know the defense, through the course of the

1    trial, tried to relate that they too, these defendants

2    too, were trained by others to do this.  But there was no

3    real evidence on that score.

4            And ultimately that the jury could view and

5    could draw inferences from the fact of these rampant

6    material misrepresentations made by the defendants that

7    they understood were designed to injure their

8    counterparties, to materially affect their -- materially

9    injure them economically, and to conclude from that that

10   that can't be proper, that that can't be legal.

11           And that to the extent that, you know, the

12   counterparties believed -- excuse me -- the

13   co-conspirators testified otherwise, that that was not

14   a -- either not an honest belief or one that they -- the

15   one that they did not ascribe to the defendants here.

16           And, frankly, can conclude from the fact that

17   they received all of its training from the others in the

18   market, including Mr. Raiff, who testified that we were

19   not, as suggested, that it was proper to do this way.

20   Mr. Abbas said he didn't understand this was a proper way

21   to trade when he was trading at Credit Suisse.

22           All of that together, Your Honor, made

23   ultimately more than sufficient evidence for the jury to

24   conclude that the defendants acted willfully here.

25           THE COURT:  Okay.  With regard to concealment,

1  what is the state of the record on concealment?

2          In other words, what does the evidence show

3  Mr. Gramins did to conceal his activity?

4          MR. NOVICK:  Certainly, Your Honor.

5          Both Shapiro and Gramins, but Gramins in

6  particular, were concealing their activity by talking --

7  excuse me -- by talking to each counterparty separately,

8  not accurately conveying the information that was being

9  provided from one counterparty to the other, concealing --

10  and I would say the 2013, the post-Litvak trade, that's a

11  good example of this.  That he and Romanelli are

12  conspiring with one another talking about how they are

13  going to get their story straight in talking to Wollman

14  and the other counterparty in doing that deal.

15          So I would say, Your Honor, that is a

16  fundamental part of this.  What I talked about before,

17  where Nomura, in this construct, is sitting between two

18  counterparties who don't know each other.  Their ability

19  to conceal information and to control information from the

20  other was critical to allow this fraud to happen.

21          THE COURT:  Is there evidence of Mr. Gramins

22  seeking to alter records or fabricate records?  Anything

23  of that sort?

24          MR. NOVICK:  That's not our case, Your Honor,

25  no.

1          This is about him, you know, lying to his

2    counterparties about information coming from the other

3    counterparty.

4          THE COURT:  Is there any evidence that Nomura

5    violated any SEC or FINRA rule or regulation or guidance

6    with regard to what was stated in the confirmations of the

7    trades?

8          I do not have expertise in securities

9    regulations unfortunately, but my rough understanding is

10   that the regulatory bodies have created rules that require

11   certain disclosures and confirmations of trades; and I

12   wonder if there are any such rules or regulations or

13   guidance that would be relevant to assessing Mr. Gramins'

14   consciousness of wrongdoing, particularly with regard to

15   failure to disclose, as perhaps required by such a rule or

16   regulation or guidance.  Is there anything like that in

17   this case?

18          MR. NOVICK:  No, Your Honor.  We are not relying

19   on a regulation with regard to the confirmation; and, in

20   fact, our argument all along here -- first of all, the

21   confirmations are an automatic process as a result of the

22   transactions having occurred.  But the rule that we're

23   relying on here is 10(b)(5).  And the cases that we've

24   cited a number of times says very clearly that 10(b)(5) is

25   to be construed flexibly given its purposes.

1          And I would argue, Your Honor, that there is no

2     need nor would we expect there to be a specific regulation

3     putting each individual industry and each individual

4     circumstance on notice that they could be prosecuted for

5     committing a fraud with the intent to harm another by

6     making material misrepresentations.

7          You know, I would argue that in the securities

8     industry, which is a heavily regulated industry where

9     folks need to go through training to tell them about

10    10(b)(5) and the risk of if you lie, you can be -- and if

11    you intend to defraud another, you know, you can be

12    prosecuted and sued civilly.  That that's sufficient, and

13    that that should actually project a higher bar, a higher

14    standard that we hold for instance in the industry rather

15    than a lower one.

16          THE COURT:  Okay.  I follow you, I think.  Let

17    me just pursue this briefly.

18          Am I right that there are disclosure

19    requirements for confirmations because of the conflict of

20    interest that can arise when you have somebody acting as a

21    broker-dealer in circumstances where they're looking for a

22    commission and their interest in the commission creates a

23    conflict of interest for the customer?  Am I right that

24    there is some regulatory authority that says you need to

25    disclose information?

1          MR. NOVICK:  Your Honor, I'm sure there are.  It

2    is not a -- I believe there are.  It is not a part of our

3    case, nor are we relying on that.

4          THE COURT:  But in the context of the due

5    process argument --

6          MR. NOVICK:  I guess my point -- I'm sorry, Your

7    Honor.

8          THE COURT:  -- it would be helpful for me to

9    know if there is a regulation that was relevant to

10   whatever was disclosed.

11          In other words, if concealment is probably, you

12   know, the most ancient and open form of evidence

13   manifesting awareness of wrongdoing, similarly failure to

14   comply with or somehow evading a regulation that would

15   require disclosure of the information would be relevant,

16   right?

17          So granting that is not a part of this case, I'm

18   just curious what you can tell me about that.

19          MR. NOVICK:  Your Honor, my response is again to

20   go back, the only regulation that we are relying on is

21   10(b)(5).  We are not relying on, nor is there a fulsome

22   record that would support an argument of concealment such

23   that it could be part of the record in this case.  I am

24   not relying on any disclosure obligation.

25          I agree and have argued repeatedly, and the

1    Second Circuit agrees, that as a matter of these

2    confirmations, these are certainly principal to principal

3    transactions.  We have said that repeatedly.  There is no

4    expectation or requirement in the confirmations that mark

5    up the disclosed.

6         What happens is how the Second Circuit treated

7    this; that in a transaction, an RMBS transaction or a BWIC

8    transaction, the defendants didn't have to, certainly did

9    not have to disclose the markup.  But when they make that

10   part of the process, in other words, the negotiation, when

11   they specifically negotiate for it, that itself can be

12   material.

13        So, again, I'm not relying on any statement in

14   the disclosure.  The opposite.  What I'm doing here, Your

15   Honor, is saying those are entirely irrelevant.  We're not

16   relying on them.  I want to make clear that we're not

17   relying on that.

18             THE COURT:  Right.

19        In a related vein, can an argument be made that

20   the information that was disclosed in the confirmations

21   risk revelation of the scheme by other market

22   participants, because a person who understood that he was

23   selling at a certain price would see that the price was

24   different?

25             MR. NOVICK:  No, Your Honor, because the lie is

1    about what the other party was buying or selling to or

2    from Nomura.

3           In other words, the party on one side of the

4    transaction -- and this is critical, Your Honor, critical

5    to the understanding of the RMBS market -- did not speak

6    what the transaction on the other side was, so had no

7    transparency with regard to what Nomura's markup actually

8    is.

