UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MICHAEL GRAMINS,<br><br>    Defendant. | S3 15-cr-00155 (RNC)<br><br>April 5, 2021 |

**MEMORANDUM OF LAW IN OPPOSITION TO THE
GOVERNMENT'S MOTION FOR ENTRY OF ORDER OF RESTITUTION**

Mukasey Frenchman LLP
2 Grand Central Tower
140 E. 45th St., 17th Floor
New York, New York
Tel (212) 466-6400

*Attorneys for Michael Gramins*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................3

    A.    Loss at Trial ..................................................................................... 3

    B.    Loss at Sentencing ........................................................................... 4

    C.    The Government's Restitution Motion .................................................. 6

ARGUMENT ....................................................................................................7

**I.   A Restitution Order is Unwarranted Because the Government Has Not Proven Actual Loss .................................................................................................7**

    A.    Legal Standard ................................................................................. 7

    B.    The Government Has Not Proven Actual Loss on Any Trade ................................. 8

    C.    The Government Has Not Proven Actual Loss on Net Trades ............................ 10

**II.  Even if the Government Could Prove Actual Loss, its Restitution Calculation is Inaccurate ...................................................................................13**

    A.    The Government's Proposed Restitution Does Not Account for Counterparties' Profits ......................................................................................... 13

    B.    The Government's Proposed Restitution Does Not Account for Funds that Nomura Must Pay to the SEC Investor Protection Fund ...................................... 16

    C.    The Government Has Not Addressed the Restitution Owed by Frank Dinucci ..... 17

**III. The Need to Provide Restitution to Nomura's Counterparties is Outweighed by the Burden on the Sentencing Process .................................................19**

**CONCLUSION** .................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*In re Brown*,
    932 F.3d 162 (4th Cir. 2019) ......................................................................... 20

*In re Newsday Litig.*,
    No. 08-MC-096(JBW), 2008 WL 2884784 (E.D.N.Y. July 23, 2008) ........................... 17

*Robers v. United States*,
    572 U.S. 639 (2014)................................................................................... 17

*United States v. Adorno*,
    950 F. Supp. 2d 426 (E.D.N.Y. 2013) ............................................................. 20

*United States v. Agate*,
    613 F. Supp. 2d 315 (E.D.N.Y. 2009) ............................................................. 18

*United States v. Allen*,
    529 F.3d 390 (7th Cir. 2008) ....................................................................... 13

*United States v. Bates*,
    No. 07-50243, 2012 WL 2458170 (E.D. Mich. June 27, 2012) ................................. 18

*United States v. Boccagna*,
    450 F.3d 107 (2d Cir. 2006)................................................................... 12, 15

*United States v. Brown*,
    No. 11-CR-00449 (SJ), 2016 WL 11263165 (E.D.N.Y. Dec. 2, 2016).......................... 15

*United States v. Calderon*,
    944 F.3d 72 (2d Cir. 2019).......................................................................... 13

*United States v. Carboni*,
    204 F.3d 39 (2d Cir. 2000).......................................................................... 8

*United States v. Chalupnik*,
    514 F.3d 748 (8th Cir. 2008) ....................................................................... 8

*United States v. Cheng*,
    96 F.3d 654 (2d Cir. 1996).......................................................................... 7

*United States v. Cornier-Ortiz*,
    361 F.3d 29 (1st Cir. 2004).......................................................................... 9

*United States v. Finazzo*,
    850 F.3d 94 (2d Cir. 2017).......................................................................... 7, 8

*United States v. Gallant*,
    537 F.3d 1202 (10th Cir. 2008) ...................................................................... 22

*United States v. Germosen*,
    139 F.3d 120 (2d Cir. 1998)............................................................................ 9

*United States v. Goldfarb*,
    No. CR-07-260, 2009 WL 2515778 (D. Ariz. Aug. 12, 2009)........................ 19

*United States v. Gushlak*,
    728 F.3d 184 (2d Cir. 2013)...................................................................... 20, 21

*United States v. Hernandez*,
    No. 3:02CR341 (EBB), 2009 WL 113267 (D. Conn. Jan. 15, 2009).......... 8, 10

*United States v. Huff*,
    609 F.3d 1240 (11th Cir. 2010) ...................................................................... 13

*United States v. Innarelli*,
    524 F.3d 286 (1st Cir. 2008)....................................................................... 8, 14

*United States v. Johnson*,
    No. 08-20384, 2013 WL 773010 (E.D. Mich. Feb. 28, 2013)........................ 14

*United States v. Koskella*,
    118 F. App'x 422 (10th Cir. 2004) ................................................................. 19

*United States v. Lotze*,
    192 F. App'x 598 (9th Cir. 2006) ................................................................... 14

*United States v. Marino*,
    654 F.3d 310 (2d Cir. 2011)........................................................................... 20

*United States v. Martinez*,
    690 F.3d 1083 (8th Cir. 2012) ....................................................................... 21

*United States v. Messina*,
    806 F.3d 55 (2d Cir. 2015)......................................................................... 8, 10

*United States v. Napout*,
    No. 15-CR-252 (PKC), 2018 WL 6106702 (E.D.N.Y. Nov. 20, 2018) ............ 9

*United States v. Nucci*,
    364 F.3d 419 (2d Cir. 2004)...................................................................... 17, 18

*United States v. Oladimeji*,
    463 F.3d 152 (2d Cir. 2006)........................................................................... 13

*United States v. Petters*,
  No. CRIM08-364, 2010 WL 2291486 (D. Minn. June 3, 2010) ..................................... 22

*United States v. Smathers*,
  879 F.3d 453 (2d Cir. 2018).................................................................................... 15, 16

*United States v. Sommerville*,
  No. 3:16CR001, 2016 WL 6699142 (N.D. Fla. Nov. 14, 2016)...................................... 10

*United States v. Suarez*,
  253 F. Supp. 2d 662 (S.D.N.Y. 2003), a*ff'd sub nom. United States v. Castillo*, 93 F.
  App'x 273 (2d Cir. 2004) ............................................................................................... 19