9           And as the Court is aware in this period of

10   time, there was no opportunity to know that.  That's the

11   way it was set up, and that's what enabled Nomura and the

12   defendants to commit this crime.

13          THE COURT:  Do you know if it's different today,

14   Mr. Novick?

15          MR. NOVICK:  I don't know the answer to that,

16   Your Honor.

17          THE COURT:  Also in a related vein, there was

18   evidence in this case that the victims, one or more of

19   them, would be contempt to transact with the defendants

20   again; and there was also evidence that if a trader got

21   caught doing this, the trader would go to the penalty box

22   for some period of time, but would be back in the game at

23   some point thereafter.

24          Does any of that matter to the due

25   process/willfulness analysis?

1            MR. NOVICK:  No, Your Honor.  I think those were

2    arguments -- well, let me back up.

3            Those arguments were a part of the materiality

4    question for the jury here as to whether -- and certainly

5    evidence that a particular trader went in the penalty box

6    for some period of time was certainly evidence that it

7    mattered, that the lies mattered to the victim.  They're

8    not going to, you know -- well, they may -- excuse me, let

9    me back up.

10           The fact that Eric Marks might trade with that

11   particular person again is a function of whether or not

12   that person has a bond that they need; and in that

13   instance, I think what was said is that they would view

14   their information differently.

15           And I think certainly, you know, all of that

16   goes into the materiality question that the jury had the

17   last word on.

18           But from a due process standpoint, in other

19   words, from looking at it in the perspective of a person

20   of ordinary intelligence, what would they have understood

21   about what put them on the wrong side of the law, again I

22   have to go back to the idea that if you are acting and

23   making misrepresentations in a way that is designed to

24   deceive another in a way that harms them economically, it

25   is hard to fathom that that does not put you on reasonable

1    notice, on fair notice, that what you're doing is on the

2    wrong side of the law.

3              THE COURT:  Okay, thank you.

4              MR. NOVICK:  Your Honor, I'll move on then.  I

5    was going to briefly touch on Johnson, which I know the

6    defense spent comparatively very little time on last time,

7    which I think is curious given that this is a -- Johnson

8    is a 2019 due process case.

9              It is certainly true that Johnson would not be

10   relevant to someone in 2011, 2013 as the defense noted,

11   but that's not why I suggested that it is relevant.  It's

12   relevant because it is the most recent statement by the

13   Second Circuit from just last year on a due process case

14   in a bond context.  And we agreed there may be

15   distinctions in the fact patterns.

16             But ultimately the case is about how price will

17   be determined, not about how the value of the underlying

18   price be, but how price shall be determined.  We've

19   discussed this at length in our briefs.

20             I'm not going to rehash everything that's said

21   but ultimately the circuit found no due process issue

22   there and I would argue, Your Honor, that it's an easier

23   case here than in Johnson.

24             In Johnson was ultimately was argued as a right

25   to control case, you know, where the lie was a little bit

1    more removed from the ultimate economic harm than we have

2    here.  The lie in Johnson was much more like in Binday,

3    which I know Your Honor is well aware of.  It's just

4    about -- it's a little bit more separate from the ultimate

5    economic harm.

6            We didn't have that issue here.  Our evidence at

7    trial is a fraudulent process in Nomura which equated to

8    the loss to a victim.  Not a decision that might have

9    affected loss down the line, and that's the point we're

10   making in the briefing.  That this is an easier case than

11   Johnson because the intent to cause harm was directly

12   apparent and the circuit had no problem with that from the

13   due process standpoint because this is what the fraud

14   statute has long been held to cover; that is, fraud with

15   the intent to deceive others about material matters with

16   the intent to defraud.

17           Before I close, Your Honor, I will briefly touch

18   on Bogucki, which is a Central District of California

19   case -- excuse me -- Northern District of California case

20   that was talked about in a briefing and a little bit last

21   time, and I'll touch on it briefly.

22           Ultimately it's a factually distinct fact-bound

23   decision by the district court in California, and it's

24   largely driven by the specific words that were used in the

25   course of that relationship.  The Court specifically

1  addressed five lies not just on materiality, but also on

2  whether they were really lies.

3          For example, one of the lies was that they were,

4  quote, not touching the market, which the Court noted, it

5  could be understood in multiple ways.  Another lie that at

6  most was a conditional lie, and another alleged lie with a

7  bullet point and a presentation that confidentiality was

8  important.

9          None of these even approximate the

10  misrepresentations here.  Whereas, I understand, in

11  looking back over the arguments made by counsel, from the

12  very beginning in many statements, the defense had

13  conceded are actually lies.  Naturally, because these are

14  clearly articulated obvious lies the defendants were

15  making.

16          I understand what attracted the defense to this

17  case was the reference to due process.  But given all

18  these factual discrepancies, there's really nothing in the

19  facts of the case that were recommended to the Court here.

20  And the reference to due process ultimately appears to be

21  driven by the fact that the lies may not even be lies, let

22  alone material, which is not the issue here.

23          So finally, Your Honor, I'll wrap up by going

24  back to one of the questions that Your Honor asked me last

25  time, and that was:  From a due process standpoint, what's

1   the rule?  How do you advise -- if you're a lawyer, how do

2   you advise your clients -- if you're in compliance, how do

3   you advise an employee?

4         And I don't think it's difficult.  I think it

5   is -- you know, I think you can say "don't lie," that

6   would be the easiest thing, which is what Nomura's

7   compliance department said.  But you can nuance it a

8   little bit and say "don't like with the intent to defraud

9   others.  If you're lying with the subjective intent to

10   defraud others, you may be on the wrong side of the law.

11   If you're lying about something an objective investor

12   could find important, you're too close to the line," and

13   that's easy in most cases, in our view.

14         Just like here, these defendants knew that it

15   was material.  Otherwise they wouldn't have done it, and

16   you see that repeatedly in the evidence.

17         How do we know, Your Honor, ultimately that they

18   intended to defraud these victims?  Well, you heard it in

19   the co-conspirators' testimony, but the most important

20   piece of evidence is simply that they did it and it was

21   successful, and they did it over and over again.

22         And the Second Circuit in the Gramins' opinion

23   takes pains to go through several of the trades and show

24   how, explain how, it was priced to Nomura's benefit and

25   their victims' detriment.

1           Your Honor, I'll just add, that what I said --

2   reiterate what I said earlier, which is, there's no

3   special regulation that enforces the law to respond to

4   each industry or trading backs.  The RMBS market doesn't

5   have some special brand of fair notice, the securities

6   fraud statute is designed to be flexible.  You know,

7   that's what the cases said.  And ultimately the fact that

8   this is a highly regulated industry should imply higher

9   standards, not what the defendant essentially argues for,

10  which is ultimately a free-for-all with very limited

11  constraint.