*United States v. Termini*,
  No. 3:09-CR-245 (SRU), 2016 WL 199398 (D. Conn. Jan. 15, 2016), *aff'd sub nom.*
  *United States v. Dalicandro,* 711 F. App'x 38 (2d Cir. 2017)................................... 13, 14

## Statutes

18 U.S.C. § 3663A ............................................................................................... 2, 7, 19

18 U.S.C. § 3664 ...................................................................................................... 15, 16

15 U.S.C. § 78u-6 ............................................................................................................ 17

## Other Authorities

*In the Matter of Nomura Sec. Int'l, Inc.*,
  Exchange Act Release No. 86372, 2019 WL 3074081 (July 15, 2019) ........................... 17

Defendant Michael Gramins, by his counsel, respectfully submits this Memorandum of Law in opposition to the government's Motion for Entry of Order of Restitution.

## PRELIMINARY STATEMENT

The government has approached every aspect of this nearly six-year-old case with draconian overzeal.  Its latest iteration – a motion asking the Court to impose a $1.2 million restitution order against Gramins – is no different.

Nomura, pursuant to its settlement agreement with the Securities and Exchange Commission ("SEC"), has already paid millions of dollars in remediation to its counterparties in connection with the same trades underlying this case.  The government, however, claims that certain counterparties have not been fully compensated by Nomura, and that Gramins should therefore be responsible for the $1.2 million deficiency.  In some instances, the government wants Gramins to pay restitution to counterparties that either *declined* to receive distributions from Nomura or failed to respond to Nomura's numerous outreach attempts.  In other instances, the government seeks to hold Gramins accountable for the discrepancy between certain remediation calculations in Nomura's SEC case and the higher loss amounts calculated by the government in this case.

The government's motion must be denied.  Unlike the loss calculation used to determine a defendant's offense level, a restitution award under the Mandatory Victims Restitution Act ("MVRA") is limited to actual loss.  In this case, the government has failed to prove that any counterparty suffered an actual loss because there is no evidence that the trades at issue would have occurred at different prices in the absence of misstatements. The government's speculatory assumption that Nomura's counterparties would have obtained more favorable prices had they known Nomura's acquisition costs is completely divorced from the reality of the RMBS market and the testimony of the government's own witnesses.  Even worse, the government claims that

the Court can calculate actual loss on trades in which no express misstatements were made about the size of Nomura's profits by assuming that counterparties expected that Nomura only earned eight ticks on these trades.   Such speculation, however, is not only inconsistent with the counterparties' actual expectations, but entirely inappropriate in the context of restitution.

Even if the government could prove that Nomura's counterparties suffered actual losses, its proposed restitution order suffers from a number of other significant defects.   Indeed, the government's restitution calculation does not account for i) profits that counterparties made as a result of executing the relevant trades, ii) the funds that Nomura must pay, pursuant to its SEC settlement, to the SEC Investor Protection Fund as a result of certain counterparties declining to receive distributions, or iii) the restitution that Nomura trader Frank Dinucci may be required to pay in connection with his guilty plea.   These factors must be considered by the Court because restitution cannot be used to seek multiple payments for the same loss or to provide victims with a windfall on top of profits they have already earned.   The only purpose of restitution is to restore victims to the positions they occupied *before* the transactions occurred.

Finally, the Court should decline to order restitution because determining complex issues related to loss "would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B).   In this case, the burden associated with accurately calculating restitution – including resolving numerous questions relating to actual loss and securing the data needed to determine the profits that must be subtracted from any actual loss calculations – would be significant.   In contrast, the counterparties' need for restitution is essentially nonexistent.   Not only are the government's proposed restitution figures trivial relative to the scale of the counterparty institutions, but some could not even be bothered to accept payment from Nomura.   It would

therefore completely defy logic to prolong the sentencing process for the sake of attempting to compensate counterparties that have themselves shown neither an interest nor a need for the unpaid restitution.

The government's motion should be denied.

## BACKGROUND

### A.  Loss at Trial

The government introduced evidence at Gramins' trial concerning 17 trades in which Gramins or other Nomura traders made misstatements to counterparties about their potential purchase and sale prices. Near the end of trial, the government attempted to introduce certain demonstrative charts (the "Profit Charts") that calculated what the government viewed as the alleged loss on a subset of those 17 trades.  The government, however, conceded that it would be improper to include in the Profit Charts any trades in which the Nomura traders did not make specific misrepresentations concerning the size of Nomura's spread (*i.e.*, "Net Trades"):

> So we're taking the total markup, the total spread, or whatever it is, profit – what Nomura made from the trade – and then subtracting out the specifically negotiated commission, to the extent there is one. If there wasn't one, we haven't done this exercise. It's not to say we don't think there's fraud there, but we don't think that it's appropriate to do this, because in that instance *we wouldn't be able to back out a specifically negotiated compensation and we don't think that's a fair thing to do*. So we've taken those out. . . . We have not included [trades] where comp was either not specifically stated or where it is ambiguous.

Trial Tr. 2439:8-18; 2443:8-10.

In assessing the admissibility of the Profit Charts, the Court noted that "[t]he government has no obligation to prove that Nomura made [a certain amount on a] trade. It has no obligation to prove the difference in ticks. That's just simply not necessary to the ascertainment of truth."  Trial Tr. at 2449:3-6.  The Court also stated that "[w]e don't know . . . that indeed [the Profit Chart

calculations are] a fair indication of the ill-gotten gain or the damage" to Nomura's counterparties.

Trial Tr. 2451:14-18.

> Ultimately, the Court excluded the Profit Charts, stating the following:

> Remarkably, it appears to me that if this were a civil case and the victims who have testified were seeking damages, it would be a challenging case. . . . [O]n the evidence here . . . how can we determine what actually happened and would have happened with regard to these transactions insofar as Nomura's profit is concerned. It's difficult. . . .