12          THE COURT:  Okay, thank you.

13          MR. NOVICK:  Thank you, Your Honor.

14          THE COURT:  I will give defense counsel an

15  opportunity to reply briefly, and then we'll move on to

16  the sufficiency of the evidence, the other issue that we

17  need to talk about.

18          MR. MUKASEY:  Josh, it's Marc.  Do you mind if I

19  make some due process points and then turn it over to you

20  and you can discuss Weimert?

21          MR. KLEIN:  That's fine.

22          MR. MUKASEY:  Judge, I'm going to be brief, and

23  hopefully to the point, with respect to several of the

24  issues you just raised with Mr. Novick.

25          Number one, you asked the question, the ordinary

1    intelligent person, are we talking about somebody in the

2    industry or are we talking about the ordinary intelligent

3    John Doe on the street?  And I would submit that

4    Mr. Novick has it wrong.

5              It is obvious that the person of an ordinary

6    intelligence standard is to be considered in a due process

7    context within the context in which the law was enforced.

8    It must evaluate the underlying conduct by reference to

9    the norms of the subject community; in other words, within

10   the context with which it occurred.

11             So I'm quoting from a District of Connecticut

12   case called Inturri v. City of Hartford, Connecticut.

13             And again it requires in a due process challenge

14   that the underlying conduct be considered by reference to

15   the norms of the subject community.

16             Well, I think it's virtually undisputed that the

17   norms of this community, as enunciated by every

18   counterparty witness in this case as well as every Nomura

19   witness in the case, showed that these negotiating tactics

20   were commonplace; not understood to be wrong; that when

21   the Litvak case came down, it was considered -- and I'm

22   quoting from the transcript -- "a major development that

23   received a significant amount of attention."  RMBS traders

24   throughout the industry were, quote, "obviously

25   surprised," unquote.

1              Various folks at Nomura were asked to stay on

2     notwithstanding the conduct and many continued to work.

3              As Your Honor just pointed out --

4                   (Connection lost.)

5              MR. KLEIN:  We may have lost Mr. Mukasey.

6              THE COURT:  He may not realize that we lost him.

7              MR. KLEIN:  We're sending him an email.

8                   (Pause)

9              MR. KLEIN:  Your Honor, this is Josh Klein.  I'm

10    happy to jump in, unless the Court thinks it's better that

11    we should just wait until Mr. Mukasey gets back on.

12             THE COURT:  Are other counsel for Mr. Gramins

13    still on the line?

14             MR. SKLAROFF:  Yes, Your Honor, this is Jeffrey

15    Sklaroff.

16             I've texted Mr. Mukasey to let him know he must

17    have cut off.  I'm sure other members of the team have

18    done that too.

19             I think either we can start with Mr. Klein or we

20    can maybe just take a nine minute recess and reconvene at

21    3:00 while we try and get Marc back.

22             THE COURT:  I'm open to either.

23             Mr. Klein, what would you prefer?

24             MR. KLEIN:  Either way is fine with me, Your

25    Honor.  I'm happy to jump in or I'm happy -- yeah --

1          THE COURT:  Mr. Novick?

2          MR. NOVICK:  Your Honor, with regard to the

3   time, I think we can continue with Mr. Klein, and then

4   continue with Mr. Mukasey when he gets back on the line.

5          THE COURT:  As long as there's no objection on

6   the part of the Gramins' team, we can go ahead with

7   Mr. Klein at this point.

8          MR. SKLAROFF:  I think that's fine.  We'll try

9   and correct the technical issue in the meantime.

10          THE COURT:  Okay, thank you.

11          MR. KLEIN:  Thank you, Your Honor.

12          Just to add one additional point to the due

13   process issue.  I think the government is not only

14   conflating --

15          MR. MUKASEY:  Hi, it's Marc, I must have got

16   kicked out for some reason.  I apologize.

17          Can you tell me where I cut off?

18          I'm happy to start from the beginning.

19          MR. KLEIN:  I think you were indicating, Marc,

20   that Inturri v. City of Hartford makes clear that due

21   process requires referencing one of the subject community,

22   and then you expanded and talked about the fact that the

23   evidence in this case shows that the norms were such that

24   no one had notice.

25          MR. MUKASEY:  Fair enough.

1          Judge, if I may continue, I don't really know
2     why I dropped off, but if I might continue.
3          THE COURT:  Yes.
4          MR. MUKASEY:  So I do think Mr. Novick has the
5     framework with in which the due process claim must be
6     judged wrong under the Inturri case.  You're talking about
7     the subject community.
8          The second issue I want to talk about is Your
9     Honor's focus and questions about concealment and what, if
10    any, steps Mr. Gramins took to conceal the conduct at
11    issue here.
12         Judge, there was undisputed testimony that
13    Mr. Gramins, Mr. Shapiro and others, that with their
14    junior traders, and taught them the way of the market.
15    Nobody told them to be quiet about it, nobody told them to
16    hide it, nobody told them to, you know, never tell a
17    supervisor about it.  There was no concealment in that
18    respect at all.  And, in fact, the victim counterparties
19    knew darn well that what they were being told was a lot of
20    posturing and bluffing.
21         And let me tell you what the ultimate evidence
22    of no concealment is, and it's something that Your Honor
23    hit on.  It's the confirmations.
24         Both the SEC and the Financial Industry
25    Regulatory Authority, FINRA, mandates certain information

1  to be given obviously accurately in the confirmations post

2  trade.  You have to accurately list the bond.  You have to

3  accurately list the transaction price.  You have to

4  accurately list the closing date and the sales date.

5          Judge, in this case not only was there no

6  concealment with respect to the confirmations that are

7  statutorily required, the defense introduced the

8  confirmations into evidence in this case, not the

9  government.  We introduced the confirmations to show

10 exactly what Your Honor put your finger on, that is, no

11 concealment.

12         Third, Your Honor asked Mr. Novick about

13 consciousness of wrongdoing and whether consciousness of

14 wrongdoing can serve, if you will, as a proxy for the due

15 process issue, and obviously if you know you're doing

16 something wrong, you don't have much of a due process

17 argument.

18         But Your Honor, in this case, not only was there

19 testimony that not a single Nomura witness had any idea

20 that using these misleading statements or these

21 negotiating tactics was unlawful, you had testimony from

22 virtually every witness in that case, including the

23 counterparties.

24         But you also had testimony that when the Jesse

25 Litvak criminal charge came down, it was a major

1    development in the RMBS industry -- that's a quote from

2    the transcript -- that received a significant amount of

3    attention, and RMBS traders throughout the industry were,

4    quote, obviously surprised, unquote.  That's from the

5    transcript at page 561, line 17.

6         The Second Circuit actually notes the novel

7    issues raised in the case and the issues of first

8    impression raised in the case notwithstanding that the

9    opinion had nothing to do with due process or with Rule

10   29, which I'll get to in a little while.

11        I'll also address very briefly the Bogucki

12   issue, and I think, you know, there are no two cases that

13   are exactly the same, but the principles of due process do

14   not change from case to case.