> The problem that we have with the charts is that you do come up with a number, and a very large number, and it suggests that that's the ill-gotten gain. . . . I don't recall a witness saying, "If I had known that the purchase price was eight and not ten, I would have insisted on getting the bond at eight plus four." I don't recall that being said.

> My recollection is the witnesses were careful not to over argue their position; in other words, they would say that they thought the omitted information or misrepresented information was important, it would have influenced them, but they didn't say exactly how it would have influenced them, and they didn't attempt to use some sort of a crystal ball to tell the jury what would have happened.

Trial Tr. 2473:21-23; 2475:8-12; 2478:10-2479:2.

### B. Loss at Sentencing

At sentencing – despite its concession at trial about the "fairness" of calculating loss on Net Trades – the government argued that Gramins was responsible for $15.26 million in loss associated with 161 total trades, regardless of whether any specific misrepresentations were made about the size of Nomura's profits. According to the government, "[e]ven if the Court were to . . . limit its loss calculations to the trial evidence that included express or implied misrepresentations about commission, the *intended loss* from Gramins's conspiracy was enormous." Gov. Sent. Br. at 23; *see also id.* at 24 ("the intent behind the lies [was] still the same" in either type of trade). The government also argued that it could accurately calculate loss on Net Trades by using the "maximally conservative" approach of "credit[ing] Gramins with a market-standard 8-tick offset" in these trades. *Id.* at 24.

Two days before Gramins' sentencing hearing, the Probation Office informed the government via email that the Court was "having some trouble trying to understand the amount of actual or intended loss in this case" and "is interested in knowing what is the total amount that the Government can prove was over paid [*sic*] by the client as a result of the misrepresentations made by Mr. Gramins." Dec. 15, 2020 Email from L. Harte. More specifically, the Probation Office relayed that the Court "is interested in transactions in which there is evidence indicating Mr. Gramins led the counterparty to believe that they were paying for 'X' when in fact they were paying for 'X' plus an undisclosed amount of commission." *Id.*

In response to the Court's inquiry, the government identified 44 trades "where Gramins was a listed participant on one or both sides of the trade" (including one trade that "Caleb Chao testified he coordinated with Gramins"). Dec. 16, 2021 Gov. Ltr. to Probation. According to the government, however, only 24 of those 44 trades involved "express or implied representations about commission" (the "Gramins Pay-on-Top Trades"). *Id.*

At sentencing, the Court concluded that Gramins was responsible for at least the 44 trades that he personally executed. *See* Sentencing Tr. at 35:7-17; 36:22-37:3.[1] The Court, however, did not indicate whether its finding was based on a theory of actual or intended loss.

The Court ultimately sentenced Gramins to a two-year term of probation, with the first six months to be served under home confinement. ECF No. 599 (Judgment). In addition to the standard terms of probation, the Court ordered Gramins to complete 300 hours of community service. *Id.* With respect to restitution, the Court's judgment states, in part:

> Currently Nomura is in the process of making remediation payments to victims in
> a related civil settlement with the Securities and Exchange Commission that may

---

[1] The loss associated with these 44 trades increased Gramins' offense level by 18 points, which resulted in a Guidelines range greater than the 60-month statutory maximum for a conspiracy conviction. *See* Sentencing Tr. at 36:2-11. Thus, the Court decided that it need not make further loss findings to determine "how much in excess of 60 the total offense level should be." *Id.* at 37:24-39:4.

lessen or eliminate the defendant's potential restitution obligation to some or all victims. Therefore the Court orders that imposition of a restitution order be delayed until the completion of that remediation process, but in any event no later than March 17, 2021, or 90 days after sentencing.

*Id.*

### C.  The Government's Restitution Motion

On March 15, 2021, the government filed a Motion for Entry of Order of Restitution.  ECF No. 609 ("Gov. Mot.").  In that motion, the government maintains that Gramins is responsible for the loss associated with 161 trades and claims that Gramins "owes restitution to 21 victims in the amount of $1,240,983.91" because those counterparties "have not been fully compensated for their losses" by Nomura.  *Id.* at 2-3.  The amounts that Gramins purportedly owes to each of those institutions are set forth in a chart attached as Exhibit A to the government's motion (the "Restitution Chart").

Only five of the institutions listed in the Restitution Chart were involved in the 44 trades that the government claims were executed by Gramins.[2]  Moreover, only two of those institutions were involved in the 24 Gramins Pay-on-Top Trades.[3]

On March 24, 2021, the government sent defense counsel additional documentation concerning the payments that Nomura has made (or attempted to make) to its counterparties pursuant to the terms of its SEC settlement agreement.  These additional documents reveal that there are a variety of reasons why 21 counterparties were either not compensated by Nomura or were compensated in amounts that are less than the loss amounts that the government has calculated in this case:

---

[2] These five institutions are BHR Capital ("BHR") (Trade 619), Goldman Sachs ("GSAM") (Trade 86), Permit (Trade 631), Mariner (Trade 518), and TCW (Trades 17 and 695).

[3] These two institutions are BHR and Permit.

- Three counterparties refused payment from Nomura (Alliance, FFTW, and Wellington);

- Three counterparties did not provide wire instructions for all of their payees, so Nomura was unable to disperse all of the funds required by the SEC settlement (BlackRock, Brookfield, and Zais Group);

- One counterparty appears to have ceased operations (BHR);

- Two counterparties could not be reached by Nomura (C12 and Permit);

- For 12 counterparties, the SEC ordered Nomura to pay amounts that are lower than the government's alleged loss calculations in this case (Aberdeen, Angelo Gordon, Axonic, EBF, Fortress, GSAM, Mariner, PIMCO, Prudential, Saye, Soros, TCW).[4]

According to the government, the counterparties that declined to receive distributions from Nomura "are included in the proposed restitution order, as they have not been fully compensated; however, if directed by the Court, the Government can ask these victims their preference with respect to restitution." Gov. Mot. at 3 n.1.