15        If I were to read to you the following

16   statement, I bet you couldn't tell me which case it came

17   from:  Gramins, Litvak or Bogucki.  "Viewing the evidence

18   in a light most favorable to the government, there is

19   simply no evidence in the record that in the context of an

20   arm's length transaction in which the parties bluffed and

21   bullshitted each other, operated as principals, looking

22   out for their own interests and understood the other party

23   to be posturing rather than providing strictly true

24   information, somebody in the victims' position could

25   objectively be induced by the statements in this case to

1    part with money or property."

2          Now, I'm only being slightly facetious here.

3    That comes from Bogucki.  But those precise words could be

4    written about the due process issue in this case.

5    Precisely.

6          The last point that I'll make is one with regard

7    to the testimony of some of the Nomura witnesses on the

8    due process point.

9          Mr. Novick was pretty loose or cavalier with

10   respect to discussing co-conspirators and who the

11   co-conspirators were.

12         Number one, there has been no finding anywhere

13   at any point in this case who the co-conspirators were.

14   In fact, to add confusion, Peters is fully acquitted,

15   Shapiro is hung on that conspiracy count, Gramins is

16   convicted on a conspiracy count.  But the count on which

17   Gramins was convicted, Shapiro was not involved in.

18         So calling anybody a co-conspirator, especially

19   Nomura witnesses who said they didn't know what was wrong

20   and were never prosecuted, I think is putting the cart

21   before the horse, and I think suggests incredible, if not

22   confusion, at least lack of clarity with respect to who

23   did what wrong, if anything, and when.

24         Judge, I want to reserve some time to discuss

25   the Rule 29 issue, so I'm going to hand it over to Josh.

1           THE COURT:  Okay, thank you.

2           MR. KLEIN:  May I proceed, Your Honor?

3           THE COURT:  Yes.

4           MR. KLEIN:  So just one additional point on the

5    issue of due process and whether it's a reasonable or

6    subjective task.

7           You know, it's really analogous to materiality.

8    Just because it's an objective test from the standpoint of

9    the reasonable or ordinary person, it's to be evaluated in

10   the appropriate context.  That's what Inturri said with

11   respect to due process, that's what Litvak and Gramins say

12   with respect to materiality.  You look at a reasonable

13   investor in the RMBS industry who's sophisticated who's

14   using models.  You're not looking at a mom and pop

15   investor.

16          The other point, Your Honor, is that the notion

17   that the Court can consider the norms in the industry, in

18   the context of a fair notice challenge, that's

19   conceptually different from willfulness.  I think the

20   government keeps conflating the concept of willfulness

21   with the concept of due process.

22          Willfulness is talking about -- normally, it's

23   talking about things like would their have been an advice

24   of counsel defense?  What exactly was told to the lawyer?

25               In an SEC disclosure case, it may look at, well,

1    did the CEO participate in the disclosure committee

2    meetings?  And did -- if he's a defendant for example.

3    Did he understand that the disclosures did or did not

4    conform with what was happening at the company?

5           Or in the context of an accounting fraud case,

6    you might look, if the defendant is a non-accountant, you

7    might look at the evidence that he was apprised of

8    generally accepted accounting principles.

9           Those are the types of things that, you know,

10   would be viewed in a willfulness analysis.  Some of the

11   things Your Honor mentioned, you know:  Was there an

12   effort to conceal information?  Was there an effort to

13   use, you know, prepaid phones?  Things like that.  The

14   norms of the industry are sort of broader.

15          And this case is peculiar, because the evidence

16   that was introduced in this case concerning intent really

17   bleeds into due process.  The most substantial evidence of

18   intent here was the Litvak indictment and the notice that

19   it conveyed and the lack of notice that existed prior to

20   it.

21          There was testimony about things like, from

22   Mr. Raiff, about whether there had ever been any

23   administrative or civil cases involving this conduct.

24          Those types of factors really bleed into the

25   types of factors that I think courts can and do consider

1    in the context of a due process challenge.  It's really

2    not that different than the Carpenter court looking not

3    only at the preexisting case history but also at the

4    publicity that surrounded that case.  You know, that's

5    relevant to the context of notice.

6         And with respect -- there was a lot of

7    discussion, Your Honor, or there was some back and forth

8    between the Court and the government with respect to

9    whether there's any specific regulation that provides

10   notice or is there anything else; and the government kept

11   saying, no, we're relying on 10(b)(5), we're relying on

12   10(b)(5).

13        It's true that, you know, I don't think there's

14   a regulation that says that, you know -- that needs to

15   convey exactly -- you know, that says that you need to,

16   you know, convey with exact specificity every respect in

17   which 10(b)(5) is going to be used.  But -- but, we do

18   have 85-year history in which we've got a dual regime

19   administering the federal securities laws that consists of

20   both civil and criminal enforcement as well as

21   administrative civil enforcement.

22        And historically I think the way that these

23   types of cases generally bubble up -- and I think we saw

24   this in the insider trading context in the 70s and 80s,

25   and I think we've seen it in a bunch of other contexts,

1   and this is something that even Carpenter talked about --

2   is usually you'll see an administrative or civil case

3   where there's a novel application of 10(b)(5) to specific

4   conduct before you see a criminal case.

5           And ordinarily that will convey some degree of

6   notice because, you know, the contexts of fair notice and

7   the rule of lenity, and things like that, operate a little

8   differently in a criminal and a civil context.

9           We know that there was none of that here, and I

10  think that's relevant to the fair notice analysis.

11          THE COURT:  Mr. Klein, I want to give you an

12  opportunity to explain to me why the evidence presented to

13  the jury was insufficient to permit the jury to find that

14  Mr. Shapiro did not appreciate the wrongfulness of his act

15  in connection with this scheme.

16          Mr. Novick talks about the instruction I gave

17  the jury which derived from my concern rooted in due

18  process and the principle of legality, that a person not

19  be subjected to criminal conviction and punishment without

20  fair notice, without blameworthiness.  In the case of

21  Mr. Gramins, I think the Second Circuit concluded that the

22  Litvak indictment was important, if not critical; and

23  given the Litvak indictment and given the post-Litvak

24  trade that was presented to the jury, Mr. Gramins stands

25  in a different position than Mr. Shapiro with regard to

1    the present motion.

2            Mr. Novick told us a minute ago about how there

3    are badges of fraud here, in that the activity was

4    concealed from the customers -- and I won't try to repeat

5    what Mr. Novick said -- but forgive me for the long

6    wind-up.

7            I'm just interested in knowing why I should not

8    conclude from the evidence in the record that Mr. Shapiro

9    knew it was wrong, that he had a clear signal that the

10   behavior was wrong and accordingly concealed it.

11           In other words, he didn't need the Litvak

12   indictment to know that this behavior was wrong and that

13   he was risking prosecution as he engaged in it.