## ARGUMENT

### I.   A Restitution Order is Unwarranted Because the Government Has Not Proven Actual Loss

#### A.   Legal Standard

Under the MVRA, a court "shall order" a defendant to "make restitution to the victim of [an] offense." 18 U.S.C. § 3663A(a)(1). The analysis, however, does not end there. "Although . . . the Sentencing Guidelines allows for loss calculation based on 'intended loss,' [the MVRA] require[s] a showing of actual loss for restitution calculations." *United States v. Cheng*, 96 F.3d 654, 657–58 (2d Cir. 1996); *see also United States v. Finazzo*, 850 F.3d 94, 117 (2d Cir. 2017) ("Since the purpose of restitution is compensatory and the MVRA limits restitution to the amount

---

[4] For these counterparties, the government seeks to hold Gramins accountable for the discrepancies between those figures. For example, the government claims that Angelo Gordon suffered $144,035.96 in loss, but the SEC only ordered Nomura to pay $82,672.95 to Angelo Gordon. Thus, the government is now seeking the $61,363.01 difference from Gramins.

of each victim's losses, a restitution order must be tied to the victim's actual, provable, loss." (citation omitted)).  Thus, the loss analysis utilized to determine a defendant's offense level is distinct from the one used to calculate restitution.  *See United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) ("Although the district court did not err in calculating [the victim's] loss for purposes of setting the offense level, we must separately analyze loss with respect to the restitution order because a court's power to order restitution is limited to actual loss."); *United States v. Hernandez*, No. 3:02CR341, 2009 WL 113267 (EBB), at *2 n.3 (D. Conn. Jan. 15, 2009) ("In sentencing, the court's interest is fixing an appropriate punishment for the crime. But to order restitution, the court must be able to accurately gauge each victim's loss while avoiding overpayment."); *United States v. Chalupnik*, 514 F.3d 748, 754 (8th Cir. 2008) ("[W]hile the fact that a defendant profited from the crime without causing actual loss to an identifiable victim may be an appropriate reason to increase his punishment . . . [r]estitution to MVRA victims must be based on the amount of loss actually caused by the defendant's offense." (citation omitted)).

The government "bears the burden of proving a victim's actual loss by a preponderance of the evidence," *Finazzo*, 850 F.3d at 117, and its calculation "cannot be based on mere speculation." *United States v. Messina*, 806 F.3d 55, 69 (2d Cir. 2015); *see also United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir. 2008) ("[A]n award cannot be woven solely from the gossamer strands of speculation and surmise." (citation omitted)).  "In other words, if the government does not provide a transparent method for fixing or reasonably estimating the victim's loss resulting from fraud, the court is not required to order restitution."  *Hernandez*, 2009 WL 113267, at *2.

## B.     The Government Has Not Proven Actual Loss on Any Trade

For all of the reasons thoroughly discussed in Gramins' sentencing memorandum, the government has not proven that any of the trades in this case caused Nomura's counterparties to

suffer actual losses, as there is no evidence that the trades would have occurred at different prices

in the absence of misstatements.  Among other things:

- Counterparties may have been willing to execute the trades at the same prices even if they had known the true size of Nomura's profits.  Counterparties considered many factors that had nothing to do with Nomura's spread (including their own sophisticated models), and may have executed at the same prices because they wanted the bonds and were unaware of a better price in the market.  *See* Gramins Sent. Memo at 25-26;

- The trades may have occurred at the same prices if Nomura traders negotiated using "all-in" prices instead of misrepresenting that certain bids and offers were provided to them by a third party.  *See id.* at 23-25; and

- There is no evidence that the Nomura traders, who always had the ability to hold bonds in inventory, would have been willing to buy or sell the bonds at different prices.  *See id.* at 26-27.

At sentencing, in response to Gramins' arguments that any loss in this case is speculative,

the government argued that "Gramins ignores intended loss, which renders irrelevant the

hypothetical question of whether a victim might have bought or sold the bond at the same price if

he had known the truth."  (Gov. Sent. Memo at 29); *see also id.* at 30 ("For purposes of intended

loss, it is irrelevant whether the loss actually occurred[.]").  While these arguments may have been

sufficient to support the government's loss calculation at sentencing, they carry no weight in the

context of restitution, which must be limited to actual loss.  *See, e.g.*, *United States v. Cornier-

Ortiz*, 361 F.3d 29, 42 (1st Cir. 2004) (vacating a restitution award when there was no proof of

actual loss and noting that "[t]he government's argument confuses the issue whether there has been

a crime with the issue whether the conditions for restitution have been met"); *see also United

States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998) ("Of course, an amount-of-loss calculation

for purposes of sentencing does not always equal such a calculation for restitution."); *United States

v. Napout*, No. 15-CR-252 (PKC), 2018 WL 6106702, at *10 (E.D.N.Y. Nov. 20, 2018)

("Although the Court previously found that this valuation of loss could be used to calculate

Defendants' sentencing ranges under the Sentencing Guidelines, the Court does not find it sufficiently reliable to use to estimate loss for purposes of restitution.").

The Court should therefore deny the government's motion for restitution because the government has not proved that any of Nomura's counterparties suffered an actual loss.

### C.   The Government Has Not Proven Actual Loss on Net Trades

While Gramins maintains that the government has not proven actual loss on *any* trade, it has not proven actual loss on Net Trades for the separate and independent reason that there is no reliable way to measure counterparties' losses in these trades.

At sentencing, the government calculated loss on Net Trades by using the "maximally conservative" approach of "credit[ing] Gramins with a market-standard 8-tick offset."  Gov. Sent. Memo at 24.  Regardless of whether this was an appropriate calculation method under a theory of intended loss – which Gramins maintains it is not – it is a blatantly improper method for a restitution order, which cannot be derived from guesswork.  *See, e.g.*, *Messina*, 806 F.3d at 69 (a restitution award "cannot be based on mere speculation"); *Hernandez*, 2009 WL 113267, at *2 n.3 ("[T]order restitution, the court must be able to accurately gauge each victim's loss while avoiding overpayment."); *Innarelli*, 524 F.3d at 294 (vacating a restitution award because "[w]e are concerned that the district court's 'rough approximation' here may not have been sufficiently reflective of the losses the buyers actually incurred"); *United States v. Sommerville*, No. 3:16CR001, 2016 WL 6699142, at *4 (N.D. Fla. Nov. 14, 2016) ("Without more specific evidence, any award of restitution would be an arbitrary calculation based on speculation and guess work, at best.").