14           MR. KLEIN:  Right.  Well, Your Honor, I'll start

15   with where the Court started, which is what the Gramins

16   Court said.

17           What they said was that they would clearly --

18   and they italicized the word clearly -- there was clearly

19   no similar evidence of intent pre-Litvak; and they then

20   cited extensively to the summations that made reference to

21   Litvak and the lack of notice that existed prior to

22   Litvak.

23           And so, you know, other than the notice provided

24   by Litvak, I don't think that there were any badges of

25   fraud.  There was no evidence to engage in these

1          communications, for example, on an unrecorded telephone

2          line using cell phones, for example.  There was no

3          evidence to hack into the Nomura system and revise the

4          memorialization of these chat communications.  There was

5          no evidence to create some sort of false verification of

6          what Nomura had paid for the bond or what they received in

7          reselling a bond.

8                      To the contrary, all of the evidence in the case

9          indicated that Mr. Shapiro did not understand that this

10         was criminal.

11                     For example, he stopped engaging in any of this

12         conduct post-Litvak.  That's a pretty powerful statement.

13         You know, for example, you know, there was an

14         institutionalized mechanism for dealing with circumstances

15         in which clients learned that this conduct had been

16         engaged in, and that was the penalty box.  And clients at

17         some point maybe after putting someone in the penalty box,

18         would resume negotiations with them.

19                     The inherent nature of the conduct consisted of

20         misrepresentations about negotiating positions.

21         Something, Your Honor, that even the Second Circuit

22         characterized as presenting inherent -- and I'm quoting

23         now -- inherently difficult materiality questions.

24                     And it's something that the Second Circuit in

25         Litvak II deemed -- in Litvak II, the Second Circuit

1     vacated on the basis that there was a confusing -- there

2     was improper evidence introduced concerning fiduciary

3     duties.

4             And on page 68, I believe, of that opinion, the

5     Second Circuit says that, you know, had Norris not been

6     permitted to testify about his view that there was a

7     fiduciary duty here, the jury may -- would have been

8     permitted to view the relationship as entailing a

9     sufficient distance such that it would have been

10    unreasonable for a counterparty to rely on these

11    statements.

12            Now, I understand that the Litvak and the

13    Gramins Court found openly that as a matter of law this

14    can go to the jury, but I think that the concerns that

15    even those courts identified about the inherent

16    difficulties involved in this case and the nature of the

17    misrepresentations and the context in which they occurred,

18    I think is far, far afield of the typical hallmarks and

19    badges of misconduct that one would ordinarily see.

20            And I don't think this is appropriate to really

21    have the jury making a determination in a case like this,

22    because I think the problems rise to the level of fair

23    notice.  And I think we could have a disagreement in

24    theory about that and, you know, a Court could say, well,

25    there's no cases exactly on point, and just because

1    there's no case, doesn't mean that the antifraud laws are

2    not flexible and broad and are designed to proscribe any

3    trick or deceit, including novel schemes.  I get all that.

4    I just don't think that one could say that with

5    intellectual honesty in the face of Weimert.

6            Because now, all of a sudden, not only do we

7    have all the arguments that the defense has been

8    advancing, but now we also know that a federal circuit

9    court looking at the same exact landscape -- you know,

10   Mr. Novick made mention of the fact that Weimert wasn't

11   relevant because it occurred post hoc relevant to the

12   conduct.

13           That's not at all true.  The relevance of

14   Weimert, unlike Litvak -- the relevance of Litvak is

15   temporal.  The whole issue of Litvak is they didn't give

16   notice.

17           And so in order to hold that the defendants had

18   fair notice, I think a Court would have to find that not

19   only was the Weimert Court in error, but the Weimert Court

20   was so wildly in error that a reasonable, ordinary person

21   could not have concluded, as the Weimert Court did,

22   looking at the exact same legal landscape; moreover --

23   that's not enough -- moreover, a court would have to find

24   that an ordinary, reasonable person could not have

25   concluded as the Weimert Court did, notwithstanding the

1    heaps of evidence that was admitted at trial to the effect

2    that all the participants in this industry had a view --

3    including the alleged conspirators -- had a view and a

4    thought process about these misrepresentations that very

5    closely tracked the thinking and the reasoning that was

6    articulated by the Weimert Court.

7            And it would be rendered even more difficult by

8    the fact that the Weimert Court carefully canvassed all

9    the relevant case law, concluded that there was nothing,

10   no other circumstance where these types of

11   misrepresentations were criminalized, and made reference

12   to the restatement of torts, the Convention on

13   Negotiation, the Rules of Professional Conduct and legal

14   commentary.  All of which recognized that making

15   misrepresentations in the context of a negotiation is a

16   very different kettle of fish than other contexts in which

17   the antifraud rule has been applied.

18           And I think, Your Honor, to try to distinguish

19   Weimert from our case, I mean, yeah, you can draw

20   distinctions, but you can't draw any meaningful

21   distinction.

22           Mr. Novick tried to explain that, you know,

23   Weimert got a piece of the deal, the defendants here

24   didn't get a piece of the deal.  I mean, that only shows

25   that the Weimert case is worse.  Weimert not only obtained

1    a piece of a real estate deal and used a portion of the

2    fee that he got to buy that, but he also obtained, you

3    know, the $310,000 fee.  He got both.  And the

4    misrepresentations in Weimert I think were clearly more

5    egregious than the misrepresentations here.

6           In Weimert, the seller had agreed to sell at a

7    certain price.  The buyer had agreed to buy at a certain

8    price, and the seller was tricked into giving Weimert a

9    piece of that purchase price that the seller would have

10    otherwise received.

11           It stands to reason that if the seller had been

12    told the truth -- as a matter of fact, we don't have to

13    stand to reason, we know because the Seventh Circuit cites

14    to testimony by board members who testified that in the

15    absence of them having been deceived into thinking that

16    they had to pay Weimert to get the deal done, they would

17    have never paid him the money and the $310,000 would have

18    gone to the seller.

19           In our case, we don't know that.  Because the

20    Second Circuit said in Litvak that no counterparty had any

21    reasonable expectation of selling a bond at the price that

22    Nomura could resell it at or purchase the bond at the

23    price that Nomura purchased the bond.

24           Moreover, the testimony at trial, from all the

25    counterparties, indicated that they would have negotiated

1  more, they might have held out for a better price, but

2  they don't know ultimately what the price would have been.

3  And I think as Aadil Abbas put it, there was a non-zero

4  chance that he would have ended up paying the same price.

5  I don't think there's a non-zero chance that that could

6  happened in Weimert.

7  　　　　　Your Honor, if I may?  If you'll indulge me just

8  another few minutes, I have just a couple of points.

9  　　　　　While we're on Weimert, I want to come back to

10  the hypothetical that Your Honor posed in which you asked

11  whether it would make a difference if the fee, if it was

12  an additional 4 percent fee that was concealed from the

13  board, you know, as opposed to them just being tricked

14  into paying him a 4 percent fee, and I just want to be a

15  little bit more specific in my answer.