Indeed, one of the trades involving a counterparty listed in the Restitution Chart provides a perfect example of why the Court cannot calculate restitution using the government's "maximally conservative" method of assuming that counterparties expected that Nomura only earned eight

ticks on Net Trades.  In the AHMA 2007-1 A1 trade – which was introduced at Gramins' trial – Nomura bought the bonds from QVT at 47-00 and sold them to GSAM at 49-00.  As discussed in Gramins' sentencing memorandum, the GSAM counterparty who executed this trade stated during a government interview that he had no idea how much Nomura profited on this trade *and* that he may have purchased the bonds at 49-00 even if he knew Nomura's acquisition price because another counterparty may have been willing to pay 49-00 and he was satisfied with that price based on his independent analysis of the bond's profitability.[5]  Unsurprisingly, the government relied on a theory of intended loss when addressing this trade in its sentencing memorandum.  *See* Gov. Sent. Memo at 25 ("[T]o be maximally conservative, and assuming that [the GSAM counterparty] would have expected Nomura to make something on the trade, the Government gave Gramins credit for the market-standard commission of 8 ticks. Thus, the *intended loss* to [GSAM] was 1.75 points[.]" (emphasis added)); *see also id.* at 36 (the government's "methodology . . . gave Gramins credit for either the agreed-upon compensation or a market-standard compensation in order to better approximate *the loss he intended*." (emphasis added)).

The government cannot calculate restitution based on its own opinion of how much profit Nomura should have earned on each trade. This is improper under the law governing restitution and, in many instances, inconsistent with counterparties' own expectations about dealers' profits. *See e.g.*, Trial Tr. 728:19-24 (Harrison testifying that the "general range was usually between 4 and 8 ticks, or *sometimes up to 16 ticks*"); Trial Tr. at 2384:11-14 (Marks testifying that "8 to 16 ticks" was the standard range); Trial Tr. at 1014:3-10 (Harrison testifying that certain trades could

---

[5] These interview notes – which are redacted in the public filing – are quoted verbatim on page 35 of Gramins' sentencing memo.

warrant a spread as large as two-and-half points, *i.e.*, 80 ticks).[6]  And, even if the government could prove that these counterparties assumed that Nomura only earned 8-tick profits on Net Trades, it would still be unable to establish that these counterparties suffered "actual losses" for the purposes of restitution.  *See United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006) ("Criminal restitution . . . is not concerned with a victim's disappointed expectations but only with his actual loss.").[7]

Thus, even if the Court determines that the government has proven actual loss in the Gramins Pay-on-Top Trades, it should exclude any Net Trades from its analysis.[8]  And, as discussed above, only two of the institutions listed in the Restitution Chart – BHR and Permit – were involved in the Gramins Pay-on-Top trades.  The BHR trade, however, should be excluded. According to the BHR trader who executed the very trade at issue, BHR was not a victim of Gramins, nor was BHR concerned at all with Nomura's spread on RMBS trades.  Set forth below is the relevant passage from the sentencing letter:

> In almost every trading situation, the client has more perfect information than any dealer with regard to the market risk of any security. . . . With regard to fundamental valuation, the client, in almost every situation, will have performed more rigorous analysis on the bond than the dealer . . . The client, in almost every trading situation, has near perfect information about the market risk and fundamental risk of a bond. The main reason a client executes a trade with a specific dealer, outside of any special situations such as an exclusive portfolio trade, is they cannot find better pricing from another dealer. The dealer is there to do one thing – provide liquidity. Does it really matter if a dealer could have sold the bond cheaper to the client or

---

[6] Moreover, the government has never even spoken to the vast majority of individuals that it has identified as "victims" in this case, and the Court therefore has no way of knowing whether these individuals assumed that Nomura was earning eight ticks on Net Trades.

[7] In addition, there is no basis to conclude that any markup that exceeds eight ticks is somehow excessive.  Neither the SEC nor FINRA has ever imposed such a standard.

[8] The Court should also decline to consider any trades executed by traders other than Gramins. The government has been on notice for over three months that the Court, for purposes of loss calculation, "is interested in transactions in which there is evidence indicating Mr. Gramins led the counterparty to believe that they were paying for 'X' when in fact they were paying for 'X' plus an undisclosed amount of commission."  *See* Dec. 15, 2020 Email from L. Harte. While the government identified 24 such trades at sentencing, it has inexplicably made no effort to identify which other of the 161 trades for which it now seeks to hold Gramins accountable involved express misstatements about the size of Nomura's profits.

should the client just be happy that they received the best execution available to them when they decided to execute the trade?

I find it laughable to be considered a victim, as I never felt, thought, or experienced that I was being robbed, threatened or harmed by Michael. It was quite the opposite. I never relied on Michael to perform the analysis on a given security, though I respected his opinion given his experience and intuition, and I always understood that, as a dealer, he needed to be paid for providing liquidity. . . . I can't say enough in this letter to describe the respect I have for Michael[.]

ECF No. 584, Ex. A-13. Under the circumstances, it is abundantly clear that BHR was not a "victim" in this case, and is not entitled to receive restitution from Gramins. *See United States v. Calderon*, 944 F.3d 72, 95 n.9 (2d Cir. 2019) ("The Government bears the burden of establishing by a preponderance of the evidence that each individual it claims is entitled to restitution was actually a 'victim.'").

In sum, the Court should exclude any Net Trades from its restitution calculation. Further, even if the Court determines that the government has established actual loss in the Gramins Pay-on Top trades, it should exclude BHR from any restitution order.