16  　　　　　When I said no, I don't think there would be a

17  difference, I was thinking it from the standpoint that the

18  purchaser would pay Weimert an additional fee, and that

19  does not alter the total consideration that's going to the

20  seller.

21  　　　　　But if, you know, Weimert had some sort of a

22  side agreement with someone at IDI who was going to pay

23  him an additional fee that the board didn't know about,

24  that I think is problematic because the board is now

25  getting less money.  They think they're getting a hundred

1   less the 4 percent fee, but they're really going to end up

2   getting the purchase price less an additional 4 percent

3   fee that is coming out of IDI and that they don't know

4   about.  I think that's a different scenario than the one

5   we have here.

6            I think if the fee is being paid by the

7   purchaser that, you know, that's a different situation.

8            I will give this one caveat, which is that as

9   the Court recognizes, Weimert was a fiduciary, there was

10  tension between the majority and the descent regarding

11  whether he should be treated as a fiduciary or an arm's

12  length individual, and the Seventh Circuit really made an

13  effort to treat him as a principal.

14           Because I think the Seventh Circuit found the

15  fact that these were sophisticated parties and these were

16  misrepresentations about negotiations so powerful that

17  even in the face of dealing with a fiduciary, they decided

18  to treat him as a principal.  And they did that, in some

19  measure, based on the fact that there was this fee that

20  was discussed between Weimert and the board.  And the

21  Seventh Circuit analogized that to a negotiation between

22  an officer and a company about pay, and they reasoned that

23  in that context, you know, the fiduciary relationship, to

24  the extent it exists, is not as strong.

25           And so maybe if you're going to change the facts

1    and maybe if there's a concealed fee and, if not a fee

2    that's out in the open that the board is being tricked

3    about, I haven't given it much thought as to whether that

4    maybe affects the analysis of whether he's a fiduciary.

5    But otherwise I don't think these misrepresentations are

6    at all materially different.

7    And if we had classified that Weimert was not an

8    officer or that Weimert ran an independent real estate

9    investment company and the IDI board negotiated with

10   Weimert and said, listen, why don't you buy this property

11   from us and flip it to another buy that you find, in that

12   scenario where it's clear that he's acting as a principal,

13   I don't think -- I can't conceive of how the Weimert panel

14   would distinguish between these types of

15   misrepresentations.  As I indicated, I think the misrep

16   that occurred in Weimert is worse because for the reasons

17   I said.

18   And by the way, I don't think the Second Circuit

19   would make any distinction either.  I acknowledge that the

20   Second Circuit, based on Litvak and Gramins, would have --

21   if they were presiding over Weimert, that case would have

22   come out differently.

23   And I think it's pretty clear when you look at

24   what the Second Circuit has said.  They never said that

25   commission is a term of the deal in the way that the

1    government propounds.  To the contrary, they said, like on

2    page 62 of Litvak II, quote, by overstating to a proposed

3    counterparty the amount he paid for a bond, appellant

4    sought to increase the all-in price paid by the

5    counterparty and increase Jefferies' profit, closed quote.

6            So there are other places where the Second

7    Circuit makes clear that the relevant issue is the price,

8    which we all know is a term, and that the

9    misrepresentations were problematic because -- potentially

10   material because they affected price.  The exact same

11   thing could be true of Weimert.

12           And this is all kind of -- a fine point is put

13   on it when you look at exactly how the Second Circuit

14   characterized these misrepresentations.

15           In Gramins, on page 434, they explicitly

16   characterized them as misrepresentations about negotiating

17   positions.  And I'm quoting, "Gramins and his

18   co-conspirators lied to their counterparties about

19   contemporaneous price negotiations with other third-party

20   counterparties."

21           That's exactly the way that Weimert

22   characterizes the misrepresentations in Weimert.  And so

23   these cases can't meaningfully be distinguished factually

24   in a way that matters to the reasoning of the Court.

25           And so they're in stark conflict; and, you know,

1    that I think makes it very difficult to credibly say that

2    an ordinary, reasonable person would have known that --

3    would have known that the types of misrepresentations

4    could be criminal.

5           In fact, my last point, Your Honor, in fact, is

6    that even the government, when Your Honor asked the

7    government last week how they respond to Weimert's holding

8    that there's no crime when someone lied to another about

9    negotiating positions to get their money, the government

10   said it shows the courts are confused, but not that

11   somebody in the defendant's position would be similarly

12   confused.

13          My question is:  If the courts are confused, how

14   could Mr. Shapiro have possibly not been confused?

15   Particularly when the Weimert Court is looking at the same

16   legal landscape.  And the government tried to, you know,

17   distinguish -- their response was, well, these cases

18   postdate the conduct.  But as I indicated a moment ago,

19   that doesn't matter with respect to Weimert.  The relevant

20   point is that they're looking at the exact same conduct

21   and they come out, you know, in a way that's totally

22   different from the way that the Second Circuit comes out.

23          And so, you know, look, I think Mr. Shapiro did

24   not know that he was engaging in criminal conduct.  I

25   think Mr. Shapiro could not have known that he was

1  engaging in criminal conduct.  And I think forcing him to

2  stand trial again for this conduct would violate all sense

3  of constitutional fairness.

4       And that's why we ask the Court to dismiss this

5  case on grounds that Weimert's reasoning in the context --

6  this is an as-applied challenge -- in the context of our

7  challenge as applied to the facts here compel dismissal.

8       THE COURT:  Okay, thank you.  I think that wraps

9  it up as far as the due process issue.  But we have the

10  sufficiency of the evidence issue.

11       Mr. Mukasey, you reserved time for that?

12       MR. MUKASEY:  Yeah, thank you, Judge.  Hopefully

13  there will be no technical glitches here.

14       Before moving into the sufficiency issue, Judge,

15  I want to say that I have been rescued by once my

16  colleagues:  The SEC rule that requires accurate confirms

17  after a trade, I believe it's SEC Rule 10b-10, and those

18  are the kinds of confirms that we introduced, the defense,

19  to show no concealment.

20       The only other point I want to make before I get

21  into the Rule 29 issue, is that the JT Mac trade, the

22  post-Litvak trade, need not upend the due process analysis

23  because, number one, it seems to me extremely unlikely, if

24  not impossible, that that's the case or that's the issue

25  on which the jury convicted; because, as I said,

1    Mr. Gramins was convicted of a conspiracy.  Mr. Shapiro's

2    jury hung on a conspiracy, but Mr. Shapiro wasn't even

3    involved in that trade.  So I think that raises the

4    question of:  What on earth kind of conspiracy could there

5    have been proven?

6            I would also point out that with respect to that

7    post-Litvak trade, we did not run from it.  In fact, we

8    embraced it.