## II.    Even if the Government Could Prove Actual Loss, its Restitution Calculation is Inaccurate

### A.    The Government's Proposed Restitution Does Not Account for Counterparties' Profits

"The Second Circuit has recognized that if a victim has recouped its losses in some way, or received some benefit from the defendants' actions, that amount should be subtracted from the final restitution award." *United States v. Termini*, No. 3:09-CR-245 (SRU), 2016 WL 199398, at *3 (D. Conn. Jan. 15, 2016), *aff'd sub nom. United States v. Dalicandro,* 711 F. App'x 38 (2d Cir. 2017); *see also United States v. Oladimeji*, 463 F.3d 152, 160 (2d Cir. 2006*)* ("had [the victim] recouped some part of the $30,000 [loss] . . . it would have been error to require restitution in the full amount"); *United States v. Allen*, 529 F.3d 390, 396 (7th Cir. 2008) (a restitution order should "deduct any value that a defendant's fraudulent scheme imparted to the victims" (citation

omitted)).  Significantly, this principle "holds true even if the benefit to the victim comes in a different form than the original loss sustained." *Termini*, 2016 WL 199398 at *3; *see also United States v. Huff*, 609 F.3d 1240, 1249 (11th Cir. 2010) ("The court must determine whether any value has been rendered to the victim in the form of a service or product that should be offset against the restitution amount.").

In this case, the government has never disputed that Nomura's counterparties often made large profits on the trades they executed with Nomura.[9]  In fact, prior to trial, the government filed a motion *in limine* that sought to preclude the defendants from introducing evidence concerning such profits.  *See* ECF No. 167.  In that motion, the government argued that "[w]hether a victim eventually made or lost money on its bond investment had no bearing on whether the defendants made material misrepresentations with criminal intent, and *loss is not an element of any charged crime*." *Id.* at 2 (emphasis added).

Regardless of whether evidence concerning profitability was admissible at trial, it is clearly and indisputably relevant in calculating restitution.  *See, e.g.*, *Innarelli*, 524 F.3d at 295 ("the amount lost as a result of [the defendant's] crimes must be offset by any amount recouped by the victim in question, including through resale of the property"); *United States v. Johnson*, No. 08-20384, 2013 WL 773010, at *4 (E.D. Mich. Feb. 28, 2013) ("Due to Johnson's fraud, the properties involved in the scheme went into foreclosure . . .  [T]he Government appropriately used the foreclosure sale price as a measure of how much money the victim recouped in order to determine the victim's losses for restitution purposes."); *United States v. Lotze*, 192 F. App'x 598, 601 (9th Cir. 2006) (district court properly ordered that the restitution award "shall be made subject to any offset for [the victim's] profits").  Here, allowing counterparties to receive restitution on top of

---

[9] For example, as discussed in Gramins' sentencing memorandum, QVT made an enormous profit when it sold the JPMAC bonds that it purchased from Nomura.  *See* Gramins Sent. Memo at 29.

any profits they made in connection with their trades with Nomura would result in "a windfall, *i.e.*, more in restitution than [they] actually lost." *Boccagna*, 450 F.3d at 117 (citation omitted); *see also United States v. Brown*, No. 11-CR-00449 (SJ), 2016 WL 11263165, at *7 (E.D.N.Y. Dec. 2, 2016) ("Restitution is intended to place victims in the position they would have occupied had they not entered the fraudulent transaction.").

Indeed, even if Nomura's counterparties could have obtained more favorable prices if they had truthful information (which, as discussed above, is entirely speculative), this inquiry is irrelevant in calculating the appropriate offset to any restitution order. For instance, in *Innarelli*, the district court rejected the defendant's argument that restitution should be offset by the profits later earned by the victims, stating the following:

> 'I don't buy the argument that you can look down the road and say that they made money off this. They could have made a great deal more money.... [I]nstead of making a million, ... they could have made 2.2 million. They lost this money. I'm comfortable with the restitution order.'

524 F.3d at 294 (quoting the district court transcript). The First Circuit reversed, finding that this logic was improper in the context of calculating restitution:

> This passage [quoted above] suggests that the district court may have impermissibly taken into account intended loss in calculating the awards for [the victims], and that it did not offset the amount recovered through the resale of the properties after foreclosure, as required by statute. To the extent this is true, the court erred.

*Id.* The First Circuit's reasoning is equally applicable here. It would be impermissible for the Court to ignore the profits made by counterparties in the context of restitution.

The Court should therefore reject the government's proposed restitution calculation because it fails to account for counterparties' profits.[10]

---

[10]Although the MVRA places the burden on the government to establish loss, "[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e); *see also United States v. Smathers*, 879 F.3d 453, 460 (2d Cir. 2018) ("[A]s to issues other than the amount of the victim's loss and the finances of the defendant and his dependents, the MVRA entrusts allocation of

**B.  The Government's Proposed Restitution Does Not Account for Funds that Nomura Must Pay to the SEC Investor Protection Fund**

Nomura has informed the SEC that it has been unable to disperse a total of $782,207.60 to certain counterparties.  The government states that these counterparties "are included in the proposed restitution order, as they have not been fully compensated; however, if directed by the Court, the Government can ask these victims their preference with respect to restitution."  Gov. Mot. at 3 n.1.  While the government does not elaborate, it is presumably referring to § 3664(g)(2) of the MVRA, which provides that "[a] victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments."  18 U.S.C. § 3664(g)(2).