9            I can't recall if the government originally

10   introduced the tape recording between Mr. Romanelli and

11   Mr. Gramins, but we played that tape for the jury three or

12   four, maybe five times in order to show the considerations

13   that Mr. Gramins gave to the language that he would use

14   given the uncertain environment that they were now

15   operating in.  And ultimately Mr. Gramins landed on

16   language that had been approved by their compliance

17   meeting; meaning, here is the price to you, as opposed to

18   here is the price I got it at.

19           And I think it's a well-founded principle that

20   where evidence such as this, such as Gramins' conduct in

21   that post-Litvak trade, is equally susceptible of an

22   innocent explanation or a more nefarious explanation, the

23   tie goes to the runner, and the innocent explanation has

24   to confer reasonable doubt.

25           So I would just add those points with respect to

1    the post-Litvak trades.

2            The environment was equally confusing, if not

3    indiscernible, after Litvak.

4            Judge, I now want to take just a couple of

5    minutes to address what the Second Circuit said in its

6    Gramins' opinion regarding the sufficiency of the evidence

7    and what it did not say.

8            The government believes that the Gramins'

9    Rule 33 opinion forecloses any possibility of relief by

10   Your Honor under Rule 29.  Quite obviously the Second

11   Circuit did not speak to Rule 29 issues in that opinion

12   much as it did not speak to due process issues.

13           What the Second Circuit opinion in Gramins did

14   address was one issue and one issue only, and that is

15   whether the Rule 33 motion that we filed posttrial was

16   properly granted by Your Honor or not.  And that is a

17   question that they answered in the negative, which we

18   vehemently disagree with, but we're not going to replow

19   that ground, because we think the Rule 29 issue is

20   certainly still open.

21           That opinion did not address Rule 29 directly,

22   that's a given; nor, as the government I think cleverly

23   but wrongly claims, did that opinion constitute a rare

24   mid-case ratification of Your Honor's original Rule 29

25   decision prior to Litvak II.  It is a basic and

1    fundamental concept, Judge, that courts of appeal --

2    certainly the Second Circuit Court of Appeals -- do not

3    issue rare mid-case ratifications of issues, problems,

4    controversies that are not before them.

5         The Second Circuit does not venture off on a

6    detour to address Rule 29 when it's evaluating a Rule 33

7    issue when the Rule 29 reconsideration question is not

8    ripe and not squarely before it.  That sort of idea is, I

9    think, offensive to notions of judicial economy that I

10   understand courts of appeals to employ.  And, frankly,

11   just from a basic standpoint for the controversy to be

12   issuable, the issue has to be before the Court.  There was

13   no Rule 29 issue before the Court.

14        So I don't think that on its face, the Rule 33

15   opinion speaks to the Rule 29 issue.

16        I will say, Judge, that the Second Circuit in

17   Gramins at most said that Your Honor properly recognized

18   that as a matter of law testimony from counterparties

19   about what might be important to them could conceivably

20   prove materiality under the right circumstances.

21        I think, put another way, Your Honor correctly

22   stated the principle, that a rational trier of fact could

23   find that the point of view of the counterparty witnesses

24   was within the thinking of a reasonable investor.

25        What it did not say, what Gramins did not say,

1    what you did not say, what the government has not proven,

2    is the nexus.  The nexus that was discussed in Litvak II,

3    and I think reaffirmed in Gramins, the nexus that is

4    necessary between the counterparty subjective views and

5    the reasonable investor in the market.  The Second Circuit

6    did not opine anywhere in the Gramins' opinion on whether

7    there was a nexus between the counterparty opinions about

8    Gramins' statements and the viewpoints of an objective

9    reasonable investor.

10              It's an entirely separate issue whether the

11   government proved the required nexus between the

12   counterparties and the objective investor in the market.

13   And even if the four government counterparty witnesses all

14   claimed in one way or another that Gramins' statements

15   were, quote/unquote, important for them, and theoretically

16   as a matter of kind of academic application of the law

17   that might in some circumstances prove to be material, in

18   no way does importance equate with materiality; and

19   certainly the government failed to show through an expert

20   or through a non-victim or through somebody else that

21   could be labeled as an objective, reasonable investor in

22   the market, that there was that nexus.

23              And in fact, Judge, the record, as I think we've

24   now gone through several times, was chockful of proof; and

25   virtually, I think almost undisputed, that nobody equated

1    important with materiality.

2            Just put another way, there was no proof that,

3    yeah, this is important, that would have been nice to

4    know, yeah, that would have been important to know, was

5    equivalent to so important that it altered the total mix

6    of information significantly.

7            I think we've said previously -- and I think

8    Your Honor's recognized early on in the case -- every

9    party to every negotiation thinks everything and every bit

10   of information could be important.  That does not mean

11   it's material, number one.

12           Number two, there was no proof here that what

13   was important to our four bluffing, deceiving, duping and

14   jiving and game playing, quote/unquote victims, was

15   material to the reasonable investor in the market.  And

16   indeed, the notion that everybody knew about the

17   deception, everybody engaged in the deceptions, everyone

18   made decisions independent of the bluffing and the

19   deception, everyone said after the fact, yeah, gee, I wish

20   I would have known that, that could have been important;

21   that doesn't make them material.  And the Second Circuit's

22   opinion certainly did not say that.

23           And for that reason, the issue of whether the

24   government proved the required nexus under Litvak II and

25   reaffirmed in Gramins is still on the table and the weight

1  of the evidence said they did not prove it.

2          I would like, Judge, to reserve three minutes

3  after Mr. Novick goes.

4          THE COURT:  Okay, thank you.

5          Mr. Novick?

6          MR. NOVICK:  Thank you, Your Honor.

7          THE COURT:  What do you say about the evidence

8  of nexus?

9          MR. NOVICK:  Sure.  Your Honor, I just wanted

10  to -- I'm going to launch into that.  I just wanted to

11  address -- Mr. Mukasey started out saying -- let me make

12  sure I get it right -- that the tie goes to the runner in

13  his view.  He referenced the post-Litvak trade.

14          I would expand that to all of the evidence and

15  just respond, Your Honor, that that principle, which is

16  often referred to as the equipoise rule, is not the law in

17  this circuit.  The Second Circuit's been very clear on

18  that.  Most recently I believe it was the Aquart case.

19          And I'm not actually saying that this is the

20  case here -- but when an inference can be drawn for

21  non-guilt, the tie goes to the jury.  And particularly

22  with regards to materiality it's especially true, that the

23  tie goes to the jury.  The jury is the one who decides

24  between competing inferences, not the Court.

25          So let me now turn, Your Honor, to the

1    defendant's Rule 29 arguments, and I will address two

2    quick points and then address the issue of nexus.

3          First, we should remember, I think, Your Honor,

4    that this is a motion for reconsideration following the

5    Court already having taken a careful look at the evidence

6    and denying the Rule 29 motion.

7          Nothing has happened since the time of the

8    Court's initial ruling that has warranted reconsideration.

9    If anything, our case has gotten overwhelmingly stronger

10   in that the Second Circuit ratified this Court's initial

11   decision denying acquittal.