Remarkably, the government completely fails to mention that Nomura's settlement agreement with the SEC requires Nomura to pay to the general fund of the United States Treasury any difference between the disgorgement amount mandated by the agreement and the amount that Nomura is in fact able to pay to its customers.  Specifically, paragraph 33d of the settlement agreement provides that:

> If the amount paid to customers and former customers totals less than the total amount of disgorgement (including prejudgment interest) ordered in section IV.B. of the Order ("Disgorgement Amount"), and Commission staff determine that the facts and circumstances support the amount Nomura paid to customers, Nomura, within thirty days of that determination, will pay the difference between the amount paid to customers and former customers and the Disgorgement Amount to the Commission for transfer to the general fund of the United States Treasury, subject to Section 21F(g)(3) of the Exchange Act. If, after discussion with Nomura representatives authorized to act on behalf of Nomura, Commission staff determines that Nomura has paid customers and former customers an insufficient amount, Nomura, within thirty days of this determination will pay customers and former customers the amount of the deficiency. If the total amount of the deficiency

---

the burden of proof to the district court's discretion.").  For instance, in *Smathers*, the court placed the burden of proving offset amounts on the defendant because "the government was not a party to the civil litigation on which [the defendant] relies, [and] the government [therefore] has no greater access than [the defendant] to the records in that litigation."  *Id.* at 461.  In this case, neither party currently has access to all of the information needed to accurately calculate counterparties' profits. Regardless of which party bears this burden, however, as discussed below, such burden on the sentencing process is yet another reason why the Court should decline to order restitution.

> plus the amount Nomura previously paid customers and former customers ("Customer Payment Amount") is less than the Disgorgement Amount, Nomura, within thirty days of the determination, will pay the difference between the Disgorgement Amount and the Customer Payment Amount to the Commission for transfer to the general fund of the United States Treasury, subject to Section 21F(g)(3) of the Exchange Act.

*In the Matter of Nomura Sec. Int'l, Inc.*, Exchange Act Release No. 86372, 2019 WL 3074081 (July 15, 2019).

Thus, in accordance with the terms of the above provision, Nomura is required to pay $782,207.60, the remediation amount that it was unable to pay to counterparties, to the general fund of the United States Treasury. Nomura does not dispute its obligations under paragraph 33d, and has indicated to defense counsel that it intends to satisfy such obligation when it is instructed to do so by the SEC. Pursuant to Section 21F(g)(3) of the Exchange Act, these funds will be deposited in the SEC Investor Protection Fund. *See* 15 U.S.C. § 78u-6(g)(3). It is axiomatic that restitution is not owed more than once. *See United States v. Nucci,* 364 F.3d 419, 423 (2d Cir. 2004) (restitution cannot result in a "double recovery" for the same loss); *see also Robers v. United States*, 572 U.S. 639, 645 (2014). The Court, therefore, cannot require Gramins to make restitution payments to the Crime Victim Fund that would be completely duplicative of the restitution payments that are owed by Nomura to the United States Treasury. Nor should the government have ignored Nomura's undisputed obligations under the SEC settlement agreement when it brought this motion. For these reasons alone, the government's proposed restitution calculation should be rejected.

### C.    The Government Has Not Addressed the Restitution Owed by Frank Dinucci

In cases with more than one defendant, the MVRA "grants a sentencing court discretion to 'make each defendant liable for payment of the full amount of restitution or . . . apportion liability among the defendants to reflect the level of contribution to the victim's loss.'" *In re Newsday*

*Litig.*, No. 08-MC-096(JBW), 2008 WL 2884784, at *3 (E.D.N.Y. July 23, 2008) (citing 18 U.S.C. § 3664(h)); *see also Nucci*, 364 F.3d at 422 ("[T]he pertinent statutory provisions establish that the decision whether to apportion restitution among defendants is a discretionary one."). Thus, "[i]mposition of restitution liability for acts of co-conspirators is not mandatory." *United States v. Agate*, 613 F. Supp. 2d 315, 323 (E.D.N.Y. 2009); *see also United States v. Bates*, No. 07-50243, 2012 WL 2458170, at *2 (E.D. Mich. June 27, 2012) ("[E]ach defendant in a conspiracy can either be ordered to pay restitution in the amount of the losses of the entire conspiracy scheme, or restitution can be apportioned to reflect the contributions of each individual defendant.").

In this case, Nomura trader Frank Dinucci pleaded guilty to participating in the same conspiracy for which Gramins was convicted, but has not yet been sentenced. *See United States v. Dinucci*, 3:17-cr-00069-RNC (D. Conn.). The government, here again, omits very significant information from its motion. The government fails to even mention Dinucci's guilty plea, much less how Dinucci's restitution obligations should factor into any restitution order against Gramins. Indeed, while the government has identified Dinucci as the trader responsible for executing a number of the trades underlying its proposed restitution order against Gramins, it does not explain why Gramins alone should be responsible for paying restitution related to those trades. Dinucci's trades and the government's corresponding proposed restitution include:

- Trade 244 (C12) - $1,289.64

- Trade 212 (Brookfield) - $55,615.00[11]

- Trade 512 (Prudential) – $141,575.27

---

[11] Brookfield was involved in two of the government's 161 trades, only one of which was executed by Dinucci. Nomura, however, was only able to distribute $25,820.13 to Brookfield due to Brookfield's unwillingness to provide wire information for the majority of its payees. It is unclear if the Court should deduct $25,820.13 from a restitution order imposed on Dinucci because defense counsel has not been informed as to which of the two Brookfield trades that payment relates.

- Trade 703 (Saye) – $8,289.67

The Court should exercise its discretion and assign restitution liability to Dinucci for the trades that, by the government's own admission, he personally executed.  *See, e.g.*, *United States v. Goldfarb*, No. CR-07-260, 2009 WL 2515778, at *2 (D. Ariz. Aug. 12, 2009) (apportioning restitution among co-conspirators "based on the number of victims with whom they spoke"). Indeed, the government does not allege that Gramins had any role in these trades whatsoever or that he was even aware that they were taking place.  *See, e.g.*, *United States v. Suarez*, 253 F. Supp. 2d 662, 663 (S.D.N.Y. 2003), a*ff'd sub nom. United States v. Castillo*, 93 F. App'x 273 (2d Cir. 2004) (ordering the defendants to pay equal shares of the total restitution award because "[t]o apportion the burden on a joint and several basis raises the risk of one Defendant eventually paying more of the restitution than the others, which the Court feels would achieve an inequitable result under the circumstances of this case").[12]

The government's restitution calculation should therefore be rejected because it does not account for the restitution owed by Dinucci.[13]

## III.   The Need to Provide Restitution to Nomura's Counterparties is Outweighed by the Burden on the Sentencing Process

A court can decline to order restitution under the MVRA if "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(B).  Thus, in analyzing this

---

[12] Alternatively, the Court should, at the very least, find that Gramins and Dinucci are jointly and severally liable for these trades in order to avoid the possibility that the counterparties receive double payment. *See, e.g.*, *United States v. Koskella*, 118 F. App'x 422, 423-24 (10th Cir. 2004) ("Currently, there are three related cases pending, none of which has yet reached the sentencing phase. If Koskella is ordered to pay full restitution and other co-conspirators are also ordered to pay restitution, the victims may collect more than their actual loss. . . Therefore, on remand the court should reconsider whether Koskella's order of restitution should be joint and several.").