12         And, Your Honor, the Court could not have said

13   it any plainer, that the Court correctly denied the

14   motion.

15         I'm sorry, Your Honor, I'm getting some feedback

16   in the phone.  I don't know if the Court is hearing that

17   as well.

18         THE COURT:  I am, and it may be that people need

19   to mute their phones.  Would you please mute your phones.

20   That seems to help.

21         MR. NOVICK:  Thank you, Your Honor, I appreciate

22   it.  And it would turn in our view, Your Honor,

23   reconsideration on its head for the Court to revisit its

24   decision on this basis, in other words, after the only

25   real difference that has occurred is that the Second

1   Circuit has specifically passed on issues in this case.

2   The second point, Your Honor, is to respond to

3   what Mr. Mukasey has said, it's this -- the Second

4   Circuit's entire analysis for 60-some odd or more pages --

5   dicta essentially.  In other words, everything except for

6   the discrete issue at hand here.

7   And as a matter of law, Your Honor, the

8   government doesn't disagree that the issue before the

9   Court was the Rule 33 issue.  That's self-evident.  But

10  it's hard to fathom how this Court could simply ignore the

11  plainly stated conclusion of the Second Circuit regarding

12  sufficiency.  It came after a fulsome recitation of the

13  facts by the circuit and, Your Honor, I'd argue why the

14  Second Circuit asked the government for all those exhibits

15  and they then went through in detail material that we did

16  not make part of the appendix in the first, and done a

17  fulsome analysis not just the testimony of each of the

18  victims in the case, which it clearly did, but also all of

19  the other documentary evidence, the co-conspirators'

20  testimony.

21  That's the second point, Your Honor.

22  And the third point, and I'll get into the

23  question of nexus.

24  Your Honor, we argued in our brief and explained

25  in our brief how the Court clearly undertook a nexus

1    analysis in analyzing Wollman's testimony.  That was part

2    of the analysis whether Wollman's testimony was

3    idiosyncratic.

4         But even more importantly, the issue here with

5    regard to nexus, the issue here is the same issue that was

6    put in argument before the jury.  The defendants argued

7    that lying flew rampant in the industry to make it

8    reasonable for someone to rely on a statement by the

9    defendants.

10        The government's vehemently disagreed with it

11   throughout the trial, and continues to disagree with that

12   characterization, and argued at length about how the

13   defendants lied and in fact caused their victims to pay

14   more and explained precisely why the testimony of the

15   victims about the importance of the lies, coupled with all

16   the documentary evidence about how the defendant -- how

17   the victims actually did change their price, change their

18   offer, or bid based on the false information provided by

19   them, was another way to prove that it was important to

20   them.

21        The bottom line though, Your Honor, is this is a

22   jury question, whether to credit the testimony that the

23   lies were important.  How the many trades showed the

24   victims' moving price are based on the lies.  How to weigh

25   the parties' characterizations of testimony and evidence.

1    That was up to the jury, because that's exactly what the

2    Litvak I and II and Gramins all say.

3            When asked evidentiary error, the jury decides

4    materiality, and it's not -- this is not to revisit or

5    reargue about who believed what, but to understand that so

6    long as there was no evidentiary error, which we have

7    established that there was not based on the Second

8    Circuit's decision, the Court is clear, that it is up

9    to -- materiality is up to the jury.

10           THE COURT:  All right.

11           MR. MUKASEY:  Thank you, Judge.  Mr. Mukasey, if

12   I may just take three more minutes.

13           THE COURT:  Yes.

14           MR. MUKASEY:  Thank you.

15           How we got to reconsideration to address

16   Mr. Novick's first point is, I think the Court invited

17   more briefing because of the haziness of this issue.

18           With respect to Mr. Novick's -- to the extent he

19   made a substantive argument, I would simply leave the

20   Court with "important" does not equal "material."  The

21   government certainly did not show that.  And how could

22   lies be material in the investment decision when the

23   victims were liars?  That would lead to a perverse result

24   that you could be materially deceived or deceived about

25   material facts while you yourself were lying.

1          Judge, I also want to make this point:  Consider

2     it a due process point, consider it a sufficiency point,

3     or both.

4          The criminal justice system looks very different

5     today than it did when this conduct took place and when

6     Mr. Gramins was indicted, and you just need to pick up a

7     newspaper everyday to see that violent criminals and drug

8     offenders and white collar prisoners are being released

9     from prison every single day, and I'm talking even before

10    this COVID-19 pandemic, and that's because there's been a

11    recognition, it seems to me, up and down the criminal

12    justice system that certain conduct was never fit for

13    criminal prosecution.

14          Drug possession is one example, arm's length

15    business dealings between sophisticated principals seems

16    now to be another according to the Weimert Court,

17    according to the Bogucki Court.  Alternative programs that

18    don't brand people with a sort of a scarlet letter "F" for

19    felon, are popping up over the country.  I'm not making a

20    sentencing argument here.  To the contrary.

21          I was an Assistant U.S. Attorney for almost ten

22    years, and I will tell you this:  I never understood the

23    enormous and sort of lifelong burden that is a felony

24    conviction.  A felony conviction is an albatross that will

25    prevent a defendant from working at Starbucks or from

1    driving an Uber.  And, ironically, in this case there were
2    and there are multiple alternatives to criminal
3    prosecution that were available to the government.  Your
4    Honor's mentioned some of them:  SEC actions, civil
5    actions, FINRA actions.
6            And wouldn't it be a tragedy at the time, you
7    know, that we're in today when the world is sort of
8    unanimous that these kinds of civil alternatives are
9    punishment enough, and even violent criminals are being
10   handled in different ways, when their crimes were clear,
11   clear-cut, crystal clear, crystal clear standards, bright
12   lines of where innocent conduct ended and criminal conduct
13   started, wouldn't it be a tragedy if Mike Gramins were the
14   only person to be held criminally accountable for conduct
15   that was widespread, conduct that was acknowledged by
16   counterparties under oath in multiple courtrooms, as
17   commonplace and disregarded in the investment decision by
18   the victims?  That would be a manifest injustice.
19           And that's why Your Honor should reconsider
20   what, if anything was proven here, and whether with
21   respect to I think Shapiro and Gramins, anybody knew or
22   anybody could tell you today where the lines are drawn.
23           Thank you, Judge.
24           THE COURT:  All right, thank you.
25           That concludes the arguments.  I appreciate your

1   help as always; and Darlene, I want to thank you for your

2   efforts.  I know it's been a long argument.

3           We will be in touch with you hopefully in the

4   next week.

5           Thank you all.

6                   (Proceedings adjourned at 3:48 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3              In Re: U.S. vs. Shaprio, Et al

4

5

6          I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                   /s/_____
16
                    DARLENE A. WARNER, RDR-CRR
17                    Official Court Reporter
                    450 Main Street, Room #223
18                  Hartford, Connecticut 06103
                  darlene_warner@ctd.uscourts.gov
19

20

21

22

23

24

25