[13] Moreover, any restitution calculation will be further complicated if Ross Shapiro (who still has a hung conspiracy count pending against him) is retried and convicted or enters a guilty plea.

provision of the MVRA, "a court must (1) make fact findings specific to two statutory factors –
'the need to provide restitution to a victim,' and 'the burden on the sentencing process posed by
determining complex issues of fact' – and (2) then explicitly balance these two factors." *In re
Brown*, 932 F.3d 162, 173–74 (4th Cir. 2019); *see also United States v. Gushlak*, 728 F.3d 184,
192 (2d Cir. 2013) (the MVRA "explicitly contemplates that the district court weigh against the
burden of ordering restitution the victims' interests in receiving restitution").  This balancing test
"reflects Congress's intent that sentencing courts not become embroiled in intricate issues of proof,
and that the process of determining an appropriate order of restitution be streamlined." *United
States v. Marino*, 654 F.3d 310, 317 (2d Cir. 2011) (citation omitted).

In this case, the burden of accurately calculating restitution far outweighs the
counterparties' needs for the government's proposed payments.  As explained above, there are
many complex issues that the Court would need to resolve in order to accurately calculate
restitution.  For instance, the Court would not only have to determine whether any counterparties
suffered an "actual loss" – an issue that was hotly debated at sentencing – but it would also have
to determine the amounts of any such loss.  *See, e.g.*, *United States v. Adorno*, 950 F. Supp. 2d
426, 431 (E.D.N.Y. 2013) (declining to order restitution because "there are issues as to whether
the bribery in fact caused a loss to the City within the meaning of the MVRA, and there are issues
as to how to calculate the loss if we assume the bribery in fact caused a loss").  This would not be
a simple inquiry, as it would require an independent analysis of numerous trades – the vast majority
of which were not before this Court at trial.

Additionally, if the Court determines that any counterparties suffered an actual loss, it will
then have to subtract any profits that those counterparties made on the relevant trades from such
loss amounts.  This would unnecessarily prolong the sentencing process, as it would necessitate

subpoenas aimed at uncovering the data needed for this analysis. *See, e.g.*, *United States v. Martinez*, 690 F.3d 1083, 1089 (8th Cir. 2012) (restitution denied when it would have been "necessary to subpoena numerous additional witnesses in order to determine" the accurate loss amounts). Moreover, determining profits might be impossible in some instances, as some counterparties appear to either no longer be in operation or have been non-responsive for other unknown reasons.

When these complications are weighed against the counterparties' needs for restitution payments, it is abundantly clear that the Court should not order Gramins to pay restitution. First and foremost, certain of these counterparties cannot possibly have some great need for restitution amounts that Nomura, despite repeated and diligent attempts, was unable to successfully pay out. Counterparties that need compensation do not reject attempts to pay restitution; they respond and they provide wire instructions and other information to facilitate payments. When a counterparty either declines payment from Nomura or does not respond to repeated attempts to deliver payment, that is an undeniable indication that the payment is neither necessary nor meaningful. Moreover, in most instances, the amounts allegedly owed by Gramins are trivial in light of the massive scale of the counterparty institutions. For example, the government seeks a restitution order that would require Gramins to pay $61,838.23 to BlackRock – an institution that currently has $6.84 trillion assets under management.[14] *Compare Gushlak*, 728 F.3d at 193 (the difficulty in calculating restitution was not outweighed by the victims' needs because the defendant "admitted to stealing from a large number of people what likely amounted to a significant portion of their personal wealth").

---

[14] *See Introduction to BlackRock*, BLACKROCK, https://www.blackrock.com/sg/en/introduction-to-blackrock (last visited Apr. 5, 2021).

Under these circumstances, it would defy logic to burden and prolong the sentencing process in order to attempt to compensate institutions that have no need for the payments and/or have displayed no interest in accepting these same payments from Nomura. *See, e.g.*, *United States v. Petters*, No. CRIM08-364, 2010 WL 2291486, at *4 (D. Minn. June 3, 2010) (declining to order restitution because "[t]he burden imposed on the Court by ordering restitution here would be significant" but "the burden imposed on victims by declining restitution would not be overwhelming" because they had "alternative avenues available to them"); *United States v. Gallant*, 537 F.3d 1202, 1254 (10th Cir. 2008) (district court did not abuse it discretion "by noting the availability of an alternative forum in applying [the MVRA's] balancing test").

## CONCLUSION

For the reasons set forth above, the Court should deny the government's Motion for Entry of Order of Restitution.

Respectfully submitted,

Mukasey Frenchman LLP

By: /s/ Marc L. Mukasey
    Marc L. Mukasey (CT29885)
    Robert S. Frenchman (CT30437)
    Kate E. Olivieri
    2 Grand Central Tower
    140 East 45th Street, 17th Floor
    New York, NY 10017
    Tel (212) 466-6400

    *Attorneys for Michael Gramins*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on April 5, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
      April 5, 2021

                                   /s/ Marc L. Mukasey
                                   Marc L. Mukasey
                                   Mukasey Frenchman LLP
                                   2 Grand Central Tower
                                   140 E. 45th St., 17th Floor
                                   New York, New York
                                   Tel (212) 466-6